IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE LORDSTOWN MOTORS CORP. SECURITIES LITIGATION | CASE NO.: 4:21-CV-00616 (PAG) |
| ------------------------------------------------------- | JUDGE PATRICIA A. GAUGHAN |
| This Document Relates to: | CLASS ACTION |
| ALL ACTIONS. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE
DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF THE CASE .................................................................. 4

    A.    Lordstown's Endurance Will Likely Be the First All-Electric Full-Sized Pickup Truck Targeted at the $65 Billion Fleet Market ........................... 4

    B.    The De-SPAC Merger with DPHC Was Mutually Beneficial and Afforded Lordstown an Ideal Opportunity to Quickly Gain Significant Funding ................. 6

    C.    Lordstown Fairly and Transparently Described Demand for the Endurance and Its Anticipated Production Timeline ................................................ 7

    D.    Lordstown's Stock Price Has Experienced Significant Volatility in Its First Year As a Public Company, Including in Response to a Short-Seller Attack ........ 8

    E.    This Lawsuit ..................................................................................... 10

III.    LAW AND DISCUSSION ...................................................................... 10

    A.    Heightened Pleading Standards Govern Plaintiffs' Claims ..................... 10

    B.    Plaintiffs Cannot State a Fraud Claim Under Section 10(b) .................. 12

        1.    None of the Challenged Statements Was Materially False or Misleading ................................................................................ 13

            a.    Statements About Pre-Orders and Demand ................................. 13

                i.    Lordstown Clearly Disclosed That Pre-orders Are Nonbinding ..................................................................... 14

                ii.    The Pre-Order Estimates Were Fair and Truthful ............ 17

                iii.    Certain Pre-Order Statements Are Also Opinions, Inactionable Puffery, and/or Protected Forward-Looking Statements ........................................................... 20

            b.    Statements About Lordstown's Anticipated Production Timeline ...................................................................................... 23

            c.    Item 105 Does Not Provide a Separate Basis for 10(b) Liability ...................................................................................... 26

        2.    Plaintiffs Cannot Plead a Strong Inference of Scienter ............................ 28

3.  Plaintiffs Cannot Plead Loss Causation ....................................................33

4.  Pre-Merger Statements Cannot Ground Plaintiffs' Section 10(b)
Claims Because Plaintiffs Have Not Pled Reliance .................................35

5.  Plaintiffs Also Cannot State a "Scheme Liability" Claim........................37

C.  Plaintiffs Cannot State a Claim Under Section 14(a)............................................38

D.  Plaintiffs Cannot State a Section 20A Violation for Insider Trading...................39

IV.  CONCLUSION ........................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Almost Fam. Inc. Sec. Litig.*,
   No. 3:18-cv-00040, 2020 WL 695654 (W.D. Ky. Feb. 11, 2020), *appeal
   dismissed sub nom. In re Almost Fam., Inc., Sec. Litig.*, No. 20-5302, 2020
   WL 3317769 (6th Cir. Apr. 24, 2020) ................................................................. 38

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
   No. 17-cv-1545, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ....................... 19, 26

*Bondali v. Yum! Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) ........................................................................ 33

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ................................................................................ 11

*Chapman v. Mueller Water Prods.*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020) ................................................................. 21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech. Inc.*,
   856 F.3d 605 (9th Cir. 2017) ........................................................................ 15, 26

*Clayton v. Heartland Res., Inc.*,
   754 F. Supp. 2d 884 (W.D. Ky. 2010) ................................................................ 37

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................................. 35

*Dailey v. Medlock*,
   551 F. App'x 841 (6th Cir. 2014) ................................................................... 16, 27

*In re Diebold Sec. Litig.*,
   No. 5:05-cv-2873, 2008 WL 3927467 (N.D. Ohio Aug. 22, 2008), *aff'd sub
   nom. Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009) ........................... 26, 30

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................ 33

*Ferron v. SubscriberBase Holdings, Inc.*,
   No. 08-cv-760, 2009 WL 650731 (S.D. Ohio Mar. 11, 2009) ............................. 12

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
   964 F. Supp. 2d 875 (N.D. Ohio 2013) ............................................................... 32

*In re Ford Motor Co. Sec. Litig., Class Action*,
    381 F.3d 563 (6th Cir. 2004) ............................................................... 21

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) ............................................................... 28

*Golub v. Gigamon Inc.*,
    994 F.3d 1102 (9th Cir. 2021) ............................................................. 15

*Gompper v. Visx, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ............................................................... 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) .................................................................... 35, 37

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155, 159-60 (S.D.N.Y. 2015) *aff'd*, 649 F. App'x 7 (2d Cir.
    2016) .............................................................................................. 18

*Havenick v. Network Exp., Inc.*
    981 F. Supp. 480, 528 (E.D. Mich. 1997) .......................................... 30

*Hayes v. Crown Cent. Petroleum Corp.*,
    78 F. App'x 857 (4th Cir. 2003) .......................................................... 11

*Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund
    v. Omnicare, Inc.*,
    583 F.3d 935 (6th Cir. 2009) ......................................................... 22, 26

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) .................................................................... 16, 29

*In re KBC Asset Management N.V.*,
    572 Fed. App'x 356 (6th Cir. 2014) ............................................... 35, 40

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) ........................................................ 11

*Laborers' Loc. #231 Pension Fund v. PharMerica Corp.*,
    No. 3:18-cv-109, 2019 WL 4645583 (W.D. Ky. Sept. 24, 2019) .......... 39

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ............................................................. 29

*Little Gem Life Sciences, LLC v. Orphan Medical, Inc.*,
    537 F.3d 913 (8th Cir. 2008) ............................................................... 11

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012) ................................................................. 2

*Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*, No. 12-cv-1750-
    PAG, 2012 WL 4958561, at *4-10 (N.D. Ohio Oct. 16, 2012) ...................................... 11, 38

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ................................................................. 24

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ................................................................. 35

*Nozak v. N. Dynasty Mins. Ltd.*,
    804 F. App'x 732 (9th Cir. 2020) ................................................................. 33

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ................................................................. 12, 28, 31

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................. *passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ................................................................. 35

*Opportunity Fund v. Unilab Corp.*,
    87 F. App'x 772 (2d Cir. 2004) ................................................................. 11

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
    918 F.3d 312 (4th Cir. 2019) ................................................................. 15

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
    940 F. Supp. 1101 (W.D. Mich. 1996) ................................................................. 39, 40

*Pittman v. Unum Grp.*,
    No. 1:18-cv-000128, 2020 WL 2846929 (E.D. Tenn. June 1, 2020), *aff'd*, 861
    F. App'x 51 (6th Cir. 2021) ................................................................. 17

*PR Diamonds, Inc. v. Chandler*,
    91 F. App'x 418 (6th Cir. 2004) ................................................................. 28, 29, 31

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................. 33

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ................................................................. 32, 33

*In re Sofamor Danek Grp., Inc.*,
    123 F.3d 394 (6th Cir. 1997) ................................................................. 27

*Tamar v. Mind C.T.I., Ltd.*,
   723 F. Supp. 2d 546 (S.D.N.Y. 2010) ................................................................. 31

*Teacher's Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ............................................................................. 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................... 11, 28

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ......................................................................... 15, 16

*In re TransDigm Grp., Inc. Sec. Litig.*,
   440 F. Supp. 3d 740 (N.D. Ohio 2020) ........................................................... 34, 35

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .......................................................................... 30

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) ............................................................................... 19

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .................................................................. 26, 31, 32

**Statutes**

15 U.S.C. § 78n(a)(1) ......................................................................................... 38

15 U.S.C. § 78t–1(a) .......................................................................................... 39

15 U.S.C. § 78u-4 ................................................................................... 11, 28, 33

15 U.S.C. § 78u-5 ......................................................................................... 22, 23

**Other Authorities**

17 C.F.R. § 229.105 ............................................................................................ 26

17 C.F.R. § 230.419 ............................................................................................ 23

17 C.F.R. § 240.10b-5 ................................................................................... 12, 37

17 C.F.R. § 240.3a51-1 ....................................................................................... 23

F. Rule Civ. P. 9(b) ...................................................................................... *passim*

**Other Sources**

Neal E. Boudette, "Ford Will Build 4 Factories in a Big Electric Push," *NY Times* (Sep. 27, 2021), *available at* *https://www.nytimes.com/2021/09/27/business/energy-environment/ford-battery-electric-vehicles.html* ...................................................................................4

Neal E. Boudette, "G.M. Will Sell Only Zero-Emission Vehicles by 2035," *NY Times* (Jan. 28, 2021), *available at* *https://www.nytimes.com/2021/01/28/business/gm-zero-emission-vehicles.html* ...................................................................................4

Ford, "Reserve Your F-150 Lightning, Online Reservation FAQs," *https://www.ford.com/trucks/f150/f150-lightning/2022/reservation-information/#faqs* ...................................................................................7

Going Public: SPACS, Direct Listings, Public Offerings, and the Need for Investor Protections: Virtual Hearing Before the Subcomm. on Investor Protection, Entrepreneurship, and Capital Markets of the Comm. on Financial Services, 117 Cong. 1, *et seq.* (2021), *available at* *https://www.govinfo.gov/content/pkg/CHRG-117hhrg45078/pdf/CHRG-117hhrg45078.pdf* ...................................................................................23

Jim Henry, "Best-Selling Cars, SUVs and Pickups of 2021 (To Date)," *Forbes* (Oct. 4, 2020), *available at https://www.forbes.com/wheels/news/best-selling-cars-suvs-pickups-2021/* ...................................................................................4

Mark Kane, "Lordstown Gets Letter of Intent to Buy 250 Endurance Electric Pickups," *InsideEVs* (Feb. 26, 2020), *available at* *https://insideevs.com/news/400781/lordstown-250-endurance-pickups-firstenergy/* ...................................................................................7, 14

Lordstown Management Corrective Statement, *available at* https://investor.lordstownmotors.com/lordstown-motors-corp-management-corrective-statement ...................................................................................32

Joshua Mitts, *Short and Distort,* Columbia Law & Econ. Working Paper No. 592 (Feb. 13, 2020), *available at* *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3198384* ...................................................................................2

Paul Munter, Acting Chief Accountant, SEC, "Financial Reporting and Auditing Considerations of Companies Merging with SPACs," (Mar. 31, 2021), *available at https://www.sec.gov/news/public-statement/munter-spac-20200331#_ftnref4* ...................................................................................6

Chris Paukert, "Tesla Cybertruck preorders 'well over half a million,' Elon Musk says," *Road/Show* (Sep. 23, 2020), *available at https://www.cnet.com/roadshow/news/tesla-cybertruck-reservation-elon-musk/*................................................................................................................7

Rivian, "About preordering," *https://rivian.com/support/about-preordering* ..............................7

Tesla, "Order Cybertruck," *https://www.tesla.com/cybertruck/design#battery* ............................7

Annie White, "Ford F-150 Lightning Production to Double Thanks to Strong Demand," *Car and Driver* (Aug. 24, 2021), *available at https://www.caranddriver.com/news/a37384636/ford-f-150-lightning-ev-production-increase/*................................................................................................................7

## I.      INTRODUCTION

Electric vehicles are the future of the automotive industry—this simple fact is beyond dispute. In recent years, and with increasing urgency, Ford, G.M., Amazon, Apple, and other major players have poured billions of dollars into developing new electric vehicles of all types, spurred by increasing consumer demand and government initiatives setting aggressive deadlines by which new combustion-engine sales will be phased out.

From its inception in April 2019, Ohio-based Lordstown Motors Corp. ("Lordstown") has been laser-focused on bringing to market the first all-electric full-sized pickup truck targeted at fleets—its flagship product, the Endurance. Full-sized pickups are the first, second, and third most popular vehicle models sold in the United States today, enjoying huge demand both from retail customers and from commercial and government entities who rely on fleets of light truck vehicles to do their daily work. The long-term demand for pickup trucks is at least as strong as for other vehicle types, and no electric vehicles have yet made a dent in this huge market. But designing and manufacturing a brand-new vehicle is an audacious and expensive undertaking. As a startup in a field dominated by giants, Lordstown had the vision, the innovative technology, and strong indications of demand, but it needed capital to execute its plans. And it needed it relatively quickly in order to stay ahead of competitors in the electric pickup race.

The October 2020 merger with DiamondPeak Holding Corp. ("DPHC"), a special purpose acquisition company ("SPAC"), presented a tremendous opportunity: Lordstown could secure a large capital infusion without breaking stride in its sprint to be first to market. While SPACs are currently under a regulatory, short-seller, and media microscope because they allow private companies to rapidly go public, Lordstown's merger with DPHC was a wise financing vehicle in these circumstances. But, with this opportunity came the inevitable short-seller scrutiny. On March 12, 2021, self-identified short-seller Hindenburg Research published an inflammatory report (the

"Hindenburg Report"), for its own financial benefit,[1] falsely accusing Lordstown of lying about the number of nonbinding "pre-orders" it had received for the Endurance and its anticipated production timeline—in essence, asserting there was in fact little demand for the Endurance and that Lordstown could never actually bring it to market, much less by fall 2021. No factual pleadings support either claim: the market for full-sized electric pickups is massive by any measure, with special demand for fleet-tailored vehicles, and Lordstown is now in pre-production of the Endurance, moving closer to full commercial production.

Nonetheless, these consolidated lawsuits quickly followed the Hindenburg Report, relying almost entirely on its analysis. The Amended Complaint (Dkt. #61; "AC") brings a host of claims against Lordstown and certain of its executives and directors under Sections 10(b), 14(a), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), all essentially repackaging Hindenburg's assertion that the Defendants intentionally made false and misleading statements about demand for the Endurance and its anticipated production timeline in order to close the merger and prop up Lordstown's stock price. Nothing in the AC supports these baseless assertions.

*First, Plaintiffs do not, and cannot, show that any of the challenged statements were false or misleading*. Lordstown consistently and repeatedly disclosed that its "pre-orders" were *nonbinding* and were one means to estimate market demand and to help it calibrate its investment in employees and tooling. Likewise, Lordstown clearly explained that its anticipated production timeline was just that—a forward-looking projection—representing Lordstown's best

---

[1] *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012) ("[S]hort sellers operate by speculating that the price of a security will decrease. . . . [T]hey have an obvious motive to exaggerate the infirmities of the securities in which they speculate."); Joshua Mitts, *Short and Distort,* Columbia Law & Econ. Working Paper No. 592 (Feb. 13, 2020), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3198384 (study set of 2,900 short-seller "attack articles" on Seeking Alpha caused stock declines "leading to over $20.1 billion in mispricing").

understanding at the time as to when initial production would likely begin. Plaintiffs fail to plead any particularized, contemporaneous facts suggesting that any of these challenged statements—many of which were statements of opinion subject to *Omnicare*'s heightened standards[2]—were false or misleading. Many also were forward-looking statements protected under the Private Securities Litigation Reform Act of 1995's ("Reform Act") safe harbor, and/or inactionable puffery.

*Second, Plaintiffs cannot plead the required strong inference of scienter.* Supreme Court precedent requires courts to weigh the competing inferences to be drawn from factual allegations in their full context in deciding whether Plaintiffs have pleaded a strong inference of the required state of mind—fraud for a Section 10(b) claim, and negligence for a Section 14(a) claim. Here, the facts and inferences show good faith conduct, and the posited fraud makes no sense. Defendant Steve Burns—Lordstown's founder, former CEO and Chairman, and the single largest owner of Lordstown stock—chose to lock up all of his shares for at least a year following the merger, setting himself up (on Plaintiffs' theory) to be the biggest victim of his own purported fraud. Moreover, Lordstown's public filings reflect that it was consistently clear and forthright with investors about the nonbinding nature of its pre-orders as well as the uncertainty inherent in its estimated production timeline. This transparency evidences good faith.

*Third*, *Plaintiffs cannot plead loss causation because their alleged losses were not caused by the alleged misrepresentations*. Lordstown's stock price began falling well before the Hindenburg Report was issued, and that Report did not reveal any "hidden truth" to the market: Lordstown had already clearly and repeatedly disclosed to investors that pre-orders were *nonbinding* and that its production timeline was an estimate. Hindenburg merely used innuendo

---

[2] *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

and vague assertions from anonymous sources to put a sinister spin on largely publicly available information to drive down the stock price. This cannot show loss causation as a matter of law.

For these and many other reasons detailed below, Plaintiffs' allegations are insufficient as a matter of law to state any of their claims. Because further amendment would be futile, the Defendants respectfully ask the Court to dismiss the AC in its entirety with prejudice.

## II.    STATEMENT OF THE CASE

### A.    Lordstown's Endurance Will Likely Be the First All-Electric Full-Sized Pickup Truck Targeted at the $65 Billion Fleet Market

The electric-vehicle industry has grown rapidly in the past decade and has accelerated significantly in the last year or two, as soaring consumer demand combined with new government initiatives promoting electric vehicle adoption have led major manufacturers like Ford and G.M. to pour billions of dollars into developing new all-electric vehicle models in an attempt to catch up. *See* Ex. 1[3] (8/3/20 Proxy), at 022.[4] Chief among the target vehicle types is pickup trucks. Full-sized pickups are the best-selling vehicle models in the country,[5] enjoying tremendous demand from both retail and commercial customers.[6] Not all customers are likely to be early adopters, but electric vehicles are a particularly good fit with fleet-usage patterns; fleets typically operate within a small geographic area and return to a central base at night, minimizing range and charging

---

[3] Defendants' Request for Judicial Notice ("RJN") explains the substantive and procedural law bases for considering materials beyond the complaint, and articulates specific bases for each exhibit and publicly available source cited. "Ex. refers to the exhibits attached to the Greene Declaration, filed herewith. Unless otherwise indicated, all internal quotation marks and citations are omitted and emphasis is added.

[4] *See also* Neal E. Boudette, "G.M. Will Sell Only Zero-Emission Vehicles by 2035," *NY Times* (Jan. 28, 2021), *available at* https://www.nytimes.com/2021/01/28/business/gm-zero-emission-vehicles.html; Neal E. Boudette, "Ford Will Build 4 Factories in a Big Electric Push," *NY Times* (Sep. 27, 2021), *available at* https://www.nytimes.com/2021/09/27/business/energy-environment/ford-battery-electric-vehicles.html.

[5] *See* Jim Henry, "Best-Selling Cars, SUVs and Pickups of 2021 (To Date)," *Forbes* (Oct. 4, 2020), *available at* https://www.forbes.com/wheels/news/best-selling-cars-suvs-pickups-2021/.

[6] *See* Ex. 1 (8/3/20 Proxy), at 024 ($150 billion U.S. pickup truck market).

infrastructure concerns.[7] And while electric passenger vehicles have been around for years, no company had yet brought a full-sized electric pickup to market when Lordstown was founded in 2019, much less one specifically targeting the $65 billion fleet market.[8]

This is the lucrative opportunity Mr. Burns saw, and around which he formed Lordstown. Unlike certain competitors' electric pickups, which are being designed more for the luxury market,[9] the Endurance will be a rugged, functional working truck, priced to compete with internal-combustion-engine alternatives both on initial price and on total cost of ownership.[10] Its innovative in-wheel hub motor system is designed to provide better traction and handling, and also means that it will have among the fewest moving parts of any vehicle.[11] Fewer moving parts and an all-electric design mean less maintenance, and Lordstown anticipates that the Endurance will have a total cost of ownership significantly lower than comparable commercially-available pickup trucks, making it especially attractive to fleets.[12] Indeed,  one of the first things Lordstown did after formation was commission a detailed analysis from Ernst & Young regarding the likely market for a full-sized electric pickup targeted at fleets.[13] That study "reiterated and confirmed the size of the market" and the significant opportunity it presented, particularly among fleet customers, and gave Lordstown additional confidence to move forward aggressively with the Endurance.[14] G.M.

---

[7] *See* Ex. 2 (8/24/20 Proxy), at 161-64.

[8] *See* Ex. 1 (8/3/20 Proxy), at 023-24 ($65 billion U.S. fleet market for full-sized pickup trucks); AC ¶ 286 (Burns explaining fleets have been "bypassed by the electrification effort—there are a lot of passenger cars coming but nothing for fleets.").

[9] Tesla's futuristic Cybertruck is directed at luxury consumers and priced accordingly; the same is true of Rivian's R1T mid-sized pickup. *See* Ex. 1 (8/3/20 Proxy), at 028.

[10] *See* Ex. 1 (8/3/20 Proxy), at 025.

[11] Ex. 1 (8/3/20 Proxy), at 012.

[12] *Id.* at 025 (comparing total cost of ownership); Ex. 2 (8/24/20 Proxy), at 161-64.

[13] Caimin Flannery speaking at Transportation and Innovation Partners event, Wisconsin Clean Cities Electric Vehicles Webinar, Sep. 24, 2020, *available at* https://www.youtube.com/watch?v=yClW0-5RHaA (~53:10; source quoted at AC ¶ 274).

[14] *Id.*

appears to have recognized this significant opportunity as well: it took a $75 million stake in Lordstown in connection with the DPHC merger, and signed a key parts supply agreement with the Company. *See* Ex. 2 (8/24/20 Proxy), at 165-66.

> **B.** **The De-SPAC Merger with DPHC Was Mutually Beneficial and Afforded Lordstown an Ideal Opportunity to Quickly Gain Significant Funding**

Vehicle design and production has traditionally been dominated by a few major players, largely because it is such an expensive and capital-intensive undertaking. Lordstown got a cost-efficient jump start in November 2019 when it purchased G.M.'s then-recently closed assembly plant in Lordstown, Ohio at a discount and in near-production ready condition.[15] But even with those savings, Lordstown needed significant additional funding to try to beat others to market.

There are not a lot of ways for private companies to secure a large amount of funding quickly. They can try to attract private investments from venture capital or other sources, but such investments tend to be smaller than what an automotive manufacturer would need to bring a vehicle to market. By contrast, SPACs can provide significant funding while also bringing private companies into the public markets quickly.[16] A SPAC raises funds through an IPO, holds those funds in trust while shopping for a private company to merge with or acquire, and then effects a transaction, resulting in the target becoming a public company. AC ¶ 65. SPACs have been around for decades but have seen a dramatic increase in popularity in recent years, along with heightened scrutiny.

For Lordstown, the SPAC phenomenon—and DPHC's interest in particular—came at just the right time. Having produced its first prototype and confirmed with E&Y that the potential fleet

---

[15] *See* AC ¶¶ 69-71; Ex. 1 (8/3/20 Proxy), at 030-31.
[16] Paul Munter, Acting Chief Accountant, SEC, "Financial Reporting and Auditing Considerations of Companies Merging with SPACs," (Mar. 31, 2021), *available at* https://www.sec.gov/news/public-statement/munter-spac-20200331#_ftnref4.

market for electric pickups was significant, Lordstown was ready to push hard towards production, it just needed a large infusion of cash. Merging with DPHC offered exactly that—$675 million in funding and entry to the public markets.[17] The merger agreement was jointly announced on August 3, 2020, DPHC shareholders approved it on October 22, 2020, and the merger closed the following day. AC ¶¶ 82-83, 98.

### C. Lordstown Fairly and Transparently Described Demand for the Endurance and Its Anticipated Production Timeline

As it moved closer to production, Lordstown needed a way to more directly quantify customer interest, both to plan for employees, tooling, and production at the proper scale and to fairly describe demand to investors.[18] For this, Lordstown turned to a metric commonly employed in the industry when an automaker does not yet have a product to sell: nonbinding "pre-orders" or "reservations." Tesla, Ford, Rivian, and others have all used similar nonbinding pre-orders to measure and describe demand for their electric vehicles before they were available for sale.[19] Thus, from the beginning, Lordstown tracked the pre-orders it received and shared those numbers with investors on a regular basis.[20] It also clearly and repeatedly explained that these pre-orders were

---

[17] *See* AC ¶ 82; *id.* ¶ 100 (quoting Burns: "Since we're in a race to be first, it was really important for us to get that funding, so that we could be assured of production by September.").

[18] *See* AC ¶¶ 318, 324.

[19] *See* Annie White, "Ford F-150 Lightning Production to Double Thanks to Strong Demand," *Car and Driver* (Aug. 24, 2021), *available at* https://www.caranddriver.com/news/a37384636/ford-f-150-lightning-ev-production-increase/ (Ford investing $850 million more in F-150 Lightning production after securing 120,000 nonbinding pre-orders); Chris Paukert, "Tesla Cybertruck preorders 'well over half a million,' Elon Musk says," *Road/Show* (Sep. 23, 2020), *available at* https://www.cnet.com/roadshow/news/tesla-cybertruck-reservation-elon-musk/; Tesla, "Order Cybertruck," https://www.tesla.com/cybertruck/design#battery; Ford, "Reserve Your F-150 Lightning, Online Reservation FAQs," https://www.ford.com/trucks/f150/f150-lightning/2022/reservation-information/#faqs; Rivian, "About preordering," https://rivian.com/support/about-preordering.

[20] *See generally* AC ¶¶ 73, 75, 249-326; *see also, e.g.*, Mark Kane, "Lordstown Gets Letter of Intent to Buy 250 Endurance Electric Pickups," *InsideEVs* (Feb. 26, 2020), *available at* https://insideevs.com/news/400781/lordstown-250-endurance-pickups-firstenergy/.

*nonbinding* and, nonetheless, were, in the Company's view, indicators of market demand.[21]

In addition, Lordstown clearly communicated its best understanding, at each point in time, of the Endurance's anticipated production timeline. *See, e.g.*, AC ¶ 342 (10/26/20: "[W]e are on target to [bring the Endurance to market] in September [2021]."); ¶¶ 354, 356, 364 (same on 12/21/20, 1/11/21, and 3/17/21). On May 24, 2021, Lordstown described its recent progress towards commercialization—constructing most of the beta prototypes, passing two of the most difficult crash tests, and completing several retooling projects—and affirmed that it remained on track to start production in "late-September 2021." Ex. 3 (5/24/21 8-K), at 04-05. But it also announced that the "[e]xpected Endurance production in 2021 will be limited," and that it would need to raise additional capital to cover higher than expected operating expenses in the final push to commercialization, due in part to COVID-related supply issues. *Id.* Since then, supply chain issues and other factors have again forced Lordstown to push out its anticipated start of commercial production, but it continues to move forward with its plan to build a limited number of vehicles for testing, validation, verification, and regulatory approvals in 2021. Ex. 4 (10/1/21 8-K), at 07.

### D. Lordstown's Stock Price Has Experienced Significant Volatility in Its First Year As a Public Company, Including in Response to a Short-Seller Attack

Perhaps not surprisingly, given its rapid entry into the public markets, Lordstown's stock price has experienced significant volatility. Even a cursory look at the full stock price history (*see* AC ¶ 37; Ex. 19), reveals dramatic ups and downs, few of which even arguably track Plaintiffs' claims. Indeed, the stock price dropped significantly (approximately 40% from its high on

---

[21] *See, e.g.*, AC ¶ 272 (quoting 8/24/20 Proxy: "Although these pre-orders are nonbinding and did not require any deposit, Lordstown believes they demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers."); AC ¶ 290 (quoting 11/12/20 Form S-1: "We currently have pre-orders primarily from fleet operators to purchase over 44,000 vehicles, which pre-orders are nonbinding and did not require any deposit."); ¶¶ 270, 278, 280, 292, 308, 312, 314 (similar).

February 11) well *before* the short-seller Hindenburg Report was issued on March 12, 2021, allegedly revealing hidden truths about the Company and causing a (comparatively minor) drop in stock price.

The inflammatory Hindenburg Report—published by a self-identified short seller who stood to profit from any drop in Lordstown's stock price—combined publicly available information with vague and unsupported allegations from anonymous former employees and customers to claim that Lordstown had "misled investors on both its demand and production capabilities." AC, Ex. A, at 1. Specifically, Hindenburg asserted (1) that Lordstown's pre-orders were "largely fictitious," (2) that Lordstown was "an estimated 3-4 years away from production" and could not possibly start production in the fall of 2021; and (3) that certain insiders had sold stock since the merger, particularly in early February 2021, before a January 13, 2021 prototype fire became public knowledge. *Id.* at 1-2, 32. Like most short-seller attacks, the Hindenburg Report was long on rhetoric and innuendo and short on facts, but it had its desired effect—the stock price dropped to some degree following the Report. It also led Lordstown's board to form a special committee to investigate the Hindenburg allegations. AC ¶ 205.

After months of extensive review, the special committee concluded that the Hindenburg Report's "challenges to the viability of Lordstown Motors' technology and timeline to start production are not accurate." Ex. 5 (6/14/21 PR), at 01. And while it found there were "issues regarding the accuracy of certain statements regarding the Company's pre-orders," it noted that Lordstown "has repeatedly disclosed that its pre-orders are non-binding, and . . . highlighted the risk that pre-orders may not be converted to actual orders," and that it "has obtained tens of thousands of pre-orders from fleets, fleet management companies, or other end users. If converted to orders, this demand will comprise substantially all of the Company's expected production

volume through 2022." *Id.* at 02. The special committee also concluded that "[e]ach of [the officer or director stock sales since the merger] were made for reasons unrelated to the performance of the company or viability of the Endurance, and each such director and executive retained substantial [Lordstown] equity holdings" following those transactions. *Id.*

### E.    This Lawsuit

Ultimately, Lordstown navigated these many challenges in its first year as a public company, and continues to move towards commercial production, albeit more slowly than previously anticipated. Nonetheless, it has been plagued by shareholder lawsuits since the Hindenburg Report, all advancing the same baseless theory: that Lordstown and its officers intentionally misled investors about how much demand there was for the Endurance and when it would begin production. Relying largely on Hindenburg's self-interested analysis, in combination with vague and conclusory allegations from three confidential witnesses ("CWs"), Plaintiffs here claim that the Defendants (i) violated Section 10(b) of the Exchange Act by intentionally making false and misleading statements between August 3, 2020 and July 2, 2021 about pre-orders for the Endurance and its likely production timeline (and allegedly participating in a fraudulent "scheme" to do the same); (ii) violated Section 14(a) by negligently making some of the same statements in the proxy materials for the de-SPAC merger; and (iii) violated Section 20A by selling Lordstown stock while allegedly in possession of material non-public information.[22] As discussed below, none of these claims has merit, and the AC should be dismissed in its entirety with prejudice.

## III.    LAW AND DISCUSSION

### A.    Heightened Pleading Standards Govern Plaintiffs' Claims

Securities fraud claims brought under the Securities Exchange Act of 1934 must meet the

---

[22] Plaintiffs also bring control-person claims under Section 20(a), which are derivative of the primary violations described above.

heightened pleading standards of the Reform Act and Rule 9(b). The Reform Act requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Where the defendant's "state of mind" (be that negligence or scienter) is an element of the claim, it also requires that plaintiffs, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—that is, that *the particular defendant* made each allegedly false or misleading statement intentionally or at least recklessly (or negligently, in the case of Section 14(a) claims). *Id.* § 78u-4(b)(2)(A). A "strong inference" is "more than merely plausible or reasonable"; it must be "powerful" and "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). And in analyzing both falsity and scienter, courts must go beyond the pleadings to consider the full factual context of the statements and conduct at issue. *Omnicare*, 575 U.S. at 190-91; *Tellabs*, 551 U.S. at 323-24; *see also* RJN (explaining *Omnicare*'s and *Tellabs'* full-context standards); *Gompper v. Visx, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002) (plaintiffs cannot "plead in a vacuum"). Here, Plaintiffs' Section 10(b), 14(a), and 20A claims all are subject to the Reform Act's heightened pleading standards.[23] And because

---

[23] The Sixth Circuit has not addressed whether the Reform Act's heightened pleading standards apply to Section 14(a) claims, but the plain language of the statute indicates that they do and most Circuits have held accordingly, particularly where, as here, the allegations "sound in fraud." 15 U.S.C. § 78u-4(b)(1)(B) (applies to "any private action arising under this chapter," referring to Chapter 2B of Title 15, which is the codification of the Exchange Act); *id.* § 78u-4(b)(2) (same); *see also, e.g., Little Gem Life Sciences, LLC v. Orphan Medical, Inc.*, 537 F.3d 913, 916 (8th Cir. 2008) (applying Reform Act pleading requirements to 14(a) claim); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005) (same); *Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004) (same); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144-45 (3d Cir. 2004) (same); *Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857,

they all "sound in fraud"—relying on the same course of allegedly fraudulent conduct—they must also meet Rule 9(b)'s particularity requirements.[24]

## B.    Plaintiffs Cannot State a Fraud Claim Under Section 10(b)

The heart of Plaintiffs' case is the assertion that Defendants Lordstown Motors Corp. (f/k/a DPHC), Lordstown EV Corporation (f/k/a Lordstown), former CEO and Chairman Mr. Burns, former CFO Julio Rodriguez, and Senior Vice President of Business Development Caimin Flannery (the "10(b) Defendants") intentionally made false and misleading statements about (i) demand for the Endurance and (ii) its anticipated production timeline, first to (allegedly) trick DPHC shareholders into approving the merger and then to artificially inflate Lordstown's common stock price, thereby violating Section 10(b) and Rule 10b-5.

To state a claim under Section 10(b) and Rule 10b-5(b), Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014). Likewise, a "scheme liability" claim under Rule 10b-5(a) or (c) requires those same elements, except that plaintiffs must plead a deceptive or manipulative act in furtherance of the alleged scheme instead of a materially false or misleading statement. 17 C.F.R. § 240.10b-5(a), (c). Here, Plaintiffs' 10(b) claims fail for multiple independent reasons: they cannot plead a false or misleading statement or other deceptive act, scienter, loss causation, or, with respect to pre-merger statements, reliance.

---

861 (4th Cir. 2003) (same); *Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*, No. 12-cv-1750-PAG, 2012 WL 4958561, at *4-10 (N.D. Ohio Oct. 16, 2012) (same).

[24] *Ferron v. SubscriberBase Holdings, Inc.*, No. 08-cv-760, 2009 WL 650731, at *5 (S.D. Ohio Mar. 11, 2009) ("Rule 9(b) is not limited to claims . . . [that] include fraud as one of the elements. Rather, the heightened pleading requirements apply to 'averments of fraud' or 'claims that sound[] in fraud—in other words, ones that are premised upon a course of fraudulent conduct.'").

1.      **None of the Challenged Statements Was Materially False or Misleading**

The AC challenges 58 different statements (many with multiple parts) made in proxy materials, other SEC filings, press releases, conference calls, interviews, and news articles between August 3, 2020 and July 2, 2021, each of which falls into one of two categories: (1) statements concerning Lordstown's pre-orders and demand; or (2) statements concerning its anticipated production schedule.[25] *See* Appendix 1 (listing all challenged statements and their pleading deficiencies). None of these challenged statements was materially false or misleading.

a.      **Statements About Pre-Orders and Demand**

Nearly all of the challenged statements regarding pre-orders take substantially the same form: an announcement that, as of a particular date, Lordstown had received "more than" or "approximately" or a certain number of "pre-orders" or "non-binding reservations" for the Endurance, "primarily from commercial fleet customers," and that these numbers indicated significant demand for the vehicle. *See, e.g.*, AC ¶ 249 (8/3/20: "[Lordstown] to date, has received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet owners."); ¶ 292 (11/16/20: "[Lordstown] has received approximately 50,000 non-binding production reservations from commercial fleets . . . ."); ¶ 312 (1/11/21: "[Lordstown] has received more than 100,000 non-binding production reservations from commercial fleets . . . ."). Plaintiffs claim that these statements were materially false and misleading, overstating true demand, because Lordstown (i) "did not in fact have any pre-orders, and instead had non-binding letters of intent" and (ii) the reported totals allegedly included certain

---

[25] Defendants read the AC as pleading that all of the statements in proxy materials challenged under Section 14(a) are also challenged under Section 10(b), and analyze them here accordingly. As a result, this falsity analysis fully disposes of Plaintiffs' Section 14(a) claim as well.

pre-orders that should not have been counted. *Id.* ¶ 248. But the pleaded facts do not support the conclusion that the challenged statements were materially false or misleading for either reason.

### i. Lordstown Clearly Disclosed That Pre-orders Are Nonbinding

Most importantly, Lordstown has always been clear and forthright about the fact that its pre-orders were nonbinding, consistent with customary practice in its industry. *See supra* pp. 7-8. This was true well before DPHC considered merging with Lordstown,[26] and it was true throughout the alleged class period. Indeed, many of the challenged statements *themselves*, across a range of different media, explicitly acknowledge the nonbinding nature of the pre-orders:[27]

> "To date, **Lordstown has received pre-orders from fleet operators to purchase approximately 27,000 Endurance vehicles**. These pre-orders are not binding and did not require any deposit, so there can be no assurance that Lordstown will successfully convert them into binding orders or sales. It is possible that a significant number of customers who submitted pre-orders may cancel or delay their pre-orders." AC ¶ 270 (quoting 8/24/20 Proxy) (same language in 10/8/20 Proxy, *see* ¶ 278);

> "**Lordstown currently has pre-orders from fleet operators to purchase 27,000 vehicles.** Although these pre-orders are nonbinding and did not require any deposit, **Lordstown believes they demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers**." *Id.* ¶ 272 (quoting 8/24/20 Proxy) (same language in 10/8/20 Proxy, *see* ¶ 280);

> "**We currently have pre-orders primarily from fleet operators to purchase over 44,000 vehicles**, which pre-orders are nonbinding and did not require any deposit." *Id.* ¶ 290 (quoting 11/12/20 Form S-1);

> "**Lordstown Motors has received approximately 50,000 non-binding production reservations from commercial fleets for its Lordstown Endurance all-electric pickup truck** . . . ." *Id.* ¶ 292 (quoting 11/16/20 Form 8-K);

> "**[Lordstown] has received 80,000 non-binding reservations for the Endurance**

---

[26] *See, e.g.*, Mark Kane, "Lordstown Gets Letter of Intent to Buy 250 Endurance Electric Pickups," *InsideEVs* (Feb. 26, 2020), *available at* https://insideevs.com/news/400781/lordstown-250-endurance-pickups-firstenergy/ (discussing nonbinding nature of pre-orders).

[27] In these examples, bolded and italicized text identifies the challenged statements as in the AC; we have added underlining for emphasis.

*to date.*" *Id.* ¶ 308 (quoting 12/21/20 Form 8-K);

"[Lordstown] has *received more than 100,000 **non-binding** production reservations from commercial fleets* . . . ." *Id.* ¶ 312 (quoting 1/11/21 PR);

"*After receiving more than 100,000 **non-binding** production reservations from commercial fleets, Lordstown advanced talks for U.S. retooling loan for EV truck factory*" *Id.* ¶ 314 (quoting 1/14/21 Lordstown tweet).

Lordstown clearly explained that pre-orders were nonbinding in many of its other communications as well, including extensive risk factor discussions in its Form 10-K:

"[One of the] principal factors and uncertainties that make investing in our Class A stock risky . . . . [is] our ability to obtain binding purchase orders and build customer relationships, including uncertainties as to <u>whether and to what degree we are able to convert previously-reported nonbinding pre-orders and other indications of interest in our vehicle into binding orders and ultimately sales</u>" Ex. 6 (3/25/21 Form 10-K), at 15;

"*With our vehicle still under development, we do not have any current customers or any pending orders and <u>there is no assurance non-binding pre-orders and other indications of interest will be converted into binding orders or sales</u>* . . . . [W]e have no binding purchase orders or commitments from customers. <u>The previously-reported non-binding pre-orders that we have signed do not require customer deposits and may not be converted into binding orders or sales</u>. . . ." *Id.* at 18 (bold and italicized emphasis in original).

These disclosures form critical context for assessing whether any of the challenged pre-order statements were false or misleading. In *Omnicare*, the Supreme Court held that in making this determination courts must consider not only the full statement being challenged and the context in which it was made, but also other statements made by the company and other publicly available information, including the customs and practices of the relevant industry.[28] 575 U.S. at

---

[28] *Omnicare* arose in the context of a Securities Act claim, but courts have consistently applied *Omnicare* to Sections 10(b) and 14(a) claims as well, since the element of falsity is common to both the Securities Act and Exchange Act. *See, e.g.*, *Golub v. Gigamon Inc.*, 994 F.3d 1102, 1107 (9th Cir. 2021) (*Omnicare* opinion standards apply to 14(a) claims); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322-23 (4th Cir. 2019) (applying to 14(a) claim); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech. Inc.*, 856 F.3d 605, 610 (9th Cir. 2017) (applying to 10(b) claim); *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (same).

190 (whether a statement is false or misleading "always depends on context" and requires consideration of, among other things, "all its surrounding text, including hedges, disclaimers, and apparently conflicting information" and "the customs and practices of the relevant industry").

Here both the fact of Lordstown's many clear disclosures that the pre-orders were nonbinding, and the fact that *nonbinding* pre-orders are commonly used in the same way by others in the electric vehicle industry, utterly defeat Plaintiffs' assertion that any pre-order statements were misleading in this respect. They were not. And this is true not only for the statements in which the nonbinding nature of the pre-orders was explicitly acknowledged, but also for those off-the-cuff remarks that on their face and viewed in isolation might be less clear. *See, e.g.*, AC ¶¶ 288, 294.[29] The securities laws do not require a speaker to restate all caveats every time she speaks. And the securities laws do not evaluate a statement in a vacuum; each statement must be evaluated in the full context of customary practices in the industry and Lordstown's many explicit disclosures that pre-orders were nonbinding, all of which the market knew. Properly viewed in this full context, none of the challenged statements was misleading as to the nonbinding nature of pre-orders. *See, e.g.*, *Dailey v. Medlock*, 551 F. App'x 841, 847-48 (6th Cir. 2014) (affirming dismissal based in part on industry context and extensive risk discussions that made challenged statements not misleading in context); *Tongue*, 816 F.3d at 213 (affirming dismissal due in part to consideration of "industry-standard dialogue" between the FDA and new drug applicants as critical context for

---

[29] As for *President Trump's* statement "I heard the sales are great" (AC ¶ 276), the mere fact that Mr. Burns was standing nearby at the time does not mean that Mr. Burns "made" this statement for purposes of the securities laws. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b-5, the 'maker' of a statement is a person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."); AC ¶¶ 282, 296 (same issue: attributing to Burns statements he did not make). Plaintiffs do not even attempt to argue that Mr. Burns had ultimate authority over President Trump's statement, nor could they.

evaluating challenged statements); *Pittman v. Unum Grp.*, No. 1:18-cv-000128, 2020 WL 2846929, at *18 (E.D. Tenn. June 1, 2020) (challenged statements were not misleading in industry context and in light of defendants' other statements), *aff'd*, 861 F. App'x 51 (6th Cir. 2021).

### ii.    The Pre-Order Estimates Were Fair and Truthful

Nor do Plaintiffs' piecemeal attacks on particular pre-order customers suggest that any statements about pre-orders or demand were materially false or misleading. Plaintiffs do not and cannot deny that there is significant fleet demand for an all-electric, full-sized pickup truck like the Endurance if it compares favorably with similar commercially available pickups on performance and price. This indisputable fact flows inevitably from the size of the U.S. fleet market and the industry's rapid movement towards electric vehicles: an all-electric full-sized pickup truck tailored to fleets' special needs stands to capture a significant portion of that market, particularly if it can be among the first to market. *See supra* pp. 4-5. Indeed, Lordstown made investment decisions based on this strong market demand, as confirmed through pre-orders, E&Y, and other means.[30]

Unable to dispute that there is likely to be abundant demand for the Endurance, Plaintiffs instead argue—relying largely on Hindenburg's self-serving analysis—that the challenged statements about pre-orders were false and misleading in that the reported totals included pre-orders from customers that should not have been included because (allegedly) the customers either did not sign a letter of intent with Lordstown, could not "plausibly be expected to order" that number of trucks, did not actually intend to purchase them, or operated as intermediaries rather

---

[30] *See* AC ¶¶ 318, 324; Ex. 7 (3/17/21 Tr.), at 18 (explaining decision to make significant upfront tooling investments based on understanding of demand); Ex. 3 (5/24/21 8-K), at 04-05 (describing significant recent tooling, equipment, and parts expenditures).

than final fleet purchasers.[31] AC ¶ 248. None of these assertions has merit.

As an initial matter, this is not, as Plaintiffs would have it, a revenue recognition case: there are no rules regulating how pre-orders are counted, mandating that customers be of a certain type or quality, or requiring Lordstown to conduct due diligence before taking a vehicle reservation. Plaintiffs fail to allege that Lordstown was under any particular obligation to investigate a customer's ability to pay or the sincerity of its intentions before accepting a pre-order. The AC relies heavily on Hindenburg's inflammatory analysis—replete with standard short-seller tropes of pictures of apartment buildings, businesses run out of people's homes, and reliance on untested allegations in unrelated lawsuits—attempting to pick holes in specific customer pre-orders. But the mere allegation that a company is run out of an apartment or has a short operating history does not mean that its pre-order was not genuine, that Lordstown did not believe it to be genuine, or that it was improper for Lordstown to count it among its estimated pre-orders. *See, e.g.*, AC ¶¶ 124, 127, 133; *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159-60 (S.D.N.Y. 2015) (dismissing complaint that "rel[ied] almost entirely on a negative report published by a short seller" and as a result was "long on sound, fury and speculation, but . . . short on specifics"), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

Nor does the fact that certain pre-order customers may be fleet management companies or other intermediaries render statements that Lordstown had received a certain number of pre-orders "primarily from commercial fleets" or "from fleet operators" materially false or misleading. Fleet purchasing is fundamentally different from retail purchasing, and many commercial fleets employ

---

[31] Both Hindenburg and the AC make a great show of "uncovering" the fact that customers understood their pre-orders to be nonbinding (*see, e.g.*, AC ¶¶ 129-30, 133, 139, 169-70, 172-73, 179-82), but this was already well-known to the market. *See supra* pp. 7-8, 14-17.

a fleet management company or other third party to handle vehicle purchasing and servicing.[32] As a result, a significant portion of commercial fleet purchases are arranged by or made through intermediaries, and pre-orders from those intermediaries also provide important indications of potential commercial fleet demand.[33] In this context, there was nothing misleading about treating pre-orders from fleet management companies and other intermediaries as commercial fleet orders; indeed, doing otherwise might have significantly *understated* the demand Lordstown was seeing from commercial fleets.

Finally, even if Plaintiffs were right that certain customers should not have been counted among pre-order totals for one reason or another, Plaintiffs still have not shown how this rendered any particular challenged statement materially false or misleading.[34] *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545, 2019 WL 4257110, at *23 (S.D.N.Y. Sept. 9, 2019) (dismissing in part because merely alleging percentage by which later-restated reported income numbers were originally overstated did not establish that those alleged misstatements were quantitatively or qualitatively material); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714-15 (3d Cir. 1996) (plaintiffs failed to show how alleged failure to write down particular loan or properly classify certain assets as nonearning made loan loss reserves or asset reporting materially false or misleading). Indeed, Plaintiffs have not even attempted to show how removing any particular "questionable" customer order from the totals would have rendered any specific challenged statement materially false or misleading at that particular time. For example, CW-2 alleges that a

---

[32] *See* Ex. 7 (3/17/21 Tr.), at 16-17 (discussing fleet management companies' role).

[33] *See id.*; Ex. 8 (6/17/21 8-K), at 02 (discussing fleet management companies' role in the market and nonbinding vehicle purchase agreements with them as meaningful indicators of fleet demand).

[34] Most of the challenged pre-order statements merely said that Lordstown had received "approximately" or "over" or "more than" a certain number of pre-orders. *See, e.g.*, AC ¶¶ 249, 270, 278, 290, 292, 312.

1,000 truck pre-order from Innervations LLC should not have been included in the pre-order totals (AC ¶¶ 126-28, 157), but that pre-order was announced on *April 7, 2020* (*id.* ¶ 126), many months before the class period began and the first challenged statements were made. Even if Plaintiffs could show that this pre-order should have been left out of the pre-order totals, no pleaded facts suggest that its inclusion rendered any subsequent pre-order totals false or misleading. The earliest challenged statement, on Aug. 3, 2020, stated that Lordstown had received "more than 27,000 pre-orders" (*id.* ¶ 249); no factual pleadings suggest that removing Innervations' 1,000-truck pre-order from the total *four months later* would have dropped the estimate below 27,000 (or, even if it brought it to 26,000 instead of 27,000, that it would have been material to investors). Ultimately, the AC—like the Hindenburg Report—asserts a host of inflammatory allegations but fails to plead with the requisite particularity how they render any specific challenged statement materially false or misleading.[35] This is insufficient to plead falsity.

### iii.  Certain Pre-Order Statements Are Also Opinions, Inactionable Puffery, and/or Protected Forward-Looking Statements

In any event, many of the challenged pre-order statements (or portions thereof) are not actionable for the additional reason that they are (i) true and not misleading statements of opinion, (ii) puffery, and/or (iii) forward-looking statements protected by the Reform Act's safe harbor.

***Opinion Statements***. Challenged statements like "<u>we feel</u> that we are about to revolutionize the pickup truck industry" (AC ¶ 312), "<u>Lordstown believes</u> [these pre-orders] demonstrate clear demand that will lead to binding orders" (*id.* ¶¶ 272, 280), or characterizing pre-orders as "very serious" (*id.* ¶ 300) or Lordstown as having a "clear path to be first to market" (*id.* ¶ 253), all

---

[35] The same is true with respect to Climb2Glory: Plaintiffs fail to explain how Climb2Glory's alleged work for Lordstown renders false or misleading any challenged pre-order statement. Companies often outsource some or all of their sales work, especially when they have only a small sales team.

express the Defendants' subjective views and/or characterize matters open to interpretation.[36] As such, they constitute statements of opinion and are subject to more stringent pleading requirements. For a statement of *opinion* to be false or misleading, a plaintiff must plead (1) facts sufficient to show that the speaker did not actually hold the stated belief at the time the statement was made; or (2) "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 184-85, 194. This is "no small task for an investor." *Id.* Here, Plaintiffs plead no facts suggesting that the 10(b) Defendants did not genuinely believe the statements of opinion or that they were misleading in context.[37] As discussed above, there is indisputably significant demand for a full-sized electric pickup targeted at fleets that can compete on performance and price, and Mr. Burns explained why he believed the pre-orders to be "serious" even though they were nonbinding. AC ¶¶ 300, 318. Plaintiffs cannot show that any of these opinion statements were false or misleading.

*Puffery.* Statements such as "the Endurance has been met with enthusiastic support" (AC ¶ 249), "Significant Pre-Orders Received" (¶ 259), "demand . . . has been overwhelming" (*id.* ¶¶ 320, 322), and that the number of pre-orders is "unprecedented in automotive history" (*id.* ¶ 312)[38] are precisely the types of vague statements of corporate optimism and positive characterizations that courts consistently hold to be non-actionable "puffery." *See In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570-71 (6th Cir. 2004) (finding immaterial as a matter of law "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the

---

[36] *See also* Appx. 1, stmnts. 3, 5-9, 13-15, 17, 19-21, 24, 27, 29, 33, 35-39.
[37] *See, e.g.*, *Chapman v. Mueller Water Prods.*, 466 F. Supp. 3d 382, 398-99 (S.D.N.Y. 2020) (dismissing where no pleaded facts suggested anything other than "honest belief" in opinion).
[38] *See also* Appx. 1, stmnts. 1, 6, 8, 15, 33, 35, 37-38.

opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").[39] The vague and generalized statements about demand identified as puffery in Appendix 1 are not actionable for this reason as well.

*Forward-Looking Statements.* In addition to being opinions, forward-looking statements such as "we expect th[e] number [of pre-orders] to increase dramatically between now and [production]" (AC ¶ 284); "it's gonna take us a couple of years to fulfill that demand" (*id.* ¶ 322); and "Lordstown believes [the pre-orders] demonstrate clear demand that will lead to binding orders once the Endurance is complete" (*id.* ¶¶ 272, 280)[40] also are protected under the Reform Act's safe harbor if they are *either* (i) identified as such and accompanied by meaningful cautionary language, *or* (ii) immaterial, *or* (iii) made without actual knowledge that the statement is false or misleading. 15 U.S.C. § 78u-5(c)(1)(A)-(B). This standard is disjunctive and protects forward-looking statements, including in non-IPO proxy materials, if they meet any of the three conditions.

Here, several challenged pre-order statements are protected forward-looking statements under at least one of the three prongs of the safe harbor: because they were identified as such and accompanied by cautionary language;[41] because they were immaterial; and/or because they were genuinely believed by the speaker at the time. Moreover, contrary to Plaintiffs' conclusory

---

[39] *See also Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.,* 583 F.3d 935, 944 (6th Cir. 2009) (challenged statements were puffery "as they do nothing more than vaguely predict positive future results, a claim so banal and ubiquitous that it cannot engender reliance by reasonable investors").

[40] *See also* Appx. 1, stmnts. 7, 13, 17, 19, 21, 33, 38.

[41] The statements in AC ¶¶ 261, 272, 280, and 312 were identified as forward-looking and accompanied by meaningful cautionary language. *See* Ex. 1 (8/3/20 Proxy), at 003-04 (forward-looking statements are contained herein, including those providing "current expectations of future events," and actual results may differ as a result of, among other things, "(viii) risks relating to . . . the conversion of pre-orders into binding orders; [and] (ix) risks related to Lordstown's limited operating history, the rollout of Lordstown's business and the timing of expected milestones"); Ex. 2 (8/24/20 Proxy), at 36-37 (similar); Ex. 9 (10/8/20 Proxy), at 36-37 (similar); Ex. 13 (1/11/21 PR), at 01 (similar).

assertions, these statements do not fall within any of the exceptions to the safe harbor.[42] DPHC (like other SPACs) was not a "blank check company" because it did not issue "penny stocks."[43] Nor does the mere fact that the de-SPAC merger resulted in Lordstown being publicly listed make it an "initial public offering" under 15 U.S.C. § 78u-5(b)(2)(D).[44] Because each of the challenged pre-order statements identified as forward-looking in Appendix 1 is protected by the safe harbor, they are not actionable on this basis as well.

### b. Statements About Lordstown's Anticipated Production Timeline

Plaintiffs' pleadings are equally insufficient with respect to the challenged statements, made between August 2020 and March 2021, stating the 10(b) Defendants' belief that Lordstown "remain[ed] on track to begin production of the Endurance in September 2021," and, around the time of the merger, that "no additional capital requirements [were] expected between now and going to market to achieve positive cash flow." AC ¶¶ 350, 334; *see also* ¶¶ 330-64.

These were true and not misleading forward-looking statements of opinion, expressing the 10(b) Defendants' subjective beliefs, at particular moments in time, as to when Lordstown would

---

[42] *See* AC ¶ 441. The AC cites the Securities Act safe harbor provisions; we refer to the operative Exchange Act provisions here. It is true that, pre-merger, Mr. Burns and Mr. Flannery were not acting on behalf of the "issuer" as defined in 15 U.S.C. § 78u-5(i)(4), when making forward-looking statements. But only two such statements are at issue here (AC ¶¶ 249, 263), and DPHC (the issuer) also "made" those statements, which appeared in the proxy materials. In any case, both statements are true and not misleading statements of opinion.

[43] *See* 15 U.S.C. § 78u-5(b)(1)(B); 17 C.F.R. §§ 230.419, 240.3a51-1. DPHC's shares were issued above the $4-a-share penny-stock threshold, and it had more than $5 million in stockholder equity.

[44] That term has generally been understood as applying only to traditional initial public offerings; indeed, that is precisely the reason why several Congressmen recently proposed legislation that would amend the Reform Act to exclude statements made in connection with a de-SPAC merger from the safe harbor's protection. *See* Going Public: SPACS, Direct Listings, Public Offerings, and the Need for Investor Protections: Virtual Hearing Before the Subcomm. on Investor Protection, Entrepreneurship, and Capital Markets of the Comm. on Financial Services, 117 Cong. 1, *et seq.* (2021), *available at* https://www.govinfo.gov/content/pkg/CHRG-117hhrg45078/pdf/CHRG-117hhrg45078.pdf.

likely start production on the Endurance and whether it would require additional cash to do so. Many of the statements are explicitly couched in terms of *projected, anticipated, or expected* future developments.[45] But even those without such explicit wording clearly constitute *opinions*; after all, how and when something will happen in the future cannot be known with certainty, and whether a plan remains "on track" is inherently a judgment call. *See Omnicare*, 575 U.S. at 183 ("most important" feature of an opinion is that it does not "express certainty" and instead "rest[s] on grounds insufficient for complete demonstration"); *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("[E]xpressions of optimism [and] projections about the future are quintessential opinion statements."). Most of the statements also are forward-looking and protected by the safe harbor.[46] No factual allegations demonstrate that the Defendants did not believe these statements at the time, or that particular omitted facts rendered them misleading in context.[47] Indeed, Lordstown's other public statements—critical context for these forward-looking opinions—clearly and repeatedly warned that bringing a new vehicle to market is a capital-intensive and complicated logistical undertaking subject to numerous risks:

> "The estimated costs and timelines that Lordstown has developed to reach full scale commercial production are subject to inherent risks and uncertainties . . . . <u>There can be no assurance that Lordstown's estimates related to the costs and timing necessary to complete design and engineering of the Endurance and to retool the Lordstown Complex will prove accurate.</u> These are complex processes that may be

---

[45] *See, e.g.*, AC ¶ 336 (8/3/20: "<u>LMC Projects</u> ~$120 million of investment to retool the equipment for full production readiness"); *id.* ¶ 340 (8/3/20: "<u>[W]e do not expect</u> that we will need any additional equity capital requirement to achieve positive cash-flow. <u>We expect</u> to achieve breakeven or better EBITDA margins in 2022, our first full year of production . . . .").

[46] *See supra* § III.B.1.iii; Appx. 1, stmnts. 43-48, 50-58. The statements in AC ¶¶ 334, 336, 338, 340, 344, 350, 354, 356, 358, and 364 were identified as forward-looking and accompanied by meaningful cautionary language. *See* Ex. 1 (8/3/20 Proxy), at 003-04; Ex. 10 (10/23/20 PR), at 01; Ex. 11 (11/16/20 8-K), at 05; Ex. 12 (12/21/20 8-K), at 01; Ex. 13 (1/11/21 PR), at 01; Ex. 14 (1/28/21 PR), at 01-02; Ex. 15 (3/17/21 8-K), at 09.

[47] Moreover, to the extent statements that Lordstown "remain[ed] on track" are read as statements of present fact (or facts embedded within opinions), Plaintiffs have not pled any facts suggesting that Lordstown was not actually "on track" as of the date of any particular challenged statement.

subject to delays, cost overruns and other unforeseen issues. . . ." Ex. 2 (8/24/20 Proxy), at 38;

"The design, manufacture and sale of vehicles is a capital intensive business. Although Lordstown anticipates that the funding from the Business Combination will provide sufficient capital to fund the completion of the Endurance and the retooling of the Lordstown Complex necessary to commence commercial production, <u>Lordstown's business plan to design, produce, sell and service commercial electric pickup trucks, including the Endurance, is expected to require continued capital investment to fund operations</u>, continue research and development and improve infrastructure." Ex. 2 (8/24/20 Proxy), at 39;

"***<u>Lordstown may experience delays in realizing Lordstown's projected timelines and cost and volume targets for the production, launch and ramp up of the Endurance and the retooling of the Lordstown Complex</u>*** . . . .Vehicle manufacturers often experience delays in the design, manufacture and commercial release of new products. To the extent Lordstown experiences delays in the retooling of the Lordstown Complex or delays the launch of the Endurance, Lordstown's growth prospects could be adversely affected. . . . To the extent Lordstown's suppliers experience any delays . . . , whether due to COVID-19 or other reasons, Lordstown could experience delays in meeting its projected timelines." Ex. 2 (8/24/20 Proxy), at 41.

Against all this, Plaintiffs offer only the conclusory and repetitive assertion that "Lordstown did not realistically have any hope of beginning the kind of production it was boasting" by September 2021 (AC ¶ 328), based on (i) the Hindenburg Report's speculation, (ii) an anonymous industry "expert" with no personal knowledge of Lordstown, and (iii) irrelevant allegations from an unreliable CW. None of these supports Plaintiffs' theory. Hindenburg's inflammatory allegations—*e.g.*, that a Lordstown prototype caught fire during a test drive on January 13, 2021 (as prototypes sometimes do), and that *as of March 12, 2021* Lordstown had not completed certain testing and validation (AC ¶¶ 187-92)—are entirely consistent with Lordstown "remaining on track" for September production and believing that it had sufficient funds to get there. Indeed, the special committee concluded, as of June 2021, that "while various factors could lead to delays in the start of production, the projected September 2021 start of production remains achievable . . . ." Ex. 5 (6/14/21 PR), at 01.

Against this informed conclusion following an extensive investigation, Plaintiffs offer an anonymous "automotive industry expert" (AC ¶¶ 193-95) who claims no personal knowledge about Lordstown, the Endurance, or how it was progressing through the pre-production process; accordingly, his opinions are entitled to no weight.[48] And CW-3's allegations are even less credible and relevant. She claims to have served as an "administrative assistant at a third-party contractor" at Lordstown for just two months (Sep.-Dec. 2020), during which time she purportedly attended a single meeting—which none of the Defendants attended—at which someone in IT supposedly said that "software" was running behind. AC ¶¶ 198-99. This is unreliable hearsay, entitled to no weight.[49] It is also irrelevant: absent a date and details, this account—even if true—is insufficient to suggest that any particular challenged statement was false or misleading.

In sum, Plaintiffs fail to plead any facts suggesting that the 10(b) Defendants did not actually believe Lordstown to be "on track" (for both production and finances) when they made opinion statements to that effect, or that those statements were misleading in context. Accordingly, these challenged statements also cannot ground Plaintiffs' Section 10(b) claim. *See, e.g.*, *City of Dearborn*, 856 F.3d at 617-19 (opinion statements not false or misleading where plaintiffs failed to allege defendants knew the statements were false at the time or that particular omitted facts rendered them misleading); *In re AmTrust*, 2019 WL 4257110, at *17-23, 27-30 (same).

### c.  Item 105 Does Not Provide a Separate Basis for 10(b) Liability

Nor can Plaintiffs state a Section 10(b) claim based on Regulation S-K Item 105 (17 C.F.R. § 229.105; "Item 105"). As an initial matter, it is not clear if an Item 105 violation can properly

---

[48] *See Indiana State Dist. Council*, 583 F.3d at 946 (CW allegations "steeply discounted" where basis for personal knowledge is insufficiently alleged); *In re Diebold Sec. Litig.*, No. 5:05-cv-2873, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) (similar), *aff'd sub nom. Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009).
[49] *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009) (rejecting CW hearsay).

ground a Section 10(b) claim, and Defendants contend that it cannot.[50] But even if it could, Plaintiffs have not pled a violation here. Item 105 requires that certain public filings, including proxy materials, registration statements, and quarterly and annual reports, include a "discussion of the material factors that make an investment in the [company] speculative or risky." *Id.*; AC ¶ 366. That is precisely what DPHC and, later, Lordstown did in their public filings: they thoughtfully identified and discussed the significant risks that Lordstown investors faced, including that nonbinding pre-orders might not turn into orders or sales, and that anticipated production timelines might be delayed.[51] Nonetheless, Plaintiffs claim that a particular risk factor—warning that manufacturing vehicles is capital intensive and Lordstown would likely need additional funding— violated Item 105 because it failed to disclose that (allegedly), even after the $675 million infusion from the merger, Lordstown still would not have enough cash to begin commercial production and would need to raise additional funds to do so. AC ¶¶ 368-74.

This is nothing more than an impermissible attempt to plead fraud by hindsight. *See Dailey v. Medlock*, 551 F. App'x 841, 847 (6th Cir. 2014). The mere fact that Lordstown ultimately needed additional cash to bring the Endurance fully to market—a large and audacious undertaking—does not suggest that any Defendant knew or expected that when the disclosures were made *more than six months earlier*, and Plaintiffs have not pled any facts suggesting such knowledge. The challenged disclosure did exactly what it was supposed to—it clearly explained both Lordstown's expectation at the time and the risk that its ambitious plan still was "expected to require continued capital investment to fund operations, continue research and development and improve

---

[50] The Sixth Circuit has not weighed in on this issue, but some courts have been reluctant to find a private right of action for Regulation S-K violations. *See In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 403 (6th Cir. 1997) (recognizing that "courts have been reluctant to recognize a private right of action under Item 303" and collecting cases).

[51] *See, e.g.*, Ex. 9 (10/8/20 Proxy), at 38-71; Ex. 16 (11/12/20 Form S-1), at 6-28.

infrastructure."[52] Nothing more was required under Item 105.

### 2.     Plaintiffs Cannot Plead a Strong Inference of Scienter

Plaintiffs' 10(b) claims fail for another independent reason: lack of scienter. To plead scienter, a plaintiff must state "with particularity" facts giving rise to a "strong inference" that each defendant acted with "intent to deceive, manipulate, or defraud" with respect to each alleged misstatement. 15 U.S.C. § 78u-4(b)(2); *In re Omnicare*, 769 F.3d at 472-73. Usually this requires "at least recklessness,"[53] but the Sixth Circuit has set an even higher bar "when plaintiffs accuse defendants of misrepresenting or omitting soft information," including "predictions and matters of opinion" like certain of the challenged statements. *See id.* at 470-72, 482-83. With respect to "soft information," plaintiffs must plead particularized facts showing that the statement "was made with knowledge of its falsity." *Id.* at 470. Regardless of which information type is at issue, the requisite "strong inference" of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. And this "inherently comparative" inquiry requires courts to weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" collectively in a holistic analysis to determine whether scienter is sufficiently pled. *Id.* at 323-24.[54]

Here, non-fraudulent inferences abound. Mr. Burns—the single largest shareholder following the merger[55]—is not alleged to have sold any stock during the class period. *See, e.g.*, *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 435-36 (6th Cir. 2004) (no scienter, in part because

---

[52] AC ¶ 368; *see also supra* pp. 24-25 (related risk discussions).

[53] "Recklessness is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011).

[54] The Sixth Circuit conducts this holistic analysis with reference to nine non-exhaustive "*Helwig* factors," none of which suggest scienter here. *See In re Omnicare*, 769 F.3d at 473. This scienter discussion is framed within the holistic *Tellabs* analysis but addresses the relevant *Helwig* factors.

[55] Ex. 16 (11/12/20 Form S-1), at 83 (~45 million shares; ~28% of outstanding common stock).

individual defendants were not alleged to have "[taken] advantage of [company's] purportedly inflated stock prices by selling shares during the class period").[56] Plaintiffs claim this is irrelevant because his shares were subject to a lock-up agreement (AC ¶ 423), but the very fact that Mr. Burns *agreed* to lock up all of his shares from the merger until at least October 2021[57]—*after Lordstown's anticipated start of production*—strongly suggests that he genuinely believed in the Endurance, its anticipated timeline, and the value of Lordstown's stock. Indeed, if, as Plaintiffs assert, Mr. Burns was orchestrating a massive fraud by touting pre-orders and an anticipated timeline he knew were unachievable, then he knowingly set himself up to be the biggest victim of the fraud he supposedly perpetrated. This makes no sense; the far more plausible inference is that he agreed to a lockup because he believed in Lordstown's long-term value.

The same is true with respect to Mr. Flannery, who also did not sell stock during the period, despite the fact that he was free to do so.[58] In fact, the only 10(b) Defendant alleged to have sold stock during the class period is Mr. Rodriguez, who is alleged to have made a single sale of 9,300 shares on Feb. 8, 2021, retaining more than 34,000 shares plus another 525,000 fully vested and exercisable stock options. AC ¶ 114; Ex. 17 (2/8/21 Form 4), at 01. Courts have consistently held that where a defendant retains the bulk of his holdings, as here, it cuts against scienter.[59] *See, e.g.,*

---

[56] *See also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037-38 (9th Cir. 2002) (no scienter where defendants "held onto most of their company's stock and incurred the same large losses" as plaintiff).

[57] Mr. Burns agreed to lock up 100% of his Class A common stock for a year from the date the merger closed, and 50% of those shares for an additional year. *See* Ex. 9 (10/8/20 Proxy), at 6.

[58] Mr. Flannery is alleged to have "made" (*see Janus*, 564 U.S. at 143) only a single challenged statement regarding pre-orders on Sep. 24, 2020. AC ¶ 274. Mr. Rodriguez is alleged to have made only one as well (by signing the 11/12/2020 Form S-1; *id.* ¶ 290), and to have violated Item 105 by signing the Nov. 15, 2020 10-Q and Dec. 1, 2020 Registration Statement (*id.* ¶¶ 372-73).

[59] Nor do limited sales by other insiders suggest anything meaningful about the *10(b) Defendants'* knowledge or intent. The allegations regarding Mr. Schmidt's, Mr. Brown's, and Mr. Post's stock sales are insufficient to state Section 20A claims against them, much less support a finding that

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (sale of 38% of holdings not suspicious); *Havenick v. Network Exp.*, Inc., 981 F. Supp. 480, 528 (E.D. Mich. 1997) (retention of 68% of holdings "rebutted" inference of scienter); *In re Diebold Sec. Litigation*, 2008 WL 3927467, at *9 (N.D. Ohio Aug. 22, 2008) ("[R]etaining a bulk of [] shares . . . is inconsistent with an inference of scienter.").

Moreover, the fact that Lordstown invested heavily in the machinery and workforce necessary to begin commercial production—based in part on its gauge of demand through pre-orders—also strongly suggests good faith.[60] It would have made no sense for the 10(b) Defendants to tool their factory and production processes to meet pre-order numbers they knew to be inflated. The 10(b) Defendants worked hard, in the face of a global pandemic and significant supply-chain issues, to bring a new vehicle to market on an ambitious timeline and at a scale they believed was warranted. And when they ran into challenges in the past six months and were forced to revise the timeline and scale of initial production and search for additional funding, they were transparent with investors about that too.[61] All this bespeaks responsible corporate stewardship, not fraud.

Against these strong inferences of good faith conduct, Plaintiffs' allegations are especially weak. Plaintiffs offer no motive whatsoever with respect to Mr. Rodriguez or Mr. Flannery, and claim only that Mr. Burns was motivated "to avoid the existential risk of insolvency by raising money" through the de-SPAC merger. AC ¶ 380. But "motives" to secure financing, fund operations, and pursue strategic transactions are common to all corporations and are routinely

---

*Mr. Burns, Mr. Rodriguez, or Mr. Flannery* was acting with fraudulent intent. *See infra* § III.D. Moreover, the special committee specifically found, after extensive investigation, that all post-merger sales of stock by executives were "made for reasons unrelated to the performance of the company or viability of the Endurance." Ex. 5 (6/14/20 PR), at 02.
[60] *See supra* note 30.
[61] *See* Ex. 3 (5/24/21 8-K), at 04-05; Ex. 4 (10/1/21 8-K), at 07.

rejected as insufficient to establish scienter. *See, e.g.*, *PR Diamonds*, 91 F. App'x at 435 (affirming dismissal: "to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the [alleged] false statements . . . . courts distinguish motives common to corporations and executives generally from motives to commit fraud").[62]

Nor do any factual pleadings provide strong circumstantial evidence of scienter. No contemporaneous document, email, or memorandum, or other smoking gun is offered; instead Plaintiffs rely largely on the vague and speculative accounts of two anonymous former Lordstown employees. But neither CW-1 nor CW-2 is alleged to have a sufficient personal-knowledge basis for any relevant factual allegations, and the allegations themselves do not suggest scienter. CW-2 claims to have been a manager at Lordstown and to have interacted with both Mr. Burns and Mr. Flannery (no dates or details), but he left prior to the merger and therefore has no personal knowledge as to anything that occurred during the class period.[63] CW-1 claims to have been "one of just a couple sales representatives at Lordstown" in 2020 and to have attended meetings with Mr. Flannery,[64] but offers only generalized allegations that he was pressured to secure pre-orders (as sales representatives typically are), that the pre-orders were nonbinding (well-known to the market), and that he understood from Mr. Flannery that Mr. Burns was regularly updated about pre-orders (no personal knowledge or details). AC ¶¶ 143-50. CW-1 also claims that executives considered pre-orders to be an important publicity tool (*id.* ¶ 149), but this is hardly surprising: it

---

[62] *See also In re Omnicare*, 769 F.3d at 484 (corporate "desire to continue earning money" is not enough); *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010) ("[Motives to] attract customers, finance current operations, and [] pursue strategic acquisitions, have been routinely rejected by courts.").

[63] AC ¶¶ 151-57; *Zucco*, 552 F.3d at 996 (CWs "not employed by [defendant] during the time period in question" lacked basis for personal knowledge).

[64] He does not claim to have interacted with Mr. Burns at any point, and his accounts of what Mr. Flannery allegedly told him Mr. Burns had said are hearsay entitled to no weight. *See supra* n.49.

would have been imprudent for a start-up *not* to take advantage of this free publicity, and doing so was entirely consistent with the pre-orders also providing an indication of demand and being used to gauge interest for internally forecasting production and tooling needs.[65] Finally, the mere fact that Mr. Flannery had access to a shared Excel file tracking pre-orders does not establish that any facts contained therein were inconsistent with the challenged statements or that he knew or believed any particular challenged statement to be false or misleading.[66]

Finally, none of Plaintiffs' other allegations suggests scienter. Mr. Burns' and Mr. Rodriguez's resignations in June 2021 came at a logical moment when Lordstown was transitioning from R&D and early production to a new commercial stage; they do not, in and of themselves, suggest scienter.[67] Likewise, the mere fact that Lordstown is under investigation by the SEC and DOJ—and has been sued by a former potential vendor—does not indicate fraud. The investigations are ongoing and do not in and of themselves suggest any wrongdoing; the same is true of the lawsuit, which has not yet been adjudicated. Nor can the disfavored "core operations" doctrine help Plaintiffs where, as here, no factual pleadings suggest that any 10(b) Defendant had

---

[65] CW-1's conclusory assertion that pre-orders were *solely* used for publicity (AC ¶ 149) is unsupported by any personal knowledge; he was in sales, not operations, and claims no basis for knowing the various ways in which pre-orders were used by the Company.

[66] *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 308 (S.D.N.Y. 2019) ("[T]o allege scienter based on access to information . . . a plaintiff must either 'specifically identify the reports or statements that are contradictory to the statements made' or 'provide specific instances in which Defendants received information that was contrary to their public declarations.'").

[67] *See* Ex. 18 (6/14/21 PR), at 01; Lordstown Management Corrective Statement, *available at* https://investor.lordstownmotors.com/lordstown-motors-corp-management-corrective-statement (clarifying that "Mr. Burns elected to resign as the Company begins to transition from the R&D and early production phase to the commercial production phase of its business, and that [his] decision was not the result of the work or findings of the Board's Special Committee"); *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 888-89 (N.D. Ohio 2013) (dismissing; "Plaintiffs have not alleged facts supporting a plausible inference that [defendants] were terminated . . . for any reason other than . . . mismanage[ment]").*See also Zucco*, 552 F.3d at 1002 ("Mere conclusory allegations that a financial manager resigns or retires . . . without more, cannot support a strong inference of scienter.").

32

access to particular internal information that contradicted their challenged statements.[68]

A motive-less alleged fraud rarely survives the Reform Act's strict scrutiny, and Plaintiffs' allegations support this maxim. Here, Plaintiffs' core theory—that the 10(b) Defendants intentionally misrepresented demand for the Endurance and its anticipated production timeline in order to close the merger and artificially inflate Lordstown's stock price, yet chose not to sell shares while the price was inflated and received no other personal benefit—has no basis in logic or fact. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter where insiders "miss[ed] the boat"). Viewed holistically, the most reasonable inference to be drawn from all of the pleaded facts is that the 10(b) Defendants actually believed in Lordstown's product and vision, and believed, at each point in time, that they were fairly representing demand for the Endurance and the expected production schedule to investors. Because Plaintiffs cannot plead particularized facts sufficient to raise a strong inference of scienter with respect to any of the 10(b) Defendants— and indeed, the competing inferences of non-culpable, good faith conduct are far stronger—all of Plaintiffs' Section 10(b) claims must be dismissed.

### 3. Plaintiffs Cannot Plead Loss Causation

Plaintiffs' 10(b) claims also fail because they cannot plead loss causation, which requires a "causal connection between the material misrepresentation [or other fraudulent conduct] and the [economic] loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); 15 U.S.C. § 78u-4(b)(4). In other words, the plaintiff must show that the false statement inflated the stock price, and the plaintiff was injured when the hidden truth was revealed and the market reacted negatively.

---

[68] CW-1's bare allegation that Mr. Flannery had access to a shared Excel file that tracked pre-orders fails to "specifically identify" how any of the contents in that file were "contradictory to the statements made." *Schiro*, 396 F. Supp. 3d at 308; *see also Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 492 (6th Cir. 2015) (no strong inference that executives were aware of specific food safety results simply because food safety was important to company and results were from their "core" China business); *Nozak v. N. Dynasty Mins. Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020).

No such showing is possible here because the losses Plaintiffs claim to have suffered were not caused by the alleged misrepresentations. Plaintiffs' whole case is premised on the theory that Lordstown's stock price was artificially inflated because it allegedly failed to disclose that (i) its pre-order estimates overstated actual demand for the Endurance, and (ii) the anticipated production schedule was unrealistic, and that investors allegedly were injured when the "truth" about pre-orders and the production timeline became known following the Hindenburg Report. But this is not what the pleaded facts demonstrate. As detailed above, Lordstown clearly and repeatedly disclosed throughout the class period that its pre-orders were *nonbinding* (as was customary in the industry) and were mere proxies for estimated fleet demand; this was well-known to the market prior to the Hindenburg Report. Nor did the Report reveal any hidden truth about the production schedule, which at the time was on track for initial production this fall.[69] Rather, Hindenburg merely used innuendo and vague assertions from anonymous sources to put a sinister spin on largely publicly available information about certain Lordstown customers and routine production issues, in hopes of driving down the Company's stock price for its own financial benefit.

Accordingly, Plaintiffs can only credibly allege that the Hindenburg Report stoked fears in the market—already hypervigilant with respect to SPACs—which led to a (relatively modest) drop in Lordstown's stock price. This is not the same as a revelation of fraud, and it is insufficient as a matter of law to show loss causation. *See, e.g.*, *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 771 (N.D. Ohio 2020) (loss causation insufficiently pled; "[corrective] information must in a practical sense be new; otherwise the market will have processed and reacted to that

---

[69] Indeed, the only disclosure during the class period that did provide new information about the timeline was Lordstown's May 24, 2021 announcement that it remained on track to start production in September but that initial production would be on a smaller scale than previously anticipated and would require additional funding. Ex. 3 (5/24/21 8-K), at 04. Three days later, the stock price was *higher* than before the announcement (*see* AC ¶ 37)—antithetical to loss causation.

information already").[70] If the market for Lordstown's stock was efficient (as Plaintiffs claim) then the Hindenburg Report did not reveal any new truth, and it cannot constitute a corrective disclosure. By the same token, if the Court were to find that the Hindenburg Report did constitute a corrective disclosure, then the class period would need to end there.[71]

### 4. Pre-Merger Statements Cannot Ground Plaintiffs' Section 10(b) Claims Because Plaintiffs Have Not Pled Reliance

In addition, Plaintiffs cannot base their Section 10(b) claims on any allegedly false or misleading statements made (or allegedly deceptive acts done) prior to the de-SPAC merger on October 23, 2021, because they have not shown that they relied on those statements or conduct in purchasing or selling securities. The reliance element of a Section 10(b) claim "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*")). A plaintiff may show this directly, by demonstrating that she was aware of the alleged misrepresentation and bought or sold stock based on it. Or she can, in certain circumstances, establish reliance instead through a rebuttable presumption based on "the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Id.* at 268 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)). For the presumption to apply, however, plaintiffs must plead and prove that the stock "traded in an efficient market." *Id.* at 277-78.

---

[70] *See also In re KBC Asset Management N.V.*, 572 Fed. App'x 356, 360 (6th Cir. 2014) (no loss causation where plaintiff failed to show disclosed fact was new); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (similar); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *Teacher's Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007) (similar).

[71] Under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), a damages model at class certification must match the plaintiff's theory of liability. A model that measures stock-price inflation caused by other, non-challenged statements, and/or losses caused by the revelation of facts other than the allegedly concealed truth, will not satisfy this requirement. *Comcast*, 569 U.S. at 38.

Here, Plaintiffs allege in a conclusory fashion that DPHC's and, later, Lordstown's securities traded on an "informationally efficient market" (AC ¶ 430), but they fail to plead any facts demonstrating that the market for DPHC stock (1) itself was efficient *and* (2) was efficient *with respect to information about Lordstown*. In the vast majority of securities fraud cases, the challenged statements are made by the operating company about itself. At the pleading stage, plaintiffs' allegation of an operating company's market efficiency usually suffices, since the company reports operational and financial results and tends to trade based on those results. But the same is not true for SPACs—inherently speculative vehicles that by definition have no business or operations to report and whose whole purpose is to find and merge with a private-company target, which also is not efficiently traded. In these very different circumstances, there is no reason to assume a SPAC's stock trades efficiently—indeed DPHC's historical stock price movement indicates that it did not[72]—and Plaintiffs must plead this factual foundation. Moreover, even if DPHC was efficiently traded, in general, prior to the merger—and that is not sufficiently pleaded—there is no reason to believe that statements about *Lordstown*, merely a potential merger target for DPHC, were efficiently impounded into DPHC's stock price. Here too, DPHC's stock price movement suggests it was not: on multiple occasions, allegedly inflationary challenged statements about Lordstown were followed by a *negative* stock price reaction.[73]

If Plaintiffs cannot rely on the fraud-on-the-market presumption, then they must plead

---

[72] *See* Ex. 19 (DPHC stock price history), at 02 (stock price increased ~10% each day, on Aug. 26 and 27, 2020, without any new news about DPHC or Lordstown); *id.* (stock price increased ~17% on Sep. 11, 2020 without any new news about either company); *id.* at 01 (beginning on Sep. 30, 2020, stock price declined more than 20% over 5 consecutive trading days without any new news about either company).

[73] *See* Ex. 19 (DPHC stock price history), at 02 (stock price declined ~4% on Aug. 5, 2020 following allegedly inflationary challenged statement); *id.* (stock price declined ~10% on Sep. 24, 2020 following allegedly inflationary challenged statement).

reliance individually with respect to each Plaintiff and each challenged statement, defeating any chance at class certification under Rule 23(b)(3). *Halliburton II*, 573 U.S. at 281-82. The AC's boilerplate pleadings regarding reliance on pre-merger statements are insufficient to establish a fraud-on-the-market presumption or individualized reliance even under *Iqbal* and *Twombly*, much less Rule 9(b). Accordingly, pre-merger statements and conduct cannot ground Plaintiffs' claims.

### 5.    Plaintiffs Also Cannot State a "Scheme Liability" Claim

Plaintiffs' "scheme liability" claim essentially duplicates the insufficient Rule 10b-5(b) claim discussed above, and fails for the same reasons. Scheme liability under Rule 10b-5(a) or (c) requires the same elements as a Rule 10b-5(b) claim—including scienter, reliance, and loss causation—except that instead of pleading a materially false or misleading statement, Plaintiffs must establish that each 10(b) Defendant committed a "deceptive or manipulative act" in furtherance of the alleged scheme to defraud. 17 C.F.R. § 240.10b-5; *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 895 (W.D. Ky. 2010). As detailed above, Plaintiffs fail to allege that any challenged statement was false or misleading, that any 10(b) Defendant acted with scienter, or that any alleged misrepresentation actually caused Plaintiffs' losses. To the significant extent that Plaintiffs' purported scheme claim relies on this same course of conduct, it fails for the same reasons. Nor do Plaintiffs allege any other facts during the class period, separate from the alleged misrepresentations, that might establish the requisite deceptive conduct by any *10(b) Defendant*.[74] And to the extent Plaintiffs rely on pre-class period allegations, those cannot ground this claim: Section 10(b) requires artificial inflation of a company's stock price *during the class period*.[75]

---

[74] As discussed *infra* § III.D, Plaintiffs' sparse Section 20A allegations cannot support even that insider trading claim, much less a fraudulent scheme claim against any of the 10(b) Defendants.

[75] *See Halliburton II,* 573 U.S. at 267-69.

### C.    Plaintiffs Cannot State a Claim Under Section 14(a)

Plaintiffs' Section 14(a) claim against the entities known as DPHC and Lordstown prior to the merger, Mr. Burns, Mr. Flannery,[76] and DPHC's Chairman and CEO David Hamamoto (together, the "14(a) Defendants") fails for essentially the same reasons as their 10(b) claims. To plead a Section 14(a) claim, a plaintiff must allege that (1) a proxy statement contained a material misrepresentation; (2) the defendants were at least negligent in making that misrepresentation; (3) it caused plaintiffs' injury; and (4) the proxy statement was an essential link in causing the transaction that harmed plaintiffs. *In re Almost Fam. Inc. Sec. Litig.*, No. 3:18-cv-00040, 2020 WL 695654, at *3 (W.D. Ky. Feb. 11, 2020), *appeal dismissed sub nom. In re Almost Fam., Inc., Sec. Litig.*, No. 20-5302, 2020 WL 3317769 (6th Cir. Apr. 24, 2020). Both falsity and negligence must be pled with particularity. *See supra* § III.A & n.23; *Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*, No. 12-cv-1750-PAG, 2012 WL 4958561, at *4-10 (N.D. Ohio Oct. 16, 2012) (dismissing 14(a) claim under Reform Act and Rule 9(b)).

Here, all of the statements challenged under Section 14(a) also are challenged under Section 10(b), and Plaintiffs cannot plead falsity, negligence, or loss causation for essentially the same reasons. As discussed at length above, the challenged statements (all of which concern either pre-orders/demand or estimated production timeline) were true and not misleading; some also were non-actionable puffery or protected forward-looking statements. *See supra* § III.B.1. Lordstown clearly and repeatedly disclosed, in the proxy materials and elsewhere, that its pre-orders were nonbinding and that its *anticipated* production timeline was an estimate subject to change.[77] *See*

---

[76] Mr. Flannery is not a proper 14(a) Defendant because he did not "solicit or [] permit the use of his name to solicit" DPHC's proxy materials (15 U.S.C. § 78n(a)(1)), and the mere fact that the proxy materials included an investor presentation that happened to show Mr. Flannery's picture does not suggest otherwise. Plaintiffs plead no facts whatsoever indicating that he had any involvement in preparing the proxy materials or that he knew his image was being used.

[77] *See supra* § III.B.1 & n.25; AC ¶¶ 270, 272, 278, 280 (8/24/20 & 10/8/20 Proxy).

*Laborers' Loc. #231 Pension Fund v. PharMerica Corp.*, No. 3:18-cv-109, 2019 WL 4645583, at *6-8 (W.D. Ky. Sept. 24, 2019) (dismissing § 14(a) claims). And while an Item 105 violation can theoretically ground a Section 14(a) claim, the AC fails to plead one. *See supra* § III.B.1.c.

Plaintiffs also cannot show that any 14(a) Defendant acted negligently. Plaintiffs claim in conclusory fashion that Mr. Burns and Mr. Flannery must have acted negligently in issuing the proxy materials (or in Mr. Flannery's case, "allowing [them] to be disseminated" with his name and image) because they were "intimately familiar" with Lordstown's business and/or sales practices (AC ¶¶ 475, 477), but Plaintiffs fail to identify what specifically each knew or should have known that would have been inconsistent with the challenged statements. The same is true with respect to Mr. Hamamoto: Plaintiffs claim he acted negligently in signing the proxy materials when "readily available information" would have demonstrated their inaccuracy (*id.* ¶ 473), but once again fail to identify what was "readily available" or how it would have contradicted any challenged statement. These allegations are insufficient even to plead negligence under *Iqbal* and *Twombly*, much less to show the "strong inference" of negligence required by the Reform Act.

Finally, Plaintiffs fail to plead loss causation, which requires them to "tie the misleading proxy statements directly to the economic harm [they] suffered." *Laborers' Loc. #231*, 2019 WL 4645583, at *4. Plaintiffs cannot do so here for the same reasons outlined in § III.B.3 above.

## D.  Plaintiffs Cannot State a Section 20A Violation for Insider Trading

To plead a 20A claim against Mr. Rodriguez, Lordstown's President Rich Schmidt, Chief Production Officer Shane Brown, or Chief Engineer Darren Post ("20A Defendants"), Plaintiffs must allege that each defendant purchased or sold stock while in possession of "material, nonpublic information," that Plaintiffs bought stock contemporaneous with that purchase or sale, and that the defendant "committed a predicate violation" under the Exchange Act. 15 U.S.C. § 78t–1(a); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1130 (W.D. Mich. 1996). And

because Section 20A claims "sound in fraud," Rule 9(b) applies. *Id*.

Here, Plaintiffs claim that each 20A Defendant sold Lordstown stock between February 2 and 4, 2021, while allegedly in possession of material nonpublic information "about Lordstown's operations." AC ¶ 485. But this is too vague even to meet a notice pleading standard, much less 9(b)'s particularity requirements: Plaintiffs fail to allege any specific material nonpublic information these executives had at that time.[78] And the only "predicate violation" Plaintiffs allege is that the 20A Defendants violated Section 10(b) by engaging in the alleged insider trading itself. But Plaintiffs cannot state a predicate 10(b) claim without pleading scienter as to each individual— which they have not even attempted to do.[79] These flaws require dismissal of Plaintiffs' 20A claim.

## IV.    CONCLUSION

Because Plaintiffs fail to state a primary violation, their control-person claim fails too.[80] Moreover, Plaintiffs' theories are so fundamentally flawed that repleading would be futile. Accordingly, the Court should dismiss the AC in its entirety with prejudice.

Dated: November 9, 2021                          Respectfully submitted,

                                                     *s/ Douglas W. Greene*
                                                 **BAKER & HOSTETLER LLP**
                                                 Douglas W. Greene
                                                 Email:   dgreene@bakerlaw.com
                                                 45 Rockefeller Plaza, 14th Floor
                                                 New York, NY  10111
                                                 Telephone:   212.589.4200
                                                 Facsimile:    212.589.4201

---

[78] If Plaintiffs mean that the 20A Defendants knew the supposedly "hidden truth" about pre-orders and the production timeline that Hindenburg allegedly revealed, Plaintiffs have not sufficiently pled any such thing.

[79] The pleadings regarding Mr. Rodriguez are insufficient for the same reasons identified in the scienter discussion above. *See supra* § III.B.2. Plaintiffs offer nothing more than job titles and descriptions with respect to Mr. Schmidt, Mr. Brown, and Mr. Post.

[80] *See In re KBC Asset Mgmt.*, 572 F. App'x at 362.

Douglas L. Shively
Email: dshively@bakerlaw.com
Key Tower, 127 Public Square, Suite 2000
Cleveland, OH 44114
Telephone: 216.621.0200
Facsimile: 216.696.0740

*Attorneys for Defendants*