**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE LORDSTOWN MOTORS CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00616 (PAG) <br><br> ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  LEGAL STANDARDS ..........................................................................................6

III.  ARGUMENT ..........................................................................................................7

    A.  Plaintiffs Adequately Pled Claims Under Section 10(b) of the Exchange Act .......7

        (1)  Defendants Misrepresented the Pre-Orders ...............................................7

            (i)  Defendants Falsely Claimed the Pre-Orders Were All From Fleets ..7

            (ii)  Defendants Fraudulently Inflated the Pre-Order Book ....................11

            (iii)  Defendants Misrepresented the Seriousness of the Pre-Orders........15

        (2)  Defendants Misrepresented Lordstown's Production Capabilities ...........21

        (3)  Plaintiffs Adequately Allege Scienter ....................................................25

        (4)  Plaintiffs Adequately Allege Loss Causation .........................................32

        (5)  Plaintiffs Adequately Allege Reliance.....................................................34

        (6)  Defendants Engaged in an Actionable Fraudulent Scheme......................35

    B.  Plaintiffs Adequately Pled Claims Under Section 14(a) of the Exchange Act .....36

    C.  Plaintiffs Adequately Pled Claims Under Section 20A of the Exchange Act.......39

    D.  Plaintiffs Adequately Pled Claims Under Section 20(a) of the Exchange Act .....40

IV.  CONCLUSION .....................................................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ....................................................................................................34

*In re Almost Fam. Inc. Sec. Litig.*,
  No. 3:18-cv-00040-RGJ, 2020 WL 695654 (W.D. Ky. Feb. 11, 2020)...............................37

*In re Am. Serv. Grp., Inc.*,
  3:06-cv0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009)..............................................29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..........................................................................................36

*In re Avon Sec. Litig.*,
  No. 19-cv-01420-CM, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ................................31

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...............................................................................................34, 35

*Beck v. Dobrowski*,
  559 F.3d 680 (7th Cir. 2009) .......................................................................................37

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
  No. 19-cv-00024-DLI-LB, 2021 WL 2646353 (E.D.N.Y. June 28, 2021) ...........................33

*Benzon v. Morgan Stanley Dist., Inc.*,
  420 F.3d 598 (6th Cir. 2005) .......................................................................................36

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020), *cert. denied sub nom. BofI Holding, Inc. v.
  Houston Mun. Emps. Pension Sys.*, 142 S. Ct. 71 (2021) ......................................................33

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
  No. 20-cv-7139-JPO, 2021 WL 2853284 (S.D.N.Y. July 8, 2021)......................................33

*Burges v. Bancorpsouth, Inc.*,
  No. 3:14-cv-1564, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) ...................................34

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...............................................................................35

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010) .......................................................................31

ii

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   387 F.3d 468 (6th Cir. 2004), *amended* 399 F.3d 651 (6th Cir. 2005) ...................................11

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) .......................................................................... 10, 11, 13, 14

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020)..................................................................................10

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   No. H-14-3428, 2017 WL 2599327 (S.D. Tex. June 15, 2017)..............................................40

*In re Comp. Scis. Corp. Sec. Litig.*,
   288 F.R.D. 112 (E.D. Va. 2012) ..........................................................................................34

*In re Compuware Sec. Litig.*,
   301 F. Supp. 2d 672 (E.D. Mich. 2004) ...............................................................................25

*In re Comshare Inc. Sec. Litig.*,
   183 F.3d 542 (6th Cir. 1999) .................................................................................................6

*Cosby v. KPMG, LLP*,
   3:16-cv-121-TAV-DCP, 2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018).............................27

*Dirks v. S.E.C.*,
   463 U.S. 646 (1983) .............................................................................................................39

*Dougherty v. Esperion Therapeutics, Inc.*,
   905 F.3d 971 (6th Cir. 2018) .......................................................................................*passim*

*Emps. Ret. Sys. of City of St. Louis v. Jones*,
   No. 2:20-cv-04813, 2021 WL 1890490 (S.D. Ohio May 11, 2021)................................ 36, 37

*In re Empyrean Bioscience, Inc. Sec. Litig.*,
   255 F. Supp. 2d 751 (N.D. Ohio 2003) ................................................................................35

*In re Envision Healthcare Corp. Sec. Litig.*,
   No. 3:17-cv-01112, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019)...................................40

*In re EveryWare Global, Inc. Sec. Litig.*,
   175 F. Supp. 3d 837 (S.D. Ohio 2016)..................................................................................24

*In re Facebook, Inc., IPO Sec. and Deriv. Litig.*,
   986 F. Supp. 2d 544 (S.D.N.Y. 2014)...................................................................................29

*Fargo v. City of San Juan Bautista*,
   857 F.2d 638 (9th Cir. 1988) ................................................................................................37

*In re FirstEnergy Corp. Sec. Litig.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004) ................................................................................10

*Fradkin v. Ernst*,
    571 F. Supp. 829 (N.D. Ohio 1983) ....................................................................................38

*Frank v. Dana Corp.*,
    649 F. Supp. 2d 729 (N.D. Ohio 2009), *rev'd*, 646 F.3d 954 (6th Cir. 2011) ................. 30, 31

*Fresno Cnty. Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................................38

*In re Gas Nat., Inc.*,
    No. 1:13-cv-02805, 2015 WL 3557207 (N.D. Ohio June 4, 2015) .......................................38

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ...........................................................................................................34

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ............................................................................ 22, 24

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
    No. 3:10-cv-371, 2011 WL 1257756 (N.D. Ohio Mar. 31, 2011) ........................................37

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
    No. 3:10-cv-371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011), *as amended*
    (Sept. 7, 2011) ....................................................................................................................36

*In re Health Mgmt., Inc. Secs. Litig.*,
    970 F. Supp. 192 (E.D.N.Y.1997) .......................................................................................27

*Hull v. Glob. Digital Sols., Inc.*,
    No. 16-cv-5153-FLW, 2018 WL 4380999 (D.N.J. Sept. 14, 2018) .....................................35

*Hurst v. Enphase Energy, Inc.*,
    No. 20-cv-04036-BLF, 2021 WL 3633837 (N.D. Cal. Aug. 17, 2021) ................................33

*In re King Pharms., Inc.*,
    No. 2:03-cv-77, 2004 WL 5043539 (E.D. Tenn. Aug. 11, 2004) .........................................37

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .......................................................................................35

*Laborers' Local No. 231 Pension Fund v. Pharmerica Corp.*,
    No. 3:18-cv-109-RGJ, 2019 WL 4645583 (W.D. Ky. Sept. 24, 2019) ...............................37

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..............................................................................29

*Lea v. TAL Educ. Grp.*,
  837 F. App'x 20 (2d Cir. 2020) ..................................................................33

*Lewis v. Brynes*,
  538 F. Supp. 1221 (S.D.N.Y. 1982)............................................................37

*Longo v. OSI Sys., Inc.*,
  No. CV 17-8841, 2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ...........................34

*Lorenzo v. S.E.C.*,
  139 S. Ct. 1094 (2019) ...........................................................................36

*Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*,
  No. 12-cv-1750, 2012 WL 4958561 (N.D. Ohio Oct. 16, 2012)............................37

*Louisiana Sheriffs' Pens. & Relief Fund v. Cardinal Health, Inc.*,
  No. 2:19-cv-3347, 2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) .......................20

*Lowinger v. Morgan Stanley & Co. LLC*,
  841 F.3d 122 (2d Cir. 2016) ....................................................................29

*Lubbers v. Flagstar Bancorp. Inc.*,
  162 F. Supp. 3d 571 (E.D. Mich. 2016) ......................................................18

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996)...........................................................40

*McPherson v. Kelsey*,
  125 F.3d 989 (6th Cir. 1997) ........................................................... 8, 34, 40

*Miller v. Champion Enters. Inc.*,
  346 F.3d 660 (6th Cir. 2003) ...................................................................25

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ..............................................................................39

*MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*,
  No. 09-12613, 2009 WL 4506418 (E.D. Mich. Nov. 30, 2009)............................18

*Morse v. McWhorter*,
  290 F.3d 795 (6th Cir. 2002) ...................................................................40

*In re Nat'l Auto Credit, Inc. Sec. Litig.*,
  No. 1:98-cv-0264, 1999 WL 33919791 (N.D. Ohio Oct. 12, 1999)........................40

*In re Nat'l Century Fin. Ents, Inc., Inv. Lit.*,
  580 F. Supp. 2d 630 (S.D. Ohio 2008)........................................................24

v

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) ...............................................................................28

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ...........................................................................32, 34

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .........................................................................................23, 24

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ...........................................................................39

*In re Questcor Sec. Litig.*,
No. SA CV 12-01623-DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)............34

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ................................................................................29

*Rubin v. Schottenstein, Zox & Dunn*,
143 F.3d 263 (6th Cir. 1998) ................................................................................11

*S.E.C. v. China Ne. Petro. Holdings Ltd.*,
27 F. Supp. 3d 379 (S.D.N.Y. 2014)......................................................................36

*S.E.C. v. Fitzgerald*,
135 F. Supp. 2d 992 (N.D. Cal. 2001)....................................................................18

*Salvani v. ADVFN PLC*,
50 F. Supp. 3d 459 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 784 (2d Cir. 2015).......35

*Smilovits v. First Solar, Inc.*,
295 F.R.D. 423 (D. Ariz. 2013) ...................................................................*passim*

*South Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009) .............................................................30

*Stein v. U.S. Xpress Enters., Inc.*,
No. 1:19-cv-98, 2020 WL 3584800 (E.D. Tenn. June 30, 2020) ..........................32

*Stratte-McClure v. Morgan Stanley*,
No. 13-0627, 2015 WL 136312 (2d Cir. Jan 12, 2015) ........................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ....................................................................................*passim*

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000) ...............................................................28

vi

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016)...................................................................39

*In re TransDigm Grp., Inc. Sec. Litig.*,
   440 F. Supp. 3d 740 (N.D. Ohio 2020) ..................................................................33

*Weiner v. Tivity Health, Inc*,
   365 F. Supp. 3d 900 (M.D. Tenn. 2019) .................................................................25

*Wilson v. Great Am. Indus., Inc.*,
   855 F.2d 987 (2d Cir. 1988) ....................................................................................38

*In re Winstar Commc'ns.*,
   No. 01-cv-3014-GBD, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)......................33

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .............................................................................26, 30

## Statutes & Rules

15 U.S.C. § 78t...............................................................................................................40

15 U.S.C. § 78t-1(a) ........................................................................................................39

## Other Authorities

Joanna Lee, *Activist Short Sellers: Market Manipulators or Market Protectors?*,
   REVIEW OF BANKING AND FINANCIAL LAW 274, 281 ............................................33

John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws* (Apr. 8,
   2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-
   under-securities-laws.................................................................................................24

Lead Plaintiff George Troicky ("Lead Plaintiff"), and additional Plaintiffs Daniel Tavares, Globestar Systems Inc., Ashith Pabbathi, and FNY Managed Accounts LLC (together, "Plaintiffs") file this opposition to the motion to dismiss ("MtD," ECF No. 70-1) filed by Defendants Lordstown Motors Corp. ("LTM"), Lordstown EV Corp., Stephen S. Burns, Shane Brown, Caimin Flannery, David Hamamoto, Julio Rodriguez, Rich Schmidt, and Darren Post.[1]

## I.      INTRODUCTION

This is a classic "fake it 'til you make it" fraud.  Defendants misled shareholders in order to secure millions of dollars of investment for Lordstown, a nascent startup that was out of cash and far from production.  Defendants falsely claimed that Lordstown was near production ready and would generate billions of dollars of revenue, beginning in September 2021, when it would start delivery of the thousands of trucks it had "pre-sold" to fleet operators.  This was all a lie and when the truth came to light — complete with SEC and DOJ investigations and the termination of Lordstown's CEO and CFO — investors lost hundreds of millions of dollars.

The motion to dismiss unapologetically denies that there were any misstatements, despite admissions by a Lordstown board committee to the contrary.  Furthermore, the facts are overwhelming and largely speak for themselves, demonstrating Defendants' fraud.

The story of Defendants' fraud begins not with Lordstown, but with Workhorse Group Inc. Shortly after being pushed out of his role as CEO of Workhorse (¶¶51, 67), Defendant Burns hatched the idea to buy a manufacturing plant that General Motors ("GM") was closing and formed a company to sell an electric truck: the Endurance.  ¶¶70-75, 77.  The vehicle's defining feature was an unprecedented "hub motor" design, placing motors inside the truck's wheels.  ¶¶75, 76.

---

[1] Unless stated otherwise, all emphasis is added and terms are defined as in the Amended Complaint ("AC," cited as "¶_"). ECF No. 61.  Plaintiffs are simultaneously filing a separate response to Defendants' request for judicial notice that addresses the exhibits attached to the Declaration of Douglas W. Greene (ECF No. 70-4)).

1

In December 2019, Burns launched Lordstown and bought the plant from GM, but did not have sufficient capital to run the company.  ¶¶69-75.  For months, he unsuccessfully tried to raise funds.  ¶82-96.  As he did this, he developed a false narrative that Lordstown had a growing number of pre-orders that would quickly convert into billions of dollars in revenue.  ¶¶73-81.  In June 2020, at an event unveiling an early Endurance prototype, Burns boasted to Vice President Mike Pence that Lordstown had "*already pre-sold*" its first year of production.  ¶¶79-80.

By August 2020, Lordstown was essentially out of cash.  ¶86.  Burns made a last-ditch bet-the-company play to secure financing, agreeing to a merger (the "Merger") with DiamondPeak Holdings Corp. ("DPHC").  ¶82.  DPHC, led by Defendant Hamamoto, was a SPAC — *i.e.,* a publicly traded blank check company formed to acquire a private company, taking it public.  ¶65.  The Merger would provide Lordstown with $675 million in desperately needed funding.  ¶82.

However, the Merger still needed to be approved by DPHC's shareholders, and so Burns renewed his efforts to fraudulently pitch Lordstown.  On August 3, 2020, Defendants filed proxy materials with the SEC.  ¶¶83-90.  The proxy touted an inflated book of pre-orders and falsely claimed the pre-orders were strong indications of demand and entirely from fleets.  ¶¶246-81.  The proxy also falsely stated Lordstown was near production ready.  ¶¶328-65.  Burns reiterated these misrepresentations in media appearances while the Merger was pending.  ¶¶91-96.  On October 23, 2020, on the basis of the materially misleading proxy materials, shareholders voted in approval, the Merger closed, and DPHC was renamed Lordstown Motors Company.  ¶¶94, 98.

Defendant Burns had succeeded in defrauding investors into funding his startup.  But, as is standard in SPAC deals, he had agreed to a "lockup" that prevented him from selling his shares for a period of time.  ¶423.  Thus, Burns continued the fraud, in hopes that it would go undetected until he could either cash out or until Lordstown found success (despite the fraud).

When virtually ringing the bell at the NASDAQ following the Merger, Burns indicated to the public that Lordstown was "on target" to bring the Endurance to market in *September 2021*. ¶99.  And then, for months, Burns continued to make media appearances touting an ever-growing count of "serious" pre-orders "all" from commercial "fleet operators."  ¶¶274-327, 328-65.  For example, on November 17, 2020, Burns appeared on *CNBC* with Jim Cramer, who asked about how "solid" the 50,000 pre-orders were — inquiring, "These people are not going to be walking away? *They are committed?*" — to which Burns responded: "*Right. Yeah. All of them,*" adding that the "average order size is about 500 trucks" and that they were "*very serious orders*." ¶300.

On February 17, 2021, Lordstown received a subpoena from the SEC inquiring into the same fraud alleged herein.  *Id.*.  However, Defendants did not disclose the subpoena, and *incredibly*, despite the subpoena undisputedly putting Lordstown's management on notice that the walls were closing in on the scheme, Burns' lies continued. ¶407.  He appeared on *Yahoo Finance* on February 23, 2021, falsely claiming they had "pre-sold" 100,000 trucks.  ¶324.

The truth began to emerge on March 12, 2021, when Hindenburg Research published a lengthy analysis of the fraud (the "Hindenburg Report").  ¶118.  After a thorough investigation, which included interviews with multiple employees and purported customers, the Hindenburg Report concluded that "Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles." ¶120.  For example:

- Lordstown counted E Squared as making a massive 14,000 truck pre-order worth *$735 million* (more than the entirety of the cash Lordstown raised in the Merger), even though E Squared was a non-incorporated "doing business as" name for a 1-2 person operation, run out of a modest one-bedroom apartment, which did not operate a fleet or own trucks, and instead hoped to eventually serve as an intermediary to sell trucks, which E Squared's operator called a "brand new" business.  ¶¶123-25.

- Lordstown counted Innervations LLC for a 1,000 truck pre-order, a self-described "influencer" business operated as a side hustle by two individuals with other jobs, which

3

did not operate a fleet, or "get involved in the actual ordering," and instead sought to act as a promoter for Lordstown trucks, by hosting events.  ¶¶126-28.

- Lordstown counted Grid-X as a "Select Pre-Order Customer" in its Merger proxy, even though Grid-X was an internet cloud services company, and did not operate a fleet or own trucks.  Grid-X's CEO had stated they were "completely unaware" of the deal when asked about it and that the inquiry was "the first time" they had heard about it.  ¶134.

- Lordstown counted a 500 truck pre-order by Clean Fuels Ohio, even though it was an educational nonprofit, not a fleet operator.  It said the deal was "promotional" and about "getting the word out," and was "really clear" with Lordstown about that fact.  ¶130.

- Lordstown counted Momentum Groups for a 900-truck pre-order, even though it is not a fleet operator and merely ran a webpage inviting others to buy the truck.  ¶131.

- Lordstown also booked pre-orders from the City of Ravenna and the City of Lordstown. Neither city placed pre-orders or signed letters of interest.  The mayor of the City of Ravenna said he was "shocked" when he heard about the supposed deal.  ¶¶159-64.

The Hindenburg Report also explained that Lordstown had faced undisclosed production issues and that it was touting an unrealistic production schedule.  ¶186.  As just one example, the report said that on January 12, 2021, Lordstown had conducted overnight testing on a public road, and during this test the Endurance prototype caught on fire and became engulfed in flames.  ¶187.

The market reaction to these revelations was sharp; Lordstown's stock closed down 16.54% the day the report was published, which news articles attributed to the report.  ¶¶200-202.

On March 17, 2021, Defendants finally disclosed the SEC investigation, and that Lordstown's board had formed a special committee to investigate the issues raised in the Hindenburg Report.  ¶¶204-205.  Shockingly, the next day, Burns appeared on *CNBC* and stated "*[w]e've never said we had orders*."  ¶206.  In response, Jim Cramer — who had previously conducted the interview where Burns claimed Lordstown had "*very serious orders*" exclaimed:

> I found it gut wrenching . . . .  I had pressed him on Mad Money about how serious the orders were . . . .  And he said, they're very serious.  He had signed letters with CEO[s].  He could have easily said . . . we never know what's going to happen with orders . . . .  And Burns [just] said, I never said that they were serious  . . . .  So to me, I thought it was like the prosecution rests.

4

¶207.  The other *CNBC* reporter in the segment added that what stood out to him was Burns denying that anyone had thought they had orders, and Cramer responded:

> I know **he point blank said the opposite to me** . . . . he said to me, our average order size — order size, order size — is 500 trucks at a time and most of them are signed by the CEOs of these large firms.  Now, is that not saying we have serious orders?  I'm asking is the order serious, give me any help, make me feel better about how serious the orders were.  How about if you said, well, look, first of all, our average order size is 500 trucks at a time.  And then I will also tell you, [that] most of them are signed by the CEOs of these large firms.  That's how serious I am.  Well, that's the evidence.  That's the core evidence.  I mean, if we had to do like, you know, stock market, I don't know, CSI.  Well, there you go.

¶208.  After the disclosure of the formation of the committee, the SEC investigation, and Burns' *CNBC* appearance, Lordstown's stock price closed down 13.8%.  ¶209.

On May 24, 2021, Lordstown slashed its prior projection guidance for September by 50%, revealing it would not be meeting the touted production schedule and admitting it would need additional funding.  ¶¶214-15.  Lordstown's stock price closed down another 7.45%.  ¶216.  By this point, Lordstown was once again on the brink of financial ruin.  On June 8, 2021, Lordstown released an amended 10-K, announcing a "going concern" notice, that it may need "significant" capital to ramp up production, and that the company had "material weaknesses in internal control over financial reporting."  ¶218-220.  Lordstown's stock fell 20.86% before pairing losses.  ¶222.

On June 14, 2021, Lordstown announced that the committee had found "***issues regarding the accuracy of certain statements regarding the Company's pre-orders***."  ¶¶224-25.  That same day, Lordstown announced the "resignations" (really, terminations) of Burns and its CFO, Defendant Rodriguez.  ¶230.  The price of Lordstown's stock fell 18.84%.  ¶232.

On July 2, 2021, *The Wall Street Journal* reported that Lordstown was under criminal investigation by the DOJ.  ¶236.  Lordstown subsequently raised some additional cash in an attempt to finance itself until it began production (¶241), but September 2021 has long passed and it has still not delivered a single truck.

In response to these facts, Defendants' motion to dismiss proceeds by misdirection (*e.g.*, irrelevant diatribes about general demand for electric vehicles) and by impermissibly disputing or just ignoring the pleadings.  For example, the MtD barely mentions one of Defendants' most frequent and insidious lies: that Lordstown's pre-orders were "***all***" with "***fleet operators***."  *E.g.*, ¶¶104; 270.  They now want to rewrite history by claiming they only made the narrower assertion that many sales were to fleets or intermediaries that sell to fleets.  *See* MtD at 18-19.  This argument not only ignores the well documented statements that "all" pre-orders were made by "fleet operators," it also ignores that Defendants booked many pre-orders from entities that were neither fleets nor fleet intermediaries and clearly were not going to buy, including from clean fuel advocacy non-profits, "influencers," and entities ranging from cloud services providers to local municipalities that had no pre-orders or letters of intent ("LOI") for the Endurance.

As to scienter, Defendants have no meaningful answers to the many mutually reinforcing facts establishing their motive and knowledge of the fraud.  In addition to compelling testimony from confidential witnesses and smoking-gun facts — *e.g.*, that the SEC subpoena put Defendants on notice of the fraud — scienter can also be inferred based on the centrality of the Endurance pre-orders and production capabilities to Lordstown's pitch to investors.  Defendants raise equally meritless challenges to loss causation, reliance, the §14A proxy violation claims, and the §20A insider trading claims.  Defendants' MtD should therefore be denied.

## II.      LEGAL STANDARDS

On a motion to dismiss, the court takes all factual allegations in the complaint as true and generally reviews the pleadings in the light most favorable to plaintiff.  *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 547 (6th Cir. 1999).  This remains true even in PSLRA fraud cases, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007), though the applicable heightened pleading standards for allegations of fraud are discussed herein.

III.     **ARGUMENT**

   A.     **Plaintiffs Adequately Pled Claims Under Section 10(b) of the Exchange Act**

      (1)     **Defendants Misrepresented the Pre-Orders**

Lordstown's special committee *already found* there were "issues regarding the accuracy of certain statements regarding the Company's pre orders." ¶224. Ignoring this, Defendants offer meritless defenses of their statements, which cannot be squared with the facts. In reality, the pre-orders were aimed at influencing investors (*see* Section III(A)(6)) and were badly misrepresented.

      (i)     *Defendants Falsely Claimed the Pre-Orders Were All From Fleets*

Defendants repeatedly claimed that all the pre-orders came from commercial fleet operators. This indicated that the pre-orders were meaningful proof of the strong demand for Lordstown's trucks from its target audience. Selling to fleets was a logical target market, since it would reduce the need to establish a broad charging and service network, but posed challenges because fleets are sophisticated and may be reluctant to rely on a startup with novel technology.[2]

Defendants repeated that the pre-orders came from fleets, at nearly every opportunity. *E.g.*, ¶294 ("50,000 pre-sales already, *all from fleets*. That's just the commercial sector . . . to have that many commercial vehicles sold already is a big deal."); ¶318 (Burns referring to pre-order count: "*all* those numbers are just commercial fleet;" interviewer: "that's *literally* just for fleets?" Burns: "Yeah. That's *just* commercial fleets"); ¶318 ("[T]hese orders are very, very sticky because I know what it takes to get them. . . This is a fleet. And fleets generally take their business very, very seriously. So I think they're very sticky."); ¶270 ("Lordstown has received pre-orders *from fleet operators* to purchase approximately 27,000 Endurance vehicles"); ¶272 ("Lordstown currently has pre-orders *from fleet operators* to purchase 27,000 vehicles"); ¶284 ("We have pre-

---

[2] The hub motors face challenges in terms of durability, access to repair shops, and engineering issues due to the motors' placement as "unsprung weight," below the vehicle's suspension. *See generally* ECF No. 61-1 at 27.

sold 40,000 of them *to fleet customers*"); ¶292 (50,000 reservations "*from commercial fleet*s" and "average order size of approximately 500 vehicles per fleet."); ¶298 ("our average order is about 500 trucks per order, so larger fleets."); ¶300 ("We sell to commercial fleets [and] we've already got 50,000 pre-orders"); ¶302 ("[W]e sell to fleets"); ¶304 (50,000 in pre-orders "just on the commercial side" from "larger fleets"); ¶312 (Lordstown is "focused on the commercial fleet market" and has 100,000 pre-orders "*from commercial fleets*" with an average order of nearly "600 vehicles per fleet"); ¶322 ("overwhelming demand . . . from commercial users for this vehicle – over a hundred thousand pre-orders"); ¶324 ("we have pre-sold 100,000 of these *to various fleets* across America."); *see also* ¶¶249, 263, 265, 274, 278, 280, 286, 290, 306, 314, 320 (similar).

In reality the pre-order book was inflated with non-fleet parties.[3]  For example, Lordstown booked a 14,000 truck pre-order from a business called E Squared Energy.  ¶123.  A sale of that size would have generated $735 million in revenue for Lordstown — which, incredibly, was about $60 million more than Lordstown raised in the Merger.  *Id.*  E Squared was an unincorporated DBA that was operated out of its founder's apartment.  ¶124.  E Squared's website claimed that it provided advisory services on cutting energy costs and gave no indication of any line of business that would require a fleet of trucks.  ¶125.  E Squared was clearly not a "fleet operator," and when interviewed for the Hindenburg Report, its founder stated, "*We don't operate a fleet*," before mentioning a vague "brand new" plan to perhaps act as an intermediary for fleets in the future.  *Id.*

Additional examples abound.  Lordstown counted a $52.5 million, 1,000 truck deal with Innervations LLC, a two-person firm that did not operate a commercial fleet.  ¶¶126-127.  In fact, Innervations' founder explained that they were "influencers" who functioned as a "promoter" that

---

[3] CWs confirm that Lordstown counted *everything* (*i.e.*, every touted pre-order, supposed LOI, and even LOIs for an entirely distinct Workhorse truck) in its pre-order total.  ¶¶145, 156.  Defendants do not dispute and therefore concede these allegations.  *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997) (arguments that are not raised in the appellant's main brief, or raised merely in a perfunctory manner, are waived).

hoped to "direct" interested companies to Lordstown to purchase vehicles, and that it did not "get involved in the actual ordering." ¶128.  Lordstown booked AutoFlex LLC as a pre-order fleet customer, despite the fact that AutoFlex serves as an intermediary for government (not commercial) fleets and did not itself operate a commercial fleet. ¶¶168-70.  Lordstown booked a large pre-order (as many as 20,000 trucks) from Mike Alberts Fleet Solutions, even though that company merely serves as an intermediary and is not itself a "fleet operator."  ¶¶179-182. Lordstown booked a 900 truck ($46 million) pre-order with "Momentum Groups," which does not operate a fleet and merely ran a website where people could request to eventually buy a truck. ¶131.  Lordstown booked pre-orders from a cemetery organization as a "commercial fleet" despite it not fitting that description. ¶¶171-73.  Lordstown also booked a 500 truck pre-order (worth $26 million in revenue) with Clean Fuels Ohio, an educational nonprofit, but it did not operate a fleet, and was merely trying to "get the word out" about Lordstown. ¶130.

**Defendants' responses are meritless**: **First**, Defendants claim they only said that the pre-orders were "primarily" from fleets.  MtD at 8, 13-14, 18.  As shown above, this is simply false.

**Second**, Defendants claim their statements were true because the pre-orders came from "fleet management companies."  MtD at 18-19.  This argument is foreclosed by the fact that Defendants specified the pre-orders were from "fleet **_operators_**," not just those that deal with fleets as intermediaries. ¶92; *see supra* at III(A)(1)(ii).  Furthermore, many supposed pre-orders were not from "fleet management companies" — *e.g.*, E Squared did not "manage" fleets, it merely hoped to sell to fleets at some point in the future, Innervations was just an "influencer" organization that hoped to promote Lordstown, and Clean Fuels Ohio was just an educational nonprofit. ¶23.

Defendants' argument also fails because it improperly attempts to interject a factual dispute about the meaning of the term "fleets" at the motion to dismiss stage.  Even in PSLRA cases, all

9

facts are to be taken in Plaintiffs' favor at this stage. *Tellabs,* 551 U.S. at 322. Even if reasonable people could disagree as to whether intermediaries hoping to sell to fleets are themselves commercial fleet operators, that would pose a factual issue that cannot be resolved at this stage. *See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) (a "question of fact . . . cannot be decided on Defendants' motion to dismiss"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (factual disputes about a word's meaning cannot be resolved in Defendants' favor on motion to dismiss).

Defendants also claim, based on articles outside the pleadings, that many fleets buy through intermediaries. MtD at 18-19. That fleets sometimes buy through intermediaries would only make it **more** significant that Lordstown claimed it had pre-orders directly from fleet operators, since direct orders from fleets would be especially compelling indications of demand. Furthermore, counting intermediaries misleadingly impounded would-be *sellers'* interest in potentially selling the trucks, into definitive statements about current demand and commitment by *purchasers*. Even if intermediaries were interested in adding the Endurance to the catalogue of vehicles they offer to fleets, this would not indicate fleets will be interested in ultimately buying the truck.

**Third**, Defendants state: "Plaintiffs do not and cannot deny that there is significant fleet demand for an all-electric, full-sized pickup truck." MtD at 17. That there may be general economic demand from fleets for some EV pickup truck, has no bearing on whether Defendants misrepresented the pre-orders for their unique hub-motor vehicle from a new market entrant.

**Fourth**, Defendants claim there were "no rules regulating how pre-orders are counted." MtD at 18. This badly misses the point. "[S]ecurities laws . . . require . . . complete and non-misleading information with respect to the subjects on which [one] undertakes to speak." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) (citing *Helwig v.*

10

*Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)); *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (upon speaking, one "assume[s] a duty to speak fully and truthfully on those subjects."). The issue is not that it was *inherently* improper to count non-fleets, the issue is that Defendants ***said*** that they were only counting "commercial fleets," which was untrue.

**Fifth**, Defendants claim that even if "certain customers should not have been counted among pre-order totals . . . Plaintiffs still have not shown how this rendered any particular challenged statement materially false or misleading." MtD at 19. Each statement claiming that the pre-orders figure was ***all*** from fleets was plainly misleading because those figures included non-fleet customers. To the extent that Defendants' point is that the inflation of the pre-order figure may not have been material, this argument fails because many of the non-fleet orders were significant standing alone (E Squared counted for almost 17.5% of the pre-orders, and offered revenue of $735 million) (¶123) — and were certainly material when taken together. In any event, "a complaint may not properly be dismissed on the ground that the alleged misstatements . . . are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,* 387 F.3d 468, 499 (6th Cir. 2004), *amended* 399 F.3d 651 (6th Cir. 2005).

### (ii) *Defendants Fraudulently Inflated the Pre-Order Book*

Defendants touted a rapidly growing pre-order count throughout the Class Period, but at all points in time this number was inflated by various deceptive tactics.

Defendants inflated the pre-order count by including LOIs that Lordstown had supposedly acquired from Workhorse. Prior to the formation of Lordstown, Workhorse had been developing a totally distinct electric pickup from the Endurance — this vehicle did not utilize "hub motors" and had significantly different range and charging specifications. ¶62. That a customer had at one

11

point been interested in the Workhorse EV truck said little about whether that customer would want the Endurance, and certainly did not amount to a "pre-order" for the Endurance.

Despite the fact that the Workhorse truck and the Lordstown Endurance were vastly different vehicles, Lordstown counted about 6,000 pre-orders from the Workhorse LOIs it had purportedly received. ¶¶72, 146. CW-1 explained that Lordstown did not reconfirm these orders with the potential purchasers that had LOIs with Workhorse. ¶146. For example, Lordstown had supposedly inherited a deal between Workhorse and the Southern California Public Power Authority, which was counted in Lordstown's pre-order book, but a representative of the power authority explained that they had signed an LOI with Workhorse (contingent on a series of discounts), but that they had not had any dealings with Lordstown, had not received any communication from Lordstown, and would not sign a similar LOI with Lordstown. ¶¶183-85. Lordstown also counted a 2,500 truck pre-order from Ryder, based on a stale LOI with Workhorse, and even that deal had been "essentially for show." ¶136. Similarly, about two years before the Merger, the City of Orlando had signed an LOI with Workhorse for 500 trucks — conditioned on Workhorse delivering a prototype within three months. Workhorse failed that requirement, and yet Lordstown counted these LOIs as Endurance pre-orders. ¶¶174-178. A city representative said that he viewed his LOI with Workhorse as separate and distinct from any order he would place with Lordstown since they were different trucks, that any order with Workhorse was not valid as to Lordstown, and that he has not been contacted by Lordstown about the LOI. ¶178.

In addition to wrongfully counting the Workhorse LOIs as pre-orders, Lordstown counted an alarming number of pre-orders from supposed customers that **had not even** signed non-binding LOIs. In some instances, Defendants invented pre-orders entirely out of thin air. Lordstown counted the cities of Ravenna and Lordstown as pre-order fleet purchasers, despite the fact that

they did not have LOIs with Lordstown, and in the words of Lordstown's mayor, there was "no way on God's green earth," it could buy the number of trucks Lordstown had counted it for.  ¶¶159-161.  Lordstown trumpeted "Summit Petroleum" as one if its "Select Pre-Order Customers," despite the fact that Summit had not even put in an LOI for a specific quantity of trucks, but had merely said that it "would be interested" in looking at the Endurance.  ¶163.  Similarly, AutoFlex exchanged e-mails with a Lordstown sales representative and provided a "rough" number of potential trucks that he may want to purchase via email, but did not sign an LOI.  ¶169.  Lordstown also trumpeted "Grid-X" as a "select pre order customer," but it was a cloud services company that did not operate a fleet, and did not have a deal with Lordstown.  ¶134.

**Defendants offer several meritless responses**:  **First**, Defendants argue that "there are no rules regulating how pre-orders are counted."  MtD at 18.  However, upon choosing to speak, one must "provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."  *Bridgestone,* 399 F.3d at 670.  Defendants' point appears to be that it was fine to tout a pre-order count that included orders that were almost certainly not evidencing real demand.  While absurd, this argument is not even relevant here (*but see* Section III(A)(1)(iii)): the issue here is ***not*** that Defendants should have ***removed*** non-credible Endurance LOIs from the pre-order count, but that they falsely ***added*** pre-orders where no LOI for the Endurance existed at all.

To the extent Defendants are seriously suggesting that it was appropriate to count pre-orders where there was not even an LOI, this argument warrants little attention, as it takes an obviously implausible view of how reasonable investors would have understood the pre-order totals.  Furthermore, this implausible view is absolutely foreclosed by Burns' own statements on *CNBC,* after the Hindenburg Report was published.  ¶206.  He downplayed his prior assertions that Lordstown pre-orders reflected "serious orders" by claiming that this just meant they had

13

"non-binding letter intents," (sic) and that "[t]hey're called pre-orders out in the kind of real world." *Id.* Thus, by Burns' own admission, at the very least pre-orders reflect LOIs. Defendants cannot now argue that they could just invent pre-orders where there were not corresponding LOIs.

**Second**, Defendants attempt to challenge materiality—essentially arguing that, even with the fabricated pre-orders, Lordstown may still have had some pre-orders backed by real LOIs. MtD at 19-20. At the motion to dismiss stage, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Bridgestone*, 399 F.3d at 681 (citing *Helwig*, 251 F.3d at 563).

The record already shows about 6,000 fake orders through the Workhorse LOIs, and many examples of additional fake orders, and it is reasonable to infer that the total number of fake orders was far greater than presently known. Even just looking at the 6,000 figure, the fake orders would amount to 22% of the total pre-orders touted at the time of the initial proxy and at least 6% at the time at the end of the Class Period. ¶¶249, 312. The fake pre-orders were not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Bridgestone*, 399 F.3d at 681.[4]

---

[4] Defendants also advance a frivolous argument that the pre-order counts may not have included the bogus orders, because Lordstown sometimes claimed "more than" a certain number of vehicles, which Defendants suggest means the fake orders might only have been uncounted as the excess orders above the quoted number. MtD at 19-20. This argument fails for at least eight reasons: (1) Defendants frequently cited the pre-order figure without the modifying "more than" language, claiming the number to be the actual or "approximate" pre-order count (*e.g.,* ¶¶251, 261, 263, 267, 270, 272, 280, 284, 286, 292, 294, 300, 302, 304, 306, 308, 310, 324); (2) two different CWs confirm that Lordstown counted *everything* in their supposed pre-order total, including the Workhorse LOIs (¶¶145, 156); (3) at the motion to dismiss stage, the facts must be construed in Plaintiffs' favor, and the exceedingly likely fact that the fake pre-orders were included in the pre-order count cannot be resolved in favor of Defendants' unfounded suggestion otherwise; (4) the evidence from CWs and Climb2Glory establish that the pre-orders were intended to secure investment, supporting the inference that the fake orders were included in the count (*see* Section III(A)(6)); (5) the special committee *admitted* that some pre-orders were improperly "included in the total number of pre-orders disclosed" (¶227); (6) the math does not work for Defendants' argument, because the pre-order count frequently increased, meaning that the bogus orders could only be consistently placed in the excess "more than" the quoted number (as Defendants claim), if Defendants precisely tracked the bogus orders and segregated them, a preposterous

14

Furthermore, the allegations of materiality are heightened here because: (a) the significance of the fake pre-orders is amplified by Defendants' other false statements; (b) Defendants' constant reference to the pre-order total in investor-facing communications demonstrates its importance; (c) the pre-orders were featured as a "Key Investment Highlight" in the proxy investor deck (¶387); (d) Lordstown's status as a pre-revenue company, meant that the pre-orders were of heightened importance; and (e) the sharp market reactions to the disclosures demonstrates materiality (¶435).

### (iii) *Defendants Misrepresented the Seriousness of the Pre-Orders*

Defendants created a false and misleading impression that Lordstown had received "serious orders" worth billions in forthcoming revenue due to "clear demand" from fleets. Defendants fostered this false impression through a variety of statements, including the following:

**First**, Defendants tied the pre-orders to future revenue. *E.g.*, ¶249 ("we have secured $1.4 billion of pre-orders" and "more than 27,000 pre-orders . . . representing over $1.4 billion of potential revenue"); ¶255 ("~$1.4bn of Existing Pre-Orders"); ¶261 (claiming pre-orders "revenue sufficient to cover 2021 production and into 2022"); ¶263 ("pre-orders . . . representing more than 1.4 billion dollars of potential revenue"); ¶265 (claiming $1.4 billion of pre-orders).

**Second**, Defendants claimed Lordstown had actually sold the trucks. *E.g.*, ¶294 ("to have that many commercial vehicles *sold* already is a big deal."); ¶261 ("Lordstown has received ~27k orders (average order size of ~300 trucks)"; ¶267 ("We got 27,000 orders"); ¶276 (Burns nodding in agreement as President Trump says "I heard the sales are great."); ¶284 ("We have pre-sold 40,000 of them to fleet customers"); ¶288 ("You can buy one now, but you can take delivery in

---

theory that is belied by CW statements and the special committees' findings; (7) the inclusion of fake orders as "Select Pre-Order Customers" in investor presentations, undercuts the idea that bogus pre-orders were not being counted, *e.g.,* ¶134 (listing Grid-X as "select pre-order customer" even though there was no LOI and Grid-X was not even familiar with Lordstown); and (8) the total number of bogus orders, including for example 6,000 from Workhorse LOIs, 1,000 from Innervations, 14,000 from E Squared, as well as many more already identified, amply support the inference that a material number of pre-orders were included in the publicly counted figure.

15

September"); ¶294 ("50,000 pre-sales already, all from fleets"); ¶298 ("our average order is about 500 trucks per order, so larger fleets."); ¶300 ("our average order size is about 500 trucks"); ¶302 ("we sell to fleets"); ¶324 ("we have pre-sold 100,000"); ¶326 ("[w]e have pre-sold 100,000").

**Third**, Defendants claimed the pre-orders were significant and a meaningful indicator of demand. *E.g.,* ¶253 ("[d]emand ***proven*** with pre-orders"); ¶259 ("Significant Pre-Orders Received"); ¶263 (Lordstown's partners are "evidencing their confidence . . . with significant pre-order activity . . . we now have garnered significant demand with pre-orders"); ¶265 ("clear lane of customers . . . evidenced by its $1.4 billion in pre-orders"); ¶274 ("40,000 per-orders . . . reiterates the demand in the fleet area"); ¶320 ("demand for the Endurance has been overwhelming . . . we have over 100,000 pre-orders"); ¶322 ("we have overwhelming demand . . . from commercial users for this vehicle – over a hundred thousand pre-orders"); ¶272 ("Lordstown believes [the pre-orders] demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers."); ¶280 (same); *cf.* ¶¶257, 105, 108, 258, 296, 304 (downplaying marketing and claiming pre-orders were all "incoming" and "just pent up demand").

**Fourth**, Lordstown touted the pre-orders and stated that the figure "does not capture interest the company has received from organizations that are ***not in position to be able to place pre-orders***, such as federal, state and municipal governments, and military fleets." ¶292; *e.g.,* ¶318 ("they ***can't*** do pre-orders. They're government entities."). By claiming government entities *could not* do pre-orders, Defendants were strongly conveying that the pre-orders were serious enough to be barred by government purchasing restrictions. ¶398. This lie is notable, because it could not plausibly have any cause besides intentional misrepresentation of the pre-orders.

16

**Fifth**, Burns directly claimed that the pre-orders were serious based on the "fleets" making the purchases.  In one interview he stated "these orders are very, very sticky . . . fleets generally take their business very, very seriously.  So I think they're very sticky."  ¶318.  On *CNBC*, Jim Cramer asked about how "solid" the 50,000 pre-orders were — inquiring, "These people are not going to be walking away?  They are committed?" —  and Burns responded:

> Right.  Yeah.  All of them.  When you order, I think our average order size is about 500 trucks at a time.  And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial.  So you've got to plan all the charging and everything.  So it's very serious orders.

¶300.

The impression created by these statements — that the pre-orders were "sticky" and "serious" and stood as a reliable indicator of upcoming revenue and fleet customer demand — was false and misleading because (a) the pre-orders were entirely non-binding and did not evidence any sort of commitment (¶206); (b) many of the supposed pre-orders weren't even based on LOIs, or were based on LOIs for an entirely different truck with an entirely different company (*see* Section III(A)(1)(ii)); (c) many of the LOIs were with entities that had made it clear to Lordstown that the LOIs did not evidence meaningful demand;[5] and (d) a large number of LOIs came from parties that could not plausibly place orders anywhere near the levels Lordstown was counting.

**Defendants' responses are meritless.**  Defendants leading response is that the Company disclosed in its SEC filings that the orders were non-binding.  MtD at 14-15.  The AC recognized this (¶395), and this disclosure did not cure the fraud.  There are two ways to look at this issue.

---

[5] *E.g.*, (1) Summit Petroleum was listed as a  "Select Pre-Order Customers," but it said it was a "friend of a friend" arrangement, and that they had said they would "be interested," but had not even committed to any particular number of trucks in their LOI (¶¶165-67); (2) Lordstown booked pre-orders from Catholic Cemeteries Association who had signed an LOI, but its representative has made it "very clear" that "he was not prepared to commit to anything" (¶¶171-73); and  (3) Lordstown booked pre-orders from Mike Albert Fleet Solutions, even though it made it "very clear" to Lordstown that it was just signing up for "a chance to order vehicles," if its customers placed orders.  (¶179).

Through one lens, the statements could be considered in isolation, and many of them are undeniably literally false. For example, Defendants repeatedly claimed that they had "orders" or "sales," (*e.g.*, ¶¶261, 276), or that you could "buy one now," (¶288). In fact, adding the context Defendants point to — that they disclosed the pre-orders were non-binding — does nothing to cure this literal falsity. Defendants' argument would seem to be that they admitted they did not have "orders" by disclosing that the deals were not a "binding" obligation. But this does not track, because plenty of real "orders" are non-binding — *e.g.*, an obligation to receive vehicles upon delivery if no cancellation is first made is both a real "order" and "non-binding."

Through the other lens, the statements must be considered in context to determine whether they were misleading. Defendants endorse this approach, stating that whether a statement is false or misleading "depends on context." MtD at 14-16 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)). However, while recognizing that context matters, Defendants ironically ignore *all context* except their disclosure that the orders were "non-binding" and fail to recognize the statements in this Section misleadingly indicated that the pre-orders were "serious" and "sticky" and showed "proven demand," when this was untrue. *See MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*, 2009 WL 4506418, at *7 (E.D. Mich. Nov. 30, 2009) ("a court must not 'pluck' disclosures out of their context and analyze their truth in a vacuum, but must look at the statements in light of the circumstances and events that create the context in which they were made"); *Lubbers v. Flagstar Bancorp. Inc.,* 162 F. Supp. 3d 571, 578 (E.D. Mich. 2016) ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.") (citation omitted); *SEC v. Fitzgerald*, 135 F. Supp. 2d 992, 1028 (N.D. Cal. 2001) ("defendant's statements must be viewed as part of a mosaic to see if those statements, in the aggregate, created a misleading impression.").

18

That Defendants' statements were misleading is highlighted by the strong market reaction to the disclosures of the truth.  Not only did the stock price fall a dramatic 16.54% after the Hindenburg Report (¶200), and continued to drop on subsequent disclosures (¶201), but public commentary firmly demonstrated that investors were deceived.  For example, *CNBC's* Jim Cramer said the report was "gut wrenching" because he had asked Burns "how serious the orders were for the company?" and Burns had said, "they're very serious," but after the Hindenburg Report came out, Burns claimed he never said they had orders, to which Cramer said: "So to me, I thought it was like the prosecution rests.  You don't even need to have a discussion."  ¶207.

Defendants also improperly seek judicial notice to raise the supposed factual point that pre-orders are commonly used in the industry and are supposedly often non-binding.  This argument cannot be considered at this stage.  But even if it could be properly raised,  it has no significance given that the issue was not "binding" vs. "non-binding," but whether Defendants' statements created a misleading impression about the pre-orders.

Defendants claim that ***some*** of the statements are opinions *e.g.*, Lordstown "believe[]" that the pre-orders "demonstrate clear demand" (¶¶272, 280).  MtD 20-23.  Defendants correctly explain that opinion statements are actionable when Plaintiff has pled (1) facts sufficient to show that the speaker did not actually hold the stated belief at the time the statement was made; ***or*** (2) "particular  (and material) facts going to the basis for the issuer's opinion . . . whose omission makes  the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  MtD at 21 (quoting *Omnicare*, 575 U.S. at 184-85, 194).

Here, any opinion statement is actionable under both prongs.  As explained above, each statement conveyed that the pre-orders were substantial indicators of demand, when this was untrue.  As explained in Section III(A)(1)(i), the entire purpose of the pre-orders, and touting them,

19

was to drive investment in Lordstown and, as explained in Section III(A)(3), Defendants acted with scienter. These allegations provide "sufficient facts" to establish subjective falsity under *Omnicare's* first prong. *Omnicare's* second prong is also met given that the statements about the pre-orders were clearly misleading given the undisclosed truth about the inclusion of fake orders not even backed by an LOI for the Endurance, that supposed orders came from implausible sources (like "influencers"), and that the LOIs did not evidence any commitment.

Defendants claim that *some* statements are puffery (MtD at 21-22), but none of the statements are "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Louisiana Sheriffs' Pens. & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *7 (S.D. Ohio Sept. 27, 2021). Rather, the information relates to the veracity of a number that Defendants touted as an important figure for the valuation of Lordstown. *E.g.,* ¶387 (referring to pre-orders as "key investment highlight"). As *Louisiana Sheriffs* stated, "context . . . is essential in determining whether a statement is puffery" and statements that "appear to be made to reassure" investors as to a material piece of information are not puffery. 2021 WL 4397946, at *7.

Defendants also claim that *some* of the statements are forward looking — *e.g.*, "it's gonna take us a couple of years to fulfill that demand" — and therefore covered by the PSLRA safe harbor. MtD at 22. The safe harbor does not apply to any statement made prior to the Merger, as explained in Section III(A)(2). While Defendants identify some statements that mention future events, that "does not automatically make them forward-looking statements," rather the critical inquiry is whether the statements "veracity can be determined at the time the statement is made." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (citation omitted). Here, each statement misrepresented the present condition of the pre-orders. The falsity of the

20

statements did not depend on whether people *later* actually made orders, but instead depended on the deceptive nature of the way the pre-orders were depicted at the time the statements were made.

**(2)     Defendants Misrepresented Lordstown's Production Capabilities**

While Defendants were misrepresenting the pre-orders, they were also defrauding investors about Lordstown's ability to actually begin producing the trucks.

**First**, Defendants falsely claimed that Lordstown would begin delivering cars in September 2021.  *E.g.*, ¶346 (Lordstown can be "assured of production by September"); ¶348 ("September deliveries start"); ¶352 ("the Endurance, is coming out in September."); ¶362 ("Production starts in September"); ¶¶346, 354, 356, 358, 360, 364, (claiming to be on track for September production); ¶¶330, 332, 344 (claiming Lordstown was near production ready).

The truth about Lordstown's production capabilities — that it was nowhere near production ready, that it faced enormous obstacles making a September 2021 launch date exceptionally unlikely, and that it would need far more financing to reach production — first began to surface through the Hindenburg Report.  The report disclosed that: (a) Lordstown's first street test of the Endurance, led to a spectacular fire and total destruction of the vehicle; (b) Lordstown was relying on a tiny Slovenian company to produce the central component of the truck (the hub motors), which company did not have capacity to make the number of motors Lordstown would require if it entered production; (c) in mid-January Lordstown had dramatically changed its production design, shifting from a plastic exterior to an aluminum one; (d) Lordstown had not completed necessary governmental testing and validation for the vehicle, which requires months of cold weather, durability, and Federal Motor Vehicle testing; and (e) and that all the battery packs were being assembled by *hand* and that it would take 5-7 months to even *receive* the parts needed to manufacture the batteries, not including installation and necessary testing.  ¶¶186-191.

21

The AC further contextualized these allegations through analysis of an automotive industry expert with over forty years of experience.  *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159-60 (N.D. Cal. 2015) (crediting plaintiff's expert at pleading stage regarding timeline of production; finding falsity).  The expert explained that a vehicle launch takes 32-36 months, and that the steps to release a vehicle need to be performed sequentially, not simultaneously.  ¶194.[6]  The Hindenburg Report showed that Lordstown was still at the early stages of this process.  For example, the change in design from a plastic exterior to an aluminum one, meant that Lordstown was still in the early stage of "designing the vehicle body" and it would not complete the remaining steps by September 2021.  CW-3 corroborated that Lordstown was behind schedule, describing meetings while the Merger was pending, where executives said Lordstown was "running way behind," with software "running severely behind."  ¶¶198-99.

As explained above, throughout the Class Period Lordstown was never on a trajectory to begin production by September 2021, meaning these statements were both literally false and omitted to disclose facts that made the assurances of a Spring start of production misleading.  On May 24, 2021, Lordstown slashed its production targets by 50%, meaning it would not be going into full production on schedule.  ¶¶214-15.  On June 8, 2021, Lordstown confirmed it was nowhere near production, noting it would need "significant" capital to begin production.  ¶218.  September has long since come and gone and Lordstown has yet to produce a vehicle.

**Second**, Defendants falsely stated that Lordstown would not need any post-Merger financing.  *E.g.*, ¶338 (capital provided through Merger "will fully fund Lordstown's current business plan and position the company to achieve positive EBITDA"); ¶334 ("[n]o additional

---

[6] The expert explained the relevant steps as: "(1) designing the vehicle body in a compliant fashion, which would take over a year;  (2) fabrication and tuning of the components, which would take over half a year; (3) tool delivery and assembly, which would take over a month; verification and vehicle validation, which would take about four months; and (4) tooling trial and certification, which would take almost 4 months."  ¶194.

capital requirements expected between now and going to market to achieve positive cash flow"); ¶342 (Merger is "the final chapter where we get the necessary resources to be able to bring" the Endurance to market); ¶344 (Merger provided "more than enough funding" to reach production).

These statements were misleading for the same reasons it was misleading to tout the September production start — the early state of the development of the Endurance and setbacks meant reaching production would be more costly and time consuming than Defendants claimed. However, these statements are qualitatively more outrageous, because they indicated *not only* that Lordstown would begin production on schedule, but that Lordstown was so far along that it would not just begin production with then-current funding, but also reach profitability. Notably, less than eight months after the Merger, and without disclosure of any major unforeseen events, Lordstown disclosed it was at risk of insolvency and would need "significant capital" to begin production. Lordstown raised another $400 million, and yet it disclosed it *still* was at risk of folding as a "going concern," further emphasizing the absurdity of Defendants' assurances that the Merger provided "more than enough funding" (¶344) to begin production.

**Third**, Defendants omitted to disclose the significant risks that made it likely it would miss its September 2021 production date and would need additional capital to begin production, as required by regulation. ¶¶366-374. Defendants cite a decades old case noting some judicial reluctance to imposing liability from such regulations (MtD at 26-28), but more recent cases find omissions like these to be actionable. *See Stratte-McClure v. Morgan Stanley*, 2015 WL 136312 (2d Cir. Jan 12, 2015). The AC adequately alleges Defendants' knowledge. *See* Section III(A)(3).

**Defendants' responses are meritless**. Defendants argue that their statements merely shared their opinions. A statement that "expresses certainty about a thing" is a statement of fact not opinion. *Omnicare,* 575 U.S. at 183. Defendants' statements were ordinary factual assertions.

23

For example, Burns flat out asserted that "**September deliveries start**" and that this was "assured." ¶¶346, 348.  Similarly, Defendants stated that Lordstown had sufficient funding as a plain fact.

Even if the statements were opinions, *Omnicare* dictates that statements that do not "fairly align[] with the information in the [statement maker's] possession at the time," like the ones here, are still fraudulent. 575 U.S. at 189; *see In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 853-54 (S.D. Ohio 2016); *In re Nat'l Century Fin. Ents, Inc., Inv. Lit.*, 580 F. Supp. 2d 630, 639 (S.D. Ohio 2008) (opinion statements actionable if "opinion is not factually well-grounded"); *Hatamian*, 87 F. Supp. 3d at 1160 ("on track" statements actionable because they "created an impression of a state of affairs that differed in a material way from the ones that actually existed").

Defendants also incorrectly argue that these statements are protected by the PSLRA safe harbor.  MtD at 24-25.  The safe harbor does not apply to statements before the Merger closed, because: (1) as Defendants concede, Burns was not acting on behalf of an issuer (¶441, MtD at 23 n.42); (2) DPHC was a blank check company and offered securities in the Merger, and thus the safe harbor does not apply to statements made in the context of the Merger (¶442);[7] and (3) the Merger was an IPO and as such the safe harbor does not apply.[8]  Additionally, while some statements concerned the future, they were not "forward looking" because they were false when made — Lordstown did not have financing to begin production and was not on track for September 2021 production.  *Dougherty,* 905 F.3d at 983 (statement not "forward looking" if its "veracity can be determined at the time [it was] made").

---

[7] Defendants now claim DPHC was not a blank check company, however, Defendants publicly stated that DPHC "was incorporated . . . as a blank check company."  Lordstown S-1 Registration Statement, at 44 (July 30, 2021), https://www.sec.gov/Archives/edgar/data/1759546/000110465921098249/tm2123645-1_s1.htm.

[8] Defendants correctly note that the Merger was not literally the initial offering of DPHC securities.  However, Congress left the term initial public offering undefined so that it could be interpreted flexibly, and as the SEC Director of Corporate Finance recently explained "it is . . . commonly understood that it is the de-SPAC [merger] – and not the initial offering by the SPAC – that is the transaction in which a private operating company . . . , engages in its initial public offering." John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws* (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

Even if the statements were "forward looking", such statements are actionable if they are (1) not "accompanied by meaningful cautionary language" and (2) there is "actual knowledge of their false or misleading nature." *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). The statements after the Merger were nearly all made to the media without any cautionary language. *E.g.,* ¶¶342, 346, 352, 360, 362. Furthermore, "cautionary language cannot be 'meaningful' . . . if it is misleading in light of historical facts," that "were established at the time the statement was made," because "such statements are neither significant nor of useful quality or purpose." *Weiner v. Tivity Health, Inc*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019) (citation omitted). Here, the purported language quoted by Defendants (MtD at 24-25) does nothing to "satisfy Defendants' obligation to warn investors of risks and negatives," *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685 (E.D. Mich. 2004), were "inconsistent with the historical facts," *Weiner*, 365 F. Supp. 3d at 912, and did not convey that the risks had ***already materialized***. *See Compuware*, 301 F. Supp. 2d at 685; *compare* MtD at 24 n.46 *with* AC ¶¶186-99. Finally, Defendants knew their statements were misleading. *See* Section III(A)(3).

### (3)    Plaintiffs Adequately Allege Scienter

To plead PSLRA fraud claims, Plaintiffs must allege a "strong inference" of scienter, but this does not require "smoking-gun" proof. *Tellabs,* 551 U.S. at 313-14, 323-24. Circumstantial evidence is sufficient. *Id.* To assess these pleadings, courts (i) "accept all factual allegations in the complaint as true," (ii) "consider the complaint in its entirety," and (iii) determine "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter." *Dougherty v. Esperion Therapeutics, Inc*., 905 F.3d 971, 979-80 (6th Cir. 2018).

The requisite "strong inference" refers to an inference of intent, knowledge, or recklessness. *Id.* It must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (ties go to the plaintiff). *Id.* The Supreme Court illustrated the

25

standard with a hypothetical, stating that if a sculpture was "stolen from a room to which only A and B had access," even these sparse facts would support a "strong inference" that B was the thief. *Id.* at 323-324.  The AC pled many mutually reinforcing facts supporting the inference of scienter.

**First**, the AC pled specific facts establishing Defendants knew or recklessly disregarded that their statements about the pre-orders were false and misleading.  *See Dougherty*, 905 F.3d at 979 ("divergence between internal reports and external statements on the same subject," which the court described as the key factor to a finding of scienter).

CW-2 explained that Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia."  ¶¶156, 393.  CW-2 stated that he "*talked with Steve frequently*," and that Burns "*knew every single order*" that was counted as a pre-order, *as well as the customers* behind them.[9]  ¶156.  Properly accepting this allegation as true (*see Dougherty*, 905 F.3d at 979-80) there can be no doubt as to scienter, as the pre-orders were clearly not from fleet customers, based on legitimate LOIs for the Endurance, or reasonably called "serious," which Burns obviously knew, given that he knew each supposed pre-order and the customers behind them.

CW-2 explained that, upon signing up the LOI with Innervations, Lordstown employees had understood Innervations had no operating history, and that Lordstown's spokesperson Ryan Halley had indicated they should not publish a press release counting the Innervations deal as pre-orders because of "how weak it was," that a member of the sales team has explained to Burns how sketchy the LOI was and strongly advised against promoting Lordstown based on the deal, but that Burns nevertheless chose to count the Innervations deal in the pre-order total.  ¶157.

---

[9] Defendants note that CW-1 left shortly before the Merger was announced, and cite *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 996 (9th Cir. 2009), to argue this invalidates the witness. But *Zucco* rejected the witness because their knowledge was only "second hand," and regardless CW-1's information is especially relevant because (1) the pre-orders from his time at Lordstown were still being counted; (2) it indicates a practice by Burns, which reasonable people would expect continued, and (3) it is corroborated by CW-2 and other allegations of scienter.

CW-1 explained that the internal sales team at Lordstown and Defendant Flannery had access to and could edit a shared Excel file that was used to keep track of letters of intent LOIs/pre-orders.  ¶¶145-50.  CW-1 said that Flannery regularly said that he had spoken with former CEO Steve Burns and provided him with updates about the pre-orders.  *Id.* CW-1 noted that he could not see how Burns would not have been aware of the practices surrounding the LOIs given his communications with Flannery who knew everything related to sales at that time.  *Id.*

Additionally, Burns himself stated, "I know what it takes to get them," claiming to be well informed of the pre-order customers.  ¶318.  As to the pre-orders Lordstown counted from those who had LOIs with Workhorse, there can be no possible doubt that Burns knew that these LOI's were for an entirely different truck,[10] especially given the information provided by CW-1.

**Second**, scienter is supported by Lordstown's receipt of the SEC subpoena.  Lordstown received the subpoena on February 17, 2021, and now admits it related to the same allegations raised by this AC.  ¶407.  Yet, Burns continued to tout the same misstatements.  ¶324.  This truly is smoking-gun evidence, because to the extent Defendants did not already understand the deceptive nature of Burns' statements, the SEC inquiry clearly alerted them to this risk.  *See Cosby v. KPMG, LLP*, 2018 WL 3723712, at *5 (E.D. Tenn. Aug. 2, 2018) (notice of SEC inquiry was a "red flag" that supported the finding of scienter); *In re Health Mgmt., Inc. Secs. Litig.,* 970 F. Supp. 192, 203 (E.D.N.Y.1997) (SEC investigation served as a red flag supporting scienter).

Defendants respond to the separate issue of whether the existence of the investigations strengthen the inference of scienter (MtD at 32), but ***ignore*** this point: the subpoena provided notice of the wrongdoing.  Given the strong allegations of falsity (*see* Section III(A)(1)-(2)), there

---

[10] Notably the deal whereby Workhorse transferred its LOIs was publicly disclosed – Burns cannot deny knowledge of these LOI.  ¶72.  While Burns knew these LOI's were being counted (¶145-50, 156), the investing public did not, and it would have been reasonable for investors to suppose that Lordstown would use the Workhorse LOIs as a lead list, but not that they would simply be counted as pre-orders for the Endurance.

can be no doubt that upon receiving the subpoena, Defendants' statements were at least reckless and their continued willingness to make false statements evidenced their scienter more generally.

**Third**, scienter is supported by Defendants' motive to salvage the insolvent startup. Lordstown was out of cash before the Merger (¶¶376-80), and misrepresentations were used to raise desperately needed cash. *See* Section III(A)(1)(i). The fraud was critical to raising funds, and raising those funds was critical to Defendants keeping their lucrative positions as executives and maintaining the upside offered by the "fake it till you make it" fraud.[11]

Defendants err in claiming this motive is less relevant because it is "common to all corporations." MtD at 30. The Sixth Circuit has expressly recognized "the self-interested motivation of defendants in the form of saving their salaries or jobs," as a motive that weighs in favor of scienter. *See Dougherty*, 905 F.3d at 979 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)). Here, the motive goes well beyond the ordinary motive to present good corporate performance for long term job prospects, due to both Burns' ownership in Lordstown's stock and due to the unique facts that made Defendants' fraud imminently relevant to the financing and financial viability of Lordstown. Not every corporation is facing insolvency, fewer still try to cure that insolvency through a take-public merger, and fewer still rely so heavily on just a few false narratives to pitch that merger. Courts recognize facts like these as a significant motive. *E.g., In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1029 (N.D. Ohio 2000) (motive supported scienter where corporation and "its officers were in a very difficult position, facing unusual pressures to perform"); *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (affirming multiple

---

[11] Defendants comment that continued investment into Lordstown's operations proves Defendants believed in the project. MtD at 30. This is mere misdirection. If a contractor falsely claims to have roofing experience this is fraudulent regardless of whether their ploy involves taking your money and disappearing, or buying shingles and hoping (despite the odds) of doing passable work. Here too, Burns' fraud ultimately misrepresented the odds of Lordstown's success, which was fraudulent, even if (despite those odds) his ideal outcome was for it to succeed.

28

opinions that the need to complete a "crucial" merger for the future of the company provides motive and is distinguishable from "routine" desire to access capital markets funding); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at \*57 (M.D. Tenn. Mar. 31, 2009) (scienter supported by motive to maintain appearance as "a financially viable company in which to invest").

In addition, Defendants Schmidt, Rodriguez, Brown, and Post sold large blocks of stock during the Class Period — including after Lordstown's catastrophic road test — which is recognized as strong evidence of scienter.  ¶¶423-25; *Dougherty*, 905 F.3d at 979 (scienter supported by "insider trading at a suspicious time or in an unusual amount").

Defendants argue that the lack of stock sales by Defendant Burns cuts against a finding of scienter.  MtD at 28-30.  As the AC explained, Burns was subject to a lockup that restricted his ability to sell for a period after the Merger, as is standard industry practice in mergers and IPOs. *See In re Facebook, Inc., IPO Sec. and Deriv. Litig.*, 986 F. Supp. 2d 544, 553 (S.D.N.Y. 2014); *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 131 (2d Cir. 2016); ¶423.  Additionally, the lockup further explains why Burns attempted to maintain the fraud even after the Merger closed.  Finally, the absence of sales cannot "negate the inference of scienter."  *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1255 (N.D. Cal. 2008).

**Fourth**, by choosing to repeatedly make specific public assertions it is fair to infer that Defendants procured basic information about the truth (or falsity) of their statements, or were deliberately reckless in making those statements.  *See, e.g.*, *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (finding that because defendant addressed particular issue in statement, that it was "unlikely that she was not aware of it").  Thus, for example, it is fair to assume that Defendants either knew that Lordstown's orders were not from fleets, or to conclude Defendants were deliberately reckless in claiming those orders were from fleets without inquiring into this issue.

29

*See South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) ("If [Defendants] did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all.").

**Fifth**, Defendants' most obvious outright lies support the inference of scienter more generally, because they establish a disregard for truth.  For example, on November 17, 2020, Burns appeared on *CNBC* claiming "very serious orders," but after the Hindenburg Report, he appeared on *CNBC* again and claimed "we've never said we had orders."  ¶¶206, 396.  This can *only* be understood as a lie, and it is reasonable to infer that a CEO caught lying once, was also intentionally lying in the other instances when he made false statements on that same subject.  *See* ¶¶249, 252, 261, 263, 274, 278, 284, 290, 292, 298, 310, 312, 318, 334, 348 (other examples of blatant lies).

**Sixth**, the "resignations" of Burns and Rodriguez support a finding of scienter, because these resignations — announced the same day the committee found "issues regarding the accuracy of certain statements regarding the Company's pre-orders" — reflected their wrongdoing.[12]  *See Frank v. Dana Corp.,* 649 F. Supp. 2d 729, 741 (N.D. Ohio 2009) ("A resignation more strongly supports scienter where plaintiff pleads facts indicating that the resignation 'should be viewed with unusual suspicion.'"), *rev'd*, 646 F.3d 954 (6th Cir. 2011) (finding scienter on appeal).  Defendants cite *Zucco,* but that case merely reaffirmed that resignations must be "accompanied by suspicious circumstances" to support scienter, as they were here.  552 F.3d at 1002.

**Seventh,** the SEC and DOJ investigations into the same allegations at issue in this Action strengthen the inference of scienter.  Defendants assert, without citation, that such investigations

---

[12] Defendants try to downplay these resignations, claiming they merely reflected management change as the company transitioned to production (MtD at 32, but this makes no sense given (a) the timing of the resignations, which were announced the same day the committee announced "issues regarding the accuracy of certain statements regarding the Company's pre-orders" (¶¶224-25); (b) Defendant Schmidt's admission at an industry event the following day, that the resignations were, at least partially, due to the investigation (¶403); (c) that Burns resigned as both CEO and chairman, but resignation from his role as chairman (which did not entail daily management of the company) did not serve the goal of having a better CEO for production; (d) that Lordstown waited months to replace these key figures.

30

are irrelevant, however courts in this circuit credit government investigations as strengthening the holistic *Tellabs* scienter analysis.  *See Frank¸* 646 F.3d at 961 (finding scienter on holistic analysis of allegations that included SEC investigation); *Chamberlain v. Reddy Ice Holdings, Inc.,* 757 F. Supp. 2d 683, 713 n.8 (E.D. Mich. 2010) (investigations are "not irrelevant to the analysis.").

**Eighth**, Defendants' disregard for lawfulness supports the inference of scienter.  In just its short operating history, Lordstown has (1) been sued for alleged corporate espionage (¶415-16); (2) announced a material weakness in internal controls (¶421); (3) failed to timely pay property taxes (¶419); (4) been sued for unpaid utility bills (¶419); and (5) been threatened with delisting due to delinquent public filings (¶420).  Defendants ignore these allegations, but together they evidence a troubling pattern of illegality that weighs in favor of the inference of their unlawful fraudulent activity here.  *Cf. Chamberlain*, 757 F. Supp. 2d at 710 ("Allegations that a defendant engaged in 'deliberately illegal behavior' can give rise to a strong inference of scienter.").

**Ninth**, the central importance of the Endurance to Lordstown supports the inference of scienter.  *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (stating that "it would be absurd to suggest that Avon's senior management was unaware of a delinquency problem in the company's single largest market").  Here, likewise, it "would be absurd" to suggest that Lordstown's executives were unaware of the true nature of the Endurance pre-orders and their production issues, given the singular importance of the Endurance orders to Lordstown.  *See Frank,* 646 F.3d at 962 (crediting scienter based on inference that, given defendants' roles and public statements, they likely knew the truth).

Defendants attempt to over-complicate this analysis by analyzing the "core operations doctrine"– which, when applied, broadly tasks executives with knowledge of all core operations. MtD at 32-33, n.68.  Here, while the doctrine would support scienter, the relevant inference is

31

more benign and the core operations framework is unneeded; a simple common sense inference (consistent with the CW testimony) that Defendants knew the true status of production and knew the basic facts about those being counted for pre-orders is sufficient to find scienter. *Stein v. U.S. Xpress Enters., Inc.*, 2020 WL 3584800, at *38 (E.D. Tenn. June 30, 2020) (crediting scienter where Defendants' knowledge of undisclosed issue "could not plausibly" be doubted).

**Conclusion Regarding Scienter**.  The comparative inquiry here weighs in Plaintiffs' favor: the notion that Defendants were simply innocently ignorant of the basic facts about Lordstown's operations that rendered their statements misleading, is far less plausible than the inference that they were at least reckless, given the allegations that: (1)  Defendants knew the truth; (2) that misrepresentations continued after receipt of the SEC subpoena; (3) Defendants' had motive to defraud; (4) Defendants' repeatedly spoke on the relevant subjects; (5) Defendants evidenced a willingness to outright lies to investors; (6) Burns and Rodriguez were terminated for the fraud; (7) the government investigations are ongoing; (8) Defendants' repeatedly acted with disregard for the law; and (9) the Endurance was of central importance to Lordstown.

### (4)      Plaintiffs Adequately Allege Loss Causation

At the pleading stage, "a plaintiff need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).  Plaintiffs allege that the fraud was revealed to the market through a series of partial corrective disclosures, which each revealed previously-concealed, material, adverse information, and caused prices of Lordstown's securities to fall—damaging investors.  ¶¶432-437.

Defendants assert the Hindenburg Report was not a corrective disclosure because it "merely used innuendo" based on public information.  MtD at 34.  The Hindenburg Report — which has been corroborated by investigation of counsel and Lordstown's admissions (¶¶118, 142-

32

99, 224-29) — disclosed facts based on interviews with former Lordstown employees, business partners, and purported customers. Defendants' citation of *TransDigm* is misplaced because there the short report was based on "public information" which had been "previously reported" and "discussed extensively." *See* MtD at 34-35 (citing *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740 (N.D. Ohio 2020)).[13] Courts routinely accept short reports as corrective disclosures. *E.g., Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020); *Hurst v. Enphase Energy, Inc.*, 2021 WL 3633837, at *3 (N.D. Cal. Aug. 17, 2021; *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, at *16 (E.D.N.Y. June 28, 2021).

Defendants cannot escape liability based on the form of the corrective disclosure. *See, e.g., Boluka Garment Co., Ltd. v. Canaan Inc.*, 2021 WL 2853284, at *3 (S.D.N.Y. July 8, 2021) (accepting short report as corrective disclosure, and holding "there is no requirement that a corrective disclosure come from a particular source, take a particular form"). If courts required corrective disclosures to take a particular form (or disregarded short reports)[14] fraudsters could inoculate themselves after accomplishing their goals, by leaking the fraud through rejected forms. *See In re Winstar Commc'ns.*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) ("defendant should not be rewarded . . . simply because the information revealing the alleged fraud was a third party's opinion, notwithstanding the fact such opinion is proven to be true.").

---

[13] The other out of circuit cases cited by Defendants are similarly inapposite. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020), *cert. denied sub nom. BofI Holding, Inc. v. Houston Mun. Emps. Pension Sys.*, 142 S. Ct. 71 (2021) (anonymous blog posts where "all of the underlying data was publicly available").

[14] While Defendants vaguely attack short sellers, the business model of short sellers is not at issue here. Any issue about the reliability of short reports is primarily an issue of falsity, and the report here has been substantially proven and corroborated. *See* ¶¶118, 142-99, 224-29. Loss causation is concerned with whether the fraud was a proximate cause of the loss, not whether the corrective event perfectly disclosed the entire fraud. Moreover, while controversial, short reports are recognized as playing a role in enhancing market efficiency. *See* Joanna Lee, *Activist Short Sellers: Market Manipulators or Market Protectors?*, REVIEW OF BANKING AND FINANCIAL LAW 274, 281 (short sellers "have uncovered serious fraud perpetuated by the companies, thereby aiding the market to adjust over-inflated share prices).

Defendants also make the threadbare assertion that if the Hindenburg Report is a corrective disclosure "then the class period would need to end there." MtD at 35. Defendants do not explain why the five partial corrective disclosures following the Hindenburg Report did not reveal new information. ¶¶432-37. Courts routinely accept partial corrective disclosures like those here. *E.g., In re Questcor Sec. Litig.*, 2013 WL 5486762, at *23 (C.D. Cal. Oct. 1, 2013) (loss causation pleaded for both release of short report and disclosure of related SEC investigation; collecting cases); *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *10 (C.D. Cal. Mar. 31, 2021) (loss causation for short report, related admissions, and SEC investigation). "[T]hese disclosures—and the speed at which [Lordstown's] share price fell after them—make it at least plausible that the disclosures had something to do with" investors' losses. *Norfolk*, 877 F.3d at 696.

### (5) Plaintiffs Adequately Allege Reliance

Plaintiffs invoke the fraud on the market theory, which holds that plaintiffs are entitled to a presumption of reliance when the relevant securities trade in an efficient market.[15] *Basic Inc. v. Levinson,* 485 U.S. 224, 246–47 (1988). The precise degree of market efficiency is "largely beside the point" because "all that *Basic* requires," is that the market be sufficiently developed for "false statements [to] affect it." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014). Securities listed on a major exchange, like those here, trade in an efficient market almost without exception. *See In re Comp. Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 120 (E.D. Va. 2012); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 431 (D. Ariz. 2013).

---

[15] Plaintiffs also invoke the *Affiliated Ute* presumption. ¶429; *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Under the *Affiliated Ute* presumption where plaintiffs allege "an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017). Defendants do not address this allegation and, therefore, concede its applicability at this stage. *Kelsey,* 125 F.3d at 995–96.

34

Defendants raise premature arguments regarding the factual issue of whether Lordstown traded efficiently.  "Proof of that sort is a matter for trial."  *Basic*, 485 U.S. at 249 n.29;  *In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 763 (N.D. Ohio 2003) ("plaintiffs need not prove that the market is efficient at the pleading stage" and only need to plead efficiency); *Hull v. Glob. Digital Sols., Inc.*, 2018 WL 4380999, at *6 (D.N.J. Sept. 14, 2018) (similar); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 473 n.9 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 784 (2d Cir. 2015) (market efficiency is a "question of fact . . . not meant to be answered on a motion to dismiss").

Defendants assert that Plaintiffs "fail to plead any facts demonstrating that the market for DPHC stock (1) itself was efficient *and* (2) was efficient *with respect to information about Lordstown*."  MtD at 36.  But, Plaintiffs allege with specificity many facts supporting a finding of market efficiency under accepted standards (*i.e.*, the factors from the seminal cases *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)), including (i) trading on NASDAQ; (ii) approximately 35 million shares outstanding and weekly volume of 20 million; (iii) low average bid-ask spread at around 8 cents per share; (iv) filing of SEC reports; (v) communication with investors; (vi) prompt market reactions to material information; and (vii) extensive news and investor publications coverage.  ¶430.

### (6)      Defendants Engaged in an Actionable Fraudulent Scheme

Defendants led a fraudulent scheme to manipulate investors by first driving Lordstown to collect pre-orders, which in the words of CW-2 were "smoke and mirrors" (¶156, 393), and then publicly touting the pre-orders to drive investment at unreasonably high prices.

According to Lordstown's third-party contractor Climb2Glory, it was hired while Lordstown was "in the middle of a significant effort to raise funds" and "*[f]undraising efforts were linked directly*" to pre-orders: "the more pre-orders achieved, the greater the *confidence* levels of prospective investors."  ¶385; ¶386 ("our role was to help *influence and acquire interest*

*that would lead to investment*.").  CW-1 had multiple conversations per week with Defendant Flannery and recalled that Flannery explicitly made the point that the LOIs were for generating investment interest and recounted pressure to meet benchmarks of pre-orders solely for Lordstown's investment timeline.  ¶¶143, 148.  CW-2 described "desperation" around reaching pre-order totals fueled by the effort to get funding, adding that the purpose of the pre-orders was to generate buzz and that that was "all it was for."  ¶¶154, 391.  CW-2 advised that the pressure related to sales and the LOIs came directly from Defendants Flannery and Burns.  ¶¶156, 391.

Defendants' conduct procuring and touting the pre-orders was a fraudulent scheme under Rule 10b-5(a)/(c).  ¶466.  Defendants' response points to their flawed defense of the misrepresentations.  *See* MtD at 37; Sections III(A)(1)-(2).  However, to plead an actionable scheme, plaintiffs must plead "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants," but not "to the same degree of specificity" as in misrepresentation claims.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 102 (2d Cir. 2007).  A "scheme" is just a deceptive "plan" and does not depend on proving misstatements.  *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1101-02 (2019); *Hawaii Ironworkers Annuity Tr. Fund v. Cole,* 2011 WL 3862206, at *6-7 (N.D. Ohio Sept. 1, 2011), *as amended* (Sept. 7, 2011) ("[C]onduct itself can be deceptive") (citation omitted); *Benzon v. Morgan Stanley Dist., Inc.,* 420 F.3d 598, 610 (6th Cir. 2005) (similar); *e.g., S.E.C. v. China Ne. Petro. Holdings Ltd.*, 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014) (finding scheme to raise money under false pretenses to be actionable).

### B.    Plaintiffs Adequately Pled Claims Under Section 14(a) of the Exchange Act

Section 14(a) claims require (1) material misrepresentations or omissions in a proxy; (2) negligence; (3) loss causation; (4) transaction causation.  *See Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *6 (S.D. Ohio May 11, 2021).  Defendants only challenge the first three elements.  MtD at 38-39.

36

**First**, Defendants Burns, Flannery,[16] Hamamoto, LTM and Lordstown EV Corp. violated §14(a) by issuing misleading proxy materials. ¶¶469-482.[17] Defendants challenges to falsity fail for the same reasons stated in Section III(A)(1)-(2), and their additional §14(a) cases add nothing to the analysis. MtD at 38-39; *In re Almost Fam. Inc. Sec. Litig.,* 2020 WL 695654, at *4 (W.D. Ky. Feb. 11, 2020) (unlike here, finding no duty to disclose certain financials); *Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*, 2012 WL 4958561, at *9 (N.D. Ohio Oct. 16, 2012) (unlike here, non-inclusion of information about M&A inactionable where plaintiff did not identify any statement rendered misleading); *Laborers' Local No. 231 Pension Fund v. Pharmerica Corp.,* 2019 WL 4645583, at *12 (W.D. Ky. Sept. 24, 2019) (unlike here, non-disclosure of certain "specific details" in "thorough disclosures" not misleading).

**Second**, Plaintiffs adequately alleged that Defendants acted with at least negligence. Defendants concede that negligence is sufficient. MtD at 38; *see Jones*, 2021 WL 1890490, at *12 (S.D. Ohio May 11, 2021). Defendants argue the pleading of negligence must meet heightened standards imposed by the PSLRA to allegations of Defendants' "state of mind." MtD at 10-11. However, "[n]egligence does not involve [a] state of mind," and the PSLRA's "strong inference" requirement is not implicated. *In re King Pharms., Inc.,* 2004 WL 5043539, at *4 (E.D. Tenn. Aug. 11, 2004); *Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) ("negligence is not a state of mind [but rather] a failure, whether conscious or even unavoidable . . . to come up to the specified standard of care"); *Fargo v. City of San Juan Bautista*, 857 F.2d 638, 642 (9th Cir. 1988) (similar). "As a matter of law, the preparation of a proxy . . . containing . . . misleading statements . . . is

---

[16] Plaintiffs allege that Flannery "made" a false statement, which appeared in a presentation next to his photo and name, because he "substantially participated in the alleged misstatements." *Hawaii Ironworkers Annuity Tr. Fund v. Cole,* 2011 WL 1257756, at * 4 (N.D. Ohio Mar. 31, 2011); *Lewis v. Brynes*, 538 F. Supp. 1221, 1224-1225 (S.D.N.Y. 1982) (finding liability where "clearly" Defendants' "identity" could have influenced shareholders proxy vote).

[17] The misleading proxies were issued by DPHC, now Defendant LTM, and signed by Defendant Hamamoto. ¶¶57, 249- 66, 269- 73, 278-81, 330-41. The proxies contained materials issued by Lordstown Motors Corp., now known as Lordstown EV Corp. and contained statements made by Defendants Burns, Hamamoto, and Flannery. *Id.*

37

sufficient to satisfy the . . . negligence standard." *Fradkin v. Ernst*, 571 F. Supp. 829, 843 (N.D. Ohio 1983); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) (same); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 560 (S.D.N.Y. 2017) (same). Regardless of the standard, Plaintiffs have alleged far more than enough to establish negligence.

Defendant Hamamoto signed and issued the proxy (¶473), and Defendant Burns actively disseminated it (¶475), wherein Defendants repeatedly quantified and characterized the quality and source of the pre-orders, together with Lordstown's production capabilities.  Defendants were also actively engaged in the solicitation effort, issuing press releases (¶249), publishing investor presentations and slide decks (¶¶251, 253, 255, 257, 259, 261), penning a shareholder letter (¶¶270, 272, 278, 280), and participating on investor calls (¶¶263, 265) and media interviews (¶¶267, 268) making the same representations regarding Lordstown's pre-orders and production capabilities.  In addition, Defendants were highly sophisticated and in positions to know that their statements concerning both the pre-orders and production capabilities were false.  (¶¶51, 53, 57).  Indeed, confidential witnesses confirmed that Defendants Burns and Flannery were heavily involved in the pre-order processes.  ¶¶148-49, 153-54, 156.  Hamamoto repeatedly touted his diligence of Lordstown, emphasizing that Lordstown had "attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its $1.4 billion in pre-orders to-date."  ¶265.

**Third**, the AC adequately pleads loss causation for the §14(a) claims on two alternative grounds.  ¶¶437-38.  Plaintiffs were induced to vote for the transaction and suffered losses when the truth was revealed and caused stock declines.  *In re Gas Nat., Inc.*, 2015 WL 3557207, at *12 (N.D. Ohio June 4, 2015) (citation omitted).  Additionally, Plaintiffs forewent their right to redeem the securities, and suffered losses equal to the difference between the price following the

38

disclosures and the $10.15 redemption price.  ¶438; *see Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385-87 (1970) (plaintiffs must merely show some injury connected to the transaction).

### C.  Plaintiffs Adequately Pled Claims Under Section 20A of the Exchange Act

While Defendants were misrepresenting Lordstown's pre-orders and production, the Company suffered a spectacular setback when its prototype burst into flames during its very first road test.  ¶287; ECF 61-1 at 32.  Before this became public, Defendants Schmidt, Rodriguez, Brown, and Post (the "Insider Trading Defendants") — who unlike Burns were ***not*** subject to lockups — rushed to sell Lordstown stock.  ¶¶114, 423-25, 483-86.  Defendants are liable to class members and FNY, who traded contemporaneously with them.  ¶486; 15 U.S.C. § 78t-1(a).

Defendants challenge scienter, but ignore that the only scienter requirement under §20A is the possession of material nonpublic information ("MNPI") at the time of the sale.  *See Dirks v. S.E.C.*, 463 U.S. 646, 656 (1983) ("[A]nyone . . . who regularly receives [MNPI] may not use that information to trade in securities without incurring an affirmative duty to disclose."); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1050 (N.D. Cal. 2016) ("§20A requires only that a party know the inside information while making the trade, not that she actually use that information"); *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 143 (S.D.N.Y. 1999).

Each of the Insider Trading Defendants had a position at Lordstown that provided him access to material nonpublic knowledge about Lordstown's operations.  ¶485.  Defendant Schmidt served as Lordstown's President (¶56), Defendant Rodriguez served as Lordstown's Chief Financial Officer (¶52), Defendant Brown served as Lordstown's Chief Production Officer (¶54), and Defendant Post has served as Lordstown's Chief Engineer.  (¶55).  Each of these positions provided the respective Defendant with access to MNPI at the time of their insider sales on February 2-4, 2021 — particularly as to the core business operations giving rise to each aspect of the MNPI at issue here.  The Hindenburg Report describes material facts that had not been

disclosed to the public, including the fictitious nature of the putative pre-orders and the catastrophic failure of the road test.  ¶¶187, 463.[18]

Defendants also misconstrue §20A's requirement of a predicate violation of the Exchange Act, as requiring something more than the violation of §10(b) that occurs when an insider trades with MNPI.  "A plaintiff makes a prima facie case that a defendant is liable . . . under Section 20A by showing that the defendant was 'aware of the [MNPI]' when he made the [trade] purchase or sale of the securities."  *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *3 (S.D. Tex. June 15, 2017) (citation omitted); *In re Envision Healthcare Corp. Sec. Litig.,* 2019 WL 6168254, at *25 (M.D. Tenn. Nov. 19, 2019) ("Failure to [disclose MNPI before trading] constitutes a violation . . . that can serve as a predicate for a Section 20A claim.").

### D.        Plaintiffs Adequately Pled Claims Under Section 20(a) of the Exchange Act

Defendants make no argument against the 20(a) claims (15 U.S.C. § 78t), thus conceding they should be sustained if the §10(b) or §14(a) claims are sustained.  *Kelsey,* 125 F.3d at 995–96.

### IV.    CONCLUSION

For the foregoing reasons, the Court should deny the MtD.  Plaintiffs request any dismissal be without prejudice, to permit Plaintiffs to seek leave to amend to cure any deficiency.[19]

---

[18] While nothing more is required to plead scienter than Defendants' possession of MNPI, their suspicious trading heightens the strong inference that they possessed such MNPI.  The Complaint alleges: (1) the trades were made shortly before Lordstown posted negative news about its production, and shortly before the Hindenburg Report was published; (2) it is unusual for executives to sell this quantity of equity within months of the company going public; (3) the trades were not made through pre-approved trading plans; and (4) it was suspect that multiple executives all sold at around the same time.  ¶¶114, 425, 484; *In re Nat'l Auto Credit, Inc. Sec. Litig.*, 1999 WL 33919791, at *19 (N.D. Ohio Oct. 12, 1999) (suspicious trading supports scienter).  Schmidt went so far as to sell 39% of his vested equity for $4.6 million.  ¶¶134, 424; *see Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1312 (C.D. Cal. 1996) (sale of 20% of stock may constitute a "suspicious amount" to support an allegation of scienter).

[19] Information about this fraud is continuing to come to light.  For example, Plaintiffs are actively seeking to unseal filings in other litigation concerning Lordstown's pre-orders and production issues, which may bolster Plaintiffs' claims here.  Upon any dismissal, Plaintiffs would request leave to submit a fulsome motion to amend to cure the defects in the pleadings.  *Morse v. McWhorter*, 290 F.3d 795, 799-800 (6th Cir. 2002) (leave to amend is "freely given when justice so requires" and may be "particularly appropriate" in securities cases).

DATED:  January 17, 2022

**LABATON SUCHAROW LLP**

By: */s/ Carol C. Villegas*

Carol C. Villegas (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
Jake Bissell-Linsk (admitted *pro hac vice*)
140 Broadway, 34th Floor
New York, NY  10005
Telephone: (212) 907-0700
Email: cvillegas@labaton.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

***Counsel for Lead Plaintiff***
***George Troicky and Lead***
***Counsel for the Class***

**THE SCHALL LAW FIRM**

Brian Schall (*pro hac vice* forthcoming)
Rina Restaino (*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, CA 60067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
Email: rina@schallfirm.com

***Additional Counsel for Lead***
***Plaintiff George Troicky***

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Steve W. Berman (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: steve@hbsslaw.com

Reed R. Kathrein (admitted *pro hac vice*)
Lucas Gilmore (admitted *pro hac vice*)
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: reed@hbsslaw.com
Email: ucasg@hbsslaw.com

***Counsel for Additional Named Plaintiff Ashith***
***Pabbathi and Additional Counsel for the Class***

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim (admitted *pro hac vice*)
Daniel Tyre-Karp (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
Email: dtyrekarp@rosenlegal.com

***Counsel for Additional Named Plaintiffs***
***Daniel Tavares and Globestar Systems Inc.***
***and Additional Counsel for the Class***

[signatures continued on following page]

**ENTWISTLE & CAPPUCCI LLP**

Andrew J. Entwistle (admitted *Pro Hac Vice*)
Frost Bank Tower
401 Congress Avenue, Suite 1170
Austin, TX 78701
Telephone: (512) 710-5960
Email: aentwistle@entwistle-law.com

-and-

Robert N. Cappucci (admitted *Pro Hac Vice*)
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
Email: rcappucci@entwistle-law.com

*Counsel for Additional Named Plaintiff*
*FNY Managed Accounts LLC*
*and Additional Counsel for the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 17, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

<em>/s/ Carol C. Villegas</em>

Carol C. Villegas