IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE LORDSTOWN MOTORS CORP. SECURITIES LITIGATION<br><br>------------------------------------------------------<br><br>This Document Relates to:<br><br>    ALL ACTIONS. | CASE NO.: 4:21-CV-00616 (DAR)<br><br>JUDGE DAVID A. RUIZ<br><br><u>CLASS ACTION</u> |

**REPLY IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
<u>CONSOLIDATED AMENDED COMPLAINT</u>**

i

**TABLE OF CONTENTS**

**Page**

I.  Plaintiffs' Section 10(b) Claim Fails for Multiple Independent Reasons ........................... 2

    A.  None of the Challenged Statements Was Materially False or Misleading ............. 2

        1.  Statements About Pre-Orders and Demand ................................................ 3

        2.  Statements About Lordstown's Anticipated Production Timeline ............. 9

    B.  Plaintiffs Cannot Plead the Requisite Strong Inference of Scienter ...................... 14

    C.  Plaintiffs Also Cannot Plead Loss Causation or, With Respect to Pre-Merger Statements, Reliance .................................................................................................... 20

    D.  Plaintiffs Cannot Plead a "Scheme Liability" Claim ........................................... 22

II.  Plaintiffs' Section 14(a) Claim Fails for Many of the Same Reasons .............................. 23

III.  Plaintiffs Cannot State a Section 20A Claim for Insider Trading .................................... 24

IV.  CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)..............................................................................................................22

*In re Almost Fam. Inc. Sec. Litig.*,
  2020 WL 695654 (W.D. Ky. Feb. 11, 2020) ........................................................................23

*In re Am. Serv. Grp., Inc.*,
  2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ..................................................................16

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
  2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..........................................................................6

*Campo v. Sears Holdings Corp.*,
  371 F. App'x 212 (2d Cir. 2010) .........................................................................................18

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010)...............................................................................20

*Clayton v. Heartland Res., Inc.*,
  754 F. Supp. 2d 884 (W.D. Ky. 2010)..................................................................................22

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
  2017 WL 2599327 (S.D. Tex. June 15, 2017).......................................................................25

*Cosby v. KPMG, LLP*,
  2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ......................................................................19

*In re Diebold Sec. Litigation*,
  2008 WL 3927467 (N.D. Ohio Aug. 22, 2008) ....................................................................15

*Dougherty v. Esperion Therapeutics, Inc.*,
  905 F.3d 971 (6th Cir. 2018) ......................................................................................8, 16, 18

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..............................................................................................................21

*In re Ford Motor Co. Sec. Litig., Class Action*,
  381 F.3d 563 (6th Cir. 2004) ..................................................................................................7

*Frank v. Dana Corp.*,
  649 F. Supp. 2d 729 (N.D. Ohio 2009)................................................................................19

iii

*In re Gas Nat., Inc.*,
  2015 WL 3557207 (N.D. Ohio June 4, 2015)..............................................................23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................................................23

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) .........................................................................11

*Havenick v. Network Exp., Inc.*,
  981 F. Supp. 480 (E.D. Mich. 1997)............................................................................15

*In re Health Mgmt., Inc. Secs. Litig.*,
  970 F. Supp. 192 (E.D.N.Y.1997) ................................................................................19

*In re Hutchinson Tech., Inc. Sec. Litig.*,
  536 F.3d 952 (8th Cir. 2008) .......................................................................................20

*Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund
  v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009)........................................................11

*In re KBC Asset Management N.V.*,
  572 F. App'x 356 (6th Cir. 2014) ..................................................................................2

*In re Keithley Instruments, Inc. Sec. Litig.*,
  268 F. Supp. 2d 887 (N.D. Ohio 2002).........................................................................11

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) .......................................................................15

*Konkol v. Diebold, Inc.*,
  590 F.3d 390 (6th Cir. 2009) .......................................................................................20

*Lewis v. Byrnes*,
  538 F. Supp. 1221 (S.D.N.Y. 1982)..............................................................................23

*Ley v. Visteon Corp.*,
  543 F.3d 801 (6th Cir. 2008) .......................................................................................17

*Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*,
  2012 WL 4958561 (N.D. Ohio Oct. 16, 2012).............................................................23

*Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc., et al.*,
  2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) .............................................................7

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) .......................................................................................16

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ...........................................................................17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)....................................................................................3, 9, 10

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
  940 F. Supp. 1101 (W.D. Mich. 1996) ......................................................24, 25

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ...........................................................................18

*Regents of the Univ. of California v. Credit Suisse First Bos. (USA), Inc.*,
  482 F. 3d 372 (5th Cir. 2007) ..........................................................................22

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ...........................................................................14

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019)...............................................................18

*South Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................18

*Stein v. U.S. Xpress Enterprises, Inc.*,
  2020 WL 3584800 (E.D. Tenn. June 30, 2020)................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).........................................................................................14

*In re Telxon Corp. Sec. Litig.*,
  133 F. Supp. 2d 1010 (N.D. Ohio 2000)...........................................................16

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .....................................................................11, 17

**Statutes**

15 U.S.C. § 78t-1(a)...........................................................................................24

15 U.S.C. § 78u-4(b)(4) ......................................................................................21

15 U.S.C. § 78u-5(i)(5).........................................................................................8

15 U.S.C. § 78u-5(b)(2)(D)....................................................................................8

15 U.S.C. § 78u-5(c)(1)(A)-(B) ...........................................................................13

**Other Authorities**

17 C.F.R. § 229.105 ................................................................................................................14

17 C.F.R. § 230.419 ..................................................................................................................8

17 C.F.R. § 240.3a51-1 ............................................................................................................8

17 C.F.R. § 240.10b-5 ............................................................................................................22

F. Rule Civ. P. 9(b) .................................................................................................................23

**Other Sources**

The Auto Channel, "Clean Fuels Ohio Signs Letter of Intent to Drive Purchase of
   500 Fully-Electric Pickup Trucks from Lordstown Motors," (Mar. 18, 2020),
   *available at https://www.theautochannel.com/news/2020/03/18/806147-
   lordstown-motors-press-release-clean-fuels-ohio-signs-letter-intent.html* ...............................6

CNBC, "Lordstown Motors CEO on early EV fleet orders, reviving GM plant and
   hiring," *MadMoney* (Nov. 17, 2020), *available at
   https://www.cnbc.com/video/2020/11/17/lordstown-motors-ceo-early-ev-fleet-
   orders-reviving-gm-plant-and-hiring.html* .................................................................................19

John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws* (Apr. 8,
   2021), *available at https://www.sec.gov/news/public-statement/spacs-ipos-
   liability-risk-under-securities-laws* ...............................................................................................8

Going Public: SPACS, Direct Listings, Public Offerings, and the Need for
   Investor Protections: Virtual Hearing Before the Subcomm. on Investor
   Protection, Entrepreneurship, and Capital Markets of the Comm. on Financial
   Services, 117 Cong. 1, *et seq.* (2021), *available at
   https://www.govinfo.gov/content/pkg/CHRG-117hhrg45078/pdf/CHRG-
   117hhrg45078.pdf* ...........................................................................................................8, 9

Mike Albert Fleet Solutions, "EV Proponent, Mike Albert Fleet Solutions,
   Reserves Units of the World's First All-Electric Commercial Pickup, the
   Endurance from Lordstown Motors" (Jan. 7, 2021), *available at
   https://www.mikealbert.com/blog/ev-pickup-truck-partner-lordstown-motors* ........................6

Mark Kane, "Lordstown Motors Reports New Order for 1,000 Endurance
   Pickups,"*InsideEVs* (Apr. 7, 2020), *available at
   https://insideevs.com/news/408469/lordstown-loi-1000-endurance-pickups/* ..........................6

Mark Kane, "Lordstown Motors Gets New Letter of Intent for 900 Endurance
   Pickups," *InsideEVs* (May 30, 2020), *available at
   https://insideevs.com/news/426063/lordstown-motors-new-loi-900-endurance-
   pickups/* .................................................................................................................................6

Lordstown Management Corrective Statement, *available at*
    *https://investor.lordstownmotors.com/lordstown-motors-corp-management-*
    *corrective-statement*.................................................................................................................19

Gustavo Enrique Ruffo, "Lordstown Motors Endurance Electric Truck Catches
    Fire While Testing," *InsideEVs* (Jan. 30, 2021), *available at*
    *https://insideevs.com/news/483166/lordstown-motors-endurance-fire-testing/*......................25

Plaintiffs' Opposition ("Opp."; Dkt. #74), like the AC[1] itself, is devoted to a laundry list of supposedly incriminating minutia—largely parroting the short-seller Hindenburg Report—that Plaintiffs claim show Lordstown is and always has been a fraud. But these pleadings do no such thing. Indeed, the independent Special Committee of Lordstown's Board of Directors charged with investigating the Hindenburg allegations found there were "issues regarding the accuracy of certain statements" about pre-orders even as it concluded that Lordstown "has obtained tens of thousands of pre-orders from fleets, fleet management companies, or other end users." Ex. 5 (6/14/21 PR), at 01-02. A finding of "issues" with the "accuracy" of certain statements does not equate to a finding that any statement was materially false or misleading under the securities laws, especially in the context of Lordstown's other statements and information known to investors, much less that any statement was made with fraudulent intent. Like the Hindenburg Report on which they are largely based, Plaintiffs' scattershot accusations may reflect certain "issues" related to pre-orders but they are insufficient—even if true—to establish that any of the challenged statements about demand for the Endurance and the anticipated production timeline were materially false or misleading when made, or that any Defendant did not genuinely believe them to be true.

Plaintiffs' inability to plead their claims makes abundant sense in the bigger picture. Electric vehicles are the future of the automotive industry. From inception, Lordstown has been singularly focused on bringing to market the first all-electric full-sized pickup truck targeted at fleets. By all measures, there appears to be tremendous demand for such a truck (Mem. 4-5), and Lordstown's market research has been borne out by the large numbers of nonbinding pre-orders

---

[1] All defined terms herein take the same meaning as in the Defendants' initial Memorandum of Law in support of their Motion to Dismiss ("Mem."; Dkt. #70-1). "Ex. __" refers to the exhibits attached to the Greene Dec. (Dkt. #70-4) in support of the Defendants' RJN (Dkt. #70-3). Unless otherwise indicated, all internal quotation marks and citations are omitted and emphasis is added.

1

that it received both before and after its de-SPAC merger with DPHC. The Special Committee press release indicates that, at a minimum, Lordstown has tens of thousands of pre-orders for the Endurance from fleets, fleet management companies or other end users. This strongly suggests both that there was "serious" demand for the Endurance, as the challenged statements indicated, and that the Defendants believed that to be the case; no CW allegations, "smoking gun" documents, or other factual pleadings suggest otherwise. Likewise, there is nothing to suggest that the Defendants did not genuinely believe the production timeline estimates they provided at each point in time. The mere fact that full commercial production ultimately was delayed—as it has been for numerous auto companies as a result of the COVID-19 pandemic—does not suggest the Defendants knew or expected at any earlier point that this would happen. And the fact that the Endurance is now in pre-production, moving closer to full commercial production, strongly suggests the timeline estimates were made in good faith and certainly were not fraudulent.

Because Plaintiffs fail to plead any of their claims and repleading would be futile, the AC should be dismissed in its entirety with prejudice.

## I.    Plaintiffs' Section 10(b) Claim Fails for Multiple Independent Reasons

Plaintiffs' 10(b) claim fails for multiple independent reasons: they cannot plead a materially false or misleading statement (or other deceptive act), scienter, loss causation, or, with respect to pre-merger statements, reliance. And because Plaintiffs fail to state a primary violation under Section 10(b), their Section 20(a) control-person claim fails as well.[2]

### A.    None of the Challenged Statements Was Materially False or Misleading

Plaintiffs challenge two categories of statements made between August 3, 2020 and July 2, 2021: (1) statements concerning pre-orders and demand for the Endurance; and (2) statements

---

[2] *In re KBC Asset Management N.V.*, 572 F. App'x 356, 362 (6th Cir. 2014).

2

concerning Lordstown's anticipated production schedule and financing for the Endurance. *See* Appx. 1 to Mem. (listing all challenged statements and their pleading deficiencies). Plaintiffs fail to plead that any challenged statement in either category was materially false or misleading.[3]

### 1.     Statements About Pre-Orders and Demand

The AC asserts that statements in this category—announcing that, as of a particular date, Lordstown had received "more than" or "approximately" or a certain number of nonbinding "pre-orders" and that this indicated significant demand for the Endurance—were false and misleading both because (i) Lordstown "did not in fact have any pre-orders, and instead had non-binding letters of intent" and (ii) the reported totals allegedly overstated demand by including certain pre-orders that should not have been counted (e.g., because allegedly they came from intermediaries instead of fleet operators, did not have LOIs with Lordstown, or had not been properly vetted). AC ¶ 248. Plaintiffs now concede that Lordstown disclosed that its pre-orders were nonbinding (Opp. 17 ("[t]he AC recognized this"); Mem. 14-17), and instead claim that "the issue was not 'binding' vs. 'non-binding,' but whether Defendants' statements created a misleading impression about the pre-orders" when considered in their full context. Opp. 18-19.

But read fairly and in context no reasonable investor could have been misled by any of these challenged statements. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (whether a statement is false or misleading "always depends on context" and requires consideration of, among other things, "the customs and practices of the relevant industry"); Opp. 18 (must consider all context when evaluating falsity).[4] Lordstown

---

[3] This fully disposes of the Section 14(a) claim as well, since all the statements in proxy materials challenged under Section 14(a) also appear to be challenged under Section 10(b). Mem. 13 n.25.
[4] Plaintiffs do not dispute that *Omnicare* applies in both the Sections 10(b) and 14(a) contexts. *See* Mem. 15 n.28; Opp. 36-39.

clearly and repeatedly disclosed to investors that the pre-orders were nonbinding (Mem. 14-17; Opp. 17), and numerous competitors were using nonbinding pre-orders in similar ways (Mem. 7-8 & n.19). Moreover, Mr. Burns explained on several occasions why the Company believed these nonbinding pre-orders were nonetheless "serious" and "sticky":

> [I]f a company [] orders 600 preorders, that is signed by the CEO of that company all likelihood or at least some C-suite person. They take it very seriously. They've got to figure out how they're going to layer these electrics in there. And the appetite for them to do that way early like that, a year out from some of them means they're trying to do their part to ensure this comes to market. So they're standing behind it and they're putting these pre-orders in. . . . I'd say it's much stickier than a consumer putting a hundred dollars [] refundable down on a Cybertruck, let's say. And I think these orders are very, very sticky because I know what it takes to get them, the education you have to do. This isn't somebody again on a website, a hundred bucks, refundable with a credit card. This is a fleet. And fleets generally take their business very, very seriously. So I think they're very sticky.

AC ¶ 318 (2/6/21 interview); *see also* ¶ 300 (11/17/20 interview).[5] All this provides critical context for the challenged pre-order statements, and defeats any suggestion that they were misleading.[6]

While Plaintiffs can quibble about percentages, and suggest that a particular LOI here or there should have been more carefully vetted and/or not been included in Lordstown's count, none of these allegations establish the fundamental premise of their claims—that "Defendants created a false and misleading impression that Lordstown had received 'serious orders' worth billions in forthcoming revenue due to 'clear demand' from fleets." Opp. 15. The Defendants did no such thing: there *was*—and still *is*—significant demand for the Endurance from commercial fleets, and

---

[5] Indeed, Lordstown made significant investments in tooling and equipment throughout the class period based on this genuine belief that the pre-orders fairly represented strong demand for the Endurance. *See* AC ¶¶ 318, 324; Ex. 7 (3/17/21 Tr.), at 18; Ex. 3 (5/24/21 8-K), at 04-05.

[6] This is equally true for unscripted statements that Plaintiffs claim were "undeniably literally false." Opp. 18; *e.g.*, AC ¶¶ 288, 294. Viewed in the full context of all of Lordstown's statements and disclosures about pre-orders, and the electric vehicle industry's customary use of nonbinding pre-orders, no reasonable investor could have been misled into believing that a customer could actually "buy one now" or that the pre-orders Defendants described were binding "orders" or "sales," especially when production had not yet begun. AC ¶¶ 261, 276, 288.

no factual pleadings indicate otherwise. Indeed, after a thorough investigation, the Special Committee found that Lordstown had in fact "obtained tens of thousands of pre-orders from fleets, fleet management companies, or other end users," which, if converted to orders, would account for more vehicles than the company even expected to build in the near-term (though it also noted "the risk that pre-orders may not be converted to actual orders"). Ex. 5 (6/14/21 PR), at 02.

Plaintiffs argue that the challenged statements nonetheless were false and misleading because they described the reported pre-orders as coming from "commercial fleets" or "primarily from commercial fleet owners" (*see, e.g.*, AC ¶¶ 249, 292, 312), indicating that the pre-orders were "meaningful proof of the strong demand . . . from [Lordstown's] target audience," when, allegedly, some of those pre-orders came from entities that did not operate their own fleets. Opp. 7-9. But many of the non-fleet examples Plaintiffs point to (e.g., Momentum Group, Mike Albert Fleet Solutions) are fleet management companies or other intermediaries of the type that play a significant role in fleet vehicle purchasing. It is widely recognized in the industry that fleets purchase vehicles differently than retail customers; many commercial fleets employ a fleet management company or other intermediary to handle vehicle purchasing and servicing. *See* Ex. 7 (3/17/21 Tr.), at 16-17. As a result, a significant portion of commercial fleet purchases are arranged by or made through third parties, and pre-orders from those entities provide important indications of commercial fleet demand. *See id.*; Ex. 8 (6/17/21 8-K), at 02. In this context, there was nothing misleading about treating pre-orders from fleet management companies and other intermediaries as meaningful indicators of commercial fleet demand; these pre-orders represented nonbinding indications of intent to facilitate commercial fleet purchases of the Endurance, from entities whose business models were to do just that. Moreover, press coverage of Lordstown's announcement of LOIs with these entities reflects that the market was well aware that they were

intermediaries and not themselves fleet operators.[7] In this context, the mere allegation that some of the reported pre-orders came from intermediaries rather than end fleet users is insufficient to establish that the challenged pre-order statements were materially false or misleading in indicating strong demand from "commercial fleets." Moreover, even if Plaintiffs were right that certain customers should not have been counted among pre-order totals for one reason or another, Plaintiffs still have not shown how this rendered any particular challenged statement materially false or misleading. *See* Mem. 18-20; *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at \*23 (S.D.N.Y. Sept. 9, 2019) (merely alleging percentage by which financial metric was overstated insufficient to show overstatement was material).[8]

---

[7] *See, e.g.*, Mark Kane, "Lordstown Motors Reports New Order for 1,000 Endurance Pickups," *InsideEVs* (Apr. 7, 2020), *available at https://insideevs.com/news/408469/lordstown-loi-1000-endurance-pickups/* (announcing LOI from Innervations "to broker 1,000 Lordstown Endurances to their clients to convert their company fleets to electric vehicles"); Mark Kane, "Lordstown Motors Gets New Letter of Intent for 900 Endurance Pickups," *InsideEVs* (May 30, 2020), *available at https://insideevs.com/news/426063/lordstown-motors-new-loi-900-endurance-pickups/* (announcing LOI from "fleet management specialist" Momentum so that it can offer the Endurance "to our customers, both small and large"); Mike Albert Fleet Solutions, "EV Proponent, Mike Albert Fleet Solutions, Reserves Units of the World's First All-Electric Commercial Pickup, the Endurance from Lordstown Motors" (Jan. 7, 2021), *available at https://www.mikealbert.com/blog/ev-pickup-truck-partner-lordstown-motors* ("leading, national fleet management company" Mike Albert announcing LOI "for delivery of a significant quantity of the Lordstown Endurances pickup model on behalf of their clients"); The Auto Channel, "Clean Fuels Ohio Signs Letter of Intent to Drive Purchase of 500 Fully-Electric Pickup Trucks from Lordstown Motors," (Mar. 18, 2020), *available at https://www.theautochannel.com/news/2020/03/18/806147-lordstown-motors-press-release-clean-fuels-ohio-signs-letter-intent.html* (announcing LOI with Clean Fuels Ohio "to help deploy 500 Lordstown Endurances").

[8] Nor do Hindenburg's inflammatory analysis and CW-1's vague allegation that Lordstown "counted everything" (AC ¶¶ 145, 156) establish that Lordstown *improperly* included any particular pre-orders in its estimates. *See* Mem. 17-19, 31-32. Contrary to Plaintiffs' assertions (Opp. 8 n.3), Defendants did not concede that Lordstown "counted everything." Defendants argued, among other things, (1) that CW-1's allegations lacked a personal-knowledge basis and were too vague to be accorded any weight, and (2) that Plaintiffs have not sufficiently pleaded either that the pre-order statements included any pre-orders that should not have been included, or that inclusion of any allegedly "improper" pre-orders caused any particular statement to be materially false or misleading. *See* Mem. 17-20, 31-32.

In short, the AC—like the Hindenburg Report—asserts a host of inflammatory allegations but fails to plead with the requisite particularity how they rendered any specific challenged statement materially false or misleading when viewed in its full context. This is particularly true for the challenged pre-order statements that are statements of opinion, subject to *Omnicare*'s more rigorous standard. Mem. 20-21. No pleadings suggest the Defendants did not genuinely believe that the pre-orders were "very serious" and "demonstrate[d] clear demand that will lead to binding orders," or that Lordstown was going to "revolutionize the pickup truck industry." AC ¶¶ 272, 280, 300, 312. As discussed above, Defendants repeatedly explained both that the pre-orders were nonbinding and why they nonetheless believed them to be "serious," reflecting significant demand and potential revenue from commercial fleets. *Supra* pp. 3-5.

In addition, many challenged pre-order statements are inactionable puffery and/or protected forward-looking statements. Mem. 21-23. Plaintiffs claim that certain positive characterizations of the pre-order totals (e.g., "significant pre-orders received" (AC ¶ 259); "demand . . . has been overwhelming" (¶¶ 320, 322)) cannot be puffery because they "relate[] to" an "important figure" for Lordstown's valuation (Opp. 20), but this is neither here nor there. The central question is whether they were the type of "rosy affirmation . . . so vague . . . and so clearly constituting the opinions of the speaker" that they are not actionable as a matter of law. *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570-71 (6th Cir. 2004).[9] That is precisely the case with the statements identified as puffery in Appendix 1 to Defendants' initial Memorandum.

As for forward-looking statements, Plaintiffs argue that (1) the safe harbor does not apply to pre-merger statements, and (2) none of the pre-order statements were actually "forward-

---

[9] *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc., et al.*, 2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) is not to the contrary. The statements at issue there were not vague positive characterizations but conveyed specific information "capable of verification." *Id.* at *7.

looking" because their "veracity [could] be determined at the time the statement [was] made." Opp. 20 (quoting *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018)). Not so. As detailed in Defendants' opening brief, the forward-looking statements contained in DPHC's proxy materials are protected by the safe harbor because none of the exceptions to the safe harbor apply. Mem. 22-23 & n.42-44. DPHC was not a "blank check company"[10] as defined in the statute and implementing regulations because its shares were issued above the $4-a-share penny-stock threshold, and it had more than $5 million in stockholder equity.[11] Nor does the mere fact that the de-SPAC merger resulted in Lordstown being publicly listed make it an "initial public offering" for purposes of the safe harbor exclusion. Mem. 23 & n.44; 15 U.S.C. § 78u-5(b)(2)(D). As Plaintiffs concede, the de-SPAC merger "was not literally the initial offering of DPHC securities."[12] Opp. 24 n.8. Plaintiffs may wish that the law were broader or different; indeed, several Congressmen recently proposed legislation that would amend the Reform Act to exclude from the safe harbor statements made in connection with a de-SPAC merger.[13] But the very fact

---

[10] The fact that a July 30, 2021 Lordstown Form S-1 refers in passing to DPHC having been incorporated as a "blank check company" is not, as Plaintiffs suggest, proof that it was a "blank check company" for purposes of the Reform Act. Opp. 24 n.7. This colloquial use of the term— referring to the fact that DPHC was incorporated as a SPAC—says nothing about whether DPHC met the technical legal requirements for a "blank check" company under the safe harbor exclusion.
[11] *See* Mem. 23 & n.43; 15 U.S.C. § 78u-5(i)(5) ("blank check company" takes meaning given by SEC rule or regulation); 17 C.F.R. § 230.419 (defining "blank check company" as one that issues "penny stocks" as defined in 17 C.F.R. § 240.3a51-1); 17 C.F.R. § 240.3a51-1 (defining "penny stocks" with reference to, among other things, issuer stock price and stockholder equity).
[12] Indeed, even while arguing that the IPO exclusion should perhaps be changed or clarified to include de-SPAC mergers, SEC Acting Director of Corporate Finance Coates acknowledged the same: "an 'IPO' is generally understood to be the *initial* public offering of a company's securities to the public, and the SPAC shell company *initially* offers . . . securities to the public when it first registers to raise funds . . . ." John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws* (Apr. 8, 2021), *available at https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws*.
[13] *See* Going Public: SPACS, Direct Listings, Public Offerings, and the Need for Investor Protections: Virtual Hearing Before the Subcomm. on Investor Protection, Entrepreneurship, and

of those Congressional efforts reflects that the IPO exclusion currently applies only to traditional IPOs and does not encompass de-SPAC mergers.

As for Plaintiffs' argument that the statements at issue are not actually "forward-looking," this fails on its face. The "veracity" of these statements could not be determined at the time because they fundamentally concerned the Defendants' expectations and projections for the future. *See, e.g.*, AC ¶ 284 ("we expect th[e] number [of pre-orders] to increase dramatically between now and [production]"; ¶ 322 ("it's gonna take us a couple of years to fulfill that demand"); ¶¶ 272, 280 ("Lordstown believes [the pre-orders] demonstrate clear demand that will lead to binding orders once the Endurance is complete"). For the reasons discussed previously (and further below), no facts suggest the Defendants did not genuinely believe these statements at the time; they also were identified as forward-looking and accompanied by meaningful cautionary language (which Plaintiffs do not dispute). Mem. 20-23. Accordingly, not only are these forward-looking statements true and not misleading statements of opinion, they also are protected under the safe harbor.

### 2. Statements About Lordstown's Anticipated Production Timeline

Nor can Plaintiffs show that any of the challenged statements expressing the 10(b) Defendants' belief that Lordstown "remain[ed] on track to begin production of the Lordstown Endurance . . . in September 2021," and that "no additional capital requirements [were] expected between now and going to market," were false or misleading when made. AC ¶¶ 350, 334; Mem. 23-26.

As an initial matter, Plaintiffs argue that some of these were not "opinion" statements because they "expresse[d] certainty about a thing." Opp. 23 (quoting *Omnicare*, 575 U.S. at 183).

---

Capital Markets of the Comm. on Financial Services, 117 Cong. 1, *et seq.* (2021), *available at https://www.govinfo.gov/content/pkg/CHRG-117hhrg45078/pdf/CHRG-117hhrg45078.pdf*.

But this is not the full test. A fact is verifiable, "a thing done or existing," whereas an opinion expresses a subjective view and "rests on grounds insufficient for complete demonstration." *Omnicare*, 575 U.S. at 183. Many of the challenged statements were specifically phrased in terms of what the Defendants projected, anticipated, believed, or expected about when Lordstown likely would begin production of the Endurance and/or whether it would need additional financing to do so.[14] But even the statements that were not explicitly couched in terms of belief clearly expressed the speakers' subjective views about an inherently unknowable future. No one could reasonably have interpreted Mr. Burns's October 26, 2020 statement that "September deliveries start" as indicating he knew with absolute certainty what would happen in the future or when; it necessarily meant that he *believed*, based on the information available to him, that deliveries would start then. AC ¶ 348. The same is true of statements that Lordstown was "on track" to begin production in September: these too necessarily were predictions, not promises, representing the speakers' best understanding as to when production would likely begin based on current information.

The challenged statements in this category were true and not misleading forward-looking statements of opinion, and no factual pleadings suggest that the 10(b) Defendants did not genuinely believe the statements at the time, or that particular omitted contemporaneous facts rendered them misleading in context. Plaintiffs claim in conclusory fashion that the statements were false and misleading because Lordstown "was nowhere near production ready" at any point during the class period (Opp. 21), but no pleaded *facts* support this assertion. Mem. 25-26. Plaintiffs still have not explained how Hindenburg's inflammatory allegations—e.g., that an Endurance prototype caught fire in January 2021, that it was sourcing its hub motors from a small Slovenian company, that it

---

[14] *See, e.g.*, AC ¶ 336 (8/3/20: "<u>LMC Projects</u> ~$120 million of investment to retool the equipment for full production readiness"); *id.* ¶ 340 (8/3/20: "<u>[W]e do not expect</u> that we will need any additional equity capital requirement to achieve positive cash-flow.").

had not yet completed all governmental testing by March 2021—were actually inconsistent with Lordstown's belief that it would begin production in September 2021. AC ¶¶ 187-92. Nor do the handful of allegations from Plaintiffs' anonymous "automotive industry expert" undercut any challenged statement. Because he claims no personal knowledge of Lordstown, the Endurance, the Company's pre-production process or progress, or even the electric vehicle industry generally (AC ¶¶ 193-95), his opinions are entitled to no weight. *See Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.,* 583 F.3d 935, 946 (6th Cir. 2009).[15] And even if one were to credit his general description of the vehicle manufacturing process and his assertion that a new vehicle launch typically takes "between 32 and 36 months" (AC ¶ 194), neither he nor Plaintiffs have explained how any of that was inconsistent with statements at any particular time that Lordstown was "on track" to begin production in September 2021 (especially given that Lordstown got a jump start on the usual development process by licensing intellectual property from Workhorse and purchasing the GM plant in near-production-ready condition).[16]

Allegations from CW-3—an "administrative assistant at a third-party contractor" for just two months early in the class period—fare no better. AC ¶¶ 198-99. CW-3 describes attending a single meeting in September 2020, which none of the Defendants attended, at which someone (doesn't say who) allegedly said that they were "running way behind." *Id.* Such hearsay allegations are unreliable and entitled to no weight.[17] But even assuming this happened, the allegations are too

---

[15] *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149 (N.D. Cal. 2015), involved far more detailed expert analysis and additional facts supporting falsity, and is not to the contrary.

[16] AC ¶¶ 69-72. The September 2021 anticipated start date for production would seem to be plausibly within range of the anonymous expert's average 32-36 months given Lordstown's significant leg up on design, engineering, and plant tooling.

[17] *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009) (rejecting CW hearsay); *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 899 (N.D. Ohio 2002) (rejecting allegation that CW was "told by someone" the defendant "was 'cutting funding'").

vague to undercut any particular challenged statement about the production timeline. The earliest challenged statement expressing Defendants' expectation that production would start in September 2021 was made October 26, 2020, more than a month after CW-3's vaguely alleged meeting. CW-3's conclusory assertion—based entirely on hearsay from an unidentified lower-level employee—that Lordstown was "running behind" in mid-September 2020 is simply insufficient to establish that any later statements about Lordstown being "on track" were false or misleading at the time.

Nor does the fact that Lordstown ultimately reduced its production targets and determined that it needed additional capital *in late May and early June* suggest that earlier statements on these topics were false or misleading when made. The last challenged statement regarding production capabilities was made in *March* 2021, more than two months prior to Lordstown's announcements that it was reducing production targets for September and would need additional financing; and most of the challenged timeline statements were made many months earlier than that. A great deal can change in a short time when dealing with the technical and logistical challenges of bringing a new vehicle to market, particularly in the midst of a pandemic and global supply chain disruptions. No factual pleadings suggest the Defendants did not genuinely believe that they were still "on track" when they made statements to that effect, nor have Plaintiffs pleaded any particular, contemporaneous *facts*, as opposed to speculative and conclusory assertions, that rendered them misleading in context. Indeed, the independent Special Committee concluded in June 2021—after the reduction in production targets—that "while various factors could lead to delays in the start of production, the projected September 2021 start of production remains achievable," strongly suggesting the Defendants genuinely believed their opinions. Ex. 5 (6/14/21 PR), at 01.

In addition to being true and not misleading statements of opinion, most of the challenged statements in this category also are forward-looking statements protected under the safe harbor.

12

As previously discussed, the safe harbor *does* protect pre-merger statements in the proxy materials because none of the safe harbor exceptions apply. *See supra* 7-9. Plaintiffs argue that the post-merger forward-looking statements were mostly made "to the media" without cautionary language (Opp. 25), but the safe harbor's test is disjunctive, requiring only that the forward-looking statement be identified as such and accompanied by meaningful cautionary language, *or* immaterial, *or* made without actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1)(A)-(B). As discussed above, Plaintiffs fail to allege any facts suggesting that the Defendants did not genuinely believe the challenged statements they made about Lordstown's anticipated production timeline and the sufficiency of its finances. Moreover, many of the forward-looking statements were accompanied by meaningful cautionary language, as detailed in Defendants' initial Memorandum. *See* Mem. 24-25 & n.46. Plaintiffs' conclusory assertion that this language was not "meaningful" because it was inconsistent with (unidentified) "historical facts" and did not "convey that the risks had already materialized" (Opp. 25), is likewise unsupported by any *factual* pleadings; the AC simply does not allege facts, as opposed to conclusory assertions, suggesting that the cautionary language was misleading or that the risks had already materialized.

Finally, Plaintiffs' improper claim based on alleged violation of Item 105 fails for the same reasons. The Opposition all but abandons this claim, devoting three cursory sentences to it (in the falsity section of the argument) without even mentioning Item 105. Opp. 23. Regardless, it fails for the same reasons discussed above: Plaintiffs have not pled any factual support for their conclusory assertion that Defendants failed to disclose "significant risks" (not specifically identified or anchored in a particular time) that made it likely Lordstown would miss its anticipated

13

September 2021 production start date or that it would need additional capital to begin production.[18] *Id.* Consistent with Item 105, DPHC's (and later, Lordstown's) public filings thoughtfully identified and discussed the "material factors that ma[d]e an investment in the [company] speculative or risky" (17 C.F.R. § 229.105), including that manufacturing vehicles is a capital intensive and complex process subject to delays and that Lordstown would likely eventually need additional funding for operations.[19] The challenged disclosure in particular (AC ¶¶ 368) clearly explained Lordstown's expectation—as of Fall 2020—that funding from the de-SPAC merger would be sufficient to commence production of the Endurance, but warned that this is a "capital intensive business" and Lordstown "expected to require continued capital investment to fund operations."[20] This full and fair discussion of material risks is all that Item 105 required.

### B.        Plaintiffs Cannot Plead the Requisite Strong Inference of Scienter

Plaintiffs' Section 10(b) claims also fail for the separate reason that they cannot allege the requisite "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007). Plaintiffs' core theory—that the 10(b) Defendants intentionally misrepresented demand for the Endurance and its anticipated production timeline in order to close the merger and artificially inflate Lordstown's stock price, yet chose not to sell shares while the price was inflated and received no other personal benefit—simply makes no sense. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter where insiders "miss[ed] the boat"). None of the 10(b)

---

[18] As previously noted, it is not clear if an Item 105 violation can even provide a basis for liability under Section 10(b). Mem. 26-27 & n.50. Plaintiffs' citation to a single out-of-circuit case allowing an *Item 303* violation to form the basis for a Section 10(b) claim does not establish that Item 105 can similarly ground a claim in this or any other circuit.

[19] Mem. 26-28; Ex. 2 (8/24/20 Proxy), at 38 ("There can be no assurance that Lordstown's estimates related to the costs and timing necessary to complete design and engineering of the Endurance . . . will prove accurate. These are complex processes that may be subject to delays, cost overruns and other unforeseen issues . . . ."); *see also id.* 39, 41; Ex. 9 (10/8/20 Proxy), at 38-70; Ex. 16 (11/12/20 Form S-1), at 6-27.

[20] AC ¶ 368; *see also* Mem. 24-25 (related risk discussions).

Defendants made unusual or suspicious stock sales during the class period: Mr. Flannery and Mr. Burns did not sell any stock at all, and Mr. Rodriguez is alleged to have made only a single sale of 9,300 shares on Feb. 4, 2021, retaining more than 34,000 shares plus another 525,000 fully vested and exercisable stock options. AC ¶ 114; Ex. 17 (2/8/21 Form 4), at 01. This means that all three individual 10(b) Defendants held all or the vast majority of their shares through the end of the class period, setting themselves up, on Plaintiffs' theory, to suffer the same losses as the alleged class.[21] This cuts strongly against scienter. *See* Mem. 28-30; *Havenick v. Network Exp., Inc.*, 981 F. Supp. 480, 528 (E.D. Mich. 1997) (retention of 68% of holdings "rebutted" inference of scienter); *In re Diebold Sec. Litigation*, 2008 WL 3927467, at *9 (N.D. Ohio Aug. 22, 2008) ("[R]etaining a bulk of [] shares . . . is inconsistent with an inference of scienter.").[22]

Nor do Plaintiffs allege Mr. Burns, Mr. Rodriguez, or Mr. Flannery personally benefited from the alleged fraud in any other concrete way. The only motive Plaintiffs allege was a desire to "salvage the insolvent startup" through the de-SPAC merger so that Defendants could "keep[] their lucrative positions as executives." Opp. 28. But "general allegations of an executive's desire to protect his position within a company . . . do not comprise a motive for fraud, because such a desire is shared by all corporate officers. Rather, to demonstrate motive, a plaintiff must show concrete

---

[21] Contrary to Plaintiffs' assertions, this is equally meaningful with respect to Mr. Burns because he *agreed* to lock up all of his shares from the merger until at least October 2021—*after* the date when he and others were telling investors Lordstown expected to begin production. *See* Mem. 29 & n.57. It makes no sense that Mr. Burns would have lied about the production timeline, knowing that it was unachievable and that this would inevitably become known to the market before he could sell his locked-up shares. The far more plausible inference is that he agreed to a lockup because he believed in Lordstown's long-term value.

[22] While the absence of sales is not dispositive, it is often highly probative when weighing competing inferences, and Plaintiffs' case is not to the contrary. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1255 (N.D. Cal. 2008) (lack of stock sales did not "negate the inference of scienter" where other allegations raised a strong inference of scienter and plaintiffs had not relied on stock sales).

benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[23] *Dougherty*, 905 F.3d at 981-82. Moreover, no factual pleadings suggest that Lordstown was insolvent prior to the merger, only that it needed significant additional funding in order achieve its goal of bringing the Endurance to market.[24] *See* AC ¶¶ 87-90; ¶ 379 (Mr. Burns needed the merger "so that he could get financing for the plant"). The mere need to acquire financing, common to most startups, especially in the auto industry, is not indicative of fraudulent intent.

Having failed to offer any plausible motive, Plaintiffs claim that the vague accounts of CW-1 and CW-2, and a handful of other pleadings, provide strong circumstantial evidence of Mr. Burns's, Mr. Rodriguez's, and Mr. Flannery's fraudulent intent. Opp. 26-32. They do not. As detailed in Defendants' opening brief, none of the CWs is alleged to have a sufficient personal-knowledge basis for any factual allegations suggesting scienter. Mem. 31-32. Indeed, it appears neither CW-1 nor CW-2 actually worked at Lordstown during the class period:[25] CW-2 is alleged to have left "pre-merger" and CW-1 claims only to have worked at Lordstown "in 2020." AC ¶¶ 143, 151. Without personal knowledge of anything that happened at Lordstown during the class period, their allegations simply cannot shed meaningful light on what any Defendant knew,

---

[23] Indeed, Plaintiffs' own authority says the same. *See Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (no scienter: "The desire to raise capital in the normal course of business does not support a strong inference of scienter because virtually all corporate insiders share this goal.").

[24] Plaintiffs' cases involved significant additional allegations suggesting scienter and are not to the contrary. *See In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1028-31 (N.D. Ohio 2000) (allegations that "officers were in a very difficult position, facing unusual pressures to perform" were insufficient by themselves to plead scienter, but raised a strong inference together with other compelling evidence); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *57 (M.D. Tenn. Mar. 31, 2009) (finding strong inference based on numerous circumstantial and motive allegations).

[25] Indeed, the Opposition appears to concede as much. Opp. 26 n.9. Whereas Defendants pointed out that *CW-2* is alleged to have left "pre-merger" (AC ¶ 151), footnote 9 of the Opposition responds as if Defendants had argued this with respect to *CW-1*, seeming to acknowledge that this is the case for CW-1 as well.

16

thought, or intended during that time period.[26] This conclusion is only bolstered by the utter vagueness of the CW allegations. Plaintiffs rely heavily on CW-2's hyperbolic assertions that Mr. Burns "micromanaged every aspect" of the business and "knew every single order," and that CW-2 "talked with Steve frequently" (Opp. 26), but CW-2 provides no dates, details, or factual support that might lend credence to these vague allegations or tie them to any particular point in time or challenged statement. CW-1 claims to have attended meetings with Mr. Flannery "in 2020" and alleges that Mr. Flannery at times (unspecified) told CW-1 that Mr. Flannery had spoken with Mr. Burns and "provided him with updates about the pre-orders," but this is both unreliable hearsay and hopelessly vague. Opp. 27; AC ¶¶ 143-50.[27] What exactly did CW-1 discuss with Mr. Flannery at meetings and when? How was it inconsistent with the one challenged statement Mr. Flannery allegedly made?[28] And what exactly did Mr. Flannery and Mr. Burns discuss about pre-orders during any particular "update," and when? CW-1 does not and cannot say. Without these necessary, probative details the CW allegations simply cannot suggest culpable knowledge on the part of any 10(b) Defendant.[29]

Nor do Plaintiffs point to any contemporaneous document, email, or other smoking gun suggesting scienter. Plaintiffs correctly note that "divergence between internal reports and external

---

[26] *See, e.g.*, *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) (CW allegations unreliable as to scienter where CW left company before any challenged statements were made); *Zucco*, 552 F.3d at 996 (CWs "not employed by [defendant] during the time period in question" lacked basis for personal knowledge).

[27] He does not claim to have interacted with Mr. Burns at any point, and his accounts of what Mr. Flannery allegedly told him Mr. Burns said are hearsay entitled to no weight. *See* Mem. 31-32 & n.49.

[28] Mr. Flannery is alleged to have "made" only a single challenged statement for purposes of the Section 10(b) claim, on Sep. 24, 2020 regarding pre-orders. AC ¶ 274.

[29] *See, e.g.*, *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) (CW allegations "too vague and conclusory to be accorded much weight" where they "fail to allege . . . what, when, where, and how [each defendant] knew" about alleged wrongdoing), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–50 (2011).

statements on the same subject" is a key factor in evaluating scienter (Opp. 26 (quoting *Dougherty*, 905 F.3d at 979)), yet they fail to allege any such divergent internal reports (or Defendants' knowledge of them). CW-1 claims that Mr. Flannery "had access to" a shared Excel file tracking pre-orders, but this bare allegation is insufficient even to establish that Mr. Flannery ever viewed the file (assuming it existed), much less *when* he did so (if he did), what if any facts contained therein were inconsistent with his challenged statement about pre-orders, or what Mr. Flannery knew or believed when he made that statement in late September 2020. *See, e.g.*, *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (CW allegations insufficient where they did not allege "whether [defendants] actually accessed or reviewed [the information]"); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 308 (S.D.N.Y. 2019). And of course this allegation says nothing at all about what Mr. Burns or Mr. Rodriguez knew, thought, or believed at any time.

Plaintiffs also argue that the simple fact of Defendants having made the challenged statements suggests scienter (Opp. 27, 29, 31), but this assumes the very point in question—namely, the alleged falsity of the challenged statements. Moreover, the fact that pre-orders were an important metric that Defendants spoke about regularly does not mean that these high-level executives knew (or should have known) every detail of every pre-order or LOI, only that they knew enough to believe their statements fairly represented demand for the Endurance.[30] Plaintiffs claim it was at least reckless for the Defendants to continue reporting pre-orders and claiming

---

[30] As Plaintiffs' own authority notes, "[h]owever important [a subject] may be to [a company], the . . . Defendants cannot be fairly presumed to know *everything* about [it]. []This is an inherent difficulty with the core-operations doctrine—no matter how important a particular issue, the presumption must dissipate at some level of detail." *Stein v. U.S. Xpress Enterprises, Inc.*, 2020 WL 3584800, at *39 (E.D. Tenn. June 30, 2020). Plaintiffs' other authorities involved circumstances that more strongly indicated scienter. *See Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014); *South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).

production was "on track" even after receiving the SEC subpoena.[31] But the mere fact of that inquiry did not "provide notice of [] wrongdoing" as Plaintiffs suggest, and the Defendants believed there was nothing to Hindenburg's allegations.[32] Nor do any of the challenged statements constitute "blatant lies" establishing disregard for the truth. Opp. 30. It was perfectly clear in Mr. Burns's *MadMoney* interview on Nov. 17, 2020 (not to mention Lordstown's many other public statements on the subject) that the "very serious orders" Mr. Burns referenced were nonbinding pre-orders.[33] And that statement was entirely consistent with his March 2021 statement after the Hindenburg Report that "[w]e've never said we had orders." AC ¶ 206. As he truthfully explained in that later interview, Lordstown had always clearly disclosed both that its pre-orders were nonbinding (as is standard in its industry) and that it nonetheless viewed them as serious due to the fundamentally different nature of fleet purchasing. *Id.*; *supra* pp. 3-5.

Finally, none of Plaintiffs' other arguments support scienter either. As the Company explained at the time, Mr. Burns's and Mr. Rodriguez's resignations in June 2021 came at a logical moment of corporate transition and do not, in and of themselves, suggest scienter.[34] Nor does the

---

[31] Only five challenged statements were made after Feb. 17, 2021. *See* AC ¶¶ 324-26, 360-64.

[32] Both *Cosby v. KPMG, LLP*, 2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018), and *In re Health Mgmt., Inc. Secs. Litig.,* 970 F. Supp. 192 (E.D.N.Y.1997)—unlike this action—involved numerous "red flags" (not just an SEC inquiry) suggesting scienter.

[33] CNBC, "Lordstown Motors CEO on early EV fleet orders, reviving GM plant and hiring" *MadMoney* (Nov. 17, 2020), *available at https://www.cnbc.com/video/2020/11/17/lordstown-motors-ceo-early-ev-fleet-orders-reviving-gm-plant-and-hiring.html* (Jim Cramer introducing Mr. Burns and stating that Lordstown claims "50,000 nonbinding reservations" (00:49); screen banner referencing "about 50,000 nonbinding production reservations" (01:40); same at beginning of discussion re "seriousness of orders" (3:00)).

[34] *See* Mem. 32 & n.67; Lordstown Management Corrective Statement, *available at https://investor.lordstownmotors.com/lordstown-motors-corp-management-corrective-statement*. As Plaintiffs' own authority notes, a resignation's mere temporal proximity to disclosures is not sufficient to suggest wrongdoing. *Frank v. Dana Corp.*, 649 F. Supp. 2d 729, 741 (N.D. Ohio 2009) (no scienter; "Even when a resignation closely follows disclosure of [improprieties], the mere fact of the resignation and its proximity to the disclosure gives little support to an inference of scienter."), *rev'd*, 646 F.3d 954 (6th Cir. 2011) (finding scienter based on other allegations).

mere fact of the SEC and DOJ having initiated investigations indicate fraud; those investigations are ongoing and have not reached any conclusions.[35] And that Lordstown allegedly failed to pay a property tax once and has been sued in unrelated actions (as businesses often are), says nothing about any particular 10(b) Defendant's mental state with respect to the challenged statements.[36]

Motive-less fraud claims rarely survive a motion to dismiss and with good reason—absent a logical motive, rarely can a plaintiff plead particularized facts demonstrating conscious misbehavior or recklessness or that fraud is more likely than good faith. That is the case here; viewed holistically, the factual pleadings fail to suggest any inference of culpable knowledge or intent, much less a strong one. The most reasonable inference to be drawn from the pleaded facts is that the 10(b) Defendants were working hard to bring to market an innovative new product they truly believed in, and to fairly describe to investors the demand they were seeing and the anticipated production schedule as it evolved over time. Plaintiffs' and Hindenburg's speculation and innuendo alone cannot demonstrate that any earlier statements were made in bad faith or transform the Defendants' good intentions into culpable conduct.

**C. Plaintiffs Also Cannot Plead Loss Causation or, With Respect to Pre-Merger Statements, Reliance**

***Loss Causation.*** Plaintiffs argue that courts "routinely accept short reports as corrective disclosures" (Opp. 32-33), but this is beside the point. Like any corrective disclosure, a short-seller

---

[35]*See Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009) ("[A] decision by government agencies to investigate a company is not sufficient to meet the heightened *Tellabs* standard on its own . . . ."), *abrogated on other grounds by Matrixx Initiatives, Inc.*, 563 U.S. at 48-50; *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false . . . nor does it add an inference of scienter."); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 713 n.8 (E.D. Mich. 2010) (same re scienter).

[36] Plaintiffs' citation to *Chamberlain*, 757 F. Supp. 2d at 710, is far off base: the allegations of "deliberately illegal behavior" that decision references concerned the conduct at issue in the securities claims, not unrelated and unadjudicated allegations raised in contested lawsuits.

report must reveal the truth previously hidden by the alleged misrepresentations. Mem. 33-35; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); 15 U.S.C. § 78u-4(b)(4). Plaintiffs cannot plead loss causation here because the Hindenburg Report did not reveal any previously hidden "truth." Mem. 34-35. And, if the Hindenburg Report does constitute a corrective disclosure, then the class period must end there; Plaintiffs have not sufficiently alleged that any subsequent "partial corrective disclosures" revealed any "truth" about pre-orders or the production timeline that was not already indicated by Hindenburg's accusations. *Id.* 35. Indeed, the Hindenburg Report is the AC's roadmap. Loss causation thus either defeats or significantly limits the AC.

     ***Reliance.*** Reliance is an essential element of Plaintiffs' 10(b) claim. Plaintiffs do not (and cannot) show that they actually relied on any of the challenged statements; instead, they invoke the fraud-on-the-market presumption of reliance. However, that requires them to demonstrate that the security in question traded efficiently, and Defendants' initial Memorandum explained at some length why Plaintiffs' allegations are insufficient to establish that the market for DPHC stock *prior to the de-SPAC merger* was efficient in general or with respect to information about potential target Lordstown. *Id.* 35-37. Indeed, Defendants explained that DPHC's stock price history strongly indicates a *lack* of efficiency during the pre-merger period—which means the fraud-on-the-market presumption does not apply and Plaintiffs' pre-merger claim fails for lack of reliance. *Id.*

     Plaintiffs have no answer to any of this, offering only the generic response that these arguments are "premature" and that the AC alleges "market efficiency under accepted standards." Opp. 35. Not so: the reliance element of a 10(b) claim must meet basic pleading requirements like any other, and in the unique circumstances of SPAC mergers, it makes no sense to assume that just because a SPAC's stock trades on a national market it is efficient as to itself, much less a merger target. Because Plaintiffs fail to allege facts plausibly establishing that DPHC stock traded

efficiently with respect to Lordstown news and information prior to the merger, they cannot invoke the fraud-on-the-market presumption with respect to any challenged pre-merger statements and those statements cannot ground Plaintiffs' claims.[37]

### D.    Plaintiffs Cannot Plead a "Scheme Liability" Claim

Plaintiffs' "scheme liability" claim essentially duplicates the Rule 10b-5(b) claim discussed above—positing the same theory of fraud, based on the same allegations—and fails for the same reasons. 17 C.F.R. § 240.10b-5; *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 895 (W.D. Ky. 2010) (scheme claim requires same 10(b)-5(b) elements except that "deceptive or manipulative conduct" can substitute for false or misleading statement). Plaintiffs fail to allege that any 10(b) Defendant acted with scienter, or that any alleged misrepresentation actually caused Plaintiffs' losses—flaws that are fatal to the scheme claim as well. *See supra* pp. 14-21. Nor does the AC sufficiently allege deceptive or manipulative conduct. For the same reasons discussed above with respect to falsity, the factual allegations simply do not suggest that any 10(b) Defendants' statements or actions were deceptive with respect to pre-orders or the anticipated production timeline. *See supra* pp. 2-13.[38] And to the extent Plaintiffs rely on pre-class period

---

[37] Nor can the "*Affiliated Ute* presumption" save Plaintiffs. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), did not involve public statements or the securities markets, much less a securities class action under Rule 10b-5(b). Rather, the defendants there failed to disclose material information in face-to-face transactions with plaintiffs as part of a fraudulent scheme in violation of Rule 10b-5(a) and (c), and the Court found that in these circumstances plaintiffs did not need to prove reliance on the material omissions. *Id.* at 153. This presumption cannot apply to actions for false or misleading statements or omissions under Rule 10b-5(b) because even a material omission is not actionable under that provision unless plaintiffs can show that it rendered an affirmative statement misleading. *See*, *e.g.*, *Regents of the Univ. of California v. Credit Suisse First Bos. (USA), Inc.*, 482 F. 3d 372, 384 (5th Cir. 2007) (*Affiliated Ute* does not apply to actions under Rule 10b-5(b)). Plaintiffs' backup invocation of *Affiliated Ute* (Opp. 34 n.15) only goes to show that they have no answer to Defendants' reliance arguments.

[38] Plaintiffs claim CW-1's and CW-2's vague allegations that "the LOIs were for generating investment interest" establish that these efforts were part of a fraudulent scheme (Opp. 35-36), but

22

allegations—such as those proffered by CW-1 and CW-2 (*see supra* pp. 16-18)—those cannot ground this claim because Section 10(b) requires artificial inflation of a company's stock price during the class period.[39]

## II. Plaintiffs' Section 14(a) Claim Fails for Many of the Same Reasons

Plaintiffs' Section 14(a) claim against DPHC, Lordstown (prior to the merger), Mr. Burns, Mr. Flannery,[40] and Mr. Hamamoto fails for essentially the same reasons as the 10(b) claims: the pleadings do not establish that any challenged statement in the proxy materials was materially false or misleading, that any 14(a) Defendant made such a statement negligently, or that any such statement caused Plaintiffs' alleged losses.[41] And while Defendants contend that both falsity and negligence must be pled with particularity,[42] Plaintiffs' pleadings fail under any standard.

All of the statements challenged under Section 14(a) also are challenged under Section 10(b), and Plaintiffs cannot plead falsity, negligence, or loss causation[43] for essentially the same reasons. As discussed above, the challenged statements were all true and not misleading, and no

---

Lordstown using LOIs for publicity was entirely consistent with the pre-orders also providing meaningful indications of demand and being used to gauge interest for internal forecasting and tooling needs. *See* AC ¶¶ 318, 324; Ex. 7 (3/17/21 Tr.), at 18 (explaining decision to make significant upfront tooling investments based on understanding of demand).

[39] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267-69 (2014).

[40] As previously noted, Mr. Flannery is not a proper 14(a) Defendant (Mem. 38 n.76), and Plaintiffs' authorities are not to the contrary. *See, e.g.*, *Lewis v. Byrnes*, 538 F. Supp. 1221, 1223 (S.D.N.Y. 1982) ("The mere appearance of one's name in a proxy statement does not create liability for any misstatements which appear in the proxy materials.").

[41] *See In re Almost Fam. Inc. Sec. Litig.*, 2020 WL 695654, at *3 (W.D. Ky. Feb. 11, 2020), *appeal dismissed sub nom. In re Almost Fam., Inc., Sec. Litig.*, 2020 WL 3317769 (6th Cir. Apr. 24, 2020).

[42] *See* Mem. 11 & n.23 (noting Sixth Circuit has not decided this issue, but that most circuits have applied Reform Act's heightened pleading standards to Section 14(a) claims); *Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*, 2012 WL 4958561, at *4-10 (N.D. Ohio Oct. 16, 2012) (dismissing 14(a) claim under Reform Act and Rule 9(b)).

[43] Like 10(b), Section 14(a) requires Plaintiffs to plead that "the misrepresentations or omissions caused the loss of which the plaintiff complains" (separate from the requirement that the proxy statement be an "essential link" in completion of the transaction). *In re Gas Nat., Inc.*, 2015 WL 3557207, at *12 (N.D. Ohio June 4, 2015). Plaintiffs fail to do so here for the same reasons discussed in Section I.C *supra*.

factual pleadings indicate otherwise (some also were non-actionable puffery or protected forward-looking statements). *See supra* § I.A. And this is particularly obvious in the context of Lordstown's many clear disclosures, in the proxy materials and elsewhere, that its pre-orders were nonbinding and that its anticipated production timeline was an estimate subject to change.[44]

Nor can Plaintiffs establish that any 14(a) Defendant acted negligently. Plaintiffs' vague assertion that Mr. Burns and Mr. Flannery must have acted negligently in issuing the proxy materials (or, in Mr. Flannery's case, "allowing [them] to be disseminated" with his name and image) because they were "intimately familiar" with Lordstown's business (AC ¶¶ 475, 477), is unsupported by any *factual* allegations establishing what specifically either man knew or should have known at the time that was inconsistent with the challenged statements in the proxy. Likewise, Plaintiffs claim Mr. Hamamoto was negligent in signing the proxy materials because "readily available information" would have demonstrated their inaccuracy (*id.* ¶ 473), but they fail to identify any such "readily available" information or how it would have contradicted any challenged statement. These allegations cannot meet even *Iqbal* and *Twombly*'s lesser standard, much less the Reform Act's heightened pleading requirements.

## III. Plaintiffs Cannot State a Section 20A Claim for Insider Trading

Plaintiffs' Section 20A claim also fails for many of the same reasons. Most importantly, Plaintiffs fail to allege with the requisite particularity that Mr. Rodriguez, Mr. Schmidt, Mr. Brown, or Mr. Post were personally in possession of any "material nonpublic information" ("MNPI") when each defendant sold stock between February 2 and 4, 2021. *See* 15 U.S.C. § 78t-1(a); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1130 (W.D. Mich. 1996). Rather, Plaintiffs argue only that each 20A Defendant "had a position at Lordstown that

---

[44] *See* Mem. 14-16, 24-25; AC ¶¶ 270, 272, 278, 280 (8/24/20 & 10/8/20 Proxy).

provided him access to material nonpublic knowledge about Lordstown's operations." Opp. 39. Sheer speculation that because of their executive positions they must have had MNPI[45]— unsupported by any facts showing what each defendant actually knew at the time of his sale—is insufficient as a matter of law to plead this element.[46] Nor can Plaintiffs plead the necessary "predicate violation" of Section 10(b) without pleading scienter, and they offer nothing more than job titles and descriptions with respect to the 20A Defendants.[47] Each of these deficiencies requires dismissal of Plaintiffs' 20A claim.

## IV.     CONCLUSION

For the reasons detailed above and in the Defendants' initial Memorandum, Plaintiffs' claims are fundamentally flawed and further repleading would be futile. Accordingly, we respectfully ask the Court to dismiss the AC in its entirety with prejudice.

---

[45] The Jan. 13, 2021 prototype fire that Plaintiffs claim was material non-public information (Opp. 39) was a matter of public knowledge no later than January 30, 2021. *See* Gustavo Enrique Ruffo, "Lordstown Motors Endurance Electric Truck Catches Fire While Testing" *InsideEVs* (Jan. 30, 2021), *available at https://insideevs.com/news/483166/lordstown-motors-endurance-fire-testing/*.
[46] *See In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *4 (S.D. Tex. June 15, 2017) (allowing 20A claim that "identif[ied] the specific [MNPI] received by the [defendants'] designees and when they received that information" but dismissing as against defendant for whom no such specific allegations of possession were offered).
[47] A predicate *10(b)* insider trading violation requires a strong inference that each 20A Defendant acted with fraudulent intent when he failed to disclose MNPI in his possession before trading. *See Picard*, 940 F. Supp. at 1128. Plaintiffs fail to plead this (or any other) element of a predicate 10(b) violation with the requisite particularity.

Dated: March 3, 2022

Respectfully submitted,


 *s/ Douglas W. Greene*
**BAKER & HOSTETLER LLP**
Douglas W. Greene
Email:   dgreene@bakerlaw.com
45 Rockefeller Plaza, 14th Floor
New York, NY  10111
Telephone:   212.589.4200
Facsimile:    212.589.4201

Douglas L. Shively
Email: dshively@bakerlaw.com
Key Tower, 127 Public Square, Suite 2000
Cleveland, OH 44114
Telephone: 216.621.0200
Facsimile: 216.696.0740

*Attorneys for Defendants*

26

**CERTIFICATE OF SERVICE**

I certify that on March 3, 2020, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_/s/ Douglas W. Greene_____
An attorney for Defendants

27

## CERTIFICATE AS TO PAGE LIMIT

This Court  granted Defendants'  Motion to Extend Page Limits on November 3, 2021. (ECF 68.) The undersigned hereby certifies that the foregoing brief complies with the applicable 25-page limit.

 _/s/ Douglas W. Greene_____
An attorney for Defendants
