# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| IN RE LORDSTOWN MOTORS CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00616 (~~PAG~~DAR) <br><br> **<u>CLASS ACTION</u>** <br><br> <u>JURY TRIAL DEMANDED</u> |

**<u>[PROPOSED]</u>**
**CONSOLIDATED <u>SECOND</u> AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE**
**<u>FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| TABLE OF ABBREVIATIONS | | | ~~3~~4 |
| I. | INTRODUCTION | | 2 |
| | A. | Touting Lordstown's Pre-Orders to Promote the Merger | 3 |
| | B. | The Merger Is Approved; the Misrepresentations Continue | 6 |
| | C. | Defendant Burns Continues to Mislead After Learning of the SEC Investigation | 8 |
| | D. | The Truth Begins to Emerge | 9 |
| | | (1) The Truth About Lordstown's Pre-Orders | 9 |
| | | (2) The Truth About Lordstown's Production Capabilities | 17 |
| | E. | The Fallout from the Hindenburg Report | 19 |
| | F. | Lordstown Continues Declining as the Truth Continues to Emerge | 20 |
| II. | JURISDICTION AND VENUE | | ~~13~~24 |
| III. | PARTIES AND KEY PLAYERS | | ~~14~~25 |
| | ~~A~~G. | ~~Parties~~Plaintiffs | ~~14~~25 |
| | H. | Defendants | 26 |
| | ~~B~~I. | Other ~~Relevant Persons and Entities~~ ~~19~~Non-Party Key Players 27 |  |
| IV. | SUBSTANTIVE ALLEGATIONS | | ~~19~~29 |
| | A. | Early Background on Lordstown and DiamondPeak Holding Corp. | ~~19~~29 |
| | B. | Defendants Mislead Investors as They Pitch and Close the Merger | ~~25~~34 |
| | C. | The Misrepresentations Escalate After the Merger | ~~31~~41 |
| | D. | The Truth Begins to Emerge | ~~38~~49 |
| | | (1) The Truth About Lordstown's Order Book | ~~39~~49 |
| | | (2) The Truth About Lordstown's Production Capabilities | ~~58~~79 |

(3)    The Market Reaction to the Hindenburg Report .......... ~~62~~89

E.    Lordstown Attempts a Clumsy Cover-Up as the Truth Continues to Emerge .. ~~63~~90

V.    ADDITIONAL ALLEGATIONS .......... ~~77~~107

    A.    False and Misleading Statements .......... ~~77~~107

        (1)    Statements Concerning Lordstown's Supposed Pre-Orders .......... ~~78~~107

        (2)    Statements Concerning Lordstown's Production Capabilities .......... ~~107~~137

        (3)    Defendants' Omissions of Information Required by Item 105 .......... ~~116~~149

    B.    Allegations of Scienter as to Certain Claims .......... ~~118~~151

        (1)    Motive and Circumstantial Evidence of Scienter .......... ~~119~~152

        (2)    Scienter as to Lordstown's Supposed Pre-Orders .......... ~~120~~153

        (3)    Scienter as to Lordstown's Production Capabilities .......... ~~127~~160

        (4)    The "Resignations" and Conclusions of the Internal Investigation Support the Inference of Scienter .......... ~~128~~161

        (5)    The SEC and DOJ Investigations Support the Inference of Scienter ~~128~~162

        (6)    Both the Pre-Orders and Lordstown Production Capabilities Were Essential to the Company's Success .......... ~~130~~165

        (7)    Defendants' Other Illegality Supports the Inference of Scienter .......... ~~131~~166

        (8)    Insider Stock Sales Support the Inference of Scienter .......... ~~134~~169

        (9)    Additional Allegations as to Insider Trading Claims .......... 170

        (10)    Additional Allegations of Scienter as to Defendant Flannery .......... 173

    C.    Transaction Causation — Reliance .......... ~~135~~173

    D.    Loss Causation .......... ~~138~~176

    E.    No Safe Harbor .......... ~~142~~180

VI.    CLASS ACTION ALLEGATIONS .......... ~~143~~181

VII.    COUNTS .......... ~~146~~185

iii

A.       COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against ~~All~~ Defendants ~~Except Defendants Hamamoto, Schmidt, Brown, and Post~~ ........ ~~146~~ Burns, Flannery, and Schmidt 185

B.       COUNT II: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against ~~All~~ Defendants ~~Except Defendants Hamamoto, Schmidt, Brown, and Post~~ ........ ~~148~~ Burns, Flannery, Rodriguez, and Schmidt ........ 186

C.       COUNT III: Violation of Section 14(a) of the Exchange Act Against Defendants ~~LTM, Lordstown EV Corporation,~~ Burns, Flannery, <u>Rodriguez,</u> and ~~Hamamoto~~ <u>Schmidt</u> ........ ~~150~~ 188

D.       COUNT IV: Violations of ~~§~~ <u>Section</u> 20A of the Exchange Act Against Defendants Schmidt, Rodriguez, Brown, and Post ........ ~~153~~ 191

E.       COUNT V: Violations of Section 20(a) of the Exchange Act Against ~~the Individual~~ Defendants ........ ~~154~~ <u>Burns, Rodriguez, Flannery, Schmidt, Post, and Brown</u> 192

VIII.    PRAYER FOR RELIEF ........ ~~155~~ 194

IX.     JURY DEMAND ........ ~~156~~ 195

iv

**TABLE OF ABBREVIATIONS**

| Term or Terms | Definition[1] |
|---|---|
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CIO | Chief Information Officer |
| Class | Defined herein |
| Class Period | The period from August 3, 2020, through July 2, 2021 |
| CW(s) | Confidential Witness(es) |
| Endurance | The Endurance pickup truck that Lordstown was purportedly developing and marketing during the Class Period |
| EV | Electric vehicles |
| Exchange Act | The Securities Exchange Act of 1934 |
| Defendants | Stephen S. Burns, Julio Rodriguez, Caimin Flannery, Shane Brown, Darren Post, and Rich Schmidt |
| DiamondPeak or DPHC | DiamondPeak Holding Corp. |
| DOJ | U.S Department of Justice |
| ~~DPHC~~ | ~~DiamondPeak Holding Corp.~~ ~~The former ticker for Lordstown's Class A common stock~~ |
| DPHCU | The ticker for units listed by ~~Lordstown while the company was named~~ DiamondPeak ~~Holding Corp.~~ |
| DPHCW | The ticker for warrants listed by ~~Lordstown while the company was named~~ DiamondPeak ~~Holding Corp.~~ |
| ~~Endurance~~ | ~~The Endurance pickup truck that Lordstown was purportedly developing and marketing~~ |
| ~~Exchange Act~~ | ~~The Securities Exchange Act of 1934~~ |

---

[1] To the extent that the term is defined differently herein, the term should be interpreted broadly enough to carry both the meaning in this table and the meaning herein.

v

| | |
|---|---|
| GM | General Motors Company |
| Hindenburg | Hindenburg Research, LLC |
| Hindenburg Report | The ~~Report~~report about Lordstown published by Hindenburg ~~Research~~ on March 12, 2021 |
| ~~Item 105 Disclosure~~IPO | ~~The material factors that make an investment in the registrant or offering speculative or risky~~Initial Public Offering |
| Lead Counsel | Labaton Keller Sucharow LLP (F/K/A Labaton Sucharow LLP) |
| Lead Plaintiff | George Troicky |
| LOI | Letter of Intent |
| Lordstown or Company | The business purportedly engaged in the development and production of the Endurance pickup truck |
| Lordstown Options | Any publicly traded option to purchase or sell DPHC or LTM's ~~class~~Class A common stock. |
| Lordstown Securities | Lordstown ~~Options~~options and securities ~~trading~~that trade (or have traded) under the tickers DPHC, RIDE, DPHCW, RIDEW, and DPHCW |
| ~~LOI~~LTM | ~~Letter of Intent~~The entity that was named Lordstown Motors Corp. during the Class Period. |
| ~~LTM~~McKinsey | ~~Lordstown Motors Corp. F/K/A DiamondPeak Holding Corp.~~McKinsey & Company |
| McKinsey Report | The Electric Truck Due Diligence Study Report that McKinsey prepared, dated July 30, 2020 |
| Merger | The take-public merger between DiamondPeak ~~Holding Corporation and Lordstown Motors Corp.~~and LTM on August 3, 2020 |
| Merger Sub | DPL Merger Sub Corp. |
| Plaintiffs | George Troicky, Daniel Tavares, Globestar Systems Inc., and Ashith Pabbathi, and FNY Managed Accounts LLC~~, together~~ |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| SEC | The U.S. Securities and Exchange Commission |
| ~~RIDE~~Securities Act | The ~~ticker for Lordstown's Class A Common~~ |

| | ~~stock~~Securities Exchange Act of 1933 |
|---|---|
| SPAC | Special Purpose Acquisition Corporation |
| Special Committee | The special committee of Lordstown's board that was formed to investigate misstatements identified in the Hindenburg Report, among other things |
| Sponsor | DiamondPeak Sponsor LLC |
| RIDE | The ticker for Lordstown's Class A common stock subsequent to the Merger and prior to Lordstown's emergence from bankruptcy |
| RIDEW | The ticker for warrants listed by Lordstown |
| ~~Sponsor~~ | ~~DiamondPeak Sponsor LLC~~ |
| Workhorse | Workhorse Group Inc. |
| §10(b) | Section 10(b) of the Exchange Act |
| §14(a) | Section 14(a) of the Exchange Act |
| §20(a) | Section 20(a) of the Exchange Act |
| §20A | Section 20A of the Exchange Act |

vii

Lead Plaintiff George Troicky ("Lead Plaintiff"), and additional named Plaintiffs Daniel Tavares, Globestar Systems Inc., Ashith Pabbathi, and FNY Managed Accounts LLC (together, "Plaintiffs") bring this consolidated second amended complaint against Defendants ~~Lordstown Motors Corp. F/K/A DiamondPeak Holding Corp. ("LTM"), Lordstown EV Corporation F/K/A Lordstown Motors Corp.,~~ Stephen S. Burns, Shane Brown, Caimin Flannery, ~~David T. Hamamoto,~~ Julio Rodriguez, Rich Schmidt, and Darren Post (collectively, "Defendants").

Plaintiffs allege the following upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included: (a) review and analysis of public filings made with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, analyst reports, news articles, and other publications; (c) a review of interviews and other public statements made by Defendants, DiamondPeak Holding Corp. ("DPHC"), and Lordstown; (d) interviews with former employees of ~~Defendants and Defendants'~~ Lordstown and Lordstown's purported customers, business partners, and affiliates; (e) consultation with experts on the automotive industry; (f) review of court filings in other matters concerning ~~Defendants and their current or~~ Lordstown and its former affiliates; ~~and~~ (g) review of information obtained through freedom of information requests~~, such as police reports.~~ ; (h) documents and information provided to Plaintiffs by Lordstown; and (i) information provided by David T. Hamamoto ("Hamamoto") in an interview with Lead Counsel.

Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein that will be revealed through continued investigation and discovery.

As more fully stated herein, Plaintiffs brings this federal securities class action on behalf of themselves and all persons or entities who (a) purchased LTM's ~~publicly traded warrants~~

1

(Ticker: "RIDEW" and prior ticker: "DPHCW")Class A common stock, LTM's publicly traded warrants, LTM's publicly traded units (Ticker: "DPHCU"), or any publicly traded option to purchase or sell LTM's Class A Common Stockcommon stock, from August 3, 2020, through July 2, 2021, inclusive (the "Class Period"), and/or (b) held LTM's Class A Common Stockcommon stock as of September 21, 2020.

## I.    INTRODUCTION

1.    This is a classic "fake it 'til you make it" fraud.  After being pushed out of his role as CEO of the previous company he had founded, Defendant Stephen S. Burns had an exciting opportunity.  He could buy a recently closed plant from General Motors ("GM") at a steep discount.  Burns hatched the idea to use the plant to manufacture a new electric pickup truck (the "Endurance") with an in-wheel "hub motor" design, which had never been used in automobiles.

2.    Burns formed a business ("Lordstown") and bought the plant from GM, but he still needed to raise the cash to develop and manufacture the truckEndurance.  To attract investments, Burns developed a *false and misleading*, but compelling, narrative about the fledgling company.  HeBurns touted a growing book of "pre-orders," which he claimed as evidence of demand for the vehicleEndurance.

3.    On November 14, 2019, Defendant Burns boasted to Ohio-politicians that the plant would enable Lordstown to be first to market, concluding: "First mover market, *we've already got pre-orderspre-orders for these vehicles*."  On May 22, 2020, the *Detroit Free Press* reported that Burns claimed, "well over several thousand" pre-orders and that he had said, "[t]he demand side is super strong, I am starting to worry we won't be able to make them fast enough.".  At a June 2020 prototype unveiling event, featuring former Vice President Mike Pence, Burns

2

claimed, "our whole year, ***our first year of production [is] already pre-sold***," and later in the event, <u>former</u> Vice President Pence stated, "Steve actually told me that they've already ***pre-sold*** 14,000 additions of the . . . truck."

4.       After months of unsuccessfully trying to raise cash from private sources, <u>Defendant</u> Burns found a solution.  On August 3, 2020, ~~he~~<u>Burns</u> announced that Lordstown was jumping on the "SPAC" bandwagon~~,~~ and that it would be taken public by merging (the "Merger") with DiamondPeak Holding Corporation ("DPHC" or "DiamondPeak"), a publicly traded shell company <u>ran by David T. Hamamoto ("Hamamoto")</u> that held cash reserves.  To secure this funding, Burns would need to persuade shareholders of DPHC to approve the Merger, and to do so, he doubled down on his false claims ~~about Lordstown's supposed pre-orders~~.

**<u>A.</u>       ~~5.~~ <u>Touting <u>Lordstown's</u> Pre-Orders to Promote the Merger</u>**

5.       ~~.~~ The Merger proxy materials stated that Lordstown had "***secured $1.4 billion of pre-orders***."  The proxies claimed <u>Lordstown had</u> 27,000 pre-orders~~,~~ "***from commercial fleet customers***" or "from fleet operators," which ~~Defendants~~<u>Defendant Burns and Lordstown</u> claimed would provide "revenue sufficient to cover 2021 production and into 2022" and represented "clear demand" for the ~~truck~~<u>Endurance</u>.  The narrative that these pre-orders were coming from <u>commercial</u> fleets was important because it suggested ~~they~~<u>that the pre-orders</u> represented true demand from Lordstown's target market.

<u>6.       The term "commercial fleets" refers to vehicles owned by commercial businesses for use in those businesses' operations to transport goods or people or to perform services. Targeting commercial fleets provided Lordstown with certain advantages as an EV startup, including that: (a) it could simplify charging the vehicles and reduce the need for Lordstown to invest in a charging architecture, because commercial fleets are more capable of managing their</u>

own vehicle charging needs; and (b) it would mean Lordstown's customers would be easier to service, resolving the otherwise substantial challenge of building out a dealership/service network that could reach geographically disbursed customers.  However, commercial fleets are sophisticated customers and have strong incentives to be discerning when buying large quantities of vehicles.  Thus, a major risk for Lordstown's business—since it was a new manufacturer and, in particular, a new manufacturer using "hub motors," which was an entirely novel technology among commercial car and truck manufacturers—was whether or not there would be strong demand for its vehicles within the target market.  As a result, statements touting pre-orders from fleets were especially important, as they spoke to the viability of Lordstown's business in persuading these selective customers, which were crucial to Lordstown's business plan.

7.      6. An investor slide deck published in the proxy materials repeated the claim of "~$1.4bn of Existing Pre-Orders" and listedincluded the logos of certain "Selected Pre-Order Customers."  InOn the conference call presenting that slide deck, Defendant Burns referred to the "*significant* pre-order activity," repeating the supposed numbers.  During the call, Defendant Hamamoto (Chairman of the SPAC and, after the Merger closed, a Lordstown Board member) stated that he had evaluated hundreds of companies on behalf of DPHC and that Lordstown stood out, noting that it had "attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its $1.4 billion in pre-orders to-date."  While promoting the Merger, Burns appeared on CNBC claiming that "[w]e got 27,000 *orders*."  Burns even appeared with former President Trump and nodded in agreement as the President, speaking about Lordstown's truck, told reportersstated: "I heard the *sales* are great."

8.      7. The market believed theDefendants' story.  For example, securities analyst BTIG published a report on October 12, 2020, recommending with a buy rating, noting: "First

4

Year of Production Sold Out."  The analyst report commented on how they liked that ~~the~~Lordstown's sales came from "fleet managers."

9.  Throughout the Class Period, Defendant Burns was heavily focused on Lordstown's supposed pre-orders.  Internal Lordstown emails throughout the Class Period show Burns regularly discussing the issue and how to position the pre-orders to promote Lordstown.  Those emails show that Burns personally commented on specific supposed pre-order deals, and personally advised on detailed issues concerning the sales team, including how to set compensation to incentivize pre-order sales.  Burns was also sent emails with detailed spreadsheets breaking down the supposed pre-orders by customer.

10.  In an interview, Hamamoto explained that Defendant Burns "certainly gave the impression that he was very involved" in overseeing Lordstown's pre-orders and sales force, and "definitely positioned himself as if he were intimately involved in" discussing the pre-order issue with Lordstown's sales force.  Hamamoto further recalled Burns "continually" telling him and others that "these were real orders signed by C-suite executives."  Hamamoto also recalled that Lordstown's Board would receive presentations about the pre-orders and believed Burns was the one making those presentations.  Likewise, Hamamoto explained that "production and pre-orders were two things that Steve [Burns] tended to focus on."  When asked how closely Burns tracked the pre-orders and whether Burns would know about particular deals with non-fleet influencer customers, Hamamoto responded: "I think so.  He was pretty focused on it."  Hamamoto added that he believed this because Burns "talked pre-orders a lot."

11.  ~~8.  **Touting Production Capability Prior to the Merger.**~~  In addition to touting the ~~"~~supposed pre-orders,~~"~~ Defendant Burns also spun a knowingly false ~~story~~narrative regarding the ~~company's~~Company's production capabilities.  For example, the proxy materials claimed

that the plant was "near production ready," required only "modest incremental investment," and that the plant "positions would "position[] Lordstown to be first to market."  More specifically, Defendants Burns and Lordstown claimed production would begin in September 2021.  Furthermore, the The proxy materials also claimed that, after the Merger, Lordstown would have sufficient cash to both move through production and become "cash flow positive."  Similarly, in These representations were reiterated by DPHC's principle (Hamamoto), who stated, on an investor call, Defendant Hamamoto claimed that pitching the Merger, that the deal would "fully fund Lordstown's current business plan and position the company [C]ompany to achieve positive EBITDA and cash flow."

### B.    9. The Merger Is Approved; the Misrepresentations Continue

12.    . On October 22, 2020, shareholders approved the Merger on the basis of these false assurances.  Following the Merger, Defendants Defendant Burns and Lordstown continued to promote the company Company with these same misleading talking points.

13.    10. For example, on October 26, 2020, Defendant Burns rang the bell to open trading at NASDAQ, and in his short remarks stated,: "This brings the final chapter where we get the necessary resources to be able to bring [the] Endurance all the way to market. . . . And we are on target to do that in September."  That same day, *The Detroit News* quoted Burns as saying the Merger provided the funding they Lordstown needed to be "*assured*" they the Company could begin production by September 2021.  In the same article he, Burns claimed Lordstown had amassed 40,000 pre-orders and that he was "surprised" by the number and that now "he's got to" make them, emphasizing the veracity of the orders.

14.    11. On November 17, 2020, Defendant Burns appeared on CNBC's *Mad Money* with Jim Cramer.  Defendant Burns claimed, "we've already got 50,000 pre-orders," and added,

"we sell to commercial fleets."  Then Cramer asked how "solid" the orders were, ~~suggesting~~questioning "these people are not going to be walking away?  They are committed?" ~~and~~ Burns responded:

> Right.  Yeah.  ***All of them***.  When you order, I think our average order size is about 500 trucks at a time.  And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial.  So you've got to plan all the charging and everything.  ***So it's very serious orders***.

15.  ~~12.~~ On November 16, 2020, Lordstown issued a press release claiming ~~they were~~the Company was "on track" for the September 2021 date for production and "deliveries." The same press release claimed 50,000 reservations "***from commercial fleets***."  The press release also stated that the 50,000 figure did not capture demand from any organization that was "not in [a] position to be able to place pre-orders," such as "federal, state[,] and municipal governments."[2]  In addition to being literally false, this statement conveyed that whatever the 50,000 figure represented, it was a degree of commitment that was serious enough that government organizations would not be able to participate.

16.  ~~13.~~ That same day, Defendant Burns reiterated these remarks in an interview hosted by the ~~website~~ *IPO Edge*: "50,000 pre-sales already, ***all from fleets***.  That's just the commercial sector.  Does not count military or police departments, municipalities, state vehicles, so really just to have that many commercial vehicles sold already is a big deal."  Later in the interview ~~he~~, Burns was asked where the demand was coming from, and ~~Burns~~he said~~:~~, "the bulk of them, our average order is about 500 trucks ***per order***, so larger ***fleets***," and referred to a recent "***order***" of 400 vehicles.

---

[2] Notably, ~~government~~many governmental organizations cannot buy vehicles unless ~~they are~~the manufacturer is on an approved list.

7

17.     14. InDuring a December 2, 2020, Credit Suisse event, Defendant Burns said, "we sell to fleets," while claiming the "50,000 pre-orders" or "*almost $3 billion in pre-orders*." When asked, "how do you find these fleet buyers," Burns claimed, "it's almost all incoming." HeBurns reiterated that the number was "just on the commercial side" from "larger fleets," and not from governmentsgovernmental organizations.

18.     15. On January 11, 2021, Lordstown issued a press release stating it was "on track for start of production in September" and claiming 100,000 pre-orders "from commercial fleets," concluding, "I think you can see why we feel that we are about to revolutionize the pickup truck industry."

19.     16. On February 6, 2021, Defendant Burns appeared on a popular investing YouTube channel and once again claimed 100,000 pre-orders, which he said that it did not include governmental organizations, and promised, "those numbers are just commercial fleets." The interviewer responded,: "Yeah, jeez.  So that's *literally* just for fleets?" and Burns then responded,: "Yeah.  *That's just commercial fleets*."  In the same interview, Burns boasted of how serious the orders were, noting that they were "signed by the CEO . . . or at least some C-suite person," and then claimingclaimed:

> *They take it very seriously*.  They've got to figure out how they're going to layer these electrics in there.  And the appetite for them to do that way early like that, a year out from some of them means they're trying to do their part to ensure this comes to market.  So *they're standing behind it and they're putting these pre-orderspre-orders in.*  But I'd say it's much stickier than a consumer putting a hundred dollars down refundable down on a Cybertruck, let's say.  And I think these orders are very, very sticky because I know what it takes to get them, the education you have to do.  This isn't somebody again on a website, a hundred bucks, refundable with a credit card.  *This is a fleet.*  And fleets generally take their business very, very seriously.  So I think they're very sticky.

8

**C.**   17. ~~Defendants Continue~~Defendant Burns Continues to Mislead After Learning of the SEC Investigation

20.   ~~.~~ On February 17, 2021, Lordstown received an information inquiry from the SEC into the pre-orders issue.  Lordstown did not disclose the SEC investigation at the time~~,~~ but has since admitted that the SEC's investigation "~~relates~~related" to the allegations at issue in this ~~action~~Action, and indeed, more recently, Lordstown settled the action, and in the accompanying documents, the SEC's fact finding focused on many of the same facts discussed herein.  Even after Defendants learned of ~~this~~the SEC investigation, Defendant Burns continued to mislead investors.

21.   ~~18.~~ On February 18, 2021, Defendant Burns was interviewed on CNBC.  The opening segment for the ~~TV spot~~television interview noted the 100,000 supposed ~~orders~~pre-orders, which Burns did not correct.  ~~He~~Burns then reasserted that Lordstown was on track for the September 2021 production date and that ~~they~~Lordstown had "enough liquidity" to get there.

22.   Incredibly, amidst these public statements, Defendant Burns wrote to the Ohio Attorney General on February 22, 2021, stating: "Lordstown has not entered into 'pre-orders' as your letter states.  Instead, Lordstown has entered into non-binding letters of intent."

23.   ~~19. On~~*Just one day after* his letter to the Ohio Attorney General, on February 23, 2021, Defendant Burns was interviewed by *Yahoo Finance*~~.  He~~, where Burns lauded the September 2021 production date.  ~~He~~Burns then stated: "Our initial foray is into fleets and *we have __pre-sold__ 100,000 of these to various fleets across America*.  So, really a big appetite."  Later adding that ~~the~~ fleets "buy in big chunks" and make "very sticky orders."

9

**D.**      ~~20.~~ **The Truth Begins to Emerge**

24.      ~~.~~ On March 12, 2021, renowned research firm, Hindenburg Research, LLC ("Hindenburg"), published a lengthy analysis of the ~~company~~Company (the "Hindenburg Report"), which included information from interviews ~~with~~regarding Lordstown's supposed pre-order customers and Lordstown's former employees.

**(1)      The Truth About Lordstown's Pre-Orders**

25.      ~~21.~~ The Hindenburg Report stated that "Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles," and that "Burns sought to book orders, regardless of quality, purely as a tool to raise capital and confer legitimacy."  In addition, the Hindenburg Report disclosed how Lordstown had paid a ~~third party~~third-party lucrative, per-truck commissions to obtain non-binding letters of intent ("LOIs"), and how in a case study posted to that third-party's website they had stated that Lordstown's fundraising was directly linked to pre-order generation—"the faster the pre-orders arrived, the greater **investors' confidence** would be in the ~~company~~[C]ompany and the faster funds would flow in."

26.      ~~22.~~ Investigation ~~of counsel~~by Lead Counsel has confirmed that the same sentiment was understood within Lordstown.  For example, CW-1, one of just a couple sales representatives at Lordstown, recalled a "fairly explicit" message that they needed to procure the reservations in order to get additional financing from investors.  CW-2, a high-level manager at Lordstown with detailed knowledge of Lordstown's sales practices, worked regularly with Defendants Burns and Flannery, and described the pre-orders as "pie in the sky" and stated that "all it was for" was to generate buzz.  CW-2 stated that~~,~~ there was "zero" due diligence conducted on the ability of potential customers to support their orders "by design."  CW-2

10

explained that when it came to securing letters of intent the only guideline provided to Lordstown's sales staff was to get "as many as possible in the shortest period of time."

27.    Internal emails show that Lordstown executives, including Defendant Burns, were heavily focused on collecting supposed pre-orders specifically for the positive publicity they could then derive from those pre-orders, rather than as a legitimate indicator of demand.

28.    23. Just a few examples of the information disclosed by the Hindenburg Report are summarized below:

- Lordstown counted E Squared as making a massive 14,000 truck pre-order worth $735 million (more than the entirety of the cash Lordstown raised in the Merger), even though E Squared was a non-incorporated "doing business as" name for a 1-2 person operation, run out of a modest one-bedroom apartment, which did not operate a fleet or own trucks, and instead hoped to eventually serve as an intermediary to sell trucks, which E Squared's operator called a "brand new business."

- Lordstown counted Innervations LLC for a 1,000 truck pre-order, a self-described "influencer" business operated as a side hustle by two individuals with other jobs, which did not operate a fleet, or "get involved in the actual ordering," and instead sought to act as a promoter for Lordstown trucks, by hosting events.

- Lordstown listed Grid XGrid X as a "SelectSelected Pre-Order Customer" in its Merger proxy, even though Grid XGrid X was an internet cloud services company, and did not appear to operate a fleet or own trucks.  The Hindenburg Report stated that Grid X'sGrid X's CEO had indicated they were "completely unaware" of the deal when asked about it and that the inquiry was "the first time" they had heard about it.

11

- ~~Lordstown listed Duke Energy as a "Select Pre-Order Customer," based on years-stale letters of intent with Workhorse to buy an entirely different truck.~~

- Lordstown counted a 500 truck pre-order by Clean Fuels Ohio, even though it was a ~~non-profit~~non-profit dedicated to educating on clean energy, not a fleet operator.  The non-profit said the deal was "promotional" and about "getting the word out," and was "really clear" with Lordstown about that fact.

- Lordstown counted Momentum Groups for a 900 truck pre-order in its Merger proxy, even though the group is not a fleet operator, and instead hosted a webpage inviting others to sign up to pre-order the truck.

29. ~~24.~~ Investigation ~~of~~by Lead Counsel, including through the review of internal Company documents provided to counsel by Lordstown, has confirmed that Lordstown's supposed pre-order book was full of ~~similar~~similarly illegitimate, non-existent, non-committal indications of interest from parties other than fleet managers.

30. Analysis of Lordstown's internal documents readily shows the scale of the fraud at the time of each misstatement touting increasingly larger numbers of pre-orders.  The table below summarizes the results of this analysis, which was prepared based on Lordstown's own internal spreadsheets tracking its supposed pre-orders.  A more detailed table along with an explanation the columns therein is provided at paragraphs 206-207.

[table on next page]

| Summary Table Demonstrating the Degree of the Deceit Concerning Pre-Orders |
|---|

12

| Claim Date | Claimed Pre-Orders | Supposed Deals with Fleets[3] | Supposed Deals with Fleets with a LOI[4] | Minimum Percent Public Claim was Overstated |
|---|---|---|---|---|
| 8/3/2020 | 27,000 | 4,770 | 4,009 | **85%** |
| 9/24/2020 | 38,000 | 4,772 | 4,011 | **89%** |
| 11/16/2020 | 50,000 | 9,507 | 6,126 | **88%** |
| 12/21/2020 | 80,000 | 9,924 | 6,541 | **92%** |
| 1/11/2021 | 100,000 | 12,934 | 8,541 | **91%** |

31.     If one only counted deals that were potentially with commercial fleet operators and actually had a supporting agreement, Lordstown was inflating its numbers by between **85% and 91%**.  Even if one counts all deals that were potentially with a commercial fleet (including those without an executed LOI) the numbers are still inflated by between **82% and 88%**.  A review of underlying supposed pre-orders paints an equally astonishing picture of the deceit.  For example:

---

[3] As detailed in paragraphs 206-207, this column generally tracks the number of supposed deals that Lordstown had recorded that were potentially with commercial fleets.  In other words, all deals Lordstown recorded minus supposed deals (a) where Lordstown recognized the counterparty was an intermediary (as opposed to a commercial fleet) and (b) where it was obvious that counterparty was not a commercial fleet (*e.g.*, a non-profit, advocacy group, intermediary, or agency).

[4] As detailed in paragraphs 206-207, this column generally tracks the number of supposed deals Lordstown had with commercial fleets, where the deal was supported by an executed agreement in the form of Lordstown's form letter of intent ("LOI") or a comparable document.  While the existence of a LOI does not mean it was legitimate to count the deal as a pre-order, or that doing so would not mislead investors, it was a bare minimum requirement that would be required under even the least strenuous definition of a pre-order.

32.     **Grid X/E Squared**.[5]  Lordstown booked a massive 14,000 truck pre-order from a company called "Grid X."  Indeed, Grid X was touted in Lordstown's Merger proxy material with its logo included as one of the "selected pre-order customers."  For scale, at the time Defendants were claiming 38,000 pre-orders, this one deal amounted to 36.8% of the total *claimed* number of pre-orders—and by the time the claimed figure was 100,000, it *still* amounted to a whopping 14% of all claimed pre-orders.  Indeed, purchasing 14,000 trucks, would have cost Grid X $735 million, which was substantially more money than Lordstown raised in the Merger.

33.     In reality, the logo shown for Grid X in its Merger documents was the logo of the company "Grid X, Inc.," which (a) does not itself operate a commercial fleet but is involved in IT solutions for utility pricing and, more importantly, (b) had **nothing** to do with the supposed deal Lordstown had secured.  Rather, Lordstown had been communicating with an individual named Tim Grosse, who was ostensibly representing a UK entity called "Grid X Limited," which was a "management consultancy" firm and appears to have had no employees besides its founder Allen St James.  On August 19, 2020, Tim Grosse wrote to Lordstown, stating: "[P]lease cancel this LOI between Grid X and Lordstown Motors as I was not acting as an official employee of the company as I was never given an official offer letter or paid the salary that I was told that I'd receive from Grid X.  I have canceled all affiliations and ties with both companies and as such I'm now acting on behalf of my own company, E Squared Energy Advisors."

34.     Despite the supposed "Grid X" deal accounting for over 30% of Lordstown's supposed pre-orders at the time, and despite expressly receiving notice that the supposed Grid X deal had been "cancelled," Lordstown went on to publish the previously mentioned Merger

---

[5] For simplicity and because the term is used inconsistently across internal Lordstown documents, the spelling/style "Grid X" is used herein, regardless of whether the original document used the style/spelling "Grid-X," GridX," or "Grid X," etc.

14

documents displaying the wrong Grid X's logo as a "selected pre-order customer" and counting the entirety of the supposed 14,000 truck Grid X pre-order.  Thereafter, Lordstown booked the entire supposed 14,000 truck pre-order, as an order from "E Squared," which, as outlined in the Hindenburg Report, was just a DBA for Tim Grosse and admittedly did not "operate a fleet." Remarkably, Lordstown simply transferred the bogus 14,000 truck pre-orders to E Squared, despite Mr. Grosse admitting in his email to Lordstown that he had signed a $735 million deal on behalf of Grid X, as its "CEO," despite having no position at that firm.  While it would be of no moment, Lordstown does not appear to have even bothered documenting that massive deal with a new LOI between E Squared and Lordstown.

35.    Defendant Burns himself was directly involved in email communications about the Grid X/E Squared situation.  Burns specifically emailed about whether or not Grid X/E Squared had any trucks, and Burns was copied on emails making clear that Grid X/E Squared was not intending to use the trucks, but instead was serving as an intermediary (*i.e.*, they would be used for the private and public sector).  Notably, on September 8, 2021, Burns emailed other senior Lordstown employees expressing that he was reluctant to publicly mention Grid X by name, because their "website is so lame," and because of concerns about their "financial strength."

36.    **Holman Enterprises**.  This was an arrangement whereby Holman Enterprises sought to broker sales of Lordstown trucks to third parties.  Unlike other comparable arrangements, Lordstown published the details of this arrangement, presumably because Holman Enterprises—unlike many parties in intermediary deals Lordstown counted—was a reputable firm.  What Lordstown did not disclose, is that it was counting the arrangement with Holman Enterprises toward its pre-order figures and inflating its pre-order figures by 12,500 trucks

15

(which would cost over $650 million) on this basis.  For scale, at the time Defendant Burns was claiming 38,000 pre-orders, this one deal amounted to 32.9% of the total *claimed* number of pre-orders—and by the time the claimed figure was 100,000, it *still* amounted to a whopping 12.5% of all claimed pre-orders.

37.     Indeed, in Lordstown's merger proxy material, it notably did not list Holman Enterprises as a "selected pre-order customer," but instead dedicated an entire slide to the arrangement and used language that more clearly indicated that such an arrangement would not be counted as part of the pre-order tally—referring only to "indicative interest" from Holman Enterprises.  Defendant Burns exchanged emails about the Holman Enterprises deal, including discussing specific terms of the Vehicle Procurement Agreement, such that Burns obviously knew the true nature of the relationship and the fact that Holman Enterprises could not legitimately be counted as a pre-order customer.  Hamamoto recalled specifically discussing the Holman Enterprises deal with Burns prior to the Merger.  Defendant Flannery was also copied on internal Lordstown emails discussing the Holman Enterprises deal.

38.     **Intermediaries.**  Lordstown booked an enormous number of pre-orders from entities that Defendants recognized were intermediaries—not fleet customers.  An intermediary might, for example, hope to turn a profit by brokering eventual sales of the Endurance to actual fleet customers, but counting "interest" from these intermediaries was highly misleading because they did not reflect any true "demand" from fleets, but merely a hope to perhaps sell to fleets.  In some of the very same Excel documents in which Lordstown booked pre-orders, it included a column classifying orders from "intermediaries" as opposed to other pre-orders it tracked as from "fleet."  By the time Lordstown was boasting that it had over 100,000 pre-orders, it actually was counting at least ***71,000*** pre-orders from entities **it recognized** as intermediaries, accounting

16

for a staggering portion of its supposed pre-orders throughout the Class Period.  In fact, nine of Lordstown's ten largest supposed pre-orders were recorded by Lordstown as deals with "intermediaries," not with "fleets."  The only one of the ten largest supposed pre-orders that was not recorded as a deal with an intermediary was the Vehicle Procurement Arrangement with Holman Enterprises, which, as discussed above, was *obviously* an arrangement with an intermediary.

39.  ~~25.~~ **No Actual Agreement**.  For example, ~~Lordstown had booked pre-orders from both~~the Mayor of the City of Ravenna ~~and the City of Lordstown.  The mayors of both cities confirmed that they had made no orders and had not even signed letters of interest~~had apparently been asked to sign a letter stating: "We recognize the value to the future of energy independence in the US.  Electric trucks help to reduce our carbon footprint, is American made for the American worker;" which then further stated: "We have ____ trucks in our fleet and would likely purchase the LMC 'Endurance.'"  The Mayor signed the letter, indicating he had "15 est." trucks in his fleet and then crossing out the term "likely," replacing it with "consider," such that he ultimately indicated: "We have 15 est. trucks in our fleet and would consider purchasing the LMC 'Endurance.'"  Despite this not even indicating that the City of Ravenna would "likely" purchase any trucks, and only indicating they *had* 15 trucks (not that they would consider purchasing 15), Lordstown counted this as a pre-order for 15 trucks.  In the words of the ~~mayor~~Mayor of the City of Ravenna, he was "shocked" when he received a notice ~~that he had made a commitment for approximately 20 Endurance trucks  and~~of the supposed pre-order, stating there was "no way on God's green earth" that such an order would be within the city of 12,000~~'s~~ resident's budget.

17

26. Lordstown claimed "Summit Petroleum" as one of its "Select Pre-Order Customers," including in the Merger proxy documents, but a company representative found it "interesting" that Lordstown would call the arrangement a pre-order, noting that their indication of interest had not listed any particular number of trucks and had done so as a "friend of a friend" type of deal.  Auto-Flex was claimed by Lordstown in its pre-orders, despite the fact that it only acted as an intermediary for governmental fleets; a representative said that while he provided a "rough" estimate of the number of trucks by email, he never saw a price sheet or any other spec sheet for the truck.

40.     Similarly, an organization called "Sacramento Clean Cities," wrote Lordstown a letter stating that it "does not have a vehicle fleet and as such, is not in a position to make a commitment to purchase electric pickup trucks," but that it was "aware of demand" for electric trucks among the commercial vehicle fleets in California.  Lordstown recorded this as a pre-order by Sacramento Clean Cities for 500 trucks, worth over $26 million.

41.     **Governmental Entities**.  Lordstown booked pre-orders from governmental parties despite explicitly telling the public it was only counting "commercial" fleets and was not counting governmental parties.  For example, during the Class Period, Lordstown wrote in a press release that its pre-order figures did not include "federal, state and municipal governments" and Defendant Burns stated in an interview that Lordstown's pre-order figure did not count "municipality, state vehicles, federal vehicles."  Yet, in Lordstown's spreadsheets tracking the supposed pre-orders, including those circulated to Defendant Burns, *many* such entities were listed.  For example, Lordstown booked pre-orders from the City of Aurora, the City of Portland, the City of the District of Columbia, the City of Houston Fire Department, and the New York Power Authority.

18

42.     Even more astoundingly, Lordstown booked a large number of pre-orders from government adjacent advocacy organizations that obviously did not operate commercial fleets. For example, Lordstown booked a 500 truck order from the "Mayors Association - Portage, Stark, Summit County."  This deal would have cost the association over $26 million.  While the Mayor's Association signed an LOI, it was obviously not a commercial fleet, and the LOI deleted the term "purchaser" and replaced it with the phrase "influencer."

### (2)     The Truth About Lordstown's Production Capabilities

43.     27. The Hindenburg Report also detailed various facts showing that Lordstown's production capabilities had been overstated.  For example, Lordstown was relying on a small Slovenian company to manufacture its hub motors, even though it appeared highly doubtful the supplier could manufacture the critical component at scale.  Lordstown had experienced a fire while conducting an overnight test of its vehicle on public roads, and the vehicle was fully engulfed in flame, showcasing how far its vehicle was from production.  The Hindenburg Report also cited a former employee's account of how critical development activity had not yet occurred, including specific testing activities that would take months to complete.

44.     28. Lead Counsel has also conferred with an automobile expert who explained that Defendants' assurances that it would produce the vehicle by September 2021 were unrealistic.  The expert explained that, even if Lordstown was developing an ordinary vehicle, it could not launch production by September 2021, and that Lordstown's unique vehicle would take even longer than typical.  This also meant that Lordstown's assurances that it had the resources needed to become profitable without the need to raise additional capital were misleading, as they would not even begin substantial production within the stated time and

19

would need to raise additional capital.  Confidential witnesses and internal Lordstown documents confirm that, even before the Merger closed, Lordstown was already behind schedule.

45.  Indeed, prior to the Merger, DPHC retained leading consulting firm McKinsey & Company ("McKinsey") to conduct diligence on Lordstown's production capabilities.  As part of this diligence process, McKinsey interviewed key members of Lordstown's management team and conducted extensive investigations.  On July 30, 2020, McKinsey provided a summary report (the "McKinsey Report"), which projected that, even if Lordstown followed "best industry practices," the first vehicle production would take place, at the earliest, by June 2022.  McKinsey even conducted a secondary analysis, predicated on the concept of Lordstown somehow performing even better than the best industry practices, and this analysis showed that even with such improvements, Lordstown's production timeline could only be shortened such that production would begin in April 2022.  Thus, McKinsey warned that there was no reasonable scenario in which Lordstown could begin production by September 2021—**at best**, it would be delayed four months and likely much longer.

46.  McKinsey's detailed analysis, which documented the sources of delay that would prevent Lordstown from meeting its production deadline, was shared with Defendant Burns.  Hamamoto confirmed that Burns was aware of McKinsey's conclusions and that "there was a lot of specific dialogue with him" about the issue.  Yet, Burns had determined to repeatedly tell investors Lordstown *would* begin production in September 2021, without ever disclosing that McKinsey had specifically apprised the Company that this could not be done.

**E.**  29. **The Fallout From from the Hindenburg Report**

47.  —Lordstown's stock opened down 20.95% upon the publication of the reportHindenburg Report, as countless news organizations summarized its revelations.  By the

20

close of trading on March 12, 2021, Lordstown's market capitalization had decreased by nearly $500 million.  Three days later, on March 15, 2021, Lordstown issued a press release asserting that production was still on track for September 2021.  Five days after the publication of the Hindenburg Report, during a conference call on March 17, 2021, Lordstown disclosed that the ~~company~~Company was the subject of a SEC investigation.

48.     ~~30.~~ On March 18, 2021, Defendant Burns appeared on CNBC and attempted a revisionist history, asserting he had never claimed the pre-orders he had touted just months earlier on the network were serious.  Most incredibly—in direct contravention to many of his statements detailed herein—Burns claimed, "[w]e've never said we had orders."  ~~He~~Burns went on to absurdly claim that he had never said the pre-orders were "serious."  Later that day, Jim Cramer exclaimed~~,~~: "I had pressed him on Mad Money about how serious the orders were . . . and he said, they're very serious~~;~~;" ~~adding,~~Cramer added: "So to me, **I thought it was like the prosecution rests**."  Another reporter responded to Cramer noting Burns' claim that they never claimed orders, and Cramer responded: "***he point blank said the opposite to me*** . . . he said to me, our average order size is 500 trucks at a time and most of them are signed by the CEOs of these large firms . . . That's the core evidence . . . if we had to do like . . . stock market, CSI.  Well, there you go."

49.     ~~31.~~ After the disclosure of the SEC investigation and ~~after~~ Defendant Burns' CNBC interview, in which he admitted that the pre-orders were not serious—albeit while dishonestly ~~claiming~~suggesting he never had claimed otherwise—the market reacted sharply, with Lordstown's stock closing the day down 13.78% below its prior closing price, for a loss of market capitalization of over $300 million.

21

**F.** ~~32.~~ **Lordstown Continues Declining as the Truth Continues to Emerge**

50. ~~.~~ On May 24, 2021, after market close, Lordstown released its First Quarter 2021 results~~,~~ and disclosed that any production occurring in September 2021 would be at "limited capacity," slashing prior production guidance by 50%, and revealing that the ~~company~~Company would need additional funding to ramp up production.  Lordstown's stock price fell 15.51% on this news.

51. On June 8, 2021, Lordstown released an amended 10-K, announcing a "going concern" notice disclosing that the ~~company~~Company was facing insolvency and that to ramp up production the ~~company~~Company may need "significant" capital.  This stood in stark contrast with the prior assurance that the ~~company~~Company had sufficient capital, not just to launch full production, but also to achieve positive cash flows.  The amended 10-K also revealed that the ~~company~~Company had "material weaknesses in internal control over financial reporting."  On this news, Lordstown's stock price fell to a daily low, 20.86% below its prior closing price.

52. ~~33.~~ On June 14, 2021, Lordstown released the results of its own internal investigation.  The report admitted that there were "issues regarding the accuracy of certain statements regarding the Company's pre-orders."  It admitted that Lordstown had paid for pre-orders, that the ~~company~~Company had misrepresented that ~~orders~~pre-orders came from fleets when they had not, corroborated specific allegations in the Hindenburg Report, and admitted that Lordstown had booked large pre-orders from companies without resources to complete the orders, or booked orders that were "too vague or infirm to be appropriately included in the total number of pre-orders disclosed."  On this news, Lordstown's stock fell 18.84%.

53. ~~34. Concurrently~~Concurrent with the release of the internal investigation report, Lordstown announced the "resignation" of CFO Rodriguez and CEO/Chairman Burns.

Numerous facts strongly indicate that Defendants Rodriguez and Burns had been ousted for their fraud—including that Lordstown did not immediately announce replacements for these critical roles, and only recently named a new CEO.  ~~On the news disclosed on June 14, 2021, Lordstown's stock fell 18.84%.~~Indeed, Hamamoto confirmed that Burns' resignation occurred at the prompting of the Board, as the Board had collectively determined Burns' resignation to be best for Lordstown.  Hamamoto pointed to several factors that the Board considered in determining whether Burns' resignation was necessary, including information that was brought to light by the Hindenburg Report and later confirmed by the Special Committee.

54.    ~~35.~~ On July 2, 2021, *The Wall Street Journal* reported that Lordstown was also under a ~~Department of Justice~~DOJ investigation related to Defendants' disclosures regarding the pre-orders.  Lordstown's stock price fell 10.82%.

55.    ~~36. Next, on~~On August 11, 2021, Lordstown issued its Second Quarter 2021~~,~~ results, disclosing that~~,~~ while vehicle "production" may begin in September 2021, the regulatory approvals to sell the vehicle would not even be complete until at least December 2021, meaning that deliveries would not occur until at least 2022, and even then~~,~~ only to "selected early customers."  On August 13, 2021, Lordstown filed a form 10-Q with the SEC, which included a revised "going concern" notice indicating that despite recent fundraising (securing $400 million, about 60% of what Lordstown raised in the Merger) the ~~company~~Company was still at risk of insolvency.

56.    On June 27, 2023, Lordstown filed for Chapter 11 bankruptcy.  Through the bankruptcy, Lordstown has ceased all operations besides pursuing certain litigation claims and similar matters.  On February 29, 2024, Lordstown settled claims brought by the SEC, and in the corresponding settlement agreement's findings of fact, the SEC concluded:

Lordstown and Burns' statements about the increasing numbers of pre-orders from 27,000 to 100,000 *were false or misleading*. **First**, the pre-orders were not all from or primarily from fleet customers, a market Lordstown had described in SEC filings as "commercial or governmental organizations with three or more trucks." As the Special Committee found, 40% to 71% of the pre-orders during this period were from intermediaries or influencers who indicated they would encourage, facilitate, or influence the purchase of the Endurance and did not intend to buy it for their own use. **Second**, Burns' statements that the pre-orders were "very serious orders" or "very sticky" were misleading because the pre-orders were non-binding and customers were not obligated to purchase any trucks. **Third**, the pre-orders included large quantities from customers who had no apparent ability to buy such quantities of the truck. As a result, Lordstown and Burns, who knew or should have known that certain pre-orders were not from or primarily from fleets, misrepresented the true nature of the demand for the Endurance, which was substantially less than what they had described to investors.

57.     As to Lordstown and Defendant Burns' claimed production capabilities, the SEC concluded:

[S]hortly after the August 2020 merger announcement, Lordstown was already experiencing delays with its suppliers, including its lack of access to GM's parts described above, that jeopardized the production and delivery timelines for the Endurance. By October 2020, Lordstown's supply chain and other issues had delayed the production timeline for the Endurance to November 2021 at the earliest, and its delivery schedule to months later, likely into 2022. Lordstown's production and engineering teams, who regularly updated Burns on the production and delivery timelines, informed Burns of these delays, and he was "in line" with them. . . . Despite these worsening delays to the Endurance's production and delivery timelines, Lordstown and Burns made false and misleading public statements that Lordstown would deliver (not just start production for) the Endurance to customers by September 2021. . . . *These statements were materially false and misleading* at the time they were made because Lordstown could not, and had no plans to, sell and deliver the Endurance to a customer by September 2021 . . . without certifying that the Endurance complied with regulatory requirements.

58.     37. This actionAction seeks to recover the losses investors suffered due to Defendants' misrepresentations and omissions. Lordstown's stock price reached a Class Period high of $31.57 on February 11, 2021, as a result of Defendants' misrepresentations and

24

omissions, as alleged herein.  As the truth was partially revealed to the market, Lordstown's stock price fell to a Class Period low of $6.69.

59.     The following graph shows the stock price movements of Lordstown throughout the Class Period, with selected events highlighted to demonstrate the relevant timeline of events:



## II. JURISDICTION AND VENUE

60. 38. The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and certain rules promulgated by the SEC. Specifically, this Complaint asserts claims under: **(1)** Section 10(b) of the Exchange Act ("§10(b)") and SEC Rule 10b-5-5 promulgated thereunder by the SEC, (*see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5); **(2)** Section 14(a) of the Exchange Act ("§14(a)") and SEC Rule 14a-9 promulgated thereunder by the SEC, (*see* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9); **(3)** Section 20A of the Exchange Act ("20A") (*see* 15 U.S.C. § 78t–1); and **(34)** Section 20(a) of the Exchange Act ("§20(a)"), (*see* 15 U.S.C. § 78t(a)).

61. 39. Venue is proper in this district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged Securities Act and Exchange Act violations or the effects of the violations have occurred in this judicial district. Many of the acts charged herein, including the preparation and/or dissemination of materially false and misleading information, occurred in substantial part in this judicial district. Defendant LTM's primary manufacturing facility and principal executive office iswas located in Lordstown Ohio, which is located in Trumbull County, Ohio.

62. 40. This Court has jurisdiction over the subject matter of this actionAction pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

63. 41. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

26

limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ, a national exchange within the United States.

### III.    PARTIES AND KEY PLAYERS

**G.**     ~~A. Parties~~**Plaintiffs**

64.    ~~42.~~ Lead Plaintiff George Troicky is, and at all relevant times was, a resident of Cleveland, Ohio.  He invested in Lordstown common stock on his own behalf.  He generates income through investments, including investments in commercial real estate, mainly warehouses and storage facilities.  As set forth in the previously filed certification ~~attached hereto as Exhibit B~~, Lead Plaintiff Troicky purchased LTM's Class A common stock during the Class Period.

65.    ~~43.~~ Additional named Plaintiff Daniel Tavares is a resident of Ontario, Canada. Plaintiff Tavares is the Chairman of the Board of Directors of Plaintiff Globestar Systems Inc. As set forth in the previously filed certification ~~attached hereto as Exhibit C~~, Plaintiff Tavares purchased LTM's Class A common stock during the Class Period.

66.    ~~44.~~ Additional named Plaintiff Globestar Systems Inc. is a healthcare software company.  The Chairman of Plaintiff Globestar Systems Inc. is Plaintiff Tavares.  As set forth in the previously filed certification ~~attached hereto as Exhibit D~~, Plaintiff Globestar Systems Inc. purchased LTM's Class A common stock during the Class Period.

67.    ~~45.~~ Additional named Plaintiff Ashith Pabbathi is a resident of Okemos, Michigan.  As set forth in the previously filed certification, Plaintiff Pabbathi's purchased LTM's Class A common stock during the Class Period ~~ECF No. 23-2~~, which is incorporated by reference herein.

68.     46. Additional named Plaintiff FNY Managed Accounts LLC is in the business of providing securities brokerage and investment services.  As set forth in the previously filed certification attached hereto as Exhibit E, Plaintiff FNY Managed Accounts LLC purchased LTM's Class A common stock during the Class Period.

### H.     Defendants

69.     Defendant Stephen S. Burns was Lordstown's Founder and CEO and the Chairman of Lordstown's Board.  Prior to founding Lordstown, Burns was CEO of Workhorse, which he founded.  Burns' experience prior to founding Workhorse involved work on several startups, none of which were in the automotive industry.[6]  On June 14, 2021, Lordstown announced that Burns was resigning "[e]ffective immediately, pursuant to mutual agreements," and as explained herein, this resignation was a result of Burns' misstatements and misconduct.

70.     Defendant Julio Rodriguez was Lordstown's Chief Financial Officer from September 2019 until his resignation.  Prior to working at Lordstown, Rodriguez served as the Chief Information Officer at Workhorse.  On June 14, 2021, Lordstown announced that Rodriguez was resigning "[e]ffective immediately, pursuant to mutual agreements," and as explained herein, it is alleged that this resignation was a result of Rodriguez' misconduct.

71.     Defendant Caimin Flannery was Lordstown's Vice President of Business Development from October 2019 until October 2020, when he was promoted to Senior Vice President of Business Development.  In Lordstown's investor presentation, filed with the SEC as part of the Merger proxy materials, Lordstown explained that Flannery ran the sales team at Lordstown.  Prior to working at Lordstown, Flannery was an executive at Workhorse.

---

[6] Defendant Burns seems to have fed media outlets a narrative that he graduated from Ohio State University with a degree in electrical engineering.  However, internal Lordstown documents show that while he attended that school, he did not actually receive a degree.

28

Lordstown's 2020 10-K lists Flannery as one of its executive officers and states that Flannery has a "long-standing working relationship with Mr. Burns."

72.     Defendant Shane Brown served as Lordstown's Chief Production Officer since November 2020 through the end of the Class Period.

73.     Defendant Darren Post served as Lordstown's Chief Engineer since November 2019 through the end of the Class Period.  Post's public LinkedIn profile states that he was responsible for executing all aspects of vehicle engineering and launch for the all new Endurance plug-in battery electric pickup trucks.  It also states that Post was responsible for building the start-up Company's engineering staff, infrastructure, and capabilities to develop and launch their first and future vehicles.

74.     Defendant Rich Schmidt served as Lordstown's President since November 2020, through the end of the Class Period.  Prior to that, Schmidt had been Lordstown's Chief Production Officer since October 2019.

### I.     Other Non-Party Key Players[7]

75.     47. DefendantNon-Defendant Lordstown Motors Corp. ("LTM") iswas a holding company that ownsowned the Lordstown business, which is throughout the Class Period.  It was purportedly developing and planning to manufacture and sell a light duty electric truck known as the "Endurance."  LTM's headquarters arewas located at 2300 Hallock Young Road, Lordstown, Ohio 44481.  LTM iswas incorporated in Delaware.  Prior to the Merger, LTM was named

---

[7] The prior complaints in this Action named LTM, DPHC, and Hamamoto as Defendants. Through Lordstown's bankruptcy proceedings, claims against both entities and Hamamoto were released.  As such, these entities and Hamamoto are no longer named as Defendants in this Action.  Claims against the remaining Defendants premised on their status as control persons of Lordstown, pursuant to § 20(a) of the Exchange Act remain in this Action.  As such, allegations remain in this Complaint asserting that Lordstown violated the Exchange Act, as such violations are relevant to the remaining Defendants' liability as control persons.

"DiamondPeak Holding Corp." ("DPHC" or "DiamondPeak") and references herein to DPHC refer to the pre-merger conduct of, or stock issued by, the entity ~~now~~that became known as LTM.~~.~~ through the Merger.  Following the Class Period, LTM underwent a restructuring through a bankruptcy process and was renamed, but because those events take place after the Class Period, LTM is still used herein to refer to Lordstown Motors Corp., from the period after the Merger until the close of the Class Period.

76. ~~48. Following the Merger, the entity previously known as DiamondPeak Holdings Corp. was renamed Lordstown Motors Corp.~~ Following the Merger, the entity that was previously known as Lordstown Motors Corp. (*i.e.*, LTM) was renamed Lordstown EV Corporation and became a wholly owned subsidiary of DiamondPeak Holdings Corp. (*i.e.*, DPHC) (which itself, as just stated, was renamed Lordstown Motors Corp. following the Merger).  Notably, Lordstown EV Corporation ~~is~~was the only business of the post-Merger LTM, and as such, explanations of the conduct of LTM or Lordstown include conduct of LTM by way of its agent and subsidiary Lordstown EV Corporation.

77. ~~49.~~ DPHC was a SPAC formed for the purpose of acquiring a privately owned company to take that company public.  Prior to the Merger, DPHC's Chairman and ~~Chief Executive Officer was Defendant~~CEO was Hamamoto.  After the Merger, the entity's Chairman and CEO was Defendant Burns, until his resignation. ~~Certain of the claims alleged herein are based on conduct of the entity now known as Lordstown Motors Corp., when that entity was known as DiamondPeak Holding Company, and because any liability of that entity survived its name change, LTM remains liable for such conduct.~~

78. ~~50.~~ Prior to the Merger, DPHC ~~(now LTM)~~ issued ~~a~~ Class A common stock that traded on the NASDAQ under the ticker "DPHC."  Following the Merger, the ticker of that

30

Class A common stock was changed to "RIDE," and ~~continues~~continued to trade on the NASDAQ throughout the Class Period.  Prior to the Merger, DPHC (now LTM) listed warrants that were exercisable for shares of DPHC (now LTM)'s Class A common stock, and these warrants traded under the ticker ~~(~~"DPHCW.~~").~~  After the Merger, DPHC maintained the listing of those warrants (until all such warrants were redeemed or exercised), under the ticker "RIDEW."  Prior to the Merger, DPHC (now LTM) listed units that were comprised of one share of its Class A common stock and 1/3 off a DPHCW warrant.  Additionally, throughout the Class Period, options based on the DPHC and LTM common stock, which provided the right to purchase or sell DPHC or LTM's Class A common stock, at a specific price, also publicly traded (all such options defined as "Lordstown Options").  The term "Lordstown Securities" is used to describe each security listed in his paragraph, including those Lordstown Options and ~~securities~~Securities trading under the tickers DPHC, RIDE, DPHCW, RIDEW, and DPHCW.[38]

79.     The term "Lordstown" as used herein refers to the business purportedly engaged in the development and production of the Endurance pickup truck.  The terms LTM and DPHC refer to specific entities.

~~51. Defendant Stephen S. Burns was Lordstown's Founder, CEO and the chairman of Lordstown's board.  Prior to founding Lordstown, Burns was CEO of Workhorse, which he founded.  According to his official biography on Lordstown's website, Burns' experience prior to founding Workhorse involved work on several startups, none of which are in the automotive~~

---

[38] At any point in time, ~~the~~ Lordstown Securities reflected the price of Lordstown's Class A common stock, and thus any allegation herein regarding the price or change in price of the common stock was also reflected in the price or change in price of ~~the~~ other Lordstown Securities.  Any allegation concerning the purchase of Lordstown Securities at inflated prices also includes the sale of put options at artificially deflated prices (as those prices ultimately

31

industry.[4] On June 14, 2021, Lordstown announced that Defendant Burns was resigning "[e]ffective immediately, pursuant to mutual agreements," and as explained herein, it is alleged that this resignation was a result of Burns' misstatements.

52. Defendant Julio Rodriguez has served as Lordstown's Chief Financial Officer since September 2019.  Prior to working at Lordstown, Defendant Rodriguez served as the Chief Information Officer at Workhorse.  On June 14, 2021 Lordstown announced that Defendant Rodriguez was resigning "[e]ffective immediately, pursuant to mutual agreements," and as explained herein, it is alleged that this resignation was a result of Rodriguez' misstatements.

53. Defendant Caimin Flannery was Lordstown's Vice President Business Development from October 2019 until October 2020, when he was promoted to Senior Vice President of Business Development.  Lordstown's presentations state that Defendant Flannery ran the sales team at Lordstown.  Prior to working at Lordstown, Defendant Flannery was an executive at Workhorse.  Lordstown's 10-K lists Defendant Flannery as one of its executive officers and states that he has a "long-standing working relationship with Mr. Burns."

54. Defendant Shane Brown has served as Lordstown's Chief Production Officer since November 2020.

55. Defendant Darren Post has served as Lordstown's Chief Engineer since November 2019.  His public LinkedIn profile states that he was Responsible for executing all aspects of vehicle engineering and launch for the all new LMC Endurance plug-in battery electric pickup

---

reflect the same artificial inflation in Lordstown's stock price based on the mechanics and economics of transacting on put options).

[4] Burns seems to have fed media outlets a narrative that he graduated from Ohio State University with a degree in electrical engineering.  However, attempts to verify his degree — through the National Student Clearinghouse — come back with an "unverified" status, suggesting that he did not receive such a degree.

32

~~trucks.  It also states that he was responsible for building the start-up company's engineering staff, infrastructure and capabilities to develop and launch their first and future vehicles.~~

~~56. Defendant Rich Schmidt has served as Lordstown's President since November 2020, and prior to that, was Lordstown's Chief Production Officer since October 2019.~~

80. ~~57.  Defendant~~Non-Party David T. Hamamoto was the Chairman and ~~Chief Executive Officer~~CEO of DPHC.  Previously, ~~Defendant~~ Hamamoto worked at Goldman Sachs for 14 years and served on the board of at least two other companies, including as ~~chairman and chief executive officer~~Chairman and CEO of Northstar Realty Finance Corp., a New York-based real estate investment trust.  ~~Defendant~~ Hamamoto signed the proxy statements soliciting investors of DPHC to approve the ~~merger~~Merger between a subsidiary of DPHC ("Merger Sub") and LTM, through which LTM would become a ~~wholly-owned~~wholly-owned subsidiary of DPHC.  ~~Defendant Hamamoto was the controller of an entity that formed DiamondPeak Sponsor LLC, in a joint venture with affiliates of SilverPeak, and the Sponsor organized the creation and management of DPHC.  Defendant Hamamoto, through his positions of Chairman and Chief Executive Officer of DPHC, was entrusted with identifying, evaluating, and acquiring a business with a real estate component or where the management team had significant expertise.  In carrying out the acquisition plan, Defendant Hamamoto assured DPHC investors of his care, when DPHC stated that that it would undertake "comprehensive due diligence, thoughtful underwriting and deep strategic analysis, resulting in a thorough evaluation of each investment opportunity."  In fact, DPHC expected Defendant Hamamoto to "leverage [his] longstanding relationships, network of industry connections and . . . uncover unique opportunities and support them with market expertise."~~

33

58. Together, Defendants Burns, Rodriguez, Flannery, Brown, Post, Schmidt, and Hamamoto are referred to herein as the "Individual Defendants."

59. The term "Lordstown" as used herein refers to the business purportedly engaged in the development and production of the Endurance pickup truck.  The terms LTM and DPHC refer to specific entities, whereas the term "Lordstown" is used to refer to the business enterprise at issue in this litigation that existed before the Merger and continued thereafter.

**B. Other Relevant Persons and Entities**

60. DiamondPeak Sponsor LLC (the "Sponsor") was an entity incorporated in Delaware that was involved in the formation of DPHC.  It was an investment fund that was created as a joint venture between DHP SPAC Sponsor LLC, an entity owned by Defendant Hamamoto, and SP SPAC Sponsor LLP, an entity controlled by Silverpeak.

61. Silverpeak is defined in SEC filings as a "platform of entities" and is associated with the formation and management of SPAC companies.  Silverpeak's principals are Kaushik Amin, Brett Bossung, and Mark A. Walsh.  Silverpeak controlled SP SPAC Sponsor LLP, which was one of two entities that formed the Sponsor through a joint venture.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Early Background on Lordstown and DiamondPeak Holding Corp.

81.    62.  Defendant Burns founded Workhorse in 1998.  Workhorse primarily manufactured commercial delivery vehicles, such as vans used by mail delivery companies.  While Workhorse utilized electric propulsion systems, its vehicles had relatively conventional drive systems powered by a BMW motor (*i.e.*, it did not use "hub motors," which are discussed further herein).  Workhorse had at one point endeavored to produce an electric truck, but the proposed specifications of the Workhorse truck were vastly different from the truck Lordstown

34

~~ultimately sought to develop, not only because it utilized an entirely different propulsion system, but also because Workhorse's truck was designed for a different maximum range in mind, utilized a range extender system and had many other design differences.~~

~~63.~~ As explained by industry publication *Electrive*~~,~~ in an article published on March 13, 2020, Workhorse terminated its development of ~~an~~its electric pickup truck following Burns' departure from Workhorse.

82.      ~~64.~~ In November 2018, GM announced it was planning to close its manufacturing plant in Lordstown, Ohio.  Prior to closing, the plant had produced the Chevrolet Cruze, a conventional internal combustion engine sedan.  ~~The~~GM's Lordstown, Ohio plant was one of the largest auto manufacturing plants in the country and had produced nearly 300,000 vehicles in a single year prior to its closure.

83.      ~~65.~~ On January 18, 2019, DPHC filed an S-1 Registration Statement with the SEC and organized as a SPAC.  The purpose of a SPAC is to raise funds through an ~~initial public offering~~IPO, hold those funds in trust for a period of time while shopping for an acquisition target, and then merge with that acquisition target, effectively taking the target public.  DPHC, like most SPACs, had no other businesses besides this fundraising, shopping, and acquisition.

84.      ~~66.~~ DPHC was led by ~~Defendant~~ Hamamoto.  ~~It~~DPHC sought to raise $250 million through its IPO, which could be used to fund an acquisition or invest into an acquisition target.  At the time of the S-1 Registration Statement, it does not appear that DPHC had any intention of acquiring Lordstown.  At that time, it was reported that DPHC would be targeting an acquisition in the real estate industry.

85.      ~~67.~~ Defendant Burns formally resigned from Workhorse on January 30, 2019.  As is typical, this was technically a resignation, but the abrupt notice of ~~his~~Burns' departure, which

35

stated ~~he~~Burns was ending his role as CEO "effective immediately," suggests ~~he~~Burns was pushed out of the company.  According to the Hindenburg Report, former senior employees of Workhorse indicated that Burns was actually pushed out by the Board for wasting R&D money and missing deadlines.  Mr. Hamamoto confirmed that Defendant Burns' resignation occurred at the prompting of the Board due, at least in part, to the misstatements at issue herein.

86.      ~~68.~~ On March 4, 2019, DPHC completed its initial public offering ("IPO"), and on March 18, 2019, DPHC reported selling additional shares and units, generating net proceeds of $280 million.

87.      ~~69. The~~GM's Lordstown, Ohio plant was closed in March ~~of~~ 2019, and the plant closure led to the elimination of 4,200 jobs.  GM's decision brought significant political pressure upon GM, including tweets from President Donald Trump asking GM to "do something quickly" about the issue and suggesting that GM should reopen the plant "maybe in a different form or with a new owner, FAST!"

88.      ~~70.~~ In June ~~of~~ 2019, Defendant Burns formed Lordstown Motors Corp., and on August 2, 2019, *The Detroit News* reported that ~~he~~Burns was planning to acquire ~~the~~GM's Lordstown, Ohio plant.  On September 25, 2019, the *Youngstown Ohio Business Journal* reported that negotiations for Burns' company to acquire the plant were ongoing and that Burns was planning to manufacture an electric pickup truck at the factory.  The article also indicated that the plant would be the headquarters for Burns' new company.

89.      ~~71.~~ In November 2019, GM agreed to sell the plant to Lordstown.  It was publicly reported that, as a component of that sale, GM loaned Lordstown $40 million to facilitate the purchase and retooling of the plant, and county records indicate the purchase price for the plant and land was recorded at $20 million.

36

90. ~~72.~~ On November 7, 2019, Workhorse disclosed in an SEC filing that it had licensed intellectual property relating to its abandoned electric truck project to Lordstown in exchange for certain royalty rights and a 10% stake in Lordstown. This filing also stated that Lordstown would "endeavor" to complete a "capital raise" to retrofit the Lordstown plant and that, "upon completion" of that raise, Workhorse would "transfer its ~6,000 existing orders for [trucks] to [Lordstown], subject to customer consent." ~~As discussed herein, Lordstown boasted this book of orders, prior to any such capital raise and even though customer consent was not obtained.~~

91. ~~73.~~ On November 14, 2019, Defendant Burns spoke with Ohio-based politicians about the Lordstown plant and boasted about the condition of the facility and how it would help the ~~company~~Company to be first to market in the electric pickup truck business. During that event, Defendant Burns exclaimed: "First mover market, we've already got pre-orders for these vehicles. We know there's a strong demand."

92. ~~74.~~ Generally speaking~~,~~ (*i.e.*, according to the *Oxford English Dictionary*), a pre-order refers to "an order for an item that has not yet been made commercially available." While ~~a pre-order may~~(standing alone) the term "pre-order" may refer to an agreement that is not ultimately ~~be~~ binding, it is understood to represent a significant transaction, often accompanied by a deposit payment, evidencing a specific intent to buy the item.[59]

---

[59] When the term "pre-order(s)" or similar phrases are used herein to refer to the purported ~~pre-orders~~pre-orders Lordstown had, that is a reference to Defendants' ~~representation(s)~~representations claiming pre-orders. Contrary to such representations, Lordstown did not have pre-orders, they had non-binding letters of intent for a portion of the purported pre-orders. References herein to Lordstown's "order book," "pre-order book," or any similar phrase, ~~refers~~refer to the purported pre-orders Lordstown ~~was~~and Defendants were touting.

93.    75. On December 5, 2019, the sale of the plant to Lordstown from GM was closed.  On December 23, 2019, industry publication *AutoBlog* reported that Lordstown was working to secure $300 million in financing to develop its electric pickup truck.  The article also reported that Defendant Burns was targeting April 2020 for the launch of preproductionpre-production vehicles and that the plant would begin producing trucks by the following November.  The article also reported that the companyCompany was taking pre-orders for the vehicle upon a $100 deposit, and that the purchase price would be $52,000.  As noted in the article, this timeline would mean that Lordstown would bring the first electric pickup truck to market, which would provide it with a materialmaterially strategic advantage.  The article explained that the vehicleEV would use a unique "hub motor" design.

94.    76. Hub motors are electric motors incorporated into the wheel of a vehicle.  They are currently used in scooters and certain other light vehicles, but they have not been used in the production of cars or trucks.  As discussed herein, while the upside of the technology is substantial, the use of hub motors in a production vehicle poses huge hurdles in terms of durability and safety.

95.    77. On April 21, 2020, Defendant Burns published a letter to the public on Lordstown's website.  HeBurns stated that the COVID-19 pandemic had delayed their production timeline.  However, he also stated that they planned to unveil the Endurance pickup truck through a virtual event in the Summersummer of 2020.  HeBurns also indicated that the companyCompany would begin distributing vehicles to customers in January 2021, writing: "We look forward to introducing you to the world's first-fully electric pickup truck this summer, and handing the keys to fleets across the country in January 2021."  This amounted to a one-month delay from his prior target of December 2020.

96.     ~~78.~~ On April 30, 2020, Lordstown published a video touting the capabilities of the Lordstown plant.  The video boasted that the plant was "very, very capable" and "very modern."  ~~He~~Defendant Burns also downplayed the task of preparing the plant for production of the Endurance, stating, "for us it's just reconfiguring," and added that "this plant has been perfect for us."

97.     ~~79.~~ On May 22, 2020, the *Detroit Free Press* published an article quoting Defendant Burns as boasting that Lordstown had secured "well over several thousand" pre-orders, even though the vehicle had yet to be formally unveiled.  The article further explained that Burns planned to unveil the truck in late June, and that after that event, Burns expected to take pre-orders for all 20,000 pickups the automaker planned to produce in its first year of production.  Burns was also quoted as saying, "~~The~~[t]he demand side is super strong, I am starting to worry we won't be able to make them fast enough."  According to the article, at that time, Lordstown employed about 70 people, nearly all engineers.  The article explained that Lordstown would be building its battery pack systems in-house, adding to the momentous challenge of bringing the vehicle to production.

98.     ~~80.~~ On June 25, 2020, Lordstown hosted an event unveiling of the Endurance.  At the event, former Vice President Mike Pence sat in the pickup truck as the ~~company~~Company rolled the vehicle on stage.  At that event, Defendant Burns claimed that their assembly line "enables high volume production," and that "the plant itself is very, very capable," and that it was a "very automated line."  ~~He~~Burns also continued to trumpet the supposed pre-orders that the ~~company~~Company had secured, stating:

> ***We started pre-selling.***  I think we have our whole year, ***our first year of production already pre-sold*** and we haven't even showed the vehicle yet.  If we get lucky, today we might get fivefold that people buying online once they see it.  So we're very excited.

99.    81. Former Vice President Mike Pence also spoke at the event, and recited Defendant Burns' false assertions that the companyCompany had "pre-sold" a large number of vehicles.  Former Vice President Pence stated:, "Steve [Burns] actually told me that they've already pre-sold 14,000 additions of the Lordstown Endurance truck that's ready to be made here and shipped out of here."

**B.    Defendants Mislead Investors as They Pitch and Close the Merger**

100.    82. On August 1, 2020, DPHC and Lordstown entered into a Merger agreement, whereby DPHC would acquire Lordstown and take the companyCompany public.  However, the Merger was contingent upon approval by DPHC shareholders.  If approved, the deal would dilute existing holders of DPHC shares through the issuance of new shares.  As part of the Merger, DPHC would offer new shares to Lordstown's pre-Merger shareholders, and would conduct a large private offering of securities to raise additional capital.  With the cash DPHC had raised in its IPO and in the offerings taking place as part of the Merger, it was expected that the Merger would contribute $675 million in funding to Lordstown, including a $75 million investment from GM.

101.    83. On August 3, 2020, Defendant Burns announced the Merger through his twitterTwitter (now known as "X") account and DPHC filed certain materials with the SEC that same day.  Those SEC materials were filed as "definitive proxy soliciting materials"—meaning that they were part of DPHC and Lordstown's formal attempt to solicit shareholders to vote in favor of the Merger.

102.    84. Among the proxy materials filed by DPHC on August 3, 2020, was a press release issued jointly by Lordstown and DPHC.  In that press release, Defendant Burns boasted:, "Since[s]ince its unveiling just over a month ago, the Endurance has been met with enthusiastic

40

support, and to date, *we have* *__secured__* *$1.4 billion of pre-orders*." ~~Later, the~~The same press release also stated that Lordstown had "received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet customers."

103.  The term "commercial fleets" refers to vehicles owned by commercial businesses for use in that business's operations to transport goods or people or to perform services.  As explained by the industry publication *Automotive Fleet*, "[t]o qualify as a fleet, a business must have purchased five vehicles in a year or have 15 total units in operation."  Federal emission standards use a similar definition, defining fleets as "10 or more motor vehicles which are owned or operated by a single person."  42 U.S.C. § 7581(5).

104.  In its SEC filings, including the Merger proxy materials, Lordstown clarified that it "plan[ned] to sell directly to commercial fleet managers," without the use of intermediaries like a "traditional dealer product distribution network."  Similarly, the SEC filings stated that "Lordstown's business plan includes the direct sale of vehicles to commercial fleet operators[.]"  Likewise, the SEC filings repeatedly refer to "fleet operators," further indicating that intermediaries who merely hope to sell to commercial fleets are not fairly included within the definition of commercial fleets.

105.  Targeting fleets provided Lordstown with certain advantages as an EV startup, including that (a) it could simplify charging the vehicles and reduce the need for Lordstown to invest in a charging architecture, because fleets are more capable of managing their own vehicle charging needs, and (b) it would mean Lordstown's customers were easier to service, resolving the otherwise substantial challenge of building out a dealership/service network that could reach geographically disbursed customers.  However, commercial fleets are sophisticated customers and have strong incentives to be discerning when buying large quantities of vehicles.  Thus, a

41

major risk for Lordstown's business—since it was a new manufacturer and, in particular, a new manufacturer using "hub motors," which was entirely novel technology among commercial car and truck manufacturers—was whether or not there would be strong demand for its vehicles within the target market.  As a result, statements touting pre-orders from fleets were especially important, as they spoke to the viability of Lordstown's business in persuading these selective customers, which was crucial to Lordstown's business plan.

106.    85. The August 3, 2023 press release also stated that the Lordstown plant was "estimated to be capable of producing in excess of 600,000 electric vehicles annually, with only modest incremental investment," described the plant as "near production ready," and stated that the plant "positions Lordstown to be first to market."  Similarly, an investor presentation prepared by Lordstown and filed with the SEC by DPHC on August 3, 2020 stated that "Lordstown has already received ~27K orders (average order size of ~300 trucks) before the first vehicle has been produced, representing potential revenue sufficient to cover 2021 production and into 2022."

107.    86. The proxy materials published on August 3, 2020, also included an "investor presentation" marketing Lordstown's business.  That presentation disclosed that Lordstown would have "$675 million of cash to fund operations and growth" after the Merger, meaning that prior to the Merger the fledgling companyCompany had essentially no cash.

108.    87. The investor presentation listed the logos of certain "Pre-Order Customers" and boasted of "~$1.4bn of Existing Pre-Orders."  The presentation also stated that "Based[b]ased on the excellent condition of the plant and equipment at the Lordstown Complex, LMC Projects ~$120 million of investment to retool the equipment for full production readiness."  Incredibly, the presentation boasted that the "Capital Raise" of $675 million

42

provided through the Merger and related transactions, were "expected to be sufficient to achieve cash flow positive."  This was an amazing proposition for investors, as it meant that Lordstown would become profitable based just on the capital raised in the proposed transactions, and would not need to raise additional funds to achieve its ambitious production schedule.  The same statement was reiterated in the financial section of the presentation, which stated, "No[n]o additional capital requirements expected between PIPE[610] and going to market, achieving positive cash-flow."

109.  88.  As part of the August 3, 2020 proxy materials, Defendants published an investor conference call transcript for an event that they held at 8:30am on August 3, 2020.  At that event Defendant, Hamamoto described how DPHC had "valuatedevaluated hundreds of companies" on behalf of DPHC but that "Lordstown stood out.  Defendant" Hamamoto stated that "Lordstown has attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its 1.4 billion dollars of pre-orders to-date[.]"  HeHamamoto also stated that "This[t]his capital will fully fund Lordstown's current business plan and position the company[C]ompany to achieve positive EBITDA and cash flow[.]"  Defendant Burns spoke immediately after Hamamoto on the conference call, but Burns in no way corrected or qualified any of Hamamoto's statements.

89. Importantly, the reference to "fleets" has a clear meaning in the automotive industry.  As explained by the industry publication Automotive Fleet, "to qualify as a fleet, a business must have purchased five vehicles in a year or have 15 total units in operation."  Federal emission

---

[610] The term PIPE refers to "private investment in public equity," and as relevant here, the PIPE investment that occurred as part of the transactions, defined herein as the Merger, was additional capital raising that coincided with the formal merger between DPHC and LTM.

43

~~standards use a similar definition, defining fleets as "10 or more motor vehicles which are owned or operated by a single person."  42 U.S.C. § 7581.~~

110.  ~~90.~~ During the same August 3, 2020 conference call, Defendant Burns stated that the plant was "estimated to be capable of producing in excess of 600,000 electric vehicles annually with only modest incremental investment."  ~~Defendant~~ Burns again boasted of the pre-orders, stating that the ~~company's~~Company's partners had demonstrated their "confidence in this technology with significant pre-order activity."  ~~Defendant~~ Burns followed that statement by claiming: "The Endurance was met with great excitement and acclaim, and we now have garnered significant demand with pre-orders totaling approximately 27,000 vehicles since inception, representing more than 1.4 billion dollars of potential revenue.  We hear from many fleets who cannot wait to get their hands on the Endurance.  The ~~electric vehicle~~EV market is expected to grow significantly in the next decade, underlying our expectations of selling more than 100,000 vehicles per year by 2024."  ~~Defendant~~ Burns also mirrored ~~Defendant~~ Hamamoto's remarks stating that the "cash proceeds" from the Merger and related transactions~~,~~ "will be used to fund production of the Endurance and we do not expect that we will need any additional equity capital requirements to achieve positive cash-flow."

111.  ~~91.~~ Also on August 3, 2020, Defendant Burns appeared on CNBC and stated ~~that~~: "We got 27,000 *orders*.  We got customers really wanting the truck."  A transcript of this media appearance was published as "definitive proxy soliciting materials" through an SEC filing made by DPHC on August 5, 2020.

112.  ~~92.~~ On August 24, 2020, DPHC published a preliminary proxy statement with the SEC.  That document stated that "~~To~~[t]o date, Lordstown has received pre-orders from fleet operators to purchase approximately 27,000 Endurance vehicles."  That document also stated~~,~~:

44

"Lordstown anticipates it will be able to commence full production in 2021 with a target of 2,200 vehicles produced and sold in the year.  Lordstown currently has pre-orders from fleet operators to purchase 27,000 vehicles.  Although these pre-orders are nonbinding and did not require any deposit, Lordstown believes they demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers."

113.    93. On September 17, 2020, Lordstown and DPHC hosted a virtual analyst event and filed the presentation used in that event as "definitive proxy soliciting materials" with the SEC.  That presentation included the same statements that were included in the presentation filed with the SEC on August 3, 2020.

114.    94. September 21, 2020 was the official "Record Date" for the Merger vote.  This meant that shareholders who held DPHC shares on that date would be entitled to vote on the Merger.

115.    95. On September 28, 2020, President Trump hosted Lordstown at an event at the Whitehouse, complete with a prototype of the Endurance outside the White House.  While Defendant Burns' remarks were primarily limited to answering a few questions posed by the President about the hub motor technology, even in this venue the false sales narrative resurfaced.  Away from the microphone Burns could faintly be heard telling former President Trump that production would be starting in September [2021] and mentioning 30,000 trucks, presumably referring to the purported number of pre-orders, which were listed at 27,000 on the most recent proxy documents.  Then, in the formal remarks to the press, President Trump stated, talking about the Endurance, "I heard the sales are great," and Defendant Burns nodded repeatedly in agreement, without clarifying that any such "sales" were, at most, mere indications of interest.

45

116. 96. On October 8, 2020, DPHC published the final proxy statement soliciting shareholders for the Merger. It contained many statements that were substantively the same as the statements that were previously described in the August 24, 2020, preliminary proxy.

117. 97. On October 12, 2020, securities analyst BTIG, published a report with a buy rating, thatwhich was substantially based on the company'sCompany's supposed order book. The report stated that Lordstown has the "First Year of Production Sold Out," and explained that "while the first Endurance pickup truck delivery is not scheduled until late 2021, 2022 targeted production (~30,000 units) is already sold out with over 40,000 pre-orders ($2B+ backlog) from established fleet customers." The analyst report went on to explain that fleets focus on cost of ownership and stated" "[t]hat is why we like management's decision to focus the Endurance on commercial fleets. And with over 40,000 pre-orders for the Endurance across multiple fleet managers, management's focus on this segment of the pickup truck market looks to have already borne a lot of fruit with the first year of production already sold out."

118. 98. On October 22, 2020, thea shareholder meeting was held to vote on the Merger. Approval of the Merger required majority support from the holders of DPHC Class A common stock that were entitled to vote. A sufficient number of shareholders voted in favor of the Merger and the Merger was closed the following day. As a result of the Merger closing, DPHC acquired Lordstown Motor Company and took control of it as a wholly owned subsidiary. DPHC was renamed Lordstown Motor Company, and the former Lordstown Motor Company was renamed Lordstown EV Corporation.

119. 99. Just days later, on October 26, 2020, Defendant Burns appeared virtually at the NASDAQ to "ring the bell" to ceremonially mark Lordstown's inclusion on the exchange. Burns once again reiterated that the funding raised in the IPO would provide Lordstown

46

sufficient capital to reach production and that they would be first to market, with a September 2021 launch.  Specifically, ~~Defendant~~ Burns stated: "This brings the final chapter where we get the necessary resources to be able to bring this Endurance all the way to market. . . .  We fully intend for this to be the first full-size electric pickup truck in the world, specifically in the US. And we are on target to do that in September."

120.    ~~100.~~ Also on October 26, 2020, *The Detroit News* published an article that included statements from Defendant Burns.  In that article, Burns reiterated the September 2021 production date and that the funding provided Lordstown the financial resources needed to reach that target, stating that the Merger "gives us the financial acumen to be able to get this done," and adding that "since we're in a race to be first, it was really important for us to get that funding, so that we could be **assured** of production by September."  The article also reiterated that Lordstown had 40,000 pre-orders and added that Burns was "surprised when he got up to 40,000 orders" and that "now he's got to make more vehicles faster than expected," further emphasizing the supposed veracity of the orders, or pre-orders, in that it supposedly meant the "he's got to" produce a certain number of trucks.

### C.    The Misrepresentations Escalate After the Merger

121.    ~~101.~~ On November 12, 2020, ~~Defendant~~ LTM filed an S-1 Registration Statement with the SEC registering shares of its stock.  That filing stated ~~that~~: "We currently have pre-orders primarily from fleet operators to purchase over 44,000 vehicles, which pre-orders are nonbinding and did not require any deposit.  We expect to ramp up our sales and marketing efforts, which were limited prior to the Business Combination."

122.    ~~102.~~ On November 16, 2020, ~~Defendant~~ LTM filed a Form 8-K with the SEC attaching a press release.  The press release was titled: "Lordstown Motors Releases Business

47

Updates; Remains on Track to Begin Production of the Lordstown Endurance in September 2021."  The first line of the press release reiterated that Lordstown "remains on track to begin production of the Lordstown Endurance, the world's first full-size, all-electric pickup truck, in September 2021."

123.    103. That same November 16, 2020, press release stated:

> Lordstown Motors has received approximately 50,000 non-binding production reservations from commercial fleets for its Lordstown Endurance all-electric pickup truck, with an average order size of approximately 500 vehicles per fleet. This figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders, such as federal, state and municipal governments, and military fleets.  Deliveries of the Lordstown Endurance are expected to begin in September 2021, with full production ramping up throughout 2022.

124.    104. On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge*.  HeBurns reiterated that the vehicle would be launched in September 2021, stating: "Our first fully electric full size pickup truck, the Endurance, is coming out in September."  HeBurns again boasted about the pre-order numbers, stating: "Today we announced a couple big things.  A, demand, like you said, 50,000 pre-sales already, all from fleets.  That's just the commercial sector.  Does not count military or police departments, municipalities, state vehicles, so really just to have that many commercial vehicles sold already is a big deal."

125.    105. Throughout the November 16, 2020, interview, Defendant Burns further emphasized that they wereLordstown was selling to fleets, commenting, "These[t]hese fleets buy on total cost of ownership," and adding, "we're enjoying the pent up demand.  I don't know if it's going to be this aggressive all the time, but to a fleet operator that's getting 15 miles per gallon in a pickup truck . . . every thing's [else has] completely passed them by with all this electrification," and that "we just got an order for 400 vehicles from an agriculture company."

48

When the interviewer asked him: to "talk about where that demand might be coming from?[,]" Burns responded, "the bulk of them, our average order is about 500 trucks per order, so larger fleets."  Later in the interview Defendant, Burns again claimed Lordstown was selling to fleets, stating: "Almost everybody that comes out with an electric vehicle starts at a luxury price point, kind of like cell phones were when they first came out, and they say, 'We'll move down with volume,' But we wouldn't be able to get fleets to really buy that, not many fleets."

126.    106. On November 17, 2020, Defendant Burns appeared on the CNBC television program *Mad Money* with Jim Cramer.   In this interview, Defendant Burns brazenly misrepresented the orders and—under direct questioning from Cramer—falsely represented theLordstown's order book.  The exchange was as follows:

> **Burns**: We sell to commercial fleets.  That's our first customer.  And like you said, we've already got 50,000 pre-orders.  And when you sell to fleets, we couldn't do what most EV companies are doing, where you come out with the luxury price point and move downstream.  A fleet guy would get fired for buying a luxury truck.  So we had to come out on par with the gas trucks pricing, and to do that, we had to invent a new drive train.  And that drive train had to be reasonably priced, but rough and tough enough, what people expect of a modern day pickup truck.  They think it should be able to climb a wall and haul and tow. So we used hub motors, which are, if you think of a Lime or a Bird scooter, right? There's no motor with a sprocket and a chain going to the back.  The motor's in the wheel.  And so we have very large versions of that.  And as a result, we didn't just kind of make a pickup truck to compared to, let's say a Ford 150, we really feel it's better on almost every metric.
>
> **Cramer**: It seems as if some of these orders, the 50,000 are from solid, Duke Energy, FirstEnergy.  These people are not going to be walking away?  They are committed?
>
> **Burns**: *Right.  Yeah.  All of them.  When you order, I think our average order size is about 500 trucks at a time.  And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial.  So you've got to plan all the charging and everything.  <u>So it's very serious orders</u>*.

\* \* \*

49

**Cramer**: All right.  So we've got Ford coming in.  Obviously we've got Tesla coming in.  I've got a Rivian truck in front of me that looks pretty darn good.  I mean, have we got room for everybody?

**Burns**: Well, first of all, I think everybody in America knows number one, number two, and number three best-selling vehicles in America are pickup trucks.  So lots of room.  We've picked a lane.  So nobody else, although that seems pretty crowded, what you're discussing there.  Nobody else has this lane where we're building a truck for fleets.  A full-size, like the Rivian that you mentioned is not a full-size truck.  The Tesla truck, reinventing it into the cyber truck.  We feel that it's not really a work truck per se.  Other three components of course will come out with electric trucks.  But they're a little bit conflicted because they can't cannibalize their gasoline trucks.  So they're going to be a little slower to market.  And I don't think anybody's at our price point, right?  So we really maniacally have kept the price low.

127. ~~107.~~ Defendant Burns participated in a conference call hosted by Credit Suisse on December 2, 2020.  During this event, Burns stated, "we sell to fleets," adding that fleets buy in big chunks and are easier to provide maintenance and service to because they allow the ~~company~~Company more geographical focus, concluding, "that's why we like fleets."  After that, he explained "[w]e have 50,000 pre-orders already well, well in advance of what we, what we thought we would have."  ~~Defendant~~ Burns then launched into discussing the potential benefit of ~~electric vehicles~~EVs before concluding, "that's all pretty compelling to a fleet [so] that even though we're a new [manufacturer], that carrot is so strong, that we've been able to garner almost $3 billion in pre-orders already."

128. ~~108.~~ The Credit Suisse analyst hosting the event asked Defendant Burns: "How do you, how do you find these, these fleet buyers?"  ~~Defendant~~ Burns responded:

[I]t's been almost all incoming.  We're just starting to build out the sales team.  So we've been able to do again these 50,000, pre-orders just by incoming.  The pent up demand.  These fleets have watched all the electrification coming . . . and there's been nothing for them.  So the, the, the pent up demand, I don't know if it'll always be this robust, it's very, very strong.  And the 50,000 doesn't include state vehicles, municipal vehicles, police vehicles, military vehicles.  It's just, that's just on the commercial side.  And so we, you know, we just it's spread

50

across all different disciplines.  Our average order is about 500 vehicles per order.
So that's larger fleets.

129.    109. On December 21, 2020, Lordstown filed another Form 8-K with the SEC boasting about the status of the pre-orders the companyCompany had secured and its supposed status towardof production.  The sole purpose of this public filing was to publish the following sentence,sentences:  "[Lordstown] has received 80,000 non-binding reservations for the Endurance to date.  The Company remains on track to begin production of the Endurance in September 2021."

130.    110. The next day, on December 22, 2020, securities analyst R.F. Lafferty Equity Research published a report on Lordstown with a "buy" rating.  The report noted the 80,000 pre-orderspre-orders Lordstown was touting at the time as a leading point of focus, noting that it should provide a "steady revenue stream through 2022."  It recounted the supposed "average customer order" of approximately 500 vehicles.  Latching onto Defendant Burns' representations that the pre-orders had all been made by fleets, the report explained that the "company[C]ompany focuses on selling the Endurance directly to commercial fleet operators, bypassing the traditional OEM dealership sales model.  The direct sales model is similar to Tesla, where potential customers for the Endurance can place a pre-order on the company's[C]ompany's website and pay a reserve fee."  Finally, the report emphasized that Lordstown was less than one year away from production of the Endurance.

131.    111. On December 16, 2020, Lordstown issued a notice that it would be redeeming all outstanding publicly traded warrants (RIDEW) on January 15, 2021 for $0.0001—essentially nothing.  This meant that warrant holders would need to exercise the warrants by that date, or they would become nearly worthless, and that Lordstown would be raising an additional amount of capital as these warrant holders purchased shares from the

51

~~company~~Company through the warrant exercise.  This ultimately raised an additional $82 million in cash.[711]

132.  ~~112.~~ On January 11, 2021, Lordstown issued a press release providing a supposed update on its order procurement and production schedule.  The press release stated that they were "on track for start of production in September of this year."  The press release described Lordstown as a company "focused on the commercial fleet market" and stated it had received "more than 100,000 non-binding production reservations from commercial fleets for its Lordstown Endurance™ all-electric pickup truck, with an average order size of nearly 600 vehicles per fleet."  The press release also quoted Defendant Burns as stating:

> Receiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history. . . .  Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry.

133.  ~~113.~~ On January 28, 2021, Lordstown issued a press release indicating that it had completed the first step in becoming authorized to sell vehicles to government fleets.  The press release also quoted Defendant Burns as stating: "we remain on track to meet our September ~~start-of-production~~start-of-production timeline while continuing to see indicators of strong demand."

134.  ~~114.~~ While the price of Lordstown's common stock was artificially inflated, Lordstown's insiders sold hundreds of thousands of shares of Lordstown common stock into the secondary market, as follows:

---

[711] This is notable, in that, Lordstown later announced a going concern notice (even with this extra cash) notwithstanding the fact that it had previously claimed the IPO proceeds themselves provided sufficient capital to fund Lordstown's operations until it reached profitability.  It now appears that Lordstown foresaw that in the near-term it would (a) need additional capital and (b) its stock would be trading below the $11.50 strike price for the warrants.

52

| Insider | Date | Price | Shares Sold | Total Proceeds |
|---|---|---|---|---|
| Defendant Schmidt | Feb. 2-3, 2021 | $25.23 | 211,512 | $5,336,530.00 |
| Defendant Brown | Feb. 2, 2021 | $24.63 | 19,008 | $468,183.00 |
| Defendant Post | Feb. 4, 2021 | $27.21 | 10,000 | $272,100.00 |
| Defendant Rodriguez | Feb. 4, 2021 | $27.00 | 9,300 | $251,100.00 |
| | | *Total* | *249,820* | *$6,327,913.00* |

135.  ~~115.~~ On February 6, 2021, Defendant Burns appeared for an interview on the popular investment YouTube Channel "Jack Spencer Investing."  Once again, Burns falsely boasted about the number of pre-orders, in the following exchange:

**Spencer**:  So I remember, I think the first number we had from you guys was when the initial investor presentation came out with something around like 28,000.  And then I remember it just kept going up and up and up.  And it was just, it was immense.

**Burns**: Yeah.  Yeah.  And again, all those numbers are just commercial fleets.  That doesn't count municipality, state vehicles, federal vehicles, military vehicles, all those folks use a lot of pickup trucks.  And most of them use them in a local fashion, so the range is perfect for them.  So they can't do pre-orders.  They're government entities.  So that a hundred thousand that we've announced doesn't even count all that.

**Spencer**: Yeah, jeez.  So that's literally just for fleets?

**Burns**: Yeah.  That's just commercial fleets.

**Spencer**: I don't think anybody's going to be upset to hear that piece of news though.  That's awesome.  And what's the average order at now?  Was it 600, the latest one?

**Burns**: Yeah.  That's on the commercial side.

**Spencer**: 600 on the commercial side.  And would there be a few bigger names in there that you can share or would it be a lot of bits and pieces going on?

**Burns**:  Well, I think we just shared a few of them.  Like Duke Energy was a big one.  ServPro was a big one.  I think we're either going to give a list of them or name a few more key other ones, but right now we're trying to keep it as a big

53

number.  And for our purposes, the reason you do pre-orders, this business of tooling up, all the money you spend on tooling, you tool based on how many you're going to sell.  And let's say it's a normal business and you get caught by surprise and people want your product more than you had planned to build.  You find a way.  In this business, it's a year lag time.  You've got to plan a year ahead of time.  And I think Musk invented this and it's really brilliant.  Let's give them a good feel for what this vehicle is and ask them, "Would you order it if we make it for this price in this timeframe, and these specs?" And that lets us know.  That appetite lets us know what to tool for.  So we've been really surprised by these numbers.  So we are then trying to prepare to build more than we originally had planned.

\* \* \*

**Burns**: Well, all I can tell you is these big ones, if a company to orders 600 pre-orders, that is signed by the CEO of that company all likelihood or at least some C-suite person.  They take it very seriously.  They've got to figure out how they're going to layer these electrics in there.  And the appetite for them to do that way early like that, a year out from some of them means they're trying to do their part to ensure this comes to market.  So they're standing behind it and they're putting these pre-orders in.  But I'd say it's much stickier than a consumer putting a hundred dollars down refundable down on a Cybertruck, let's say.  And I think these orders are very, very sticky because I know what it takes to get them, the education you have to do.  This isn't somebody again on a website, a hundred bucks, refundable with a credit card.  This is a fleet.  And fleets generally take their business very, very seriously.  So I think they're very sticky.

136.  ~~116.~~ On February 18, 2021, Defendant Burns appeared on CNBC for an interview about Lordstown's production status.  The opening segment for the television spot noted the 100,000 supposed orders.  The interviewer then asked Burns: "in terms of the September timeframe for full production of the Endurance Steve, do you have enough liquidity to get you to there from here?"  ~~Defendant~~ Burns responded: "Yep.  We've been really maniacal about that and we're on track."

137.  ~~117.~~ On February 23, 2021, Yahoo Finance hosted an interview with Defendant Burns where he continued to perpetuate the false narrative about the pre-orders and the Company's production progress.  ~~He~~ Burns began the interview by stating unequivocally: "Production starts in September."  ~~He~~ Burns also continued to falsely represent the

54

~~company's~~Company's pre-orders—after a direct question from the interviewer asking: "Steve, how many pre-orders do you have and who's ordering these trucks?" ~~and~~ Burns stated:

> Yeah.  We set out a fleet.  This is a full-size pickup truck, and as I think most people know, it's a favorite of consumers and of workers.  Our initial foray is into fleets and **we have pre-sold 100,000 of these to various fleets** across America.  So, really a big appetite.  You've got a fleet that's been using a 17 mile per gallon pickup truck for the last 30 years and we come out with one that gets the equivalent of 75 miles per gallon.  And it's just what we had hoped, a lot of pent up demand, a lot of excitement around it.  And you do these pre-orders to get a feel what to tool for.  In this business, tooling and all the costs associated with the automation required to bring these to market.  And so it gives you a good feel of what to tool for, what to build for, and we've been just really happy with 100,000 pre-orders.

*  *  *

> Commercial has a lot of benefits.  They buy in big chunks, very sticky orders, a lot of loyalty once you're good to them.  And consumer can be a little more fickle, and so for a new OEM with a new kind of vehicle, cutting our teeth on fleets that are very focused, they know exactly what they want their vehicles to do, they buy your vehicle only if it matches that definition.  So, by definition, you get a good fit and a happy customer.

### D.      **The Truth Begins to Emerge**

138.    ~~118.~~ The truth about Lordstown began to emerge on March 12, 2021, when the renowned research firm~~,~~ Hindenburg Research ("Hindenburg")~~,~~ published a lengthy analysis of the ~~company~~Company (the "Hindenburg Report").  Hindenburg specializes in forensic financial research and its website states that its most impactful research results from uncovering hard-to-find information from atypical sources.  This was no exception, as ~~Hindenburg's~~the Hindenburg Report included information from many interviews with Lordstown's purported customers and former employees of Workhorse and Lordstown, as well as information uncovered from other sources like freedom of information law requests.[12]  Investigation ~~of~~

---

[12] A copy of the Hindenburg Report ~~is~~was attached as Exhibit A to ~~this~~the prior complaint.  ~~It has been~~ in this action (*see* ECF No. 61-1) and is incorporated by reference herein.  It was generated by copying the content of the Hindenburg Report from Hindenburg's website and has been modestly reformatted for readability in PDF form.

55

~~counsel~~by Lead Counsel has corroborated the veracity and credibility of the Hindenburg Report. As detailed below, there were two main sets of allegations in the Hindenburg Report: (1) The Truth About Lordstown's Order Book; and (2) The Truth About Lordstown's Production Capabilities.

### (1)      The Truth About Lordstown's Order Book

139.      ~~119.~~ Despite ~~nearly~~ constantly touting the importance of having "pre-sold" a large volume of trucks to "fleets" representing billions of dollars in forthcoming revenue, these figures were vastly inflated, including by: (i) booking supposed pre-orders from supposed customers that had made no such pre-orders by any name whatsoever; (ii) booking pre-orders based on entirely non-binding LOIs, where Lordstown clearly knew the relationship was not representing actual demand; (iii) booking pre-orders from parties that could not possibly order the volume of trucks claimed by Lordstown, including by counting supposed pre-orders from ~~non-fleet~~non-fleet customers; and (iv) ~~employing many other practices aimed at inflating the pre-order count~~booking pre-orders from parties other than commercial fleets, including intermediaries that did not themselves own fleets, and government entities.  As explained herein, these practices were an effort by Lordstown and members of its management to deceive the investing public into believing that the Endurance—and ~~the company~~Lordstown—was on track to be an instant success.

### (i)      *The Hindenburg Report*

140.      ~~120.~~ The Hindenburg Report documented how Lordstown had repeatedly lauded the strength and seriousness of the pre-orders it allegedly had secured, when, in fact, these orders did not indicate true customer demand.  For example, the Hindenburg Report stated:

> Our research has revealed that Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles.  According to former employees and business partners, CEO Steve

56

> Burns sought to book orders, regardless of quality, purely as a tool to raise capital and confer legitimacy.  In addition, we show how, in desperation to claim there was demand for the proposed vehicle, he paid for customers to book valueless, non-binding pre-orders.
>
> We detail conversations with Lordstown "customers" who were eager to explain that the letters of intent ("LOI"s) with the company were "promotional".  Others assured us they were "not committed to anything" and that the pre-order commitment size recorded by Lordstown was "totally impossible."  One CEO at a 'key' customer told us our outreach was the first he had heard of any arrangement with Lordstown.

141.   ~~121.~~ The Hindenburg Report also quoted statements from former employees regarding the veracity of the order book.  For example, one former sales representative explained: "You're right to have some apprehension.  I think the way it's being communicated especially to the media is probably not accurate."  The former employee went on to explain: "I could commit to 100,000 pre-orders or reservations but I have no commitment, no financial commitment, no nothing. . .   I hope they can get all 100,000 of them but I think that's extraordinarily unlikely."

142.   ~~122.~~ The ~~report~~Hindenburg Report gave numerous specific examples of the ways that Lordstown had inflated its order book, several of which are detailed in the following paragraphs.

143.   ~~123.~~ The Hindenburg Report investigated a massive purported pre-order of 14,000 trucks that was announced on December 24, 2020, from a ~~from a~~ business called "E Squared Energy."   This supposed pre-order represented almost 17.5% of the 80,000 total ~~pre-orders~~pre-orders Lordstown was touting at the time.  At the $52,500 price point, this supposed pre-order represented $735 million in demand for Lordstown——*i.e.*, substantially more money than the ~~company~~Company had raised in the Merger, and correspondingly substantially more cash than Lordstown had in its coffers.

144.  124. As the Hindenburg Report detailed, E Squared's principal was an individual named Tim Grosse, and according to LinkedIn, E Squared had only one other employee.  The other employee identifies as a "retired freelance energy consultant."  The reportHindenburg Report explained that E Squared was not an incorporated business, but merely a "doing business as" name given to Grosse's business.  The business address for E Squared was registered to Grosse's apartment, which the Hindenburg Report explained was modest——with similar units in the building renting for just over $1,000 per month.

145.  125. The website for E Squared indicates that it is focused on advising companies on cutting energy costs through energy audits, LED lighting, and other power-saving means.  The Hindenburg Report explained that there was no indication on E Squared's website that it had a fleet of trucks or even that it focuses on the electric vehicle space.  Further, the Hindenburg Report detailed how, when asked whether E Squared operates a fleet, Grosse responded: "We don't operate a fleet but we provide the fleets.  It's kind of a hybrid of a lease but it's not a lease," and then explained, "It's a brand-new program we're offering.  We've primarily been in the building sector."

146.  As explained herein, Lordstown's supposed deal with E Squared was actually a mere alteration to the prior, entirely fraudulent deal with Grid X, transferring that deal from the almost entirely non-existent Grid X to the also almost entirely non-existent E Squared.  At the time the Hindenburg Report was published in March 2021, it was apparently not known to the Hindenburg report's author that Lordstown had engaged in this alteration, and so the report *separately* discussed the illegitimacy of both the E Squared *and* Grid X deals.  Thus, the Hindenburg Report explained that Lordstown's September 17, 2020, investor presentation had listed Grid X as one of their "Selected Pre-Order Customers," complete with a picture of the

58

company's logo.  However, the Hindenburg Report explained that Grid X is an internet cloud services company.  As explained herein, *that* Grid X (which operates an internet cloud services company) is *not even* the Grid X that Lordstown purportedly had any dealings with, despite the fact that Lordstown used the cloud-services company's logo in Lordstown's investor-facing materials.  The Hindenburg Report pointed out that the internet cloud services company Grid X does not appear to own any fleet trucks according to department of transportation records, and that a review of Grid X's website did not provide any indication that it operated vehicle fleets.  The Hindenburg Report quoted the internet cloud services company's former CEO, Jian Zhang, as stating, "I don't know anything about LMC or Lordstown Endurance pick-up" and as stating, "We are completely unaware of this.  I heard of them from your inquiry message the first time."

147.  126. The Hindenburg Report also looked at Lordstown's supposed deal with Innervations LLC.  On April 7, 2020, Lordstown announced a 1,000 truck order (worth $52.5 million at the price Lordstown was marketing the Endurance at), with Innervations.  At the time, this was the largest order Lordstown had ever announced.

148.  127. The Hindenburg Report detailed that Innervations was incorporated four months prior to the announcement, and listed a virtual office as its address.  The reportHindenburg Report  explained that Innervations' corporate documents list two individuals — one a 2018 law school graduate who works full time at a software company and the other worked full time at an architecture design firm and runs a contracting firm out of his modest 2-bedroom home (valued by Zillow at $187,000 at the time the Hindenburg Report was published).

149.  128. According to the Hindenburg Report, Innervations' website did not provide any indication that it operated vehicle fleets.  Instead, the report detailed that Innervations' role

59

was primarily as a promoter, not as a purchaser. It quoted Innervations' David Hein as explaining the business as follows:

> What we do is we host and support events with companies and then we invite Lordstown Motors to the event to show the product. We just direct the company to Lordstown directly. When they tell us they're interested in purchasing trucks that's what we do. **We don't get involved in the actual ordering**.
>
> * * *
>
> We're influencers, our numbers, that's a very small number but what Innervations does is we promote the product… We think we can influence. Remember, we don't sell the truck, we just influence companies, and it's more on a broader spectrum.

129. The Hindenburg Report explained that Lordstown had booked 40 trucks of pre-orders from the Catholic Cemeteries Association. But the Hindenburg Report explained that this supposed pre-order customer, made clear to Lordstown that its interest was entirely premised on the non-binding nature of the order, stating "I'm not committed to anything, **not to buying a single vehicle**. I committed to consider buying vehicles. I'd have a lot of questions before I commit to anything."

150. 130. The Hindenburg Report also probed the supposed 500 truck pre-order secured by Lordstown from Clean Fuels Ohio, in March 2020. However, as the reportHindenburg Report explained, Clean Fuels Ohio was a non-profit focused on educating fleet operators around Ohio and was merely planning to encourage purchases of trucks. The reportHindenburg Report quoted the Executive Director of Clean Fuels Ohio as agreeing with that characterization and then adding: "It is really that, promotional and getting the word out. And when we signed those letters of intent, we were really clear with them that that's what we would be doing, and they understood that and welcomed that."

60

151.  ~~131.~~ The Hindenburg Report explained that Lordstown had issued a public statement claiming the Momentum Groups had pre-ordered 900 Endurance trucks.  The Hindenburg Report further explained that Momentum Groups is a vehicle reseller that does not operate a fleet or purchase vehicles on its own behalf.  In fact, ~~it~~the Hindenburg Report explained that the Momentum Groups instead had launched a page on its website marketing the vehicle and trying to find actual customers for the Endurance.  Thus, this supposed "pre-order" did not represent any actual demand for the product, but merely that Momentum Group might be interested in buying trucks *if* it could find end-customers that did have an interest in buying the vehicle.

152.  ~~132.~~ The Hindenburg Report explained that Lordstown's September 17, 2020, investor presentation had listed "First Energy" as one of their "~~Select~~Selected Pre-Order Customers," and explained that Lordstown had issued a public statement claiming that First Energy had pre-ordered 250 trucks, quoting one of First Energy's executives Dennis Chack.  By the time of the September 17, 2020~~,~~ investor presentation, First Energy had been embroiled in a massive bribery scheme that had led to the Ohio Speaker of the House of Representatives being arrested and to Mr. Chack being fired.  While this did not *necessarily* mean the orders were fake, it certainly suggested that one of Lordstown's "key customers" lacked credibility.  It would have been even more doubtful that ~~pre-orders~~pre-orders by a fired executive terminated in the bribery scandal would convert into actual orders.

153.  ~~133.~~ The Hindenburg Report explained that Lordstown's September 17, 2020, investor presentation had listed Summit Petroleum Inc. as one of their "~~Select~~Selected Pre-Order Customers."  However, the ~~report~~Hindenburg Report explained that Summit Petroleum was a small Ohio-based oil & gas exploration company with about 24 total employees.  Thus, the

61

notion that they could produce a large number of orders was highly unlikely——as a company of that size would not be expected to buy *even* 24 trucks. The Hindenburg Report quoted William Kinney, the president of Summit Petroleum, as stating "For us it's really just a look-see[.] I don't know enough about them to make an honest.... . . . . We want to evaluate them on their merits . . .. A friend of a friend is involved in [Lordstown] and asked us if we would consider it and we said we would and we are not locked in."

134. The Hindenburg Report explained that Lordstown's September 17, 2020, investor presentation had listed Grid-X as one of their "Select Pre-Order Customers," complete with a picture of the company's logo. However, the report explained, that Grid-X is an internet cloud services company. The report pointed out that Grid-X does not appear to own any fleet trucks according to department of transportation records, and a review of their website does not reveal that they perform any services requiring the use of trucks. The Hindenburg Report quoted the company's CEO, Jian Zhang, as stating, "I don't know anything about LMC or Lordstown Endurance pick-up" and as stating, "We are completely unaware of this. I heard of them from your inquiry message the first time."

154. 135. The Hindenburg Report explained that Lordstown's September 17, 2020 investor presentation had listed Duke Energy as one of their "SelectSelected Pre-Order Customers," complete with a picture of the company's logo. The Hindenburg Report explained that former employees told them that this deal was essentially for show and done as a favor to CEO Steve Burns in order to aid in the capital raising process. In fact, the report published a copy of the letter of intent that Lordstown was using to claim the pre-orders. That LOI was between Duke Energy and Workhorse (not Lordstown), and firmly stated that there was no reservation payment, and no obligation to purchase, related to an entirely different vehicle than

62

the one Lordstown was developing, the Workhorse LD1500 (a vehicle with a conventional electric engine, not hub motors), and listed a different price than the one Lordstown was promoting.  Furthermore, the LOI was dated November 1, 2016, and called for trucks to be delivered (if actually ordered) over a two-year period, meaning there was no credible basis to claim that this LOI indicated interest as of September 2020 for delivery of an entirely different truck in September 2021 (or whenever thereafter Lordstown might actually produce vehicles). The Hindenburg Report quoted Duke Energy's media spokesperson as saying they would need to "see the truck and kick the tires before we buy."

155.    136. The Hindenburg Report explained that Lordstown had also counted Ryder as having made pre-orders for 2,500 trucks.  However, the Hindenburg Report explained that, as with Duke Energy, former employees told them that this deal was essentially for show and done as a favor to CEO Steve Burns in order to aid in the capital raising process.  As with Duke Energy, the purported agreement with Ryder was actually a deal with Workhorse for an entirely different truck that had been penned back in early 2017.  Furthermore, the report noted that in a public interview Ryder explained that they were partnering with Workhorse to provide maintenance and service for the Ryder trucks.  Public documents do not show any similar agreement between Lordstown and Ryder, and Burns promised the maintenance and service relationship to Camping World — casting even greater doubt on the notion that Ryder's stale LOI with Workhorse was a meaningful indication of its demand for the Endurance.

156.    137. The Hindenburg Report explained that Lordstown had announced procuring pre-orders from Mike Albert Fleet Solutions, in a press release calling it a "major" step forward, and noted that it was the only deal announced by press release in January of 2021, when Lordstown's pre-order book supposedly jumped from 80,000 to 100,000.  The Hindenburg

63

Report explained that this purported "pre-order" was actually merely an agreement to potentially place referrals.  The report quoted Nate Shadoin, Director of Sales at Mike Albert Fleet Solutions as explaining: "They (Lordstown) are an Ohio-based company and so are we (Mike Albert Fleet Solutions) and I have a personal relationship with some of the business development executives that are there.  And we go out and talk to the same people and so they're talking to fleets and I'm talking to fleets.  We refer business introductions and opportunities to each other."

157.     138. The Hindenburg Report explained that, according to Lordstown documents reviewed by the report's author, Lordstown had recorded pre-orders of 15 vehicles from Frank Seman, the Mayor of the City of Ravenna.  However, the report explained that when Mayor Seman was asked about the order, he explained:

> I was asked to write a letter of support to help get the plant repurposed and reopened to help provide more jobs for residents of Northeast Ohio.  While we have an interest in the plant's success and this technology, we did not commit to the purchase of any vehicles.  We are a small town.  The commitment of that size is totally impossible.

158.     139. Similarly, the Hindenburg Report noted that the same situation was true as to the City of Kent, where city manager Dave Ruller told the report's Hindenburg Report's author that their city could potentially be in the market for 3 or 4 trucks subject to a formal bidding process, but not the 15 recorded by Lordstown as pre-orders.  Mr. Ruller added, "We were happy to write that letter to show our support—and to help them finalize all their production financing—knowing that it is not an official bid document or purchase order so it is not legally binding us to buy something that hasn't even been produced yet beyond a prototype."

159.     140. In addition to these specific examples, the Hindenburg Report also explained how many of the pre-orders that Workhorse had procured, which Lordstown had marketed as its own, were the result of commission-based sales efforts by a former Workhorse employee who

64

had since sued the company for failure to pay those commissions.  That employee was paid $30 commissions per truck for each pre-order obtained, even though the pre-orders were entirely nonbinding.  The complaint filed by that former employee stated that he had obtained the orders with Duke Energy, Clean Fuels Ohio, and Ryder under such arrangements.

160.  ~~141.~~ The Hindenburg Report also explained that in early 2020, according to former employees, Defendant Burns was desperate to increase the number of pre-orders, regardless of quality and that he wanted to get to 10,000 pre-orders to secure better financing terms.  Toward that end, the ~~company~~Company hired an outside firm called Climb2Glory LLC to procure additional pre-orders on a commission basis.  Through this arrangement, the report explained, Lordstown would pay $50 commissions per truck for each LOI obtained.

**(ii)  *Investigation ~~of~~by Lead Counsel[913]***

161.  Investigation by Lead Counsel was able to confirm many of the claims in the Hindenburg Report and through review of Lordstown's internal documents, subsequently publicly disclosed information, and interviews, Lead Counsel has been able to confirm the massive degree to which Lordstown's pre-orders were overstated.  Similarly, this investigation has firmly demonstrated that Defendants, including Defendant Burns, were personally aware of the true condition of Lordstown's pre-order book.

162.  Throughout the Class Period, Defendant Burns was heavily focused on Lordstown's supposed pre-orders.  Emails throughout the Class Period show Burns regularly discussing the issue and how to position the pre-orders to promote Lordstown.  Those emails

---

[913] Confidential witnesses ("CWs") are identified herein by number (CW-1, CW-2, etc.).  All CWs are described in the masculine to protect their identities.  Plaintiffs believe that the details of the responsibilities of the CWs contained herein are sufficient to satisfy the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  However, Plaintiffs can provide additional specificity to the Court through an *in camera* submission.

show that Burns personally commented on specific supposed pre-order deals, and personally advised on detailed issues concerning the sales team. Burns was also sent emails with detailed spreadsheets breaking down the supposed pre-orders by supposed customer, which included additional information about those supposed customers. For example, shortly before the Class Period (on August 14, 2020) Defendants Burns, Rodriguez, Schmidt, and Flannery received such a spreadsheet, which listed the supposed customers by name, stated the supposed order amount, described how the supposed customer was obtained (*e.g.*, Climb2Glory), stated who the signatory was and their title (*e.g.*, "mayor"), and broke out categories of supposed pre-orders (*e.g.*, specifically listing "Holman"). Notably, the August 14, 2020 email attaching the spreadsheet described "LMC Cumulative LOIs *and* preorders," (emphasis added) indicating an understanding that there is a distinction between LOIs and preorders. Similarly, shortly after the start of the Class Period (on September 19, 2020) Burns, Rodriguez, Schmidt, and Flannery received a spreadsheet listing the same types of information, including a cover email that expressly broke out "consumer pre-orders" and again distinguishing between "LOIs *and* Preorders" (emphasis added). As yet another example, Burns and Rodriguez recieved an email on March 20, 2021, with a spreadsheet that listed Lordstown's supposed pre-orders by customer and specifically stated next to each one whether it was a "intermediary" or "fleet" (with some listing an empty cell instead of either option),

163. 142. Investigation of counsel was able to confirm many of the claims in the Hindenburg Report and found the report to be reliable. Additionally, counselLead Counsel has interviewed several of Lordstown's purported pre-order customers and former Lordstown employees and continues to find evidence that Lordstown misrepresented its supposed pre-order book.

66

164.    ~~143.~~ CW-1 was a Manager at Lordstown in 2020. According to CW-1, he met several times a week with former Senior Vice President of Business Development Defendant Flannery and attended meetings with him as well.

165.    ~~144.~~ According to CW-1, the executive team, including Chief Operating Officer John LaFleur, Defendant Flannery, and former CEO Defendant Burns, were all "very close," with each other and "like-minded." ~~He~~ CW-1 noted that they had all worked together before working at Lordstown.

166.    ~~145.~~ CW-1 explained that the internal sales team at Lordstown and ~~Caimin~~Defendant Flannery had access to and could edit a shared Excel file that was used to keep track of letters of intent (LOIs)/pre-orders. CW-1 explained that all the ~~number of~~ trucks listed in the LOI's figures were counted in the total pre-order number, regardless of the likelihood that a customer would even be able to fulfill them when the time came to do so. CW-1 added that Lordstown "counted everything."

167.    ~~146.~~ According to CW-1, when Lordstown counted the total number of ~~pre-orders~~pre-orders, it included LOIs that had originally been obtained by Workhorse. CW-1 continued to say that he did not recall any attempts being made to reconfirm LOI quantities with those companies that had signed LOIs with Workhorse prior to the formation of Lordstown. CW-1 added that he did not experience any follow ups being made to customers that signed on with Lordstown either, though he did recall conversation about how they should eventually do so.

168.    ~~147.~~ CW-1 explained that he did not feel comfortable referring to the ~~letters of intent~~ (LOIs~~)~~ signed by customers as pre-orders, or anything with the word "order" in them. According to CW-1, he would refer to them instead as "reservations" given the non-binding

nature of the agreements.  CW-1 recalled that the document that the supposed customers would sign made it very clear in bold text that the agreements were non-binding.

169.  148. CW-1 recalled the message from executives at Lordstown being "fairly explicit" that they needed to obtain these reservations in order to get additional financing from investors.  According to CW-1, Defendant Flannery expressed this sentiment to CW-1 directly in meetings that he attended.  According to CW-1, he had multiple conversations with Flannery per week and recalled conversations where Flannery explicitly made the point that the LOIs were for generating investment interest.  CW-1 continued to say that there was pressure to meet benchmarks of pre-orders solely for Lordstown's investment timeline.  CW-1 continued to say that Flannery regularly said that he had spoken with former CEO Steve Burns and provided him with updates about the pre-orders.  CW-1 noted that he could not see how Burns would not have been aware of the practices surrounding the LOIs given his communications with Flannery who knew everything related to sales at that time.

170.  149. According to CW-1, the letter of intentLOI figures were not used to gauge market size or forecast the supplies that would be required to actually produce the vehicles, they were solely used by the companyCompany for the image that "we [Lordstown] have all these orders" and to lure investors.  CW-1 added that he would be "shocked" if Defendant Burns was not aware of the nature of the pre-orders and the reasoning behind them (the need to generate buzz for investors), given how close Burns was with Flannery and LaFleur.

171.  150. CW-1 recalled an instance on a call where CW-1 grew frustrated by the frivolous nature of the pre-orders and asked why Lordstown did not just open the phonebook and put a million orders for random people, implying that the orders they were obtaining were equally as meaningless.  CW-1 described the LOIs as "not worth the paper they were written on."

68

CW-1 continued to say that he had grown suspicious that customers were just being signed up without their consent.  More specifically, CW-1 heard of two instances where significant pre-orders were obtained from one company that operated out of a P.O. box and another that operated out of an apartment that were particularly questionable to him and ~~he~~ CW-1  recalled there was one customer based out of an apartment that had an LOI for over 10,000 vehicles.

172.  ~~151.~~ CW-2 was a high-level manager at Lordstown who left pre-merger.  CW-2 interacted with Defendants Burns and Flannery.

173.  ~~152.~~ CW-2 recalled that Flannery was Burns' "right hand man" and that much of Lordstown's staff was comprised of people with personal connections to Burns, including members of his family or his church.  As a result, according to CW-2 much of the senior staff was not qualified.  CW-2 added that much of the experience of working at Lordstown was a result of the "nature of Steve Burns."

174.  ~~153.~~ CW-2 explained that during his tenure Lordstown's sales team was comprised of Vice President of Business Development Caimin Flannery, a director of sales, and up to two sales representatives.  According to CW-2, Climb2Glory reported to Flannery and was paid a commission of $50 for each truck listed in a letter of intent and that the sales representatives were also financially incentivized to get as many LOIs as they could.

175.  ~~154.~~ CW-2 characterized Lordstown's pursuit of LOIs, which were marketed as Pre-Orders, as desperate, explaining that there was "nothing binding" about the agreements Lordstown was getting, which he described as "pie in the sky."  According to CW-2, the "desperation" around reaching pre-order totals was fueled by the effort to get funding for Lordstown, adding that the purpose of the pre-orders was to generate buzz and that that was "all

69

it was for."  CW-2 advised that the pressure related to sales and the LOIs came directly from Flannery and Burns.

176.    ~~155.~~ According to CW-2, there was "zero" due diligence conducted on the ability of potential customers to support their orders based on existing fleet size "by design," adding that the ~~company~~Company did not want to know, because they just wanted to get the signed letters.  CW-2 explained that when it came to securing letters of intent the only guideline provided to Lordstown's sales staff was to get "as many as possible in the shortest period of time."  CW-2 continued to say that there were no instructions regarding what types of customer-leads to pursue.

177.    ~~156.~~ According to CW-2, Lordstown "counted everything," as pre-orders, including all the LOIs, even if the customer's ability to fulfill them was not apparent or even likely.  CW-2 continued to say that the "pressure" to continue to grow LOI numbers "100%" came from Burns and Flannery.  CW-2 explained that Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia."  CW-2 stated that he "talked with Steve frequently," and that Burns "knew every single order" that was counted as a ~~Pre-Order~~pre-order, as well as the customers behind them.  CW-2 also recalled talking with a more senior employee at Lordstown about how the LOIs were "all smoke and mirrors."

178.    ~~157.~~ As an example of Burns' knowledge of the truth about the pre-orders, CW-~~2~~2 recalled that one of the two sales associates had gotten a 1,000 truck LOI from Innervations LLC, but that someone had done a quick search and seen that it had no operating history and was a ~~two-person~~two-person operation run out of an apartment.  According to CW-2, Lordstown spokesperson Ryan Hallett had indicated that they should not publish a press release because of how weak the LOI was.  CW-2 explained that Hallett did not want to publicize the

70

LOIs given how they were ~~non-binding~~non-binding and given that everyone at Lordstown knew that all the big orders were "BS."  Lead Counsel understands, from talking with CW-2, that a member of the sales team had called Burns to explain how sketchy the LOI with Innervations was, and ~~has~~had strongly advised Burns not to publish a press release about Innervations, but despite that warning Burns went ahead with publishing a press release and counted Innervations in the tally of pre-orders.

179.    Throughout the Class Period, Defendant Burns was personally involved in and focused on Lordstown's pre-orders, as confirmed by his near-constant public statements on the topic, frequent email communications on the topic, CW statements, and the statements of Lordstown director Hamamoto during an interview with Lead Counsel.

180.    In that interview, Hamamoto explained that Defendant Burns "certainly gave the impression that he was very involved" in overseeing Lordstown's pre-orders and sales force and "definitely positioned himself as if he were intimately involved in" discussing the issue with Lordstown's sales force.  Hamamoto further recalled Burns "continually" telling  Hamamoto and other investors that "these were real orders signed by C-suite executives."  Hamamoto also recalled that Lordstown's Board would receive presentations about the pre-orders and believed Burns was the one making those presentations.  Likewise, Hamamoto explained that "production and pre-orders were two things that Steve [Burns] tended to focus on."   When asked how closely Burns tracked the pre-orders and whether he would know about particular deals with non-fleet influencer customers, Hamamoto responded: "I think so.  He was pretty focused on it" and added that he believed this because Burns "talked pre-orders a lot."

181.    Internal Lordstown emails also firmly confirm that the pre-orders were understood internally to be directly linked to Lordstown's ability to drive investment in the Company.  For

71

example: On February 17, 2020, Burns was sent an email by Defendant Flannery recounting the "plans to engage Intermediaries to accelerate . . . the signing of LOIs."  In a May 21, 2020 email one Lordstown salesperson sent an email to Burns stating that the pre-orders would be used for "driving investment in LMC."  In an email on July 19, 2020, with the subject line "Updated Marketing Materials" Lordstown insiders discussed revising the investor presentation (which was ultimately included in the Merger proxy materials) to include the arrangement with Holman Enterprises as pre-orders for use in "investor meetings going forward."  In an internal September 2, 2020 email Defendant Burns recognized the pre-orders were not a "binding commitment," but stated "we still want preorders."  Incredibly, in a February 22, 2021, letter to the Ohio Attorney General, signed by Burns, he stated: "Lordstown has not entered into 'pre-orders' as your letter states.  Instead, Lordstown has entered into non-binding letters of intent."

182.  ~~158. With respect to particular supposed pre-order customers,~~A review of internal Lordstown ~~has~~documents by Lead Counsel has confirmed that Lordstown also engaged in a wide range of practices to exaggerate the size and strength of the order book, consistent with the revelations in the Hindenburg Report.  A few such examples are listed below:

~~159.  **First**, Lordstown apparently counted the City of Ravenna among its supposed pre-order customers, as has been reported in news articles.  According to the Hindenburg Report, Lordstown's pre-order book counted 15 pre-orders from the City of Ravenna.  However, the city had not placed any pre-orders or even made an indication of interest regarding the vehicle.~~

183.  **Grid X/E Squared**.  Lordstown booked a massive 14,000 truck pre-order from a company called "Grid X."  Indeed, Grid X was touted in Lordstown's Merger proxy material with its logo, listed as one of Lordstown's "selected pre-order customers."  For scale, at the time Defendants were claiming 38,000 pre-orders, this one deal amounted to 36.8% of the total

*claimed* number of pre-orders—and by the time the claimed figure was 100,000, it *still* amounted to a whopping 14% of all claimed pre-orders.  Indeed, purchasing 14,000 trucks, would have cost Grid X $735 million, which was substantially more money than Lordstown raised in the Merger.

184.    In reality, the logo shown for "Grid X" in Lordstown's Merger documents was the logo of the company "Grid X, Inc." which (a) does not itself operate a commercial fleet but is involved in IT solutions for utility pricing and, more importantly, and (b) had **nothing** to do with the supposed deal Lordstown claimed it had secured.  Rather, Lordstown had been communicating with an individual named Tim Grosse, who was purportedly representing a UK entity called "Grid X Limited," which was a "management consultancy" firm and appears to have had no employees besides its founder Allen St James.  On August 19, 2020, Tim Grosse wrote to Lordstown stating: "please cancel this LOI between Grid X and Lordstown Motors as I was not acting as an official employee of the company as I was never given an official offer letter or paid the salary that I was told that I'd receive from Grid X. I have canceled all affiliations and ties with both companies and as such I'm now acting on behalf of my own company, E Squared Energy Advisors."

185.    Despite the supposed "Grid X" deal accounting for over 30% of Lordstown's supposed pre-orders at the time, and despite expressly receiving notice that the supposed Grid X deal had been "cancelled," Lordstown went on to publish the previously mentioned Merger documents displaying the wrong Grid X's logo as a "selected pre-order customer" and counting the entirety of the supposed 14,000 truck Grid X pre-order.  Thereafter, Lordstown booked the entire supposed 14,000 truck pre-order, as an order from "E Squared," which as outlined in the Hindenburg Report, was just a DBA for Tim Grosse and admittedly did not "operate a fleet." Remarkably, Lordstown simply transferred the bogus 14,000 truck pre-order to E Squared,

73

despite Mr. Grosse admitting in his email to Lordstown that he had signed a $735 million deal on behalf of Grid X, as its "CEO," despite having no position at that firm. While it would be of no moment, Lordstown does not appear to have even bothered documenting that massive and significant change to the supposed deal with a new LOI between E Squared and Lordstown.

186. Defendant Burns himself was directly involved in email communications about the Grid X/E Squared situation. Burns specifically emailed about whether or not they had any trucks, and was copied on emails making clear that Grid X/E Squared was not intending to use the trucks, but instead was serving as an intermediary (*i.e.*, they would be used for "the private and public sector"). Most notably, on September 8, 2021, Burns emailed other senior Lordstown employees expressing that he was reluctant to publicly mention Grid X by name, because their "website is so lame," and because of concerns about their "financial strength." Similarly, in another September 12, 2020 email Burns commented on the "financial viability" of Grid X, and noted it would be "tough" to pay a commission to the sales person who brought the deal in, because of concerns with the "level/quality" of the pre-order, and noting "some of the pre-orders are more solid than others."

187. **City of Ravenna**. Lordstown improperly booked a 15 truck pre-order from the City of Ravenna despite not even having a non-binding LOI reflecting any such pre-order. The Mayor of the City of Ravenna had apparently been asked to sign a letter stating "We recognize the value to the future of energy independence in the US. Electric trucks help to reduce our carbon footprint, is American made for the American workers," which then stated: "We have ___ trucks in our fleet and would likely purchase the LMC 'Endurance.'" The Mayor signed the letter, indicating he had "15 est." trucks in his fleet and then crossing out the term "likely," replacing it with "consider," such that he ultimately indicated: "We have 15 est. trucks in our

74

fleet and would consider purchasing the LMC 'Endurance.'" Despite this not even indicating that the City of Ravenna would "likely" purchase any trucks, and only indicating they *had* approximately 15 trucks in total (not that they would consider purchasing 15), Lordstown disingenuously counted this as a pre-order for 15 trucks.

188. ~~160.~~ Lead Counsel spoke with the Mayor of the City of Ravenna. The city has a population of just under 12,000 people. The ~~mayor~~Mayor recalled writing a letter of support for the Lordstown Motors' project, and the economic support it could provide to Lordstown and the surrounding area.

~~161.~~ The ~~mayor~~Mayor explained that while he wrote a letter of support, he was "shocked" when he received a notice that he had made a commitment for approximately 20 Endurance trucks. According to the ~~mayor~~Mayor, there was "no way on God's green earth" that such an order would be within the City of Ravenna's budget. The ~~mayor~~Mayor noted that people in Ravenna are familiar with the city budget and would think "where the hell is the money coming from" regarding an order of this size. According to the ~~mayor~~Mayor, there is no deficit spending for cities in Ohio, so purchases need to be planned well in advance, like they had recently done with the acquisition of a $600,000 firetruck.

189. ~~162. He~~The Mayor recalled a representative from Lordstown coming to confirm the order and that she "hemmed and hawed" when the ~~mayor~~Mayor informed her that there was never any such order. ~~He~~The Mayor explained that he thought that there was "something wrong" with the situation and that it seemed like a "scam." According to the ~~mayor~~Mayor, the Lordstown representative finally admitted that there was indeed no order. ~~He~~The Mayor added that no one from his office had ordered any trucks from Lordstown. Lead Counsel's investigation and review of internal Lordstown documents has confirmed that Lordstown indeed

targeted small town Mayors, noting in a February 28, 2020 email that "they are easier to 'shame'" into signing LOIs.

190.    **Holman Enterprises**.  This was an arrangement whereby Holman Enterprises supposedly was going to broker sales of Lordstown trucks to third parties.  Unlike other comparable arrangements, Lordstown published the details of this arrangement, presumably because Holman Enterprises—unlike many other parties in intermediary deals that Lordstown counted—was a reputable firm.  What Lordstown did not disclose, is that it was counting the arrangement with Holman Enterprises toward its total pre-order figures and inflating its pre-order figures by 12,500 trucks (which would cost over $650 million) on this basis.  For scale, at the time Defendant Burns was claiming 38,000 pre-orders, this one deal amounted to 31.6% of the total *claimed* number of pre-orders—and by the time the claimed pre-order figure was 100,000, it *still* amounted to a whopping 12.5% of all claimed pre-orders.

191.    Indeed, in Lordstown's Merger proxy material, it notably did not list Holman Enterprises as a "selected pre-order customer," but instead dedicated an entire slide to the arrangement and used language that more clearly indicated that such an arrangement would not be counted as part of the pre-order tally—referring only to "indicative interest" from Holman Enterprises.  Defendant Burns exchanged emails about the Holman Enterprises deal, including discussing the terms of the deal, such that Burns obviously knew the true nature of the relationship and the fact that Holman could not legitimately be counted as a pre-order customer. Hamamoto recalled specifically discussing the Holman Enterprises deal with Burns prior to the Merger.  Defendant Flannery was also copied on internal Lordstown emails discussing the Holman Enterprises deal.

~~163. **Second**, just as with the City of Ravenna, Lordstown touted the city of Lordstown as having made indications of interest.  However, the city had not made any sort of indication of interest with the company.~~

~~164. Lead Counsel spoke with the Mayor of Lordstown regarding the city's purported pre-orders of the Endurance truck.  The mayor explained that while he did participate in brief conversations with representatives from Lordstown regarding the village's possible interest in purchasing Endurance trucks that no orders or pre-orders were made.~~

~~165. **Third**, Lordstown trumpeted "Summit Petroleum" as one if its "Select Pre-Order Customers," including in the Merger proxy documents.  However, Summit had only provided a non-binding letter of intent, and believed that "pre-order" was an "interesting" term to describe the relationship.  Summit did not even put in a LOI for a specific quantity of trucks.~~

~~166. Lead Counsel spoke with a representative of Summit Petroleum, an oil and gas company located in Twinsburg, Ohio.  The representative recalled that he had spoken with a representative of Climb2Glory LLC and had said that he "would be interested" in looking at the Lordstown Endurance.  He also recalled informing the Climb2Glory representative that he typically purchases 20 pickup trucks per year but did not place an order with Lordstown.~~

~~167. The representative of Summit Petroleum further stated that the phrase "pre-order" was an interesting term to use, since he had only signed a non-binding letter of intent.  While on the call he pulled up the LOI and noted that it did not specify a quantity.  He added that he signed the letter of intent as a "friend of a friend" type of deal to show support.  The representative continued to say that he "definitely had not placed an order."~~

192.  ~~168. **Fourth**,~~**AutoFlex**.  Lordstown ~~touted~~counted a supposed 1,000 truck pre-order from Auto-Flex Inc., ~~as having provided letters of intent to buy trucks, as was reported~~

77

in news articles.  However, AutoFlexeven though it could not itself be considered a "commercial fleet", as it operates as an intermediary that assists fleets including governmental organizations in securing vehicles and only actually places orders once AutoFlex's customers order trucks. Accordingly, Defendant Burns' statements that Lordstown's pre-order tally did not include demand from governmental fleets was materially misleading.

169. Lead Counsel spoke with a representative of AutoFlex who stated that he met with representatives of Lordstown at an industry event in 2020 and within six months of that meeting he had exchanged e-mails with a Lordstown sales representative and provided a "rough" number of potential trucks that he may want to purchase via e-mail, indicating that he may be interested in approximately 100 units within the first year of production.  He explained that he never saw a price sheet, or other spec sheet about the Lordstown truck, but believes the price would ultimately be approximately $50,000.

193.     170. The representative of AutoFlex, explained that he was very upfront about his business model when talking with Lordstown which includes him purchasing vehicles to lease to customers only after a customer has requested the truck from him.  He noted that "it's up to the customer" to place an order.  He also explained that he felt his customers would be interested in Lordstown's truck, but that he had not received any specific indications from customers asking him to order Lordstown's truck for them.  He added that fleet managers lean towards companies with an established track record, but that Lordstown's technology was interesting.   The representative of AutoFlex stated that he hashad not received any updates from Lordstown regarding the status of production.   Defendant Flannery was involved in and copied on Lordstown emails soliciting AutoFlex and booking the LOIs that Lordstown attributed to AutoFlex.  Defendant Burns was sent an email notifying him when Lordstown supposedly

secured the AutoFlex deal and expressly adding the deal to the supposed preorder count.  He also received an email explaining that AutoFlex Fleet was a "Green Fleet Management Company," *i.e.*, as opposed to a fleet operator itself.

171. **Fifth**, according to the Hindenburg Report, Lordstown booked pre-orders based on non-binding indications of interest from an organization that purchases 2-4 trucks a year in total, where the would-be customer indicated that he may be interested in 40 trucks at some point in the future and over a stretch of many years.

194.    **Sacramento Clean Cities**.  Lordstown improperly booked a 500 truck pre-order from the Sacramento Clean Cities despite not even having a non-binding LOI reflecting any such pre-order.  Sacramento Clean Cities wrote Lordstown a letter stating that it "does not have a vehicle fleet and as such, is not in a position to make a commitment to purchase electric pickup trucks," but that it was "aware of demand" for electric trucks among the commercial vehicle fleets in California.  Lordstown recorded this as a pre-order by Sacramento Clean Cities for 500 trucks, worth over $26 million.  Defendant Flannery was involved in and copied on Lordstown emails soliciting Sacramento Clean Cities.

195.    **Innervations**.  As discussed in the Hindenburg Report, Innervations did not own or operate a fleet, and was just a two-person operation by "influencers" who "don't get involved in the actual ordering," and yet Lordstown counted its LOI with Innervations for a $52.5 million 1,000 truck pre-order as a legitimate deal with a commercial fleet.  Defendant Burns was personally involved in emails about this pre-order.  For example, Burns responded "Great job" when he was notified that Innervations signed the LOI.  Burns was copied on emails stating that the arrangement with Innervations would call for Innervations to "broker" the Endurance trucks to its clients and that Innervations' business was "assist[ing] corporations in converting *their*

79

existing gas or diesel fleets to all-electric vehicles." (emphasis added). Defendant Burns and Defendant Flannery were even copied on an email expressly saying the LOI with Innervations was not a "purchase LOI," *i.e.*, because Innervations was merely hoping to broker eventual sales. In an email thread titled, "difference between LOI and broker deal," which Burns and Flannery were copied on, Lordstown employees discussed how the deal with Innervations meant it was "encouraging their customers to buy Endurances for their fleets."

196. **Governmental Entities**. Lordstown booked pre-orders from governmental parties despite explicitly telling investors and the public it was only counting "commercial" fleets and was not counting government parties. For example, during the Class Period, Lordstown wrote in a press release that its pre-order figures did not include "federal, state and municipal governments" and Defendant Burns stated in an interview that the pre-order figure did not count "municipality, state vehicles, federal vehicles." Yet, in Lordstown's internal spreadsheets tracking the supposed pre-orders, including some which were circulated to Burns, *many* such entities were listed. For example, Lordstown booked pre-orders from the City of Aurora, the City of Portland, the City of the District of Columbia, the City of Houston Fire Department, and the New York Power Authority.

197. **Mayors Association - Portage, Stark, Summit County**. Lordstown booked a 500 truck order from the "Mayors Association - Portage, Stark, Summit County." This deal would have cost the association over $26 million. The association is a non-profit organization comprised of mayors focused on promoting civic policy. While the Mayor's association signed an LOI, it was obviously not a commercial fleet, and the LOI deleted the term "purchaser" and replaced it with the phrase "influencer."

80

198.  ~~172.~~ **Catholic Cemeteries**.  Lead Counsel spoke with a representative of Catholic Cemeteries Association – Diocese of Cleveland.  The representative explained that his organization has 60-70 vehicles and estimated that he purchases between two and four medium to light-duty trucks each year.  He had signed a document regarding his interest in the Endurance~~,~~ but had made it "very clear" to the employee from Climb2Glory ~~that he was dealing with~~ that he was not prepared to commit to anything and that he "intended to take a hard look" at the Endurance before ordering anything.  The representative~~,~~ said that he was told that the ~~letter of intent~~LOI was just a way to gauge interest, and he wanted to support a new local business given that he was upset when GM departed.

199.  ~~173.~~ The representative of the Catholic Cemeteries Association noted the nonbinding ~~letter of intent~~LOI listed 40 trucks as a figure he might buy at some point in the future, but that he made clear at the time that this number represented an estimate of the number of trucks he might want over a stretch of many years, as he only buys a couple trucks a year in total.  He added that he did not have the ability to invest in 40 trucks all at once and that he "never would've signed the letter of intent if there was any commitment to buy any trucks at all."  The representative recalled the Climb2Glory employee telling him that the LOIs were non-binding and "don't worry."  The representative further recalled that he has not received any updates or follow-ups regarding the status of his ~~letter of intent~~LOI or production.

~~174. **Sixth**, among the "pre-orders" that Lordstown supposedly received from Workhorse was an arrangement Workhorse had with the City of Orlando.  The City of Orlando had signed an LOI to buy 500 trucks from Workhorse, but that deal has long since lapsed and the City of Orlando has only verbally indicated it was interested in buying two trucks from Lordstown.~~

81

175. Counsel spoke with a representative of the fleet management division for the City of Orlando, who had dealt with Workhorse in that capacity.  The representative confirmed that he had signed a letter of intent regarding 500 trucks with Workhorse, based upon the contingency that the company would provide him with a prototype vehicle to pilot for three months first.

176. The representative explained that Workhorse "went dark" and "fell off the earth" approximately two and a half to three years ago, at which time the company stopped returning his e-mails.  According to the representative, around this time, his relationship with Workhorse "fell apart" as they missed their deadline to deliver the pilot vehicles and had stopped responding to him.  He even recalled attending a trade show in Nashville, where he knew Workhorse had a booth, in hopes of contacting them, but nobody from the company showed up at the event.

177. The representative of the fleet management division for the City of Orlando explained that he had communicated with a Lordstown salesperson regarding making a pre-order for the Endurance truck for approximately $52,000.  He recalled receiving a "boiler plate" LOI for two trucks that he had not signed by a deadline set by the sales representative.  However, he stated that his lot had hosted a "Central Florida Show and Tell" for Lordstown, which allowed fleet managers to test drive and view a prototype, and that after this event the Lordstown sales representative reached out to him "on behalf of management" to offer him the opportunity to sign for two trucks off the initial rollout and around March 2020 the representative verbally indicated he was interested in buying two trucks from Lordstown, but did not sign an LOI.  The representative explained that he had not made any additional pre-orders with Lordstown since placing that initial order for two trucks.

178. The representative explained that his LOI with Workhorse was separate and distinct from any order he would place with Lordstown.  He stated that the trucks were different between

82

~~the two companies and that any pre-order he had placed with Workhorse was not valid as to Lordstown. He added that he had not discussed his pre-orders carrying over with representatives from either company.~~

200. ~~179. **Seventh**, Lordstown touted a deal with~~ **Mike Albert Fleet Solutions**~~, which stated that the deal called for "delivery of a significant quantity of the Lordstown Endurance pickup." While the number of trucks was not specified, Lordstown's book of supposed pre-orders jumped by 20,000 the month of the announcement, and no other major deals were announced that month. In fact, Lordstown only has non-binding LOIs with the company~~. Mike Albert Fleet Solutions operates as an intermediary for fleets, not as a purchaser, and ~~as part of agreeing to the LOI the company made it "very clear" to Lordstown that it was just signing up for a "a chance to order vehicles," at a later date, when its customers actually placed orders.~~

~~180.~~ <u>Lordstown booked it as making a 100 truck pre-order.</u> Lead Counsel spoke with a representative of Mike Albert Fleet Solutions, who had held that position since at least 2016. The representative explained that Mike Albert Fleet Solutions buys and leases vehicles to customers, explaining that the company only actually places an order with a manufacturer once they have a customer placing an order with them. The representative explained that while he believed there may be customer demand for the Endurance, they did not have specific orders from customers for the vehicle.

201. ~~181.~~ The representative of Mike Albert Fleet Solutions explained that he has a relationship with some of the business development employees at Lordstown, since they occupy the same business circles and he "wanted to help." He detailed how Lordstown was looking for individuals to sign non-binding ~~letters of intent~~<u>LOIs</u>, "just like [it was described] in the Hindenburg report."

83

182.  The representative of Mike Albert Fleet Solutions indicated that prior to COVID the company had signed a LOI for a number of trucks and told Lordstown that if they have customers who ultimately want the trucks they would order them.  According to the representative, it was made "very clear" that the letter of intentLOI was non-binding and was just "a chance to order vehicles" at a later date.  The representative of Mike Albert Fleet Solutions explained that the discussion was framed as a "slow roll out" of possible orders over a two-year period.

202.  Defendant Burns received internal Lordstown emails concerning the arrangement with Mike Albert Fleet Solutions indicating that they were not a commercial fleet purchaser.  For example, one email sent to Burns described how Lordstown had secured deals with parties that had "relationships with a wide range of commercial fleets" and listed Mike Albert Fleet Solutions as one example, before distinguishing Mike Albert Fleet Solutions from actual "commercial fleet LOI prospects."

203.  **Momentum Groups**.  Lordstown counted a 900 truck pre-order from a supposed counterparty called the Momentum Groups.  Momentum Groups does not itself operate a fleet, but as their website makes clear they instead seek to broker the sale of vehicles to third parties.  Defendant Burns himself emailed internally about Momentum Groups, circulating a link to their website in which their business model (as a fleet supplier, as opposed to a fleet operator) was clear, to which another Lordstown employer responded to Burns that they are "working to get a fleet management agreement in place."  Similarly, in an email titled "sales notes for Board call," Burns was sent an update by a Lordstown's Director, Corporate and Sales Strategy, distinguishing between on the one hand "FMC's" (*i.e.*, fleet management companies) listing Momentum as one such example, and "commercial fleet LOI prospects."  Indeed, in pitching to

84

another potential pre-order purchaser, a Lordstown salesperson told that other potential purchaser, "you don't have to be a purchaser," urging them they could sign "more like an influencer," and described Momentum as one such example of someone signing in that capacity.

204.  **Clean Fuels Ohio**.  Lordstown recorded a large 500 truck pre-order from Clean Fuels Ohio even though it was an advocacy organization, did not operate a fleet, and could not possibly order that many trucks.  Clean Fuels Ohio describes itself as "non-profit organization that is dedicated to making Ohio a cleaner, healthier, and more prosperous state."  Lordstown's own records accounted for Clean Fuels Ohio as an intermediary.  Defendants Burns and Flannery were directly involved in negotiating the Clean Fuels Ohio LOI and corresponding press release.

205.  Defendant Burns personally emailed saying "excellent work" to the salesperson who brought in the supposed pre-order with Clean Fuels Ohio, and other participants in the email conversation immediately pivoted to talking about how to generate publicity based on the pre-orders.  Defendant Burns and Defendant Flannery were then copied on emails discussing how Clean Fuels Ohio is a non-profit that provides a "united voice" to "promote the use of cleaner fuels," as opposed to a fleet that operates trucks.  Defendants Burns and Flannery were also copied on an email with the subject "difference between an LOI and a broker deal," in which Lordstown employees discussed how Innervations, did not own (or "ground") vehicles, but were "more along the lines of what Clean Fuels Ohio is doing. They're encouraging their customers to buy Endurances for their fleets."

206.  The deceit concerning Lordstown's pre-orders goes far beyond the examples listed above.  Indeed, Lead Counsel conducted a thorough review of their supposed pre-orders throughout the Class Period using internal Lordstown company documents, including the spreadsheets that were routinely circulated internally within Lordstown to track the supposed

pre-orders, and internal communications concerning those supposed pre-orders. The following table reflects the results of that analysis:

| | Summary Table Demonstrating the Degree of the Deceit Concerning Pre-Orders | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
| Claim Date | Claimed Pre-Orders | Max. Count | Not Fleet | Potential Fleet | Fraud % re Fleets Only | No Agreement | Potential Fleet w/ Agreement | % Fraud |
| 8/3/2020 | 27,000 | 42,847 | 38,077 | 4,770 | 82% | 15,806 | 4,009 | **85%** |
| 9/24/2020 | 38,000 | 42,850 | 38,078 | 4,772 | 87% | 15,806 | 4,011 | **89%** |
| 11/16/2020 | 50,000 | 54,765 | 45,258 | 9,507 | 81% | 18,936 | 6,126 | **88%** |
| 12/21/2020 | 80,000 | 82,444 | 72,520 | 9,924 | 88% | 19,000 | 6,541 | **92%** |
| 1/11/2021 | 100,000 | 102,464 | 89,530 | 12,934 | 87% | 20,010 | 8,541 | **91%** |

~~183. **Eighth**, Lordstown had supposedly inherited a deal between Workhorse and the Southern California Public Power Authority, which was counted in Lordstown's pre-order book. However, the non-binding LOI that Workhorse had with this organization could not properly be counted as Lordstown pre-orders.~~

~~184. Lead Counsel spoke with a representative of the Southern California Public Power Authority. He explained that while they had signed a non-binding LOI from Workhorse Motors in February 2017 that expired in February 2020. He further explained that the LOI outlined tiers of discounts that would be provided based upon how many trucks were eventually purchased. The representative added that the LOI was signed by Burns in his former capacity as Workhorse's CEO.~~

207. The following subparagraphs explain the meaning of (or calculations relevant to) the columns in the prior table – each subparagraph letter corresponding to a particular column:[14]

---

[14] This analysis was conducted by Lead Counsel through the use of internal Company documents obtained from Lordstown following its bankruptcy. Lead Counsel reviewed available internal spreadsheets, many of which were circulated to Defendants (as discussed herein), and conducted

(a)      This column reflects the date of one of the relevant misstatements.  Not all alleged misstatements and omissions are reflected in this table.  The selection of misstatements primarily reflects substantial touted incremental increases in pre-orders;

(b)      This column reflects the number of pre-orders Defendants claimed to have from fleet customers at the time of the misstatement at issue.  Notably, many of the statements were framed to claim that Lordstown had "more than" the stated amount or used similar language;

(c)      This column reflects the maximum number of supposed "pre-orders" Lordstown had at the time of the misstatement at issue, based on its own documentation in internal excel spreadsheets.  The following principles were used to ensure the numbers in this column are as generous to Lordstown as possible (*i.e.*, as large as possible as early as possible), even where doing so does not make sense:  (1) Where the date of a supposed deal was ambiguous, where multiple dates were listed, or where a single supposed purchaser made multiple deals, the earliest date listed was used for all supposed pre-orders involving that counterparty.  Where no date was listed, the supposed preorders were counted as predating August 3, 2020.  All supposed consumer pre-orders were counted as predating August 3, 2020; (2) Where a supposed deal was reflected in some records but not others or where a supposed deal was cancelled, it was counted in this column; and (3) Where it was ambiguous for any other reason whether a deal should be counted, it was counted in this column;

the analysis described in this paragraph and subparagraphs.  Lead Counsel believes these calculations are a reasonable assessment of the supposed preorders Lordstown had at the relevant times and is limited by the available documents.  Lead Counsel believes that even more precise analysis would be possible upon additional discovery from Defendants and Third Parties.

(d)     This column reflects the number of supposed pre-orders Lordstown had at the time of the misstatement at issue, where the supposed purchaser was not a commercial fleet, because one (or more) of the following were true: (1) the deal was recorded in Lordstown's internal spreadsheets noting the supposed party was an "intermediary" as opposed to a "fleet;" (2) other internal documentation within Lordstown recognized the party was not a fleet or was making the preorder expressly for the purpose of brokering deals as an intermediary; (3) Lead Counsel could readily verify the party did not own a commercial fleet; (4) the party was a governmental agency or municipality, which Lordstown publicly claimed would not be counted as commercial fleet purchasers.  In many instances a single supposed deal would be counted as not a deal with a commercial fleet for purposes of this column for more than one of these reasons.  The figures listed in column (d) are generous to Lordstown (*i.e.*, err in favor of counting supposed deals as deals with commercial fleets), because any supposed deal that was not verified as fitting into one of the four categories listed above, was not counted in this column.  This includes many supposed deals for smaller numbers of trucks, and many supposed deals with individuals who likely did not operate commercial fleets.  Additionally, no financial analysis of the supposed purchasers' ability to pay was used to count deals as not with commercial fleets, even though in many instances large multi-million dollar orders were placed with entities that did not plausibly have the financial resources to conduct such an order.  That a supposed deal was not counted in column (d), does not mean it actually was a deal with a commercial fleet;

(e)     This column reflects the total number of pre-orders at the time of the misstatement at issue that were potentially with commercial fleets, because they were not counted in column (d) as supposed deals with non-commercial fleets.  The figures shown in this

88

column are equal to the figure shown in column (c) (*i.e.*, all potential pre-orders), minus the figure from column (d) (*i.e.*, supposed deals that were not with commercial fleets);

(f)     This column reflects the percent of the claimed preorders from column (b) that were not with commercial fleets.  It is derived by taking 1 - (the figure in column (e) / the figure in column (b)).  Thus, where the figure in column (f) shows 82% at the time of the claimed 27,000 pre-orders on August 30, 2020, that 82% means that even with the generous counting described above, Lordstown was overstating the number of supposed preorders it had with commercial fleets by 82%;

(g)     This column reflects the number of supposed pre-orders at the time of the misstatement at issue, where there was not an executed letter of intent (or similar agreement ) between Lordstown and the supposed customer, regardless of the form of the document.  To mitigate the possibility that a deal would be counted in this column merely because Lead Counsel did not find an executed LOI or similar agreement where one existed, deals were only counted for purposes of this column if (1) Lead Counsel did not identify a fully executed letter of intent or similar agreement but (2) did identify (a) a form letter of intent that had not been fully executed, (b) written communication within Lordstown discussing the lack of a fully executed letter of intent or similar agreement; or (c) another document that makes clear that Lordstown had not entered into a letter of intent or similar agreement with the party.  That a supposed deal was counted in column (g), does not mean that there was in fact an agreement.  The use of the term "agreement" in this chart is not meant to convey that the letter of intent or similar agreement was a legitimate "pre-order," but merely whether there was any agreement in roughly the form of Lordstown's letter of intent document, which Lordstown held up as evidencing "pre-orders;"

(h)      This column reflects the number of supposed pre-orders at the time of the misstatement at issue, where the supposed deal was with a potential commercial fleet (*i.e.*, a supposed deal counted for purposes of column (e)), where there was an executed letter of intent (or similar agreement) between Lordstown and the supposed customer, regardless of the form of the document, using the same methodology as was used in calculating column (h); and

(i)      This column reflects the percent of claimed preorders from column (b) that were not with commercial fleets or were with potential commercial fleets but lacked an agreement.  The figures in this column are derived by taking 1 - (the figure in column (h) / the figure in column (b)).

208.   Even analyzing only the deals that Lordstown itself recognized in its internal spreadsheets as arrangements with intermediaries demonstrates that an astoundingly large portion of the pre-orders were not with commercial fleet customers.  In fact, nine of Lordstown's ten largest supposed pre-orders were recorded by Lordstown as deals with "intermediaries"—and not with "fleets."  The only one out of Lordstown's ten largest supposed deals that was not recorded as a deal with an intermediary was the arrangement with Holman Enterprises, which as discussed above, was *obviously* an arrangement with an intermediary.  The following graph shows a breakdown of the supposed pre-orders based on the reason it was not legitimate to count it as a pre-order with a commercial fleet.

| Breakdown of Supposed Pre-Orders with Non-Commercial Fleet Customers | | | | | | | |
|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) |
| Claim Date | Claimed Pre-Orders | Max Count | LTM Recognized Intermediaries | Holman Enterprises | Consumer Pre-Orders | Gov. Pre-Orders | Other Non-Fleets |
| 8/3/2020 | 27,000 | 42,847 | 22,210 | 12,500 | 1,317 | 150 | 1,900 |
| 9/24/2020 | 38,000 | 42,850 | 22,210 | 12,500 | 1,317 | 151 | 1,900 |
| 11/16/2020 | 50,000 | 54,765 | 28,880 | 12,500 | 1,317 | 161 | 2,400 |
| 12/21/2020 | 80,000 | 82,444 | 54,380 | 12,500 | 1,317 | 423 | 3,900 |
| 1/11/2021 | 100,000 | 102,46 | 71,290 | 12,500 | 1,317 | 423 | 4,000 |

| | | 4 | | | | |
|---|---|---|---|---|---|---|

~~185. **The representative of the Southern California Public Power Authority explained that they had not had any dealings with Lordstown nor has he received any direct communications.  He added that while he was not familiar with the Lordstown truck, Southern California Public Power Authority would not sign a similar LOI today, as now they would prefer to have the individual entities under the Southern California Public Power Authority sign their own LOIs.**~~

209.    The following subparagraphs explain the meaning of (or calculations relevant to) the columns in the prior table – each subparagraph letter corresponding to a particular column:[15]

(a)    Has the same meaning as described in the prior table, *see* paragraph 206.

(b)    Has the same meaning as described in the prior table, *see* paragraph 206.

(c)    Has the same meaning as described in the prior table, *see* paragraph 206.

(d)    Refers to parties that Lordstown itself recognized as coming from intermediaries in its internal spreadsheets tracking supposed preorders.

(e)    Refers to the arrangement with Holman Enterprises, discussed herein.

(f)    Refers to all consumer pre-orders, which have all been counted as existing as of the beginning of the Class Period (a neutral assumption here, because they would not add to legitimate commercial fleet pre-order counts regardless of when counted).

(g)    Column (g) refers to any deal with a governmental party – specifically: City of Warren; Summit County Executive; City of Ravenna; City of Kent, Ohio; City of Colton; City of Pasadena; Port Of San Diego; Sacramento Municipal Utility District; Village of Lordstown; City of Aurora; Carson City; City of Bowling Green; City of Aurora, Stark, Summit County; City of Houston Fire Department; City of the District of Columbia; D.C. Department of Transportation; Canfield Joint Fire; Cardinal Joint Fire; and New York Power Authority.

---

[15] If a single supposed pre-order deal would fit into more than one category, it is only counted once and only counted in the first category it would fit within (*i.e.*, in the order of column (d), (e), (f), (g) and (h)), among the following categories.

91

(h) Column (h) refers to the following supposed deals: (1) AutoFlexFleet (discussed herein); (2) a 1,000 truck deal with an individual who Lordstown recognized did not operate a commercial fleet, (3) Momentum Group (discussed herein); (4) Sacramento Clean Cities (discussed herein); and (5) Mike Albert (discussed herein).

**(2)     The Truth About Lordstown's Production Capabilities**

210. ~~186.~~ Despite routinely boasting that Lordstown would be "first to market," that it would be producing vehicles by September 2021, and that it would become profitable ("cash flow positive") without the need to raise additional capital, in truth ~~Lordstown was~~, Defendants were touting impossible production plans and omitting to disclose the enormous specific risks its business faced.

211. ~~187.~~ The Hindenburg Report explained that Lordstown had faced several production issues.  ~~Most prominently, it~~Prominently, the Hindenburg Report explained that on January 13, 2021~~,~~ Lordstown had conducted overnight testing on a public road, and during this test, their prototype caught on fire within about ten minutes and became fully engulfed in flame. This dramatic failure of their vehicle clearly evidenced that their production schedule was too ambitious, as they were not able to even safely drive their test vehicle at this time.

212. ~~188.~~ The Hindenburg Report also detailed how the supplier for Lordstown's primary component—the hub motor—was a small Slovenian company (Elaphe), indicating that Lordstown would not be likely to produce sufficient components for Lordstown to meet its production schedule.  Specifically, the ~~report~~Hindenburg Report quoted an employee who noted that the supplier was developing the capability of producing 100,000 hub motors a year, but was "far from that number."  Even if Elaphe could produce 100,000 hub motors, this would only be enough for 25,000 vehicles, as each truck needed 4 hub motors.

213. ~~189.~~ The Hindenburg Report also detailed that in mid-January 2021 Lordstown had dramatically changed its production design, shifting from a plastic exterior to an aluminum one, further evidencing the lack of progress the ~~company~~Company had made toward meeting its publicly touted development goal.

214. ~~190.~~ The Hindenburg Report also explained that a former Lordstown employee had explained that Lordstown had not completed necessary testing and validation for the vehicle, including: (1) cold weather testing, which the Hindenburg Report explained typically takes three months, but had not yet begun; (2) durability testing, which the Hindenburg Report explained typically takes ~~6~~six months of 24/7 testing; and (3) major testing required by the Federal Motor Vehicle Safety Standards.

215. ~~191.~~ As further evidence of Lordstown's unrealistic development targets, the Hindenburg Report noted that Defendant Burns had claimed the ~~company~~Company would assemble battery packs inside the plant, however, the report stated that former employees explained that all the battery packs were being assembled by hand and that it would take 5-7 months to even receive the parts needed to manufacture the battery packs, not including installation, testing, and getting the equipment into production.

216. ~~192.~~ The Hindenburg Report also detailed that, at that time, Lordstown was being sued by Karma ~~automotive~~Automotive for allegedly secretly hiring its employees and taking its intellectual property, a lawsuit that ~~could~~posed risk of further ~~delay~~delaying Lordstown's ability to produce its vehicles.

217. ~~193.~~ Investigation by Lead Counsel has further confirmed that Lordstown ~~had~~ overstated its production capabilities. Lead Counsel consulted with an automotive industry expert with 40 years of experience, including as a Senior Chief Engineer, decades of experience

at GM, and expertise in developing and industrializing automobiles for global production and sale.

218.    194. The expert explained that new vehicle launches take between 32 and 36 months to produce a fully developed and validated vehicle meeting all Safetysafety requirements. Upon reviewing available information regarding the Endurance at the time of the Merger, he explained Lordstown could not have realistically launched a production vehicle by September 2021.  HeThe expert further explained that manufacturing steps, including: (1) designing the vehicle body in a compliant fashion, which would take over a year; (2) fabrication and tuning of the components, which would take over half a year; (3) tool delivery and assembly, which would take over a month; (4) verification and vehicle validation, which would take about four months; and (45) tooling trial and certification, which would take almost 4 months.  HeThe expert further explained that these steps need to be performed sequentially (not simultaneously) and that, at the time of the Merger, Lordstown appeared to be near the start of this process.  Even if all this work had previously been done, a full validation of the vehicle would require two winters of testing to ensure that the vehicle dynamics and thermal management systems are operating the vehicle in a safe manner.

219.    195. The expert further explained that the fastest vehicle launch in the industry appears to have been by VinFast in Vietnam in 2019, and that process took 24 months, and was only capable of that quick timing due to the fact that VinFast's vehicle was essentially a localization of an existing BMW model with slight cosmetic modifications.  In contrast, Lordstown was developing an entirely new vehicle, which included an industry first in the hub motor technology.

94

220. ~~196.~~ Additionally, the notion that Lordstown had sufficient capital to complete production was premised on the unrealistic prospect of them launching the vehicle by September 2021. As would come to light shortly after the Hindenburg Report was published, Lordstown would not ~~be able to~~ meet this deadline and lacked the resources to produce their vehicle~~, contrary to their prior public assurances~~.

221. ~~197. Additionally, interviews~~Interviews with Confidential Witnesses also confirm that Lordstown was not on schedule to meet its assurances that production would begin in September 2021.

222. ~~198.~~ CW-3 worked as an administrative assistant at a third-party contractor that provided services to Lordstown from within the Lordstown plant. He worked in that role from September 2020 to December 2020, and his responsibilities included taking down minutes for various meetings for Lordstown.

223. ~~199.~~ CW-3 recalled taking down minutes for various meetings related to stamping and body and production. He recalled one meeting on September 19, 2020, which was attended by Mike Wood (Information Technology Director), Michael Fabian (Director of Stamping Operations), John Ritter (~~current~~former Director of Facilities and Central Maintenance at Lordstown) and others. During this meeting it was said that "we [Lordstown] are running way behind" and Mike Wood said that software was "running severely behind."[~~10~~16]

---

[~~10~~16] CW-3 detailed observing a series of bizarre activities at Lordstown including: (a) another employee being asked to duplicate a manufacturer's manual so that Lordstown could "rework it" and "make it Lordstown," even though the words "do not duplicate" were printed on the manual; (b) being told to have documents notarized on behalf of individuals who were not actually present to sign the document; (c) Director of Paint Operation at Lordstown Shane Brown setting up a hunting perch and actively baiting animals on the property, despite this being against Ohio law; (d) receiving directions to not hire older candidates or women as well as ~~racial~~racially profiling candidates; and (e) discussion during a meeting about building Endurance trucks using a Silverado's frame, which he included in his notes, before he was instructed to erase it.

224.    Indeed, prior to the Merger, DPHC retained leading consulting firm McKinsey to conduct diligence on Lordstown's production capabilities.  As part of this diligence process, McKinsey interviewed key members of Lordstown's management team and conducted extensive investigations.  On July 30, 2020, McKinsey provided a summary report, which projected that even if Lordstown followed "best industry practices" the first vehicle production would take place at the earliest, by June 2022.  McKinsey even conducted a secondary analysis, predicated on the concept of Lordstown somehow performing even better than the best industry practices, and this analysis showed that even with such improvements, Lordstown's production timeline could only be shortened such that production would begin in April 2022.  Thus, McKinsey warned that there was no reasonable scenario in which Lordstown, could begin production by September 2021 — at **best**, it would be delayed four months and likely much longer.  The following image is taken from the McKinsey Report:



225.    McKinsey's detailed analysis, which documented the sources of delay that would prevent Lordstown from meeting its production deadline, was shared with Defendant Burns. Hamamoto confirmed that Burns was aware of McKinsey's conclusions and that "there was a lot

96

of specific dialogue with him" about the issue.  Yet, Burns had determined to repeatedly tell investors Lordstown *would* begin production in September 2021, without ever disclosing that McKinsey had specifically apprised the Company that this could not be done

226.    However, while McKinsey had already warned Defendants that the September start of production would not be possible in any scenario from the start of the Class Period, the situation was, in reality, even more dire than depicted by McKinsey.  Lordstown's production plans relied heavily on the supply of parts from GM, and Lordstown failed to disclose that its arrangement with GM quickly broke down and ensured additional delays in Lordstown's ability to begin production.

227.    The issues concerning the GM arraignment were well summarized by the SEC's findings of fact released as part of its February 29, 2024 settlement with Lordstown, which explained that:

> Under the agreement with GM, Lordstown's management expected to get access to over 200 GM parts, including approximately 100 critical non-customer-facing parts necessary to develop the Endurance, beyond the three parts mentioned in the SEC filings.  These parts were necessary for building the Endurance prototypes and testing them for compliance with federal motor vehicle safety standards ("FMVSS") established by the National Highway Transportation Safety Administration before any Endurance could be sold and delivered to customers.
>
> But soon after the announcement of the merger in August 2020, Lordstown's management realized they did not have access to the vast majority of the critical non-customer- facing GM parts.  These parts could not be purchased directly from GM because GM did not make them; the parts were made by GM's suppliers under GM's authorization, which was a complex, time-consuming process with no certainty as to whether GM would ultimately authorize Lordstown to use the parts.  For each part requested by Lordstown, Lordstown had to obtain authorization from GM to determine whether the part could be used by Lordstown.  If GM authorized Lordstown's use of the part, GM had to authorize the part's supplier to conduct a feasibility analysis to determine whether the supplier could produce the quantities of the part requested by Lordstown.  If so, then Lordstown and the supplier had to develop a product agreement for the part for GM's approval.  After that, the supplier could then produce the part, which could take months to do.

97

By October 2020, Lordstown still had no access to the vast majority of the requested GM parts.  A Lordstown officer alerted Burns, "so far we have GM Tooling authorization letters for just 4 of ~90 parts completed. . . .  The Endurance program timing is now in jeopardy for the key parts that need [GM] approval."  Also in October, another Lordstown officer complained to a GM officer, "we represented to the market that [Lordstown] and GM had a parts deal. . . .  We are not getting the necessary support from [GM] . . . .  This delay is going to have a serious impact if it is not addressed immediately."

By the end of December 2020, Lordstown's lack of access to the GM parts remained unchanged, and Lordstown's plan to produce and deliver the Endurance by the second half of 2021 was in serious jeopardy.  Lordstown had no visibility into if or when it might obtain access to the GM parts needed to produce and certify the Endurance with FMVSS before selling and delivering it to customers.  In fact, GM informed Lordstown and Burns in December 2020 that Lordstown's requests for GM parts would constrain GM's own supply chain, and advised Lordstown to find a backup solution for the vast majority of the requested parts in case GM ultimately rejected Lordstown's request.

228.    Internal Company documents confirm that the SEC's findings concerning GM as a supplier of critical parts are accurate and further demonstrate that the situation concerning the arrangement with GM was even more dire than the SEC's summary would indicate—as Lordstown seemed to have essentially given up on obtaining the vast majority of its requested parts through GM early in the Class Period.  For example:

(a)    Prior to the Merger, Lordstown had requested "200+ total GM parts" for the Endurance, and as of September 2020, Lordstown had begun taking "[a]ggressive actions to find alternative sourcing options," as summarized in a memorandum received by Defendant Schmidt on June 23, 2021 via email.

(b)    On September 8, 2020, Defendant Post wrote in an email to a GM employee: "The GM OEM Sales team did present LMC's steering wheel styling concept to a GM executive review team several times, but we did not get approval to use a GM steering wheel.  Lordstown Motors *cannot* develop an all new wheel and maintain program timing.  This is a *very urgent issue* for LMC" (emphasis added).  Defendant Post had sent a draft of that same

98

email to Defendant Burns, copying Defendant Schmidt, on September 1, 2020, and Burns responded on September 3, 2020, noting that "[t]he list you provided [the GM Employee] seems way too intense . . . . I think the sheer quantity will spook him."

(c)     On September 9, 2020, Defendant Post wrote in an email that the "[t]he tool usage agreement," which Lordstown was apparently still trying to negotiate, "states a 50 part limit."

(d)     On October 12, 2020, Defendant Post sent an email, copying Defendant Schmidt, explaining that while GM had approved of a "parts deal" with Lordstown in April 2020, Lordstown was still in the process of securing "tooling authorization letters" from GM, which would then enable it to "engage suppliers and determine feasibility"—in other words, the agreement Lordstown had with GM was only the first step in actually accessing GM's parts supply and did not mean GM would actually enable it to procure the relevant parts.  Post explaining that Lordstown had only secured such tooling letters for "4 of ~90 parts."  He declared that: "The Endurance Program timing is now in jeopardy for the key GM parts that need OEM approval."

(e)     On October 28, 2020, Lordstown's General Counsel wrote an email to a GM employee, copying Defendants Burns and Post, in which he forwarded the above referenced October 12, 2020 email from Post, and then stated: (1) "Our engineering and purchasing teams have been trying to work through the process with GM to secure the necessary parts for the truck pursuant to the Letter Agreement[;]" (2) "Aside from the impact to our engineering and production timeline, the problem from our side (other than the impact to our engineering process) is that we represented to the market that LMC and GM had a parts deal[;]" (3) "We are not getting the necessary support from the folks Darren [Post] and Steve Slawson have been

working with and are in many cases getting no feedback[;]" and (4) "This delay is going to have a serious impact if it is not addressed immediately."

(f)     In a November 11, 2020 email, a Lordstown's purchasing manager wrote that: "GM is not accepting any other items to the tooling authorization list.  Out of the 100+ we requested, we are only realistically getting less than 10 parts this way.  Ordering from the portal for production is setting ourselves up for disaster.  There['s] no volume, timing or availability guarantees.  It would be like trying to Amazon your production parts only with less reliability."

(g)     On December 11, 2020, a Lordstown employee sent an email to a GM employee and Defendant Post, copying Defendants Schmidt and Burns, stating: "We are at a critical time where action is needed.  GM has tremendous upside [] supporting LMC but the lack of progress is now delaying critical beta part shipments . . . ."

(h)     On December 14, 2020, a Lordstown employee emailed a Senior Manager of OEM Sales for GM and copied Defendants Post and Burns, providing a list of items Lordstown was requesting as "[t]op priorities."  The list, which was shared with Defendants Post, Schmidt, and Burns in the December 11, 2020 email detailed above, included several critical elements of the vehicle, demonstrating that Lordstown was still dependent on sourcing critical items from GM without any certainty that GM would actually supply the parts.  The list was as follows:

100

| (Added) | System Description |
|---|---|
| 1 | Steering Gear |
| 2 | Driver Airbag |
| 3 | Restraints - front and rear seats |
| 4 | Steering column Assembly |
| 5 | Latches/strikers/actuators - complete locking mechanism |
| 6 | Seat Frame |
| 7 | Window Regulator Assembly (4) |
| 8 | Windshield wash wiper system |
| 9 | Fuse box assemblies |
| 10 | Hood hardware (e.g., hinges, struts) |

(i)     On December 16, 2020, the Senior Manager of OEM Sales for GM emailed Lordstown employees, copying Defendants Post and Burns, stating: "From a GM perspective, there is a heightened level of concern regarding capacity constraints this program would put on our supply base." The Senior Manager of OEM Sales for GM continued: "I would recommend Lordstown motors establishes a critical path for each part with timing. Knowing this information would be helpful to help drive focus. In the event that GM is not able to support by the required time, you would be able to quickly move to your back up solution." Burns responded the same day, with a copy to Post: "Given the realities that you point out . . . maybe best to laser focus on the 2 or 3 items that are really critical to us. I will let the team decide on those items, but I am sure one of them is the steering gear." On December 20, 2020, the GM employee wrote back to Burns, with a copy to Post: "The main purpose of the email was to signal the constraints that we are facing and allow LMC time to set up contingency plans."

(j)     On December 16, 2020, Defendant Schmidt was forwarded the email from GM's Senior Manager of OEM Sales, that had referenced the "concern regarding capacity constraints," and in forwarding that message, the Lordstown employee wrote to Schmidt: "GM is again communicating to us that their support will be limited. In my view, we are not focusing enough on the backup plans —the plans/resource requirements will not be pretty but it appears

GM is messaging to us that we are increasing likely to be on our own."  Also on December 16, 2020, Schmidt forwarded that email to Defendant Burns.

229.    The issues concerning Lordstown's ability to obtain parts from GM are extremely relevant in several ways.  First, Lordstown publicly overstated the nature of its arrangement with GM, when, in reality, it only had secured a nascent arrangement that could possibly have provided it routes to purchasing parts, which could even then only occur by way of GM's approval of the usage of GM suppliers.  Second, especially in light of the McKinsey Report in which Defendants had already been warned that a September 2021 start of production date was not obtainable, the delays Lordstown was facing pursuant to the arrangement with GM, further established that the publicly touted schedule could not be achieved.  As the internal documents discussed above reveal, Lordstown could not produce and deliver one Endurance truck, without the parts from GM's suppliers, and had no "backup plans" in place at the time of many of the misstatements touting that production would begin in September 2021.  Indeed, in the McKinsey Report, Defendants had been warned that *McKinsey's* optimistic scenario – which still projected production beginning well after September 2021 – would require Lordstown to have "full access to GM's parts bin."  Third, the uncertainty surrounding the GM arrangement was a specific material risk that Lordstown failed to apprise investors about, despite Defendant Burns' touting of the value of that relationship during the Class Period.

### (3)    The Market Reaction to the Hindenburg Report

230.    ~~200.~~ The market reaction to the Hindenburg Report was sharply negative, as it partially revealed that many of Defendants' prior positive statements about the ~~company~~Company were false and omitted to disclose the truth about the ~~company~~Company.

231.    ~~201.~~ The Hindenburg Report was published before markets opened on March 12, 2020.  Lordstown's stock price closed at $17.71 on March 11, 2020 and opened at $14.00 on March 12, 2020, for a decline of 20.95%.  The stock recovered slightly by the close of markets on March 12, 2020, to a closing price of $14.78, but even at this price there was a 16.54% decline compared to the prior day's closing price.

232.    ~~202.~~ A multitude of news articles and media reports commented on the publication of the Hindenburg Report, further emphasizing its significance to investors.  Headlines of articles published on March 12, 2021 included: *Seeking Alpha*, "Lordstown Motors slides after Hindenburg accuses it of 'fake orders;'" *The Motley Fool*, "Why Lordstown Motors Stock Is Crashing Today;" *Forbes*, "Lordstown Motors Stung By Short Seller's Accusations Electric Truckmaker Misled Investors;" *The New York Post*, "Lordstown Motors stock sinks after report calls pre-orders a 'mirage;'" *Tech Crunch*, "Lordstown Motors accused of faking EV truck ~~pre-orders~~pre-orders by short-seller firm Hindenburg Research;" *The Wall Street Journal*, "Short Seller Trains Sights on EV Startup Lordstown, Prompting Share Slide;" *Bloomberg*, "Lordstown Motors Sinks After Attack by Short That Hit Nikola."

E.    **Lordstown Attempts a Clumsy Cover-Up as the Truth Continues to Emerge**

233.    ~~203.~~ On March 15, 2021, Lordstown issued a press release indicating that it was aware of the Hindenburg Report and that it would respond "in due time."  The press release also asserted that Lordstown "remains on track for start of production of its Lordstown Endurance all electric pickup truck in September 2021."

234.    On March 16, 2021, Lordstown's general counsel sent an email to auditor KPMG responding to a request by KPMG about "a listing of our LOIs with a breakdown of Fleets vs Intermediaries," by attaching a spreadsheet with that data.  Defendant Rodriguez was copied on

103

this correspondence. The KPMG employee responded to the data noting that it showed "75% of the LOI's are with intermediaries" and asking whether, in the Company's upcoming earnings call, it intended to "differentiate between fleets & intermediaries?" In the same email thread, on March 17, 2021, outside legal counsel for Lordstown commented that a "significant part of the Special Committee's investigation will be focused on whether the pre-orders reflected in the attached spreadsheet were properly characterized," and stating, "we have already identified documents that raise some issues about whether all of these are properly characterized." On March 20, 2020, Defendant Burns was copied on this email thread.

235. 204. On March 17, 2021, after the close of trading, Lordstown issued a press release regarding its full year 2020 results. This report reiterated that the "Timeline to Start of Production (SoP) in September 2021 remains on track, with beta prototype build underway and the first beta vehicles to be ready by the end of March; vehicles to be sent for durability, crash, validation, and lighting testing with various partners and to early initial customers for feedback."

236. 205. During the conference call for Lordstown's full year 2020 results on March 17, 2020, which was held after the close of trading, Defendant Burns stated that the companyCompany had received an SEC inquiry and disclosed that the board had formed a special committee to review the matter. He stated, "We are aware of the short sellers' report and we have also received a request for information from the SEC and we are cooperating with that inquiry, in addition the board of directors has formed a special committee to review these matters."

237. 206. On March 18, 2021, before markets opened, Defendant Burns returned to CNBC to speak with Phil LeBeau of *Squawk Box* to address the allegations in the report.

104

Throughout the interview, ~~Defendant~~ Burns unsuccessfully—and in stark contradiction ~~of~~to his previous *Mad Money* interview—tried to defend his statements.  The exchange was as follows:

> **LeBeau**: Let's be clear here.  The way that you have characterized your pre-orders or reservations in the past, I mean, you called these on CNBC "serious orders."  Now, people would look at this and say, "If you have a company that's not putting down a deposit, that doesn't have a fleet, but basically are collecting letters of interest, are those truly 'serious orders?'"
>
> **Burns**: Well, no, we've been...  Phil, we always been very clear, right?  These are just what they're intended to be, right?  These are non-binding letter intents.  They're called pre-orders out in the kind of real world.  So, always classified them for that.  And we have a lot of those pre-orders.  I think we have pre-orders directly from fleets.  We have pre-orders from people that sell to fleets because that's the way fleets buy.  Fleets don't buy. . . in general, they don't buy like consumers buy.  They buy through intermediaries.
>
> And so all we've done is gone out and gauge interest because you've got a tool to build something like this in an automated fashion.  We're going to build one of these every six minutes.  We kind of have to know how to tool, and you've got to know about a year in front of your building.
>
> So that's what everybody uses pre-orders for.  They are always, by definition, nonbinding, no money down.  I mean, that's the nature of EV startups trying to gauge interest.
>
> **LeBeau**: I understand that, Steve, but some people would look at this and say, "Look, you were far more aggressive in characterizing those pre-orders as true commitments, that you have Company X, Y, Z, that has said, 'Sign us up for 5,000 or 6,000.'"  Do you regret the way you characterize those reservations?
>
> **Burns**: Well, reservation...  Phil, all I can tell you.  I don't want to get into the specifics.  All I can tell you is demand is robust.  We've never said we had orders.  We don't have a product yet.  By definition, we can't have orders, right?  So when you're early and you're years away from a product, in this case one year, and now, we're down to six months, so now that we have the betas.  We are starting to be able to shore some of that up.
>
> But the pre-orders did exactly what they were supposed to do: gauge interest.  Nobody knew if fleets would buy an electric pickup truck, right?  It was completely unknown science, no data around it.  So we queried them.  We have very robust interest, and that's just what they are.  They're letters of interest.  You can't do any more than that in this stage.  So I don't think anybody thought that we had actual orders, right?  That's just not the nature of this business.

238.   ~~207.~~ Following the interview, later in the day Jim Cramer spoke on the issue commenting on his previous interview with Defendant Burns.  His reaction is demonstrative of the feeling many investors had upon seeing the truth about Lordstown begin to emerge.  He stated:

> Well, Nate Anderson of Hindenburg first put out a report when I was away.  They talked about how Lordstown could have had some serious issues with the truth.  And I found it gut wrenching because I had pressed Steve Burns when he was on the show and the CEO of Lordstown.  I had pressed him on Mad Money about how serious the orders were for the company.  And he said, they're very serious.  He had signed letters with CEO.  He could have easily said, look, they, we never know what's going to happen with orders, which is fine.  He could have said that he did not say that.  Well, this morning Phil LeBeau who is an amazing reporter, asked him point blank.  And Burns said, I never said that they were serious.  I don't know where he got that.  So then we ran the tape of when Burns said it to me on Mad Money.  So to me, **I thought it was like the prosecution rests**. You don't even need to have a discussion.  You just listen to what he said to Phil.  You listen to what he said to me, case closed you decide.  I listened.  And I just said, that is someone that is hard for me to trust.  And that's where I come out.

239.   ~~208.~~ The other CNBC reporter in the segment responded to Cramer stating: "the quote that really stood out for me from Burns himself was I don't think anybody thought we had actual orders to say that on television," to which Cramer responded:

> I know he point blank said the opposite to me.  And you know, as I go through, I mean, there's, it was, I mean, I had, obviously I was frantically getting my people to cut the tape of when, when he was on Mad Money, but the quotes that would, that you know, that we were struck by were basically, let me see if I can just call some of them up.  But, you know, we were, were struck by the fact that there was just simply no doubt in this man's mind, that things were, that the orders were serious and solid.  And it, it was, it was quite, you know, one point he wrote, he said to me, our average order size—order size, order size—is 500 trucks at a time and most of them are signed by the CEOs of these large firms. Now, is that not saying we have serious orders?  I'm asking is the order serious, give me any help, make me feel better about how serious the orders were.  How about if you said, well, look, first of all, our average order size is 500 trucks at a time.  And then I will also tell you, the most of them are signed by the CEOs of these large firms.  That's how serious I am.  Well, that's the evidence.  That's the core evidence.  I mean, if we had to do like, you know, stock market, I don't know, CSI.  Well, there you go.

106

240.    209. Lordstown's stock closed on March 17, 2021, at $15.09 per share.  The Fourth Quarter 2021 results were published after markets closed on March 17, 2021, and Lordstown's conference call was also held after markets closed that day.  Defendant Burns' interview on *Squawk Box* was aired before markets opened on March 18, 2021.  The price of Lordstown's stock opened at $13.85, an 8.21% decline from the prior closing price.  During the day, Lordstown stock price continued to fall on this news, closing on March 18, 2021, at a price of $13.01—a decline of 13.78% from the prior closing price.

241.    210. On March 18, 2021, Morgan Stanley issued an analyst report slashing their price target for Lordstown by 33% on reduced expectations for their sales.

242.    211. On March 25, 2021, Lordstown published its 10-K annual report (which it would later be required to amend).  The document asserted that Lordstown would meet its previously stated production schedule.  Specifically, it stated: "We are targeting commencement of commercial production of the Endurance in September 2021 and initial sales starting in late 2021."

243.    212. Additionally, and critically, the 10-K disclosed that Lordstown had actually been notified of the SEC investigation almost a month before the Hindenburg Report was published.  The filing stated that "[o]n February 17, 2021, the company received a request from the SEC for the voluntary production of documents and information, including relating to the merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles. The Company is responding to the SEC's requests and intends to cooperate with its inquiry."  Internal Lordstown company documents show that the SEC request looking for documents concerning Lordstown's "pre-orders" was received on February 17, 2021, and discussed at Lordstown's February 22, 2021, Board meeting, which Defendant Burns attended.

244.   213. Similarly, the 10-K disclosed that the Lordstown was the subject of an SEC inquiry.  The 10-K stated that "on February 17, 2021, we received a request from the SEC for the voluntary production of documents and information, including relating to the merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles."  Notably, the 10-K followed this statement by describing two "**_related_**" class actions.  It stated: "We are responding to the SEC's requests and intend to cooperate with its inquiry.  Additionally, on March 18 and 19, 2021, two related putative class action lawsuits were filed against us and certain of our officers in the U.S. District Court for the Northern District of Ohio (Case Nos. 21-cv-616 and 21-cv-633)."

245.   Internally, on April 25, 2021, Lordstown executives (including Defendant Flannery) discussed how pushing the start of production "from October 2021 to February 2022" could help conserve cash, and that doing so would mean cash from sales would not start until March.  A May 12, 2021, presentation for Lordstown's Board discussed steps the Company could take to manage its liquidity, and discussed pushing the start of production out even further, until June 2022, which would allow the Company to delay substantial work that _still_ needed to be completed in order to reach start of production, including "frame automated weld line," "supplier tooling," "frame soft tooling."  The next day Defendant Rodriguez, Defendant Brown, Defendant Schmidt, among others, discussed "there not being a way to get to September production and have cash left in May," without additional financing.

246.   214. On May 24, 2021, Lordstown issued a press release announcing its First Quarter 2021 results.  It reiterated that the "Timeline to Start of Production (SoP) in late-September 2021, which will be at limited capacity, remains on track."  However, the company previewed that it was in truth facing production delays.  Despite the fact that

Lordstown became public and constantly promoted its production schedule even after COVID-19 had fully emerged as a global event, the company now vaguely blamed COVID-19 for production delays.

247.    215. In the press release regarding the results, Lordstown stated, ""we do need additional capital to execute on our plans," and in the May 24, 2021 analyst call for Lordstown's First Quarter results, Defendant Burns stated "the pace of our production ramp will depend on our ability to secure additional funding," and similarly stated that "capital may limit our ability to make as many vehicles as we would like."  Putting numbers on this point, Defendant Burns explained that Lordstown now planned to end the year with a mere $75-50 million of cash on hand, without additional financing, and that even meeting this expectation would require, "pursuing a conservative budget, reducing costs and delaying investments and the production would start" and that as a result, "in September would be at best 50% of the prior 2021 unit expectations."

248.    216. The May 24, 2020, press release was released after markets closed that day, and the analyst call was also held after markets closed.  As of the close of markets on May 24, 2020, Lordstown's stock price was $9.67, and the next day, the opening stock price was a mere $8.17—a decline of 15.51% from the prior closing price.  By the close of trading on May 25, 2021, Lordstown's stock price was at $8.95, which was still a decline of 7.45%, compared to the prior closing price.

249.    217. On May 27, 2021, Avise Analytics issued an analyst report questioning "Can Lordstown Motors Withstand The Latest Test Of Its Endurance" focusing on the Hindenburg Report, SEC investigation, and the company's "higher than expected forecasted expenses and lowering of the production forecast."  Similarly, on May 28, 2021, Deutsche Bank issued an

analyst report recognizing that "Lordstown's business has so far been running quite differently than presented in its initial business plan."  The report explained "[o]n its 1Q earnings call this week, Lordstown guided for a 50% production cut this year without any additional financing, limiting its planned output to just ~1k units this year.  Therefore, we worry that Lordstown will be unable to get a strong enough foothold in the market in just a few short months before more well-established models enter the market."  Additionally, Morgan Stanley issued an analyst report, further slashing their price target for Lordstown by 33%, citing its "reduced forecast" and "need for outside capital."

250.  218. On June 8, 2021, Lordstown released an amended 10-K, disclosing that it was facing financial catastrophe.  The filing included a "going concern notice" stating that: "We require additional capital to implement our business plan, and it may not be available on acceptable terms, if at all, creating substantial doubt as to our ability to continue as a going concern."  In addition to revealing that Lordstown was on the brink of insolvency, the filing stated that: "Our current budget only provides for limited commencement of production in 2021. Additional funding is needed for production in 2022 and beyond and to continue our ramp up to full commercial production.  The amounts required may be significant."

251.  219. This "going concern notice" was obviously in stark contrast to Defendants' promises that the Merger provided adequate resources—not just to begin production of the Endurance, but to push production and sales forward to the point that the company would become cash flow positive and profitable.

252.  220. Additionally, the amended 10-K disclosed that the company had materially deficient internal controls.  It stated that management had identified a "material weaknesses in

110

internal control over financial reporting."  Accompanying this disclosure was a notice that the company had developed a plan to remediate its reporting weaknesses.

253.  221. The amended 10-K also disclosed that Lordstown had received two subpoenas from the SEC and provided some additional details about the investigation. Specifically, the filing disclosed that: We have in the past been and may in the future be subject to, or become a party to, litigation, regulatory actions, and government investigations and inquiries.  For example, we have received two subpoenas from the SEC for the production of documents and information, including relating to the Merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles.  We are responding to the SEC's requests and are cooperating with its inquiry."

254.  222. The amended 10-K with the going concern notice and additional details about the SEC investigation was filed after the close of markets on June 8, 2021.  As of the close of the market on June 8, 2021, Lordstown was trading at $11.22 a share, and at market open the next day, it was trading at $10.12—a 9.8% decline from the prior close.  On June 9, 2021, the Lordstown's stock price reached a daily low of $8.88, for a total decline of 20.86% compared to the prior closing price.  However, on June 9, 2021, Lordstown issued a new statement that it was supposedly actively pursuing additional financing with several parties, and the share price increased on this news.

255.  223. On June 8, 2021, RBC published an analyst report that advised that Lordstown would underperform. It focused on whether the fleet market will buy Lordstown's vehicles at levels claimed by the company, noting that the Hindenburg report had "placed increased scrutiny on RIDE's orders and management's credibility."  On June 10, 2021, Morgan Stanley issued an analyst report focused on Lordstown's going concern notice.  The report stated,

"The stock has reacted very negatively and, based on our discussions with clients, we are concerned that there has not been a greater level of consideration about the alternative use-cases for RIDE's assets." Put differently, Morgan Stanley was considering what would happen to Lordstown's assets if it were to go bankrupt, which emphasizes the dire nature of the situation.

256. 224. On June 14, 2021, Lordstown issued a press release reporting the results of the company's internal investigation into the allegations in the Hindenburg Report. While the press release disclosed that the company was continuing to deny the Hindenburg Report's allegations regarding its production capabilities, it admitted that: "The investigation did, however, identify **issues regarding the accuracy of certain statements regarding the Company's pre-orderspre-orders**."

257. 225. The internal investigation report admitted that:

> In most instances, Lordstown Motors' pre-orders did not require a reservation or similar payment, though pre-orders submitted through a website portal required a refundable $100 payment. Lordstown Motors entered into an arrangement to pay one entity commissions for procuring pre-orders. That entity procured approximately 1,000 pre-orders and also assisted Lordstown Motors into entering into an important commercial relationship with a leading fleet management company.

258. 226. This disclosure conceded that Lordstown had paid a third-party to procure pre-orders, but itself was at odds with other publicly available information about that practice. The third-party at issue was Climb2Glory, but Climb2Glory itself claimed to have generated 25% of Lordstown's pre-orders during a six-month period preceding March 2021, which starkly contradicts the company's claim that Climb2Glory had only procured 1,000 pre-orders.

259. 227. Most significantly, the internal investigation admitted that the company had made inaccurate statements regarding pre-orders. The relevant portion of the internal investigation report is as follows:

Lordstown Motors made periodic disclosures regarding pre-orders which were, in certain respects, **inaccurate**.

Lordstown Motors has stated on several occasions that its pre-orders were from, or "primarily" from commercial fleets. In fact, many pre-orders were obtained from (i) fleet management companies or other end users that indicated interest in purchasing Endurance trucks, similar to commercial fleets, and (ii) so-called "influencers" or other potential strategic partners that committed to attempt to secure pre-orders from other entities, but did not intend to purchase Endurance trucks directly.

One entity that provided a large number of pre-orders does not appear to have the resources to complete large purchases of trucks. Other entities provided commitments that appear too vague or infirm to be appropriately included in the total number of pre-orders disclosed.

260. 228. While these findings largely admitted to some of the misstatements alleged herein, Lordstown nevertheless tried to downplay the issue. It emphasized the word "primarily," to imply that the language regarding pre-orders had typically been offset by qualifying language. In fact, Defendant Burns' actual statements were far more emphatic. *E.g.*, Burns: "50,000 pre-salespre-sales already, **all from fleets**." (November 16, 2020); Burns: "**all** those numbers are just commercial fleets," Spencer: "that's **literally** just for fleets?" Burns: "Yeah. That's just commercial fleets." (February 6, 2021); Burns: "Lordstown Motors has received approximately 50,000 non-binding production reservations **from commercial fleets** for its Lordstown Endurance all-electric pickup truck" (November 16, 2020); Burns: "We sell to commercial fleets." (November 7, 2020); Burns: "more than 100,000 non-binding production reservations **from commercial fleets**" (January 11, 2021); Burns: "Our initial foray is into fleets and **we have pre-sold 100,000 of these to various fleets** across America." (February 23, 2021).

261. 229. Similarly, while Lordstown admitted that "[o]ne entity that provided a large number of pre-orders does not appear to have the resources to complete large purchases of trucks," it failed to disclose that many of Lordstown's other supposed customers—including

113

several of those listed as "Selected Pre-Order Customers" in Defendants' pre-Merger investor deck and proxy materials—also were clearly not viable purchasers of any significant number of Endurance trucks.  Likewise, while the report of the special committee correctly stated: "Other entities provided commitments that appear too vague or infirm to be appropriately included in the total number of pre-orders disclosed," it failed to disclose that in many instances Lordstown was booking ~~pre-orders~~pre-orders from entities that had not made *any* indication of interest to buy a particular number of trucks whatsoever, like the Mayor of City of Ravenna.

262.   ~~230.~~ Concurrently with the release of the internal investigation report, ~~On~~on June 14, 2021, Lordstown also issued a press release regarding the departures of ~~Defendant~~Defendants Burns and ~~Defendant~~ Rodriguez.  The press release did not provide much detail explaining the sudden departure of the company's founder, CEO, and board Chairman and the departure of its CFO.  Instead, it stated that the departures were being made "as the Company begins to transition from the R&D and early production phase to the commercial production phase of its business," which did not explain why that transition called for the immediate departure of key executives.

263.   ~~231.~~ The obvious truth was that Defendants Burns and Rodriguez had been pushed out for their roles in misrepresenting the business to the investing public.  This fact is all the more obvious given that the company did not announce any long-term replacement for either executive – and instead left the CEO role vacant as former director Angela Strand took over as Executive Chairwoman and Becky Roof took over as "interim CFO."  The notion that ~~Defendants~~ Burns and Rodriguez had departed as part of an orderly progression as the company transitioned to the "production phase" is completely belied by any common-sense inquiry, given that narrative would necessarily be predicated on the idea that other management would more effectively handle the new phase, whereas the company was not announcing any such new

114

management.  In fact, Lordstown operated without a CEO for more than two months, until August 26, 2021.

264.  Indeed, Hamamoto later confirmed that Defendant Burns' resignation occurred at the prompting of the Board, as the Board had collectively determined that Burns' resignation was what was best for Lordstown.  Hamamoto pointed to several factors that the Board considered, including that Burns the information that was brought to light by the Hindenburg Report and later confirmed by the Special Committee.  Hamamoto confirmed that he believed that Burns made inaccurate statements.  Hamamoto stated that a large part of the pre-orders did not come from fleets, but rather came from influencers and intermediaries which, in Hamamoto's opinion, should not have been counted towards Lordstown's proven demand.

265.  232. The news of the CEO and CFO "resignations" and the investigative report was released before markets opened on June 14, 2021.  On the prior trading day, at the close of trading, Lordstown's stock price was $11.41.  When markets opened on June 14, 2011, Lordstown's stock price was $9.39, a 17.7% decline of from the prior close.  By the close of trading on June 14, 2021, Lordstown's stock price was $9.26—a staggering 18.84% decline from the prior close.

266.  233. Before markets opened on June 14, 2021, *Seeking Alpha* wrote, "Lordstown Motors stock down 12% as CEO and CFO exit following board probe," and later in the day that publication wrote, "down sharply after this morning's bombshell double resignation of the electric truck maker's CEO and CFO.  On top of that, an independent report found issues with the pre-order statements made by the company."  That same day, *The Wall Street Journal* reported, "Lordstown Motors Executives Resign Amid Inaccurate Preorder Disclosures."  *Bloomberg* reported, "Lordstown Motors Slumps Most Ever on CEO Exit, Misstatements."

115

267. 234. Clearly worried about the sharp market reaction to the prior day's disclosures, on June 15, 2021, Lordstown made bizarre statements to the media.  Defendant Schmidt claimed in a media event that the company had "firm orders" for "two years" of production.  This sent shares sharply upward.  For example, *Reuters* reported that day, that Lordstown claimed it has that "has 'firm' and 'binding' orders for the first two years of production of its electric pickup truck . . . sending shares up 6.4%."

268. 235. However, two days later, on June 17, 2021, Lordstown corrected this statement, noting that even by that date it did not have binding orders.  That day, *Reuters* wrote, "EV maker Lordstown backtracks to say it has no binding orders."  Similarly, *The New York Times* reported that day that, "Lordstown Motors reverses itself again, telling SEC it has no 'binding' orders."  In reporting on this correction, the *Detroit Tribune* noted that Executive Chairwoman Angela Strand had tried to rebuild confidence in her remarks two days prior, calling it a "new day," but that with this near immediate correction of continued misstatements, it appeared to be the "[s]hortest new day ever."  The publication ZeroHedge, wrote ""Lordstown Motors Lied About ""Binding"" Orders, Again, Just One Day After Its CEO And CFO Resigned." That same day *Seeking Alpha* wrote, "Lordstown Motors tumbles after clarifying that it has no binding orders."

269. 236. On July 2, 2021, *The Wall Street Journal* announced that Lordstown was under criminal investigation by the U.S. Department of Justice ("DOJ").  Citing people familiar with the matter, the article explained that the DOJ inquiry was being handled by the Manhattan U.S. Attorney's Office, *i.e.*, the office for the Southern District of New York.  The article also quoted a Lordstown spokesperson, who stated that the company is committed to cooperating with any investigations and inquiries.

270. ~~237.~~ *The Wall Street Journal* article publishing this news was released mid-day on July 2, 2021. Lordstown stock price opened at $10.35 on July 2, 2021, and fell to $9.23 by close—a total same day decline of 10.8%.

271. ~~238.~~ News coverage regarding the revelation of the DOJ investigation was striking. For example, on July 2, 2021, *Seeking Alpha* ran the headline, "Lordstown Motors stock falls sharply on report of DOJ probe." That same day, CNBC wrote that the investigation was "sending shares of the embattled electric-vehicle start-up plunging." Also, that same day, *The Detroit News* ran the headline "Lordstown Motors' shares tank after WSJ reports DOJ investigation." Similarly, *Bloomberg's* headline that day stated: "Lordstown Motors Tumbles as Justice Department Begins Probe."

272. ~~239.~~ About two weeks later, on July 15, 2021, Lordstown disclosed additional details about the previously disclosed investigations it was facing. Specifically, the filing disclosed that: "we have received two subpoenas from the SEC for the production of documents and information, including relating to the Merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles, and we have been informed by the U.S. Attorney's Office for the Southern District of New York that it is investigating these matters. We have cooperated, and will continue to cooperate, with these and any other regulatory or governmental investigations and inquiries."

273. ~~240.~~ The further revelation about the subject and status of the SEC and DOJ probes was widely covered in news articles. For example, *~~Market Watch~~MarketWatch* wrote in a July 16, 2021, article that "The electric-truck startup says probe focuses on matter related to its reverse merger deal and ~~preorders~~pre-orders for Endurance."

274.    In an interview with Lead Counsel, Hamamoto later confirmed that the SEC's factual findings—including that Lordstown and Defendant Burns made materially false or misleading statements about Lordstown's pre-orders for the Endurance and that Lordstown's pre-orders were not all from or primarily from fleet customer, that Lordstown and Burns made false and misleading statements about Lordstown's access to certain critical parts from GM to develop the Endurance, and that Lordstown and Burns made materially false and misleading statements about Lordstown's ability to deliver the Endurance to the commercial fleet market—were consistent with the Special Committee's findings and that Hamamoto had no reason to doubt these findings.

275.    For example, the SEC stated that in DiamondPeak's September 21, 2020 preliminary proxy statement, Lordstown stated that it had "received pre-orders primarily from fleet operators to purchase over 38,000 Endurance vehicles."  But the SEC noted that, "according to the Special Committee's analysis, pre-orders from intermediaries or influencers, and not fleets, comprised over 40% of the 38,000 amount."

276.    The SEC also recounted that on October 26, 2020—the first day first day of trading for Lordstown's common stock—Defendant Burns stated in an interview that Lordstown had "pre-sold 40,000 of [the Endurance] to fleet customers already," and that on November 12, 2020, Lordstown filed a Form S-1 stating it currently had "pre-orders primarily from fleet operators to purchase over 44,000 vehicles[.]"  As the SEC noted, "[a]ccording to the Special Committee's analysis, 48% of the 40,000 amount was from intermediaries or influencers."

277.    Additionally, the SEC referenced a press release issued on November 16, 2020 where Lordstown stated that it had "received approximately 50,000 non-binding production reservations from commercial fleets…."  On that same date, Defendant Burns stated in a capital

118

markets-oriented forum that Lordstown had "50,000 pre-sales already, all from fleets," which he then reiterated in an interview by CNBC on November 17, 2020, stating that Lordstown had received "50,000 preorders," sold to "fleets," and described the pre-orders as "very serious orders." Lordstown's Form S-1/A filed on December 1, 2020 similarly stated it had "received pre-orders primarily from fleet operators to purchase approximately 50,000 Endurance vehicles." The SEC acknowledged that, according to the Special Committee's analysis, 50% of the 50,000 amount was from intermediaries or influencers.

278. The SEC additionally referenced that on December 21, 2020, Lordstown posted on social media and filed a Form 8-K stating it had received "80,000 non-binding reservations for the Endurance to date." As the SEC referenced, the Special Committee's analysis concluded that 67% of the 80,000 amount was from intermediaries or influencers.

279. The SEC further stated that on January 11, 2021, Lordstown stated in a press release that Lordstown "has received more than 100,000 non-binding production reservations from commercial fleets…." The press release quoted Defendant Burns as saying, "[r]eceiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history…." According to the Special Committee's analysis, however, by that time 71% of the 100,000 amount was from intermediaries or influencers.

280. 241. On July 26, 2021, Lordstown announced that it has secured a source of some additional financing for the company. The technologies publication *TechCrunch* aptly published a July 26, 2021, article, titled "Troubled EV company Lordstown Motors gets $400M lifeline in stock-sale agreement."

281. 242. On August 11, 2021, Lordstown published a press release announcing its Second Quarter 2021 results. The press release regarding the results claimed that the company

119

would "[b]egin[] limited vehicle production in late September," a far cry from its prior and repetitive disclosures that it would be in full production by September.  Similarly, the press release stated that "production in 2021 will be limited to coincide with commercialization roadmap," which again contradicted the prior claims that the company would be in full production by September 2021.

282.    243. Furthermore, in the August 11, 2021, press release, the company stated that it would not even "complete vehicle validation and regulatory approvals [until] December and January," meaning that while "limited" **production** might begin in September, meaningful vehicle sales would be delayed until well after then.  Furthermore, even once the company began selling vehicles in 2022, it apparently was only expecting "selected early customers in Q1 in advance of commercial deliveries in early Q2."

283.    244. On August 13, 2021, Lordstown filed a Form 10-Q about its previously released Second Quarter results.  This filing reiterated much of the information disclosed two days prior.  However, it notably also included a renewed "going concern" notice.  The disclosure noted the capital raising activity that the company conducted the prior month, but concluded: "notwithstanding management's plans and efforts to date, there continues to be substantial doubt about our ability to continue as a going concern."

284.    245. On August 26, 2021, Lordstown announced that—more than two months after the resignations of Defendants Burns and Rodriguez—it had finally selected a new CEO, Daniel Ninivaggi.  Mr. Ninivaggi was previously an executive working at Carl Icahn's business Icahn Enterprises, but who has not held a full-time job since August 2019, according to his LinkedIn profile.

120

V.        ADDITIONAL ALLEGATIONS

A.        **False and Misleading Statements**

285.    ~~246.~~ Plaintiffs allege that the statements highlighted in ***bold and italics*** within this Section were materially false, misleading, and omitted to disclose material information.  In some instances, graphical material is alleged to be false and misleading and no bold and italic text has been applied.  As alleged herein, the false and misleading statements artificially inflated or artificially maintained the price of ~~the~~ Lordstown Securities~~.  As described below, Defendants~~ because they created an impression of a state of affairs related to ~~the company's~~Lordstown's pre-orders and production capabilities that differed in a material way from the one that actually existed.

286.    ~~247. Each statement attributed to Defendant Burns prior to the close of the Merger was also made by Defendant Lordstown EV Corporation, which was known at the time as Lordstown Motor Corp., and each statement attributed to Defendant Burns after the close of the Merger, was also made by Defendant LTM, in both cases because he was speaking on behalf of the relevant entity as its CEO and chairman of its board.  Each statement by Defendant Hamamoto was also made by Defendant LTM, which prior to the Merger closing was known as DPHC, because he was speaking as its CEO and the chairman of its Board.~~ Each statement contained in a public filing, presentation, or press release issued by an entity was made by that entity.  Statements made by each Defendant are also attributable to non-Defendant Lordstown[17] because they made these statements in their capacity as Lordstown employees, representatives, and/or agents.  Throughout this Section, entities are referred to by their name at the time that the

---

[17] That the statements were made by Lordstown is relevant to the control person claims stated in Count V.

statement was made.  The use of three asterisks in the middle of a quoted passage signifies the omission of ~~a paragraph~~one or more paragraphs.  That a statement is not included in this Section or marked as false and misleading in this Section does not imply its accuracy.  The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

**(1)      Statements Concerning Lordstown's Supposed Pre-Orders**

287.   ~~248.~~ Statements touting the number of pre-orders obtained by Lordstown were false and misleading because Lordstown did not, in fact, have pre-orders or pre-orders with commercial fleets of the amounts listed, including for the following reasons, both ~~together~~collectively and individually: (a) Lordstown did not have any pre-orders and instead had non-binding letters of intent; (b) Lordstown and the Defendants counted supposed pre-orders from entities ~~that did not sign letters of intent to buy the Endurance, either because they had not signed any LOI at all or because they had signed a LOI with Workhorse to buy an entirely different truck and had not agreed to buy the Endurance~~where there was not even an executed letter of intent or similar agreement between Lordstown and the supposed purchaser; (c) Lordstown and the Defendants counted supposed pre-orders from businesses that could not plausibly be expected to order the listed number of trucks; (d) Lordstown and the Defendants counted supposed pre-orders from entities ~~that merely operated as intermediaries for ultimate purchasers, or who had no such operations but sought to open such lines of business, even though such orders could not reasonably be counted as pre-orders, and even though Defendant Burns expressly claimed all orders were from "fleets," when such intermediaries do not own or operate~~other than commercial fleets, including entities it internally recognized were mere "intermediaries," entities that obviously did not operate fleets, governmental entities, which

could not be regarded as *commercial* fleets, and supposed deals that it characterized as "consumer pre-orders," which were obviously not with commercial fleets; (e) Lordstown ~~counted pre-orders from LOIs obtained by Workhorse, even though the conditions precedent for Lordstown to receive such pre-orders had not been satisfied; and (e) Lordstown~~and the Defendants counted pre-orders from persons and entities that Lordstown and the Defendants knew, or was reckless in not knowing, did not intend to order Endurance trucks or the number of trucks Lordstown and the Defendants used in ~~its~~their count.

288.    Statements describing the pre-orders in terms that described their veracity as indications of demand, such as, for example, by stating they were "secured," "received," "significant," or reflected demand that was "proven," as well as statements claiming that Lordstown had any "sale" or "pre-sold" a quantity of trucks, were misleading because those statements mischaracterized the nature of the arrangements Lordstown had with potential customers by overstating their veracity and tendency to indicate true demand, or directly misrepresented that the arrangements were actual sales, as opposed to, at most, indications of interest.

289.    The number of pre-orders ~~was~~and veracity of those orders as indications of demand is material because it was a key fact broadcasted to investors, served as a signal of demand for the Endurance, served as a signal of expected future revenues, served as an indicator of industry opinions of Lordstown and the Endurance, and served as an indicator of the capabilities and success of Lordstown's sales and marketing functions.

290.    ~~249.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC that included a press release issued by ~~Lordstown~~LTM and DPHC, and this press

123

release included statements made by Defendant Burns.  Thus, ~~DPHC,~~ Lordstown and Burns stated the following:

> Steve Burns, Founder and Chief Executive Officer of Lordstown, commented, "We are thrilled with the opportunity to build Lordstown Motors into a top-tier electric truck company that is highly differentiated from the competition.  We are uniquely positioned to be a leader in the industry, with our first vehicle, the revolutionary Lordstown Endurance.  Our all-electric full-size pickup truck delivers the equivalent of 75 miles per gallon and has been systematically engineered and competitively priced specifically for the large commercial fleet market, which includes companies in manufacturing, contracting, utilities, transportation and delivery, and agriculture, among others.  ***Since its unveiling just over a month ago, the Endurance has been met with enthusiastic support, and to date, we have secured $1.4 billion of pre-orders***.  Our platform is rooted in sustainability, and the entire Lordstown team is committed to ensuring we contribute to a healthier planet for generations to come."

> \* \* \*

> ***Lordstown unveiled the prototype of its flagship Endurance pickup truck on June 25, 2020, and to date, has received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet customers.***

291.  ~~250.~~ The ~~statement(s)~~statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statements were especially misleading because the use of the words "secured" and "received" implied that the pre-orders were concrete, when in reality, the purported "~~pre-orders~~pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading ~~by representing~~because they represented that the pre-orders came "primarily" from "commercial fleet customers," and this was especially misleading because ~~it~~the statements implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand

from its target market.  This was untrue, as the number of pre-orders was ~~completely~~ fabricated, and ~~at a minimum, involved~~the pre-order counts included a significant number of fabricated orders from individuals and non-fleet organizations.

292.    ~~251.~~On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC ~~that~~, which included an investor presentation issued by Lordstown, and thus DPHC and Lordstown made the statements therein.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez, and Flannery.  The presentation included the following graphic, which contains false and misleading statements:



**Selected Pre-Order Customers**

293.    ~~252.~~The statement(s) in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, it was especially misleading to boast that the pre-orders had come from a number of established companies when these pre-orders were highly fabricated.  For example, the purported pre-orders from "Selected Pre-Order Customer[]," ~~Grid X~~Grid X, were baseless, as ~~Grid X had indicated they were "completely unaware" of the deal when asked about it, and that the inquiry was "the first time" they had heard about it~~explained herein.

125

294.    ~~253.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC ~~that~~, which included an investor presentation issued by Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez, and Flannery.  The presentation included the following graphic, which contains false and misleading statements:

295.    ~~254.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, Defendants' claim that demand ~~is~~was "proven" was highly misleading, as the basis for the purported demand was fabricated pre-orders.

296.    ~~255.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez and Flannery.  The presentation stated: "~*$1.4bn of Existing Pre-Orders*."

297.    ~~256.~~ The statement in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statement was especially misleading because the use of the word

"~~existing~~[e]xisting" implied that the pre-orders were concrete, when in reality, the purported "~~pre-orders~~[p]re-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

298.     ~~257.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez, and Flannery.  Additionally, the following statement was also made by Defendant Flannery~~,~~ because he provided or allowed his image to be used in propagating the statement, in a way that conveyed his assent to the statement being made.  The presentation included the following graphic, which contains false and misleading statements:



- • Sales team run by Caimin, consists of internal and external representatives
- • Marketing efforts are at an early stage, however existing pre-orders have been achieved with minimal marketing costs

Caimin Flannery

299.     ~~258.~~ The statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore ~~were~~was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the ~~statements~~statement were especially misleading because the use of the word "existing" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not

even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statement that the pre-orders were "achieved with minimal marketing costs" ~~is further~~was especially misleading, as it ~~conveys~~conveyed that the pre-orders could be further increased once marketing ~~is~~increased, and because Lordstown had engaged in substantial and expensive marketing, including paying Climb2Glory lofty commissions to procure totally non-binding LOIs.

300.     ~~259.~~On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez, and Flannery.  The presentation stated: "***Significant Pre-Orders Received***."

301.     ~~260.~~The ~~statements~~statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statement was especially misleading because the use of the word "~~received~~[r]eceived" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~persons or entities signed a non-binding LOI, did not even sign ~~any LOI at all (binding or otherwise), or was~~a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

302.     ~~261.~~On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by

128

Defendants Burns and Post.  The presentation included the following graphic, which contains false and misleading statements:

> Lordstown has already received ~27k orders (average order size of ~300 trucks) before the first vehicle has been produced, representing potential revenue sufficient to cover 2021 production and into 2022

303.    262. The ~~statements~~statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore ~~were~~was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statement that "Lordstown has *already received . . . orders*" was especially misleading because it implied that the pre-orders were concrete, when in reality, the purported "orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

304.    263. On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of a conference call that ~~Defendants~~Defendant Burns ~~and Hamamoto~~ participated in.  Internal Lordstown documents reveal that Burns was involved in drafting the script used for the August 3, 2020 conference call.  The following ~~statement was~~statements were uttered by ~~Defendant~~ Burns during that call:

> We are uniquely positioned as a leader in the pickup truck industry with the revolutionary Lordstown Endurance, an all-electric full-size pickup truck that delivers the equivalent of 75 miles per gallon, total EV range of 250 miles and a towing capacity of an impressive 7,500 pounds.  One of the most unique elements of the vehicle is its innovative in-wheel drive system, the first of its kind in a commercial vehicle.  Equipped with hub motors in each wheel, and seamlessly integrated with our software system, we are effectively able to deliver a motor and mind in each wheel – benefiting efficiency of the vehicle and driver experience.  This has long been sought after in the automotive industry, and we're excited to be the first to accomplish this major innovation.  ***We appreciate the support by***

> *our world-class partners who are evidencing their confidence in this technology with significant pre-order activity.*
>
> * * *
>
> We officially unveiled the Endurance in late-June.  The Endurance was met with great excitement and acclaim, and *we now have garnered significant demand with pre-orders totaling approximately 27,000 vehicles since inception, representing more than 1.4 billion dollars of potential revenue.  We hear from many fleets who cannot wait to get their hands on the Endurance*.  The electric vehicle market is expected to grow significantly the next decade, underlying our expectations of selling more than 100,000 vehicles per year by 2024.

305. ~~264.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statement that ~~Defendants "have~~Lordstown "ha[d] garnered significant demand" is highly misleading, as the basis for the purported demand was fabricated pre-orders.  In addition, the ~~statements were especially misleading by representing~~statement that "many fleets~~" "~~ . . . cannot wait to get their hands on the Endurance" was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market.  This was untrue, as the number of pre-orders was ~~completely~~ fabricated~~,~~ and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.  Additionally, the reference to the "pre-order activity" as "significant" was false and misleading, given that the pre-orders were non-binding and from sources that did not credibly evidence demand at the level Lordstown was claiming.

~~265. On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of a conference call that Defendants Burns and Hamamoto participated in.  The following statement was uttered by Defendant Hamamoto during that call:~~

> ~~The Lordstown Endurance is a full-sized electric pick-up truck, which utilizes the revolutionary hub motor design that is expected to be the first electric pick-up~~

130

~~truck to market.  *Lordstown has attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its $1.4 billion dollars of pre-orders to-date*, with a product that has a significant total cost of ownership advantage over competitors in both traditional and electric trucks, supports sustainable clean energy, and has a simple design that provides a robust, safe and stable ride.~~

~~266. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore were false and misleading for the reasons set forth in paragraph 248.  Furthermore, the statements were especially misleading by representing that Lordstown had "a clear lane of customers in the commercial fleet segment of the market" because it implied that Lordstown was receiving reliable orders representing true demand from its target market.  This was untrue as the number of pre-orders was completely fabricated, and at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.~~

306.  ~~267.~~ On August 3, 2020, after markets closed, Defendant Burns appeared for an interview on CNBC.  During that interview, he stated: "*We got 27,000 orders.  We got customers really really wanting the truck.*"

307.  ~~268.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statement that "*We got 27,000 orders*" ~~is~~was especially misleading because it implied that the pre-orders were concrete, when in reality, the purported "orders" were anything but concrete, and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading by representing that "customers really really want[ed] the truck."  This was not the case, as the number of pre-orders was highly fabricated.

308.    ~~269.~~ On August 5, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of Defendant Burns' August 3, 2020~~,~~ interview with CNBC. ~~Thus, DPHC made the same false statements for the same reasons listed in paragraphs 268.~~

309.    ~~270.~~ On August 24, 2020, before markets opened, DPHC filed proxy materials with the SEC.  ~~This material~~These materials substantively began with a letter signed by ~~Defendant~~ Hamamoto encouraging shareholders to read the proxy materials and vote, ~~and thus he and DPHC are makers of the following statement therein~~which also stated:

> To date, **Lordstown has received pre-orders from fleet operators to purchase approximately 27,000 Endurance vehicles.**  These pre-orders are not binding and did not require any deposit, so there can be no assurance that Lordstown will successfully convert them into binding orders or sales.  It is possible that a significant number of customers who submitted pre-orders may cancel or delay their pre-orders.

310.    ~~271.~~ The ~~statements~~statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore ~~were~~was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the ~~statements were~~statement was especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the ~~statements were especially misleading by representing~~statement that the pre-orders came "from fleet operators,~~,~~" was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market.  This was untrue, as the number of pre-orders was ~~completely~~

132

fabricated, and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

311. 272. On August 24, 2020, before markets opened, DPHC filed proxy materials with the SEC.  This materialThese materials substantively began with a letter signed by Defendant Hamamoto encouraging shareholders to read the proxy materials and vote, and thus he made the following statement thereinwhich also stated:

> *Growing Sales*.  If Lordstown is able to complete the foregoing actions consistent with expectations, Lordstown anticipates it will be able to commence full production in 2021 with a target of 2,200 vehicles produced and sold in the year. ***Lordstown currently has pre-orders from fleet operators to purchase 27,000 vehicles***.  Although these pre-orders are nonbinding and did not require any deposit, ***Lordstown believes they demonstrate clear demand that will lead to binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers***.  As described in the Business Combination section above, Lordstown also expects to ramp up its sales and marketing efforts following the Business Combination, which have been limited to date.

312. 273. The statements in the prior paragraph touted Lordstown's supposed pre-orderspre-orders and therefore were false and misleading for the reasons in paragraph 248paragraphs 287-289.  Furthermore, the statements were especially misleading because the use of the word "currently" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where the persons or entities signed a non-bindingnon-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading by representingstatement that the pre-orders came "from fleet operators," was especially misleading because it implied that Lordstown was receivinghad received reliable orders representing true demand from its target market.  This was untrue, as the number of pre-orders was completely

fabricated, and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

313. 274. On September 24, 2020, Lordstown participated in an event hosted by The Transportation and Innovation Partners, and a recording of the event was broadcast over the internet.  During the event, Defendant Flannery spoke on Defendant LTM's behalf.  While presenting the following graphic, Flannery stated, "*we have as was announced yesterday in the paper when the Endurance was shown at Columbus, Ohio that our estimates [are] that we have up to 40,000 pre-orders for the Endurance, which again reiterates the demand in the fleet area.  And these are some of the, the entities that have been working very closely with us.*"  The graphic Defendant Flannery referenced was as follows:



314. 275. The statements in the prior paragraph touted Lordstown's supposed pre-orderspre-orders and therefore were false and misleading for the reasons set forth in paragraph 248paragraphs 287-289.  Furthermore, it was especially misleading to claim Defendantsthat Lordstown had been "working very closely with" several "Selected Pre-Order Customers," as, for example, Grid X had indicated they were "the Grid X business whose logo was shown was "completely unaware" of the deal when asked about it, and that the inquiry was

134

"the first time" they had heard about it Grid X Lordstown had purportedly been dealing with had cancelled its order and was never actually a pre-order customer.

315. 276. On September 28, 2020, President Trump met with Defendant Burns and stated, referring to the Endurance,: "*I heard the sales are great*." Defendant Burns stood next to President Trump, did not correct or modify this statement, and nodded repeatedly in agreement and thus can be deemed a maker of the statement uttered by President Trump, and/or made the statement of affirming President Trump's statement.  The event was broadcast by news services, including C-SPAN.

316. 277. The statements statement in the prior paragraph touted Lordstown's supposed pre-orders pre-orders and therefore was false and misleading for the reasons set forth in paragraph 248 paragraphs 287-289.  Furthermore, the acknowledgment of "sales" was especially misleading because it, at a minimum, implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

317. 278. On October 8, 2020, before after markets opened closed, DPHC filed proxy materials with the SEC.  These materials substantively began with a letter signed by Defendant Hamamoto encouraging shareholders to read the proxy materials and vote, and thus he made the following statement therein.  Additionally, the proxy statement itself was signed by Defendant Hamamoto.  The.  Included in the proxy materials stated were the following statements:

> To date, Lordstown has *received pre-orders primarily from fleet operators to purchase over 38,000 Endurance vehicles*.  These pre-orders are not binding and did not require any deposit, so there can be no assurance that Lordstown will successfully convert them into binding orders or sales.  It is possible that a

135

significant number of customers who submitted pre-orders may cancel or delay their pre-orders.

318. ~~279.~~ The ~~statements~~statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore ~~were~~was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the ~~statements were~~statement was especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or ~~was~~were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the ~~statements were especially misleading by representing~~statement that the pre-orders came "primarily from fleet operators," was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market.  This was untrue, as the number of pre-orders was ~~completely~~ fabricated, and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

319. ~~280.~~ On October 8, 2020, ~~before~~after markets ~~opened~~closed, DPHC filed proxy materials with the SEC.  ~~This material substantively began with~~These materials included a letter signed by ~~Defendant~~ Hamamoto encouraging shareholders to read the proxy materials and vote, ~~and thus he made the following statement therein.  Additionally, the proxy statement itself was signed by Defendant Hamamoto.  The~~.  Included in the proxy materials ~~stated~~were the following statements:

> *Growing Sales*.  If Lordstown is able to complete the foregoing actions consistent with expectations, Lordstown anticipates it will be able to commence full production in 2021 with a target of 2,200 vehicles produced and sold in the year. ***Lordstown currently has pre-orders primarily from fleet operators to purchase 38,000 vehicles.***  Although these pre-orders are nonbinding and did not require any deposit, ***Lordstown believes they demonstrate clear demand that will lead to***

136

*binding orders once the Endurance is complete and potential customers are able to see firsthand the value that it offers.*  As described in the Business Combination section above, Lordstown also expects to ramp up its sales and marketing efforts following the Business Combination, which have been limited to date.

320.  281.  The statements in the prior paragraph touted Lordstown's supposed pre-orderspre-orders and therefore were false and misleading for the reasons set forth in paragraph 248paragraphs 287-289.  Furthermore, the statements were especially misleading because the use of the word "currently" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading by representingstatement that the pre-orders came "primarily from fleet operators," was especially misleading because it implied that Lordstown was receivinghad received reliable orders, representing true demand from its target market.  This was untrue, as the number of pre-orders was completely fabricated, and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

321.  282.  On October 26, 2020, during the trading day, *The Detroit News* published an article that included statements from Defendant Burns.  The statements were not written as exact quotes from Burns, but conveyed his statements as follows:

*Burns was surprised when he got up to 40,000 orders.  Now he's got to make more vehicles faster than expected, and he's hired about 200 folks to help make it happen, including former Tesla Inc. employees.*

322.  283.  The statements in the prior paragraph touted Lordstown's supposed pre-orderspre-orders and therefore were false and misleading for the reasons set forth in

137

paragraph 248paragraphs 287-289.  Furthermore, that Defendant Burns stated he was "surprised" that Lordstown received 40,000 orders was highly misleading, as it implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

323.    284. On October 26, 2020, during the trading day, *The Detroit News* published a video of Defendant Burns discussing Lordstown.  DefendantIn the video, Burns stated: "Next September deliveries start.  ***We have pre-sold 40,000 of them to fleet customers already and we expect that number to increase dramatically between now and then***."

324.    285. The statementsstatement in the prior paragraph touted Lordstown's supposed pre-orderspre-orders and therefore werewas false and misleading for the reasons set forth in paragraph 248paragraphs 287-289.  Furthermore, the statements were especially misleading because the use of the word "*pre-sold*" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

325.    286. On October 26, 2020, the *Youngstown Business Journal* published an article including, which included statements by Defendant Burns.  The article stated: "***Burns said the company[C]ompany has received 40,000 in pre-orders for The[t]he Endurance, which is targeted initially for the commercial fleet market.***"  It also quoted Burns as saying, "***We didn't expect that much that quickly***," and as saying, "***It's just a pent-up demand.  Fleets are***

138

*bypassed by the electrification effort – there are a lot of passenger cars coming but nothing for fleets.*"

326. ~~287.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. The statement was also misleading because it claimed the pre-orders were "just a pent-up demand," further implying the pre-orders were credible reflections of demand, when in fact, they were highly fabricated, and reflected Lordstown's heavy use of marketing, including paying ~~Climb2Glory~~Climb2Glory's hefty commissions to generate entirely non-binding orders, ~~and when they reflected indications of interest between Workhorse and potential customers~~. Furthermore, the statements were especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or ~~was~~were clearly not in a position to order the number of trucks Lordstown was counting from them.

327. ~~288.~~ On October 27, 2020, during the trading day, Defendant Burns participated in an interview on *Fox Business*. During that interview Burns was asked, "when can I actually buy one?" ~~and~~ Burns responded: "*You can buy one now, but you can take delivery in September.*" Later that day ~~Defendant,~~ LTM's official Twitter account posted a link to that interview.

328. ~~289.~~ The statement in the prior paragraph was false and misleading because, in the context of Defendants' repeated statements about the pre-order numbers ~~it~~, they falsely conveyed to investors that those pre-orders represented people or companies "buy[ing]" the

139

trucks, when in reality, Lordstown was not selling any trucks at the time and was only gathering non-binding ~~letters of intent~~LOIs.

329. ~~290.~~ On November 12, 2020, after markets closed, ~~Defendant~~ LTM filed an S-1 Registration Statement with the SEC. The Registration Statement was signed by Defendant Burns and Defendant Rodriguez. That filing stated: "***We currently have pre-orders primarily from fleet operators to purchase over 44,000 vehicles***, which pre-orders are nonbinding and did not require any deposit. We expect to ramp up our sales and marketing efforts, which were limited prior to the Business Combination."

330. ~~291.~~ The ~~statements~~statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore ~~were~~was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. Furthermore, the ~~statements were~~statement was especially misleading because the use of the word "currently" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the ~~statements were especially misleading by representing~~statement that the pre-orders came "primarily from fleet operators~~,~~" was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market. This was untrue, as the number of pre-orders was ~~completely~~ fabricated~~,~~ and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

331. ~~292.~~ On November 16, 2020, before markets opened, ~~Defendant~~ LTM filed a Form 8-K with the SEC, attaching a press release. The press release stated:

140

*Lordstown Motors has received approximately 50,000 non-binding production reservations from commercial fleets for its Lordstown Endurance all-electric pickup truck, with an average order size of approximately 500 vehicles per fleet. This figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders, such as federal, state and municipal governments, and military fleets.* Deliveries of the Lordstown Endurance are expected to begin in September 2021, with full production ramping up throughout 2022.

332. ~~293.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the ~~statements were especially misleading because the~~ statement~~,~~ "received . . . production reservations from commercial fleets" was especially misleading because it implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statement that the 50,000 pre-order figure does not capture interest from others that are not in a position to place pre-orders is especially misleading because it implies that pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

333. ~~294.~~ On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge*.  During the interview, Burns stated:

Today we announced a couple big things.  *Demand, like you said, 50,000 pre-sales already, all from fleets.  That's just the commercial sector.  Does not count military or police departments, municipalities, state vehicles, so really just to have that many commercial vehicles sold already is a big deal*.

334. ~~295.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in

141

~~paragraph 248~~paragraphs 287-289.  Furthermore, the statements were especially misleading because the use of the word "*pre-sales*" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the ~~statements were especially misleading by representing~~statement that the pre-orders came "all from fleets," was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market.  This was untrue, as the number of pre-orders was ~~completely~~ fabricated, and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.  Also, the statement that the 50,000 pre-order figure only represents the "commercial sector" and "[d]oes not count" other potential customers was wildly misleading, as it implies that pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

~~296. On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge* and failed to correct the interviewer who confirmed the recent update of pre-orders was 50,000.  The following is an excerpt of that interview:~~

335.    Additionally, during his interview with *IPO Edge* on November 16, 2020, Defendant Burns failed to correct a statement by the interviewer claiming Lordstown had 50,000 pre-orders and engaged with the interviewer's statement in such a way as to leave investors with the perception that the interviewer's statement was accurate.  The following is an excerpt of that interview:

> **Interviewer**: Well, let's talk about your product, the pickup truck that you mentioned, and the demand now.  *I think the last update was 40,000, so now*

142

*we're hearing today it's up to 50,000*, which congratulations on all that. Where is the demand coming from?

**Burns**: This is a full size truck. In pickup truck world, there's two classes, full size and mid size. Full size is what the Ford 150, the Silverado, and the Ram are. I think most people know that the Silverado, the Ram, and the 150 represent number one, number two, and number three best selling vehicles in America. If the number one, number two, and three best selling vehicles don't even have a mild hybrid, right and we're coming with a full electric, we're enjoying the pent up demand. I don't know if it's going to be this aggressive all the time, but to a fleet operator that's getting 15 miles per gallon in a pickup truck, and they have to use a pickup truck for their vocation, and every thing's completely passed them by with all this electrification and all the sedans and SUVs coming out, but no work trucks, so it's coming from almost. We have to look, but we just got an order for 400 vehicles from an agriculture company. . . I think everybody has been behind a pickup truck in traffic and noticed all the different things people do with a pickup truck, so it's a best selling consumer vehicle, it's a best selling fleet vehicle, so it's just a natural that we would see this demand.

336. ~~297.~~ The statement~~(s)~~ in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore ~~were~~was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.

337. ~~298. On~~During the interview with *IPO Edge* on November 16, 2020, Defendant Burns ~~participated in an interview hosted by the investor website *IPO Edge*. During the interview, Burns~~ was asked if he could "talk about where that demand might be coming from," and Burns responded:

*We got everybody, the bulk of them, our average order is about 500 trucks per order, so larger fleets.* But we have a landscaper with three trucks. Really, it's very... since we are on par, the initial purchase price is the same as if they'd bought a gas truck. They start making money on fuel and maintenance the first day. To a landscaper, it's significant. Really, they're even more in tune to it. What we were seeing is small businesses that use trucks, and you tell them, you start making a thousand dollars a month savings, it's significant.

338. ~~299.~~ The ~~statements~~statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore ~~were~~was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.

143

339.    ~~300.~~ On November 17, 2020, <u>Defendant</u> Burns appeared on the CNBC television program *Mad Money* with Jim Cramer.  An excerpt of the interview is provided below:

> **Burns**: *We sell to commercial fleets.  That's our first customer.  And like you said, we've already got 50,000 pre-orders.  And when you sell to fleets, we couldn't do what most EV companies are doing, where you come out with the luxury price point and move downstream.*  A fleet guy would get fired for buying a luxury truck.  So we had to come out on par with the gas trucks pricing, and to do that, we had to invent a new drive train.  And that drive train had to be reasonably priced, but rough and tough enough, what people expect of a modern day pickup truck.  They think it should be able to climb a wall and haul and tow.  So we used hub motors, which are, if you think of a Lime or a Bird scooter, right?  There's no motor with a sprocket and a chain going to the back.  The motor's in the wheel.  And so we have very large versions of that.  And as a result, we didn't just kind of make a pickup truck to compared to, let's say a Ford 150, we really feel it's better on almost every metric.
>
> **Cramer**: It seems as if some of these orders, the 50,000 are from solid, Duke Energy, FirstEnergy.  These people are not going to be walking away?  They are committed?
>
> **Burns:** *Right.  Yeah.  All of them.  When you order, I think our average order size is about 500 trucks at a time.  And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial.  So you've got to plan all the charging and everything.  So it's very serious orders.*

340.    ~~301.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~<u>pre-orders</u> and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~<u>paragraphs 287-289</u>.  Furthermore, the ~~statements were especially misleading by representing~~<u>statement</u> that the pre-orders came from <u>"commercial</u> fleets<u>" was especially misleading</u> because it implied that Lordstown ~~was receiving~~<u>had received</u> reliable orders<u>,</u> representing true demand from its target market.  This was untrue<u>,</u> as the number of pre-orders was ~~completely~~ fabricated<u>,</u>~~-~~ and<u>,</u> at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

341.    302. On December 2, 2020, during the trading day, Defendant Burns participated in a conference call hosted by Credit Suisse.  During the conference call, Burns stated:

> *[W]e sell to fleets.*  I learned this at my previous company at Workhorse fleets are in big chunks.  They only buy if the duty cycle that need matches your duty cycles.  So you get happy customers and you can kind of control your geographical layout to make sure you have support centers where they need them.  So that's why we like fleets.  *We have 50,000 pre-orders already well, well in advance of what we, what we thought we would have.*  We compete mostly with internal combustion engine vehicles.

342.    303. The statements in the prior paragraph touted Lordstown's supposed pre-orderspre-orders and therefore were false and misleading for the reasons set forth in paragraph 248paragraphs 287-289.  Furthermore, the statements were especially misleading because the statement that Lordstown hashad "50,000 pre-orders already well, well in advance of what we, what we thought we would have," was especially misleading because it implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where the persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, the statements were especially misleading by representingstatement that Lordstown "sell[s] to fleets," was especially misleading because it implied that Lordstown was receivinghad received reliable orders, representing true demand from its target market.  This was untrue, as the number of pre-orders was completely fabricated, and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

343.    304. On December 2, 2020, during the trading day, Defendant Burns participated in a conference call hosted by Credit Suisse.  During the conference call, a Credit Suisse analyst

asked Burns: "How do you, how do you find these, these fleet buyers?"  ~~and Defendant~~ Burns responded:

> *[I]t's been almost all incoming.*  We're just starting to build out the sales team.  *So we've been able to do, again, these 50,000, pre-orders just by incoming the pent up demand.*  These fleets have watched all the electrification coming . . . and there's been nothing for them.  *So the, the, the pent up demand, I don't know if it'll always be this robust, it's very, very strong.  And the 50,000 doesn't include state vehicles, municipal vehicles, police vehicles, military vehicles.  It's just, that's just on the commercial side.  And so we, you know, we just it's spread across all different disciplines.  Our average order is about 500 vehicles per order.  So that's larger fleets.*

344.  ~~305.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statement that the 50,000 pre-order figure only represents the "commercial side" and does not include other potential customers is especially misleading ~~as~~because it implies that pre-orders could be even higher, when in reality, the pre-orders were already highly fabricated.  ~~The~~In addition, statement ~~was also misleading because it claimed~~that the pre-orders were "almost all incoming~~,~~" ~~further implying~~was also misleading because it conveyed that the pre-orders were credible reflections of demand, when in fact, they were highly fabricated, and reflected Lordstown's heavy use of marketing, including paying Climb2Glory hefty commissions to generate entirely non-binding orders~~, and when they reflected indications of interest between Workhorse and potential customers~~.

345.  ~~306.~~ On December 4, 2020, after markets closed, Lordstown filed a prospectus with the SEC.  The prospectus stated that: "*As of the date of this prospectus, we have received pre-orders primarily from fleet operators to purchase approximately 50,000 Endurance vehicles*."

146

346. ~~307.~~ The statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons in ~~paragraph 348~~paragraphs 287-289. Furthermore, the statement was especially misleading because the use of the word "received" implied that the ~~pre-orders~~pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a ~~non-binding~~non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the ~~statements were especially misleading by representing~~statement that the pre-orders came "primarily from fleet operators~~,~~" was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market. This was untrue, as the number of pre-orders was ~~completely~~ fabricated~~,~~ and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

347. ~~308.~~ On December 21, 2020, after markets closed, ~~Defendant~~ LTM filed a Form 8-K with the SEC. This filing stated: "*[Lordstown] has received 80,000 non-binding reservations for the Endurance to date.*"

348. ~~309.~~ The statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. Furthermore, the statement was especially misleading because the use of the word "received" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

147

349.  ~~310.~~ On December 21, 2020, while markets were open, ~~Defendant~~ LTM posted the following false and misleading message via its Twitter account:



350.  ~~311.~~ The statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, this statement was especially misleading because it referred to the 80,000 figure as a "milestone" signifying that it was an important metric, when in reality, it did not meaningfully represent actual demand for the Endurance.

351.  ~~312.~~ On January 11, 2021, before markets opened, ~~Defendant~~ LTM issued a press release that included the following statement, including statements attributed to Defendant Burns:

> Lordstown Motors Corp. (Nasdaq: RIDE), ("Lordstown Motors"), an emerging OEM producing electric light duty trucks focused on the commercial fleet market, has **received more than 100,000 non-binding production reservations from commercial fleets for its Lordstown Endurance™ all-electric pickup truck, with an average order size of nearly 600 vehicles per fleet.**
>
> **"Receiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history,"** said Steve Burns, CEO of Lordstown Motors. **"Adding in the interest we have from federal, state,**

*municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry.*"

352. ~~313.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. Furthermore, the statements were especially misleading because the use of the words "received" and "production reservations" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. In addition, the ~~statements were especially misleading by representing~~statement that the pre-orders came "from commercial fleets~~,~~" was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market. This was untrue, as the number of pre-orders was ~~completely~~ fabricated~~,~~ and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations. Also, the statement conveys that the 100,000 pre-order figure does not include government fleets, which is wildly misleading as it ~~implies~~implied that pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

353. ~~314.~~ On January 14, 2020, while markets were open, ~~Defendant~~ LTM posted the following false and misleading message via its Twitter account:

149



**Lordstown Motors** ✔ @LordstownM... · Jan 14 ···
After receiving more than 100,000 non-binding production reservations from commercial fleets, Lordstown advanced talks for U.S. retooling loan for EV truck factory. Read more from @Reuters below. #RideWithLordstown #Workforit

354. ~~315.~~ The ~~statements~~statement in the prior paragraph was false and misleading because it claimed that Lordstown's had 100,000 reservations, when in fact, it was including within that number LOIs that had been made with parties to Workhorse, supposed reservations where no LOI existed at all, supposed reservations where the counter-party either was not plausibly in a position to order the stated number of trucks or ~~where the counter-party~~they had indicated that they were unlikely to order the stated number of trucks. Furthermore, the statement was false and misleading because the statement claimed the "reservations" were from "fleets," when they were often from individuals or non-fleet organizations, including non-profits that did not operate fleets, and intermediaries that did not operate fleets.

355. ~~316.~~ On January 28, 2021, before markets opened, ~~Defendant~~ LTM issued a press release stating: "[W]e remain on track to meet our September start-of-production timeline *while continuing to see indicators of strong demand.*"

356. ~~317.~~ The statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. Furthermore, the statement that ~~Defendants claimed~~ demand was "strong" was highly misleading, as the basis for the purported demand was fabricated pre-orders.

150

357.    318. On February 6, 2021, while markets were open, Defendant Burns appeared for an interview on the popular investment YouTube Channel "Jack Spencer Investing."  The following is an excerpt of that interview:

**Spencer**:  So I remember, I think the first number we had from you guys was when the initial investor presentation came out with something around like 28,000.  And then I remember it just kept going up and up and up.  And it was just, it was immense.

**Burns**: *Yeah.  Yeah.  And again, all those numbers are just commercial fleets. That doesn't count municipality, state vehicles, federal vehicles, military vehicles, all those folks use a lot of pickup trucks.  And most of them use them in a local fashion, so the range is perfect for them.  So they can't do pre-orders. They're government entities.   So that a hundred thousand that we've announced doesn't even count all that.*

**Spencer**: Yeah, jeez.  So that's literally just for fleets?

**Burns**:  *Yeah.  That's just commercial fleets.*

**Spencer**: I don't think anybody's going to be upset to hear that piece of news though.  That's awesome.  And what's the average order at now?  Was it 600, the latest one?

**Burns**: *Yeah.  That's on the commercial side.*

**Spencer**: 600 on the commercial side.  And would there be a few bigger names in there that you can share or would it be a lot of bits and pieces going on?

**Burns**:  *Well, I think we just shared a few of them.  Like Duke Energy was a big one.  ServPro was a big one.  I think we're either going to give a list of them or name a few more key other ones, but right now we're trying to keep it as a big number.  And for our purposes, the reason you do pre-orders, this business of tooling up, all the money you spend on tooling, you tool based on how many you're going to sell.*  And let's say it's a normal business and you get caught by surprise and people want your product more than you had planned to build.  You find a way.  In this business, it's a year lag time.  You've got to plan a year ahead of time.  And I think Musk invented this and it's really brilliant.  Let's give them a good feel for what this vehicle is and ask them, "Would you order it if we make it for this price in this timeframe, and these specs?" And that lets us know.  That appetite lets us know what to tool for.  *So we've been really surprised by these numbers.  So we are then trying to prepare to build more than we originally had planned.*

\* \* \*

151

**Burns**: Well, all I can tell you is these big ones, if a company to orders 600 pre-orders, that is signed by the CEO of that company all likelihood or at least some C-suite person. They take it very seriously. They've got to figure out how they're going to layer these electrics in there. And the appetite for them to do that way early like that, a year out from some of them means they're trying to do their part to ensure this comes to market. So they're standing behind it and they're putting these pre-orders in. But I'd say it's much stickier than a consumer putting a hundred dollars down refundable down on a Cybertruck, let's say. ***And I think these orders are very, very sticky because I know what it takes to get them, the education you have to do. This isn't somebody again on a website, a hundred bucks, refundable with a credit card. This is a fleet. And fleets generally take their business very, very seriously. So I think they're very sticky***.

358. ~~319.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. Furthermore, the statements were especially misleading by characterizing the pre-orders as "very, very sticky[,]" which implied that the pre-orders were concrete, when in reality, the purported "~~pre-orders~~pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them. ~~In addition, the statements were especially misleading by representing~~Internal Lordstown documents reveal that Defendants knew that many of their supposed pre-orders were far from "sticky[,]" and Defendant Burns noted in a September 12, 2020 email that "some of the pre-orders are more solid than others." In addition, the statement that the pre-orders came entirely from "commercial fleets~~,~~" was especially misleading because it implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market. This was untrue, as the number of pre-orders was ~~completely~~ fabricated~~,~~ and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations. Also, the statement conveys that the 100,000 pre-order figure does not include government fleets, which is wildly misleading, as it implies that

152

pre-orders could be even higher, when in reality, the "received" pre-orders were already highly fabricated.

359. ~~320.~~ On February 17, 2021, Lordstown hosted a news conference. During that conference, on behalf of ~~Defendant~~ LTM, Chris Kerzich, claimed: "***demand for the Endurance has been overwhelming. And so we have a really interesting market of, of the fleet commercial user. Right now we have over 100,000 pre-orders for the Endurance***."

360. ~~321.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. Furthermore, the statements ~~were especially misleading by representing~~ that demand was "overwhelming" and from "fleet commercial user[s]" were especially misleading because ~~it~~they implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market. This was untrue, as the number of pre-orders was ~~completely~~ fabricated, and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

361. ~~322.~~ On February 17, 2021, Lordstown hosted a news conference. During that conference, on behalf of LTM, Chris Kerzich, claimed: "***as we stated earlier, we have overwhelming demand for commercial, from commercial users for this vehicle – over a hundred thousand pre-orders, uh, right now it's gonna take us a couple of years to fulfill that demand. We are really trying to ramp up as fast as we can to, to meet the demand.***"

362. ~~323.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289. Furthermore, the statements ~~were especially misleading by representing~~ that Lordstown had "overwhelming demand" from "commercial users" were

153

especially misleading because ~~it~~they implied that Lordstown ~~was receiving~~had received reliable orders, representing true demand from its target market.  This was untrue, as the number of pre-orders was ~~completely~~ fabricated~~,~~ and, at a minimum, involved a significant number of made-up orders from individuals and non-fleet organizations.

363.  ~~324.~~ On February 23, 2021, *Yahoo Finance* hosted an interview with Defendant Burns.  During the interview ~~Defendant~~, Burns was asked "how many pre-orders do you have and who's ordering these trucks?" ~~and~~ Burns responded:

> Yeah.  We set out a fleet.  This is a full-size pickup truck, and as I think most people know, it's a favorite of consumers and of workers.  ***Our initial foray is into fleets and we have pre-sold 100,000 of these to various fleets across America. So, really a big appetite.***  You've got a fleet that's been using a 17 mile per gallon pickup truck for the last 30 years and we come out with one that gets the equivalent of 75 miles per gallon.  And it's just what we had hoped, a lot of pent up demand, a lot of excitement around it.  And you do these pre-orders to get a feel what to tool for.  In this business, tooling and all the costs associated with the automation required to bring these to market.  ***And so it gives you a good feel of what to tool for, what to build for, and we've been just really happy with 100,000 pre-orders.***

364.  ~~325.~~ The statements in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore were false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statements were especially misleading because the use of the word "pre-sold" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" were anything but concrete, and often, for example, were based on supposed deals where ~~the~~ persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.  In addition, this statement was misleading because it claimed that the 100,000 ~~orders~~pre-orders came from fleets, when in reality, they came from a variety of individuals and non-fleet organizations.

365.    326.  On February 23, 2020, after markets closed, ~~Defendant~~ LTM posted a message to its Twitter account linking to the *Yahoo Finance* interview mentioned in paragraph ~~348~~363.  The false and misleading Twitter ~~message~~post was as follows:



366.    327.  The statement in the prior paragraph touted Lordstown's supposed ~~pre-orders~~pre-orders and therefore was false and misleading for the reasons set forth in ~~paragraph 248~~paragraphs 287-289.  Furthermore, the statement was especially misleading because the use of the word "pre-sold" implied that the pre-orders were concrete, when in reality, the purported "pre-orders" supporting the 100,000 figure were anything but concrete, and often, for example, were based on supposed deals where ~~the~~persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

367.    On June 15, 2021, Defendant Schmidt—then President of Lordstown—participated at an Automotive Press Association event in Detroit.  At that event, Schmidt stated: ***"Currently, we have enough orders for production for '21 and '22. . . . Those are firm orders we have for those two years."***  When questioned if they were binding orders, Schmidt responded: ***"they are basically binding orders that are committed here in the last two***

155

*weeks, reconfirmed orders. They're pretty solid, and I think that's on the light side or conservative side."*

368. The statements in the prior paragraph touted Lordstown's supposed pre-orders and therefore was false and misleading for the reasons set forth in paragraphs 287-289. Furthermore, the statements were especially misleading because the use of the words "firm orders," "binding orders," and "reconfirmed orders" implied that the pre-orders were concrete, when in reality, Lordstown's purported "orders" were anything but concrete, and often, for example, were based on supposed deals where persons or entities signed a non-binding LOI, did not even sign a non-binding LOI, or were clearly not in a position to order the number of trucks Lordstown was counting from them.

**(2)    Statements Concerning Lordstown's Production Capabilities**

369. ~~328.~~ Statements touting Lordstown's supposed production capabilities, including its ability to begin production in September 2021, were false and misleading~~,~~ because Lordstown did not realistically have any hope of beginning the kind of production it was boasting of during that time period. ~~While Lordstown may literally manufacture some vehicles in that month, the~~, had been advised that, even in a best case scenario, Lordstown would not begin production until many months later than the September 2021 start of production date they touted, and was reliant on a parts supply arrangement with GM that was uncertain from the start of the Class Period and had badly broken down and lead to delays early in the Class Period..

370. The statements conveyed that Lordstown would begin commercial production and ~~begin delivering~~deliver vehicles in that time period, but this omitted to disclose the present fact that doing so was unrealistic or impossible, given the development, manufacturing, and regulatory steps that the ~~company~~Company would need to ~~be~~ complete ~~by that time to~~

156

~~begin~~before beginning commercial production.  At the time of making of these statements, Defendants omitted to disclose present facts about its current development, production, and regulatory progress that rendered its statements claiming production would begin in September 2021 materially incomplete and misleading.  ~~The lauded September~~Defendants also omitted to disclose that they had been advised that the claimed deadline was unachievable.  The claimed September 2021 production date was material to investors because it conveyed information about the status of Lordstown's production capabilities and regulatory process, and because it was highly relevant to when Lordstown would begin generating revenue and ~~when it would~~ become profitable.

371.    ~~329.~~ Statements claiming that Lordstown had (or, upon completion of the Merger, would have) the financial resources needed to begin production in September 2021 were false and misleading because Lordstown did not have the financial resources needed to begin production in that time frame.  Defendants failed to disclose specific information about the costs and expenses necessary to begin commercial production.  Information about whether Lordstown had the financial resources needed to begin production in September 2021 were material to investors because they conveyed important information about the status of Lordstown's production capabilities, conveyed important information about the ~~risks~~risk that Lordstown would become insolvent or risk insolvency and need to issue a "going concern" notice, conveyed important information about the risk to investors that their shares would be diluted or otherwise made less valuable through capital markets or other fundraising activity, and conveyed important information about the prospect and timeline over which Lordstown could be expected to generate revenue and positive cash flows.

157

372.    330. On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a press release issued by Lordstown and DPHC.  The press release stated:

> *To accomplish Lordstown's mission, in November 2019 the company purchased the former General Motors Lordstown Assembly Plant, a 6.2 million square foot facility estimated to be capable of producing in excess of 600,000 electric vehicles annually, with only modest incremental investment. Lordstown is believed to be one of the first electric vehicle manufacturers to acquire a near production ready plant.  The Lordstown complex provides Lordstown with critical flexibility and line-of-sight to production, immediate access to a well-trained and highly capable workforce in Ohio's Mahoning Valley, and positions Lordstown to be first to market.*

373.    331. The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29369-371.

374.    332. On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez, and Flannery.  The presentation included the following graphic, which contains a false and misleading statementsstatement:

> The Lordstown Complex transferred in a near production-ready state and capable of large annual production volume with only modest incremental investment

375.    333. The statementsstatement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore was false and misleading for the reasons stated in paragraphs 328-29369-371.  Specifically, it was especially misleading that Lordstown boasted of

158

the capabilities of the plant because it implied that the ~~company~~Company could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

376.    ~~334.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by ~~Defendant Lordstown, and thus DPHC and Lordstown made the statements therein~~Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez, and Flannery.  The presentation included the following graphic, which contains false and misleading statements:

| Capital Structure | • Lordstown will have $675mm of cash to fund operations and growth<br>• **No additional capital requirements expected between now and going to market to achieve positive cash flow** |
|---|---|

377.    ~~335.~~ The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs ~~328-29~~369-371.  The statements were especially misleading because they claimed that~~,~~ in addition to having the financial resources ~~needs~~needed to begin production, Lordstown would ~~also~~ have resources to meet the ~~much more~~ challenging ~~further~~ step of operating profitably, *i.e.*, having positive cash flows.

378.    ~~336.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included an investor presentation issued by Lordstown.  Internal Lordstown documents reveal that, prior to its filing with the SEC, the presentation was reviewed by Defendants Burns, Schmidt, Rodriguez, and Flannery.  The presentation stated: "***Based on the***

*excellent condition of the plant and equipment at the Lordstown Complex, LMC Projects ~$120 million of investment to retool the equipment for full production readiness*."

379. ~~337.~~ The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore was false and misleading for the reasons stated in paragraphs ~~328-29~~369-371.  Specifically, it was especially misleading that Lordstown boasted of the condition of the ~~Plant~~plant because it implied that the ~~company~~Company could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

380. ~~338.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of an analyst call that Defendants Burns ~~and Hamamoto~~ participated in.  Internal Lordstown documents reveal that Defendant Burns was involved in drafting the script used for the August 3, 2020 conference call.  The following statement was uttered by ~~Defendant~~ Hamamoto during that call:

> Based on strong investor demand, the PIPE was upsized to 500 million dollars, anchored by GM as well as several long-term institutional investors, including Fidelity, BlackRock and Federated.  ***This capital will fully fund Lordstown's current business plan and position the company to achieve positive EBITDA and cash flow, and there are no cashing out shareholders.  Finally, we feel investors have the opportunity to buy into this exciting and high-growth company at a very compelling valuation, especially on a relative basis.***

381. ~~339.~~ The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs ~~328-29~~369-371.  The statements were especially misleading because they claimed that, in addition to having the financial resources ~~needs~~needed to begin production, Lordstown

160

would ~~also~~ have resources to meet the ~~much more~~ challenging ~~further~~ step of operating profitably, *i.e.*, having positive cash flows.

382.    ~~340.~~ On August 3, 2020, before markets opened, DPHC filed proxy materials with the SEC, which included a transcript of an analyst call that Defendants Burns ~~and Hamamoto~~ participated in.  Internal Lordstown documents reveal that Defendant Burns was involved I n drafting the script used for the August 3, 2020 conference call.  The following statement was uttered by ~~Defendant~~ Hamamoto during that call:

> Through the combination of DiamondPeak cash in trust and the 500 million dollar PIPE investment we expect to add 675 million dollars to the pro-forma Balance Sheet.  ***The cash proceeds will be used to fund production of the Endurance and we do not expect that we will need any additional equity capital requirements to achieve positive cash-flow.  We expect to achieve breakeven or better EBITDA margins in 2022, our first full year of production, and eclipse 10 percent by 2024.***

383.    ~~341.~~ The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs ~~328-29.   The statement was~~ 369-371.   The statements were especially misleading because ~~it~~ they claimed that, in addition to having the financial resources ~~needs~~ needed to begin production, Lordstown would ~~also~~ have resources to meet the ~~much more~~ challenging ~~further~~ step of operating profitably, *i.e.*, having positive cash flows.

384.    On August 3, 2020, after markets closed, Defendant Burns appeared for an interview on CNBC.  During that interview, Burns stated: "***We have a factory and prototype and we are marching towards production.***"

385.    The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial

production, and therefore was false and misleading for the reasons stated in paragraphs 369-371.  Additionally, Defendant Burns' statements in the prior paragraph touted Lordstown's supposed production readiness.  However, this was not the case, as internal Lordstown documents reveal that on that very same day, Defendants Burns, Shane, and Schmidt communicated via email that the truck was still "missing parts," and that Lordstown "can't show the front" on camera during the interview.  Indeed, the front of the truck was only clearly displayed through a still photo, during the CNBC interview – whereas the back of the truck shown behind Burns while he spoke.

386.  342.  On October 26, 2020, after markets closed, Defendant Burns appeared on video to "ring the bell" at the NASDAQ.  He made the following statementstatements: "*This brings the final chapter where we get the necessary resources to be able to bring [the] Endurance all the way to market. . . .  We fully intend for this to be the first full-size electric pickup truck in the world, specifically in the US.  And we are on target to do that in September*."

387.  343.  The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 328-29369-371.  Specifically, it was especially misleading that LordstownDefendant Burns boasted the capabilities ofof Lordstown's production capabilities because it implied that the companyCompany could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

388.  344.  On October 26, 2020, after markets closed, LTM issued a press release stating, which quoted Defendant Burns as stating: "*We have a near production-ready plant and*

162

*approximately $675 million in proceeds from this transaction, which is more than enough funding to get us through initial production.*"

389. 345. The ~~statements~~statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore ~~were~~was false and misleading for the reasons stated in paragraphs ~~328-29~~369-371. The statements were especially misleading because ~~they~~Defendant Burns claimed that Lordstown had the financial resources needed to begin production.

390. 346. On October 26, 2020, during the trading day, *The Detroit News* published an article that included statements from Defendant Burns. A relevant passage quoting ~~Defendant~~ Burns was as follows:

> "*It gives us the financial acumen to be able to get this done*," Burns said of the merger, noting that he chose to go through a special purpose acquisition company rather than a traditional public offering because it's faster. "*Since we're in a race to be first, it was really important for us to get that funding, so that we could be assured of production by September*."

391. 347. The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs ~~328-29.~~369-371. The statements were especially misleading because Defendant Burns claimed that Lordstown had the financial resources needed to begin production.

392. 348. On October 26, 2020, during the trading day, ~~the~~*The* Detroit News published a video of Defendant Burns discussing Lordstown. Burns stated: "*September deliveries start*. We have pre-sold 40,000 of them to fleet customers already and we expect that number to increase dramatically between now and then."

163

393.    349. The statements statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were was false and misleading for the reasons stated in paragraphs 328-29 369-371.  Specifically, it was especially misleading that Lordstown because Defendant Burns boasted that deliveries would start in September, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

394.    On November 12, 2020, Lordstown published an S-1 Registration Statement with the SEC, which was signed by Defendants Burns and Rodriguez.  In that Registration Statement, Defendants Rodriguez and Burns stated:

> The Endurance body is designed to be fully compatible with existing third-party parts, upfitting options and accessories.  This design is expected to enable us to take advantage of an agreement *we have entered into with GM that provides us with access to certain non-customer-facing GM parts, including airbags, steering columns and steering wheels.  We expect that this arrangement will reduce the time that it will take to build out our supply chain and bring the Endurance to market and reduce our tooling and development costs.*

395.    The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 369-371.  Specifically, it was especially misleading that Lordstown and Defendant Rodriguez and Burns claimed Lordstown had access to GM parts and that such arrangement would reduce the time it would take to bring the Endurance to market because, by the time of this statement, Lordstown knew that GM had informed it that it would not be able to provide the requested parts and that the lack of access to these GM partes would further render Lordstown's touted September 2021 start of production date impossible.

164

396.    350.  On November 16, 2020, before markets opened, ~~Defendant~~ LTM filed a Form 8-K with the SEC, attaching a press release.  The press release was titled: "Lordstown Motors Releases Business Updates; ***Remains on Track to Begin Production of the Lordstown Endurance in September 2021***."  The first line of the press release stated:

> Lordstown Motors Corp. (Nasdaq: RIDE), ("Lordstown Motors"), a leader in electric light duty trucks focused on the commercial fleet market, today announced recent commercial, operational and strategic developments, ***as it remains on track to begin production of the Lordstown Endurance, the world's first full-size, all-electric pickup truck, in September 2021***.

397.    351.  The ~~statement~~statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore ~~was~~were false and misleading for the reasons stated in paragraphs ~~328-29~~369-371.  Specifically, it was especially misleading that Lordstown touted that the Endurance would be produced ~~in~~ in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

398.    352.  On November 16, 2020, Defendant Burns participated in an interview hosted by the investor website *IPO Edge*.  During the interview, Burns stated: "***Our first fully electric full size pickup truck, the Endurance, is coming out in September.***"

399.    353.  The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore was false and misleading for the reasons stated in paragraphs ~~328-29~~369-371.  Specifically, it was especially misleading that ~~Lordstown~~Defendant Burns boasted that the Endurance was "coming out in September," when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

400.     On November 17, 2020, Defendant Burns appeared on CNBC's *Mad Money* and claimed that GM "***has opened up their parts bin***" to Lordstown.

401.     The statements in the prior paragraph touted Lordstown's supposed access to parts that would be necessary for it to bring the Endurance to market and was therefore false and misleading for the reasons stated in paragraphs 369-371.  Specifically, by the time of this statement, Defendant Burns knew that GM had informed Lordstown that it would not be able to provide the requested parts and that the lack of access to these GM parts would further render Lordstown's touted September 2021 start of production date impossible.

402.     ~~354.~~ On December 21, 2020, after markets closed, ~~Defendant~~ LTM filed a Form 8-K with the SEC.  This filing stated: "***The Company remains on track to begin production of the Endurance in September 2021***."

403.     ~~355.~~ The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore~~,~~ was false and misleading for the reasons stated in paragraphs ~~328-29~~369-371.  Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in ~~in~~ September 2021, when in reality, Lordstown was unequipped to bring ~~a truck~~the Endurance to production by September 2021.

404.     ~~356.~~ On January 11, 2021, before markets opened, LTM issued a press release that included the following statement:

> The Lordstown Endurance is a full-size, all-electric pickup that has a range of 250 miles, the equivalent of 600hp and can tow up to 7,500lbs.  ***After successful prototype and Alpha builds, Lordstown is now building the first Beta Endurance vehicles and is on track for start of production in September of this year.***  The initial Endurance is a crew cab configuration with medium bed length, priced at $45,000 after federal rebate.

405.   357. The statementsstatement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore werewas false and misleading for the reasons stated in paragraphs 328-29369-371.  Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

406.   358. On January 28, 2021, before markets opened, Defendant LTM issued a press release stating: "*[W]e remain on track to meet our September start-of-production timeline while continuing to see indicators of strong demand.*"[11][18]

407.   359. The statementsstatement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore werewas false and misleading for the reasons stated in paragraphs 328-29369-371.  Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

408.   360. On February 18, 2021, after markets closed, Defendant Burns appeared on CNBC for an interview.  The interviewer asked Burns "in terms of the September timeframe for full production of the Endurance Steve, do you have enough liquidity to get you to there from here?"  Burns responded: "*Yep.  We've been really maniacal about that and we're on track*."

409.   361. The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin

---

[11][18] The statement concerning demand is also alleged to be false and misleading, but has not been highlighted in this sub-Section because it is addressed in Section V(A)(1)the prior section.

167

commercial production, and therefore, was false and misleading for the reasons stated in paragraphs 328-29369-371.  Specifically, it was especially misleading that LordstownDefendant Burns boasted the capabilities ofof Lordstown's production capabilities because it implied that the companyCompany could achieve its production timeline, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

410.  362. On February 23, 2021, *Yahoo Finance* hosted an interview with Defendant Burns.  During the interview, Burns stated: "***Production starts in September***."

411.  363. The statement in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore, was false and misleading for the reasons stated in paragraphs 328-29369-371.  Specifically, it was especially misleading that LordstownDefendant Burns boasted that the Endurance would be produced in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

412.  364. On March 17, 2021, after markets closed, Defendant LTM issued a press release that stated:

> "***Timeline to Start of Production (SoP) in September 2021 remains on track***, with beta prototype build underway and the first beta vehicles to be ready by the end of March; vehicles to be sent for durability, crash, validation, and lighting testing with various partners and to early initial customers for feedback."

413.  365. The statement(s) in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore, was false and misleading for the reasons stated in paragraphs 328-29369-371.  Specifically, it was especially misleading that Lordstown boasted that the Endurance would be produced in in September 2021, when in reality, Lordstown was unequipped to bring the Endurance to production by September 2021.

168

414. On June 15, 2021, Defendant Schmidt—then President of Lordstown—participated at an Automotive Press Association event in Detroit. At that event, Schmidt stated: *"Currently, we have enough orders for production for '21 and '22. . . . Those are firm orders we have for those two years."* When questioned if they were binding orders, Schmidt responded: *"they are basically binding orders that are committed here in the last two weeks, reconfirmed orders. They're pretty solid, and I think that's on the light side or conservative side."*

415. The statements in the prior paragraph touted Lordstown's supposed production capabilities and misrepresented the investment necessary for Lordstown to begin commercial production, and therefore were false and misleading for the reasons stated in paragraphs 369-371. Specifically, it was especially misleading that Defendant Schmidt boasted that the Company had "enough orders for production for '21" when in reality, Lordstown was unequipped to bring the Endurance to production at any time in 2021.

### (3) Defendants' Omissions of Information Required by Item 105

416. ~~366.~~ The federal securities laws—in particular, Regulation S-K, Item 105 (17 C.F.R § 229.105)—require that certain public filings include a description of "the material factors that make an investment in the registrant or offering speculative or risky~~.~~" ("Item 105 Disclosure"). These Item 105 Disclosures must be made in proxy statements, registration statements, and quarterly and annual reports.

417. ~~367.~~ The failure to disclose the information required by Item 105 Disclosures is a material omission and actionable under §14(a) and §10(b) ~~and §14(a)~~. The failure to disclose the required material rendered the proxy statements, registration statements, and quarterly and annual reports that Lordstown issued during the Class Period materially misleading because

investors would reasonably expect that those statements disclosed all material required by Item 105, such that the absence of such disclosure indicated to investors that there was no such additional material required to be disclosed—*i.e.*, no additional risks to disclose.  The failure to disclose material risks is material to investors because this information helps investors to understand the company they are investing in, and the specific factors that make investment in that company risky.  Defendants provided certain generic risk language, but failed to adequately disclose the material risks that made investment in Lordstown risky.

418.    As explained herein, Defendants Burns, Flannery, Schmidt, and Rodriguez were involved in the preparation of the proxy materials and/or the solicitation of proxy votes with respect to the Proxy Materials related to the Merger.

419.    368. On August 24, 2020, before markets opened, DPHC published the following risk language in its proxy materials, which materials included a letter signed by Defendant Hamamoto:

> The design, manufacture and sale of vehicles is a capital intensive business. Although Lordstown anticipates that the funding from the Business Combination will provide sufficient capital to fund the completion of the Endurance and the retooling of the Lordstown Complex necessary to commence commercial production, Lordstown's business plan to design, produce, sell and service commercial electric pickup trucks, including the Endurance, is expected to require continued capital investment to fund operations, continue research and development and improve infrastructure.  Unlike established OEMs that have greater financial resources than Lordstown does, there can be no assurance that Lordstown will have access to the capital Lordstown needs on favorable terms when required or at all.  If Lordstown cannot raise additional funds when Lordstown needs them, Lordstown's financial condition and business could be materially adversely affected.

420.    369. This statement in the prior paragraph failed to disclose the risk that Lordstown would need significantly more capital than it was raising to even begin commercial production of the Endurance truck, and instead claimed that the Merger would provide sufficient

170

capital to begin such production.  Lordstown failed to disclose the risk that it would lack sufficient capital to begin commercial production, because the money made available to Lordstown in the Merger was simply insufficient to begin production—even if no major unforeseen events occurred.  In other words, DPHC failed to disclose that Lordstown's purported production plan was unrealistic and simply did not provide sufficient capital to reach its goals. Lordstown also failed to disclose the risks and uncertainties imposed by its reliance on an underdeveloped parts supply arrangement with GM or the delays that were caused by the breakdown in that arrangement.

421.   370.  On October 8, 2020, after markets closed, DPHC published a proxy statement with the materially the same risk language listed in paragraph 368419, and again failed to disclose the material risks identified in the paragraph 369.  That proxy statement was signed by Defendant Hamamoto and included a letter signed by Defendant Hamamoto.420.

422.   371.  On November 12, 2020, after markets closed, Defendant LTM published a Registration Statement, with materially the same risk language listed in paragraph 368419, and failed to disclose the material risks identified in the paragraph 369.  That proxy statement was signed by Defendant Hamamoto and included a letter signed by Defendant Hamamoto.420.

423.   372.  On November 15, 2020, Defendant LTM published a quarterly report on Form 10-Q that incorporated by reference the same risk language listed in paragraph 368419, and again failed to disclose the material risks identified in the paragraph 369420.  That 10-Q was signed by Defendants Burns and Rodriguez.

424.   373.  On December 1, 2020, Defendant LTM published an amended Registration Statement with materially the same risk language listed in paragraph 368419, and again failed to

171

disclose the material risks identified in the paragraph ~~369~~420.  That amended Registration Statement was signed by Defendants Burns~~,~~ and Rodriguez~~, and Hamamoto~~.

425.  ~~374.~~ On December 4, 2020, after markets closed, Defendant LTM filed a prospectus with the SEC with materially the same risk language listed in paragraph ~~368 prior~~419, and again failed to disclose the material risks identified in the paragraph ~~369~~420.

### B. Allegations of Scienter as to Certain Claims

426.  ~~375.~~ The ~~allegations in this Section allege scienter as to each Defendant, except Defendant Hamamoto.  The~~ inference and conclusion that Defendants acted with scienter, *i.e.*, that ~~they intended to mislead~~Defendants acted with intent when misleading the investing public or ~~were reckless~~acted with recklessness as to the ~~possibility~~prospect of misleading the investing public, is supported by the following facts.  While organized into sub-Sections for readability, many of the following allegations of scienter are mutually corroborating in demonstrating Defendants' scienter.

### (1) Motive and Circumstantial Evidence of Scienter

427.  ~~376.~~ From the moment Defendant Burns founded Lordstown, it had a very unique trajectory.  After Burns had been ousted from Workhorse ~~and~~, Lordstown offered him an opportunity to revive his career.  Everything about Lordstown's business was predicated upon buying the Lordstown plant from GM, which was itself a unique opportunity likely only existing due to political pressure on GM to sell the plant—in the words of President Trump, GM was to "do something quickly."

428.  ~~377.~~ Defendant Burns had the unique opportunity to buy the Lordstown plant, but it also posed huge challenges.  The plant was one of the largest automotive plants in the country, and such plants are either on or off—they are not built for limited small batch production.  This

meant that Burns needed a business plan whereby he could sell the idea that the business would reach scale immediately.

429.    ~~378.~~ At the same time, prior to the Merger, Defendant Burns had supposedly "endeavored" to find financing~~,~~ but ~~had~~ failed to do so.  ~~He~~Burns needed financing to convert the abandoned GM plant into something that could be useful to the nascent startup.  Recall, at the time of the Merger, Lordstown had essentially no assets.

430.    ~~379.  So~~Therefore, Defendant Burns needed a narrative that would convince investors to approve the Merger so that he could get financing for the plant.  The pre-order lie was the perfect solution.  Burns could tell investors that ~~Defendants~~Lordstown had an innovative business idea, and a batch of customers ready to buy—the missing ingredient was just investor cash that could allow the ~~company~~Company to meet a production schedule.  ~~Defendant~~ Burns told investors that the only cash he needed was what would be raised in the Merger, and that the ~~company~~Company would start selling in less than a year.  It was exactly the story Burns needed to tell to get investors to back his project.

431.    ~~380.~~ Without Defendants' misrepresentations about the pre-order quantities and production capabilities of the business, the ~~company~~Company likely would have ~~failed~~immediately.  This unique motive—the motive to avoid the existential risk of insolvency by raising money under false premises in a take-public Merger—goes far beyond the ordinary motive of executives to manage a company profitably.  This motive strengthens the inference of scienter—*i.e.*, the common-sense conclusion that Defendant Burns succumbed to this motive and defrauded investors is compelling, especially in conjunction with the other allegations of scienter alleged herein.

173

**(2)      Scienter as to Lordstown's Supposed Pre-Orders**

432.    381.  While the pre-orders were publicly described as a legitimate tool for Lordstown to assess the demand for its product, numerous facts demonstrate that the true purpose of developing the order book was to mislead investors about the value of the business.

382. **Defendants Used the Pre-Orders to Sell Lordstown to Investors.**  Many facts show that Defendants viewed the gathering and lauding of pre-orders as a key tool to persuade investors to place a high value on Lordstown's stock.  This fact directly indicates that Defendants understood the importance of the information to investors and the risk that investors would be misled if Defendants misrepresented those pre-orders.  It also supports the inference that the now-admitted misrepresentations were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled.  Further, former employees of Lordstown establish that Defendants intentionally permitted the pre-order book to be inflated as part of their effort to induce investors to place a high value on the company.

433.    Defendant Burns was personally involved in overseeing the pre-orders and was thoroughly aware of the true content of Lordstown's pre-order books, as evidenced by the email communications discussed herein, as well as statements by Hamamoto, statements by CWs, Burns' own public statements, which purported to speak about the pre-orders with specificity, and his role as Lordstown's CEO, given the importance of the pre-orders to Lordstown's business.  Burns also made statements claiming that he was knowledgeable about Lordstown's sales processes.  For example, on February 6, 2021, Burns stated in an interview posted to YouTube: "And I think these orders are very, very sticky because I know what it takes to get them."

174

434. In an interview with Lead Counsel, Hamamoto explained that Defendant Burns "certainly gave the impression that he was very involved" in overseeing Lordstown's pre-orders and sales force, and "definitely positioned himself as if he were intimately involved in" discussing the issue with Lordstown's sales force. Hamamoto further recalled Burns "continually" telling himself and others that "these were real orders signed by C-suite executives." Hamamoto also recalled that Lordstown's Board would receive presentations about the pre-orders and believed Burns was the one making those presentations. Likewise, Hamamoto explained that "production and pre-orders were two things that Steve [Burns] tended to focus on[.]" When asked how closely Burns tracked the pre-orders and whether he would know about particular deals with non-fleet customers, Hamamoto responded: "I think so. He was pretty focused on it[,]" and added that he believed this because Burns "talked pre-orders a lot." Hamamoto agreed that orders by influencers or intermediaries, rather than commercial fleets, should not have been counted as pre-orders.

435. The specific emails discussed herein indisputably establish Defendant Burns' knowledge and/or deliberate recklessness. For example, he was personally copied on emails with the list of pre-orders, which demonstrated that he was overstating the true quantity of pre-orders from commercial fleets at any given time. As discussed herein, Lordstown itself categorized nine of its ten largest pre-order customers as deals with intermediaries, not commercial fleets. And Burns was copied on, or engaged with, numerous emails about particular supposed pre-orders in which it was made obvious that the party making the supposed pre-order was not a commercial fleet. For example, he was directly copied on correspondence about E Squared/Grid X, and personally expressed doubts about the legitimacy of that deal, and yet, he touted pre-order figures in which Grid X/E Squared accounted for a substantial portion of

175

the pre-orders.  Likewise, he was aware of the true relationship with Holman, and yet published pre-orders figures in which the arrangement with Holman was counted as contributing to a substantial portion of the pre-orders.

436.    Defendant Burns also personally understood the pre-orders were not legitimate orders but (at best) entirely non-binding letters of intent.  He was copied on emails that distinguished between "preorders" and "LOIs," indicating that there was a distinction between a mere LOI and a pre-order.  Before the Class Period even began, Defendant Flannery emailed Burns stating that that Lordstown had received requests from the media for "sales figures and total preorders," adding that it would put Lordstown "in a less than desirable position" if they published "LOIs without strong numbers [*i.e.*, actual preorders] to back us up."  Indeed, Burns sent a letter to the Ohio Attorney General on February 22, 2021, stating that "Lordstown has not entered into 'pre-orders' as your letter states.  Instead, Lordstown has entered into non-binding letters of intent . . . ."  On March 18, 2021, after the Hindenburg Report surfaced, Burns admitted that he always knew the true nature of the supposed pre-orders, placidly claiming on CNBC that "all we've done is gone out and gauge interest," and "[w]e've never said we had orders."

437.    Defendant Burns was also well aware that the pre-orders were intended primarily as a tool for generating investment in Lordstown, and that those LOIs had only been obtained (to the extent they were obtained at all) through the use of substantial marketing efforts (contrary to Burns' public representations).

438.    383. While Lordstown did not publish the LOI form in any of their public filings, the form was published by the Hindenburg Report and viewed by Lead Counsel in numerous internal documents.  Notably, while the form states, in multiple ways, that the indication of interest is entirely non-binding and states that it does not require any sort of deposit payment, one

176

of its very few concrete terms relates to using the LOI for publicity.  The LOI states that the parties will "consider cooperating in drafting and ~~release~~releasing a press release" regarding the agreement.  This indicates the direct connection between procuring the LOI's and advertising them to investors, which runs contrary to Defendant Burns' assertion that the LOIs were merely a tool to assess demand for the ~~truck~~Endurance.

439.  ~~384.~~ Lordstown relied heavily on third-party contractors from a company called Climb2Glory to procure supposed pre-orders.  This was notable for several reasons—, including because Defendant Burns had publicly claimed that the efforts to market the truck were "limited" at the time of the Merger, even though, by that time, they had already been relying heavily on Climb2Glory, who had been frantically "marketing" the Endurance since ~~at least September~~early 2020, well before the Merger.  Contrary to ~~Defendant~~ Burns' repeated representations that pre-orders had "been almost all incoming" and the result of "pent up demand," in fact, Lordstown's order book was dependent on its marketing effort, including the marketing efforts of Climb2Glory.  Furthermore, it was peculiar to describe Lordstown's marketing effort as "limited" because Climb2Glory was being paid a commission of $50 per truck pre-order, a hefty sum for entirely non-binding orders, from a company that (at that time) had essentially no spare cash.

440.  ~~385.~~ Climb2Glory published a case study on their website regarding the success of their marketing effort on Lordstown's behalf.[~~12~~19]  That case study makes clear that Climb2Glory was instructed by Lordstown as to the true purpose of running up the book of supposed orders.  First, Climb2Glory notes that when they were hired, Lordstown "was in the

---

[~~12~~19] This case study stayed on the Climb2Glory website until the Hindenburg Report surfaced and then was scrubbed from the internet, in an apparent attempt to hide the evidence; it does not appear that Climb2Glory has similarly deleted any of their case studies for other companies.

177

middle of a significant effort to raise funds to complete its preparations for full production."

Then ~~they~~the case study directly ~~state~~states: "**Fundraising efforts** were **linked directly** to the generation of customer leads and Endurance pre-orders; the more pre-orders achieved, the greater the confidence levels of prospective investors."  This same point is reiterated again later in the case study:

> Fundraising was directly linked to pre-order generation—the faster the pre-orders arrived, the greater **investors' confidence** would be in the ~~company~~[C]ompany and the faster funds would flow in.  When we met them, LMC's primary challenge was that it was not generating pre-orders fast enough.  It needed to find a way to accelerate its pre-order capture process.

441.  ~~386.~~ According to the Hindenburg Report, Climb2Glory reiterated this same sentiment—that the purpose of the pre-orders was to influence investor sentiment—during a phone interview.  The Hindenburg ~~report~~Report quotes Climb2Glory managing partner Pat Mangin, as stating:

> Because of the letters of intent from Climb2Glory and some marketing, Diamond Group came to the table and they did the reverse merger.  So our role was to help influence and acquire interest that would lead to investment.  That was Climb2Glory's role.

442.  ~~387.~~ As detailed herein, Defendants routinely used their book of supposed ~~pre-orders~~pre-orders to market the ~~company~~Company to investors, including in media appearances, proxy materials, other SEC filings, press release, and in various other events.  For example, the pre-orders were prominently featured in the investor deck, filed ~~as~~in the proxy materials, as a "Key Investment Highlight" given the supposed "[d]emand proven with pre-orders covering first year production" and with a flashy list of the logos showing "Selected Pre-Order Customers."

443.  ~~388.~~ CW-1 recalled the message from executives at Lordstown being "fairly explicit" that they needed to obtain these reservations in order to get additional financing from

178

investors.  According to CW-1, Defendant Flannery expressed this sentiment to CW-1 directly in meetings that he attended.  According to CW-1, he had multiple conversations with Flannery per week, and recalled conversations where Flannery explicitly made the point that the LOIs were for generating investment interest.  CW-1 continued to say that there was pressure to meet benchmarks of pre-orders solely for Lordstown's investment timeline.  CW-1 ~~continued to say~~further underscored that Flannery regularly said that he had spoken with ~~former CEO Steve~~Defendant Burns and provided him with updates about the pre-orders.  CW-1 noted that he could not see how Burns would not have been aware of the practices surrounding the LOIs, given his communications with Flannery, who knew everything related to sales at that time.

444.    ~~389.~~ CW-2 recalled that Defendant Flannery was Defendant Burns' "right hand man," and that much of Lordstown's staff was comprised of people with personal connections to Burns, including members of his family or his church.  As a result, according to CW-2, much of the senior staff was not qualified.  CW-2 added that much of the experience of working at Lordstown was a result of the "nature of Steve Burns."

445.    ~~390.~~ CW-2 explained that during his tenure Lordstown's sales team was comprised of Vice President of Business Development Caimin Flannery, a director of sales, and up to two sales representatives.  According to CW-2, Climb2Glory reported to Defendant Flannery and was paid a commission of $50 for each truck listed in a letter of intent, and that the sales representatives were also financially incentivized to get as many LOIs as they could.

446.    ~~391.~~ CW-2 characterized Lordstown's pursuit of LOIs, which were marketed as ~~Pre-Orders~~pre-orders, as desperate, explaining that there was "nothing binding" about the agreements Lordstown was getting, which he described as "pie in the sky."  According to CW-2, the "desperation" around reaching pre-order totals was fueled by the effort to get funding for

179

Lordstown, adding that the purpose of the pre-orders was to generate buzz and that that was "all it was for."  CW-2 advised that the pressure related to sales and the LOIs came directly from Defendants Flannery and Burns.

447.  ~~392.~~ According to CW-2, there was "zero" due diligence conducted on the ability of potential customers to support their orders based on existing fleet size "by design," adding that the company did not want to know, because they just wanted to get the signed letters.  CW-2 explained that when it came to securing letters of intent the only guideline provided to Lordstown's sales staff was to get "as many as possible in the shortest period of time."  CW-2 continued to say that there were no instructions regarding what types of customer-leads to pursue.

448.  ~~393.~~ According to CW-2, Lordstown "counted everything," as pre-orders, including all the LOIs, even if the customer's ability to fulfill them was not apparent or even likely.  CW-2 continued to say that the "pressure" to continue to grow LOI numbers "100%" came from Burns and Flannery.  CW-2 explained that Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia."  CW-2 stated that he "talked with Steve frequently," and that Burns "knew every single order" that was counted as a ~~Pre-Order~~pre-order, as well as the customers behind them.  CW-2 also recalled talking with a more senior employee at Lordstown about how the LOIs were "all smoke and mirrors."

449.  ~~394.~~ As an example of Burns' knowledge of the truth about the pre-orders, CW-~~2~~2 recalled that one of the two sales associates had gotten a 1,000 truck LOI from Innervations LLC, but that someone had done a quick search and seen that it had no operating history and was a ~~two-person~~two-person operation run out of an apartment.  According to CW-2, Lordstown spokesperson Ryan Hallett had indicated that they should not publish a press release

180

because of how weak the LOI was.  CW-2 explained that Hallett did not want to publicize the LOIs given how they were ~~non-binding~~non-binding and given that everyone at Lordstown knew that all the big orders were "BS."  Lead Counsel understands, from talking with CW-2, that a member of the sales team had called Defendant Burns to explain how sketchy the LOI with Innervations LLC was, and ~~has~~ strongly advised Burns not to publish a press release about Innervations LLC, but despite that warning, Burns went ahead with publishing a press release and counted Innervations LLC in the tally of pre-orders.

450.  ~~395.~~ Defendants blatantly misrepresented the pre-orders, in ways that further demonstrate that their true motive was to mislead investors.  While Lordstown occasionally disclosed that the orders were "non-binding," Defendant Burns frequently described them in much stronger terms, indicating his clear desire to exaggerate the veracity of the supposed orders.  *E.g.*, Burns: "*our first year of production already pre-sold.*"  (June 25, 2020); Burns: "the Endurance has been met with enthusiastic support, and to date, *we have secured $1.4 billion of pre-orders.*" (August 23, 2020); Burns: *the pre-orders represent* "over $1.4 billion of potential revenue.*" (August 3, 2020); Lordstown Investor Presentation: "*Lordstown has already received ~27K orders (average order size of ~300 trucks).*" (August 3, 2020); Burns: "*We got 27,000 orders.  We got customers really really wanting the truck.*" (August 5, 2020); President Trump, with Burns agreeing~~,~~: "*the sales are great*" (September 28, 2020); Burns: "*to have that many commercial vehicles sold already is a big deal.*" (November 16, 2020); Burns: "*we just got an order for 400 vehicles . . . our average order is about 500 trucks per order.*" (November 16, 2020); Burns: "*average order size of nearly 600 vehicles per fleet.*" (January 11, 2021).

~~396. **Defendant Burns' own admissions support scienter**.  There is no doubt that Defendant Burns always knew that the company had neither "pre-sold" the trucks nor "secured~~

181

$1.4 billion in pre-orders," that the pre-orders were neither "orders" nor "sales," that the trucks had not been "sold," and that the company did not have a 500 truck "order" or any specific "order size."  In fact, on March 18, 2021, Defendant Burns admitted that he always knew this after the Hindenburg Report surfaced, placidly claiming on CNBC that "all we've done is gone out and gauge interest," and "[w]e've never said we had orders."  The now-clear attempt to trump-up the significance of the pre-orders, combined with the undisclosed truth about the order book, firmly shows Defendant Burns' true intent was to mislead investors about the order book and its significance.

397. Similarly, Defendants frequently claimed that various potential customers associated with the government were unable to make pre-orders.  *E.g.*, Defendant Burns: "That doesn't count municipality, state vehicles, federal vehicles, military vehicle . . . they **can't** do pre-orders. They're government entities" (February 6, 2021); Lordstown: "This figure does not capture interest the company has received from organizations that are **not in position** to be able to place pre-orders."  (November 16, 2020).

398. As a threshold issue, as explained herein, the pre-order figures that Defendants were boasting did in fact include supposed pre-orders from government entities.  Therefore, these extremely specific statements by Defendant Burns clarifying where the orders were coming from were just brazenly false—and yet Burns spoke on the topic definitively.  Furthermore, not only did these statements falsely convey that there was even greater demand than implied by Lordstown's present order book (because the book did not include all these supposed potential customers), but it also created a false picture regarding the certainty of the orders that had supposedly been procured.  In other words, Defendant Burns was representing that the "pre-orders" were not mere indications of potential interest (which governmental organizations

182

obviously **could** provide), but were instead something far more firm (which government organizations "could not" provide).

399. Defendant Burns made specific statements about E Squared that evidence a brazen disregard for the truth. As previously stated, Lordstown had counted 14,000 pre-orders from E Squared, even though it was a one-man operation run out of a modest apartment, with no fleet, and no history selling to fleets—despite the fact that this order meant that E Squared's supposed order would have been worth $735 million in revenue. Even though E Squared had no operations that called for the use of multiple trucks (aside from the purported hope of one day leasing or selling trucks to potential customers), in the announcement for the pre-orders Burns stated that the arrangement "positions E Squared Energy to integrate sustainable energy systems into **every element of their business structure**." This now-obvious chicanery evidences Burns' willingness to either deliberately mislead investors or to recklessly trumpet the pre-orders without concern for the truth.

400. Defendant Burns also made statements claiming that he was knowledgeable about Lordstown's sale process. For example, on February 6, 2021, Burns stated in an interview posted to YouTube that, "And I think these orders are very, very sticky because I know what it takes to get them."

### (3) Scienter as to Lordstown's Production Capabilities

451. ~~401.~~ In a now-eerie preview of his true intent, Defendant Burns disclosed to a room of media ~~correspondence~~correspondents, at an event hosted by the *Business Journal* in Youngstown, Ohio, on March 6, 2020, that "~~in~~[i]n a lot of ways **this whole business is like a kidnapping case**, and we have to show proof of life[. ~~. . So we are doing little bits as we march toward production at the end of the year.~~]"

183

402.   This seems to have meaningfully summed up ~~Defendant~~ Burns' view of public disclosures.  ~~He~~Burns constantly provided "proof of life" updates to the market—not to accurately disclose the status of production, but to convince investors to put their confidence in him, despite the fact that the ~~company's~~Company's schedule was unachievable and that such ~~updated~~updates concealed massive risks and serious incidents at the ~~company~~Company.

452.   Most notably, Defendant Burns touted the September 2021 start of production date throughout the Class Period, even though he had been warned from the beginning of the Class Period that this was not an attainable target, including via the McKinsey Report that Burns personally received and discussed, which estimated a June or April 2022 start of production date, at best.  Defendant Burns was also well apprised of the delays and uncertainty caused by Lordstown's reliance on an underdeveloped parts supply arrangement with GM, as discussed herein.

### (4)   The "Resignations" and Conclusions of the Internal Investigation Support the Inference of Scienter

453.   ~~403.~~ The resignations of Defendants Burns and Rodriguez support the inference of scienter based on the specific facts of this case.  Both resignations occurred on the very day that the special committee of Lordstown's ~~board of directors~~Board of Directors published their report finding that the ~~company~~Company (which spoke through ~~Defendants~~ Burns and Rodriguez) had made misrepresentations.  The timing of these resignations, especially in light of the fact that the ~~company~~Company did not have replacements lined up, strongly supports the conclusion that these executives were pushed out for their misconduct.  The fact that the insiders conducting and reviewing the investigation called for the immediate ~~ouster~~ousting of ~~Defendants~~ Burns and Rodriguez strongly suggests that additional evidence available within the ~~company~~Company demonstrates that Defendants' misstatements were made with scienter.  In

184

fact, ~~Lordstown~~ Defendant Schmidt confirmed the obvious~~: that~~ at an Automotive Press Association event on June 15, 2021—the resignations were at least partially a result of the internal investigation~~, which Schmidt explained at an event at the Automotive Press Association on June 15, 2021~~.

~~404. Additionally, Defendant Burns also resigned from his role as chairman of Lordstown's board of directors.  This powerfully indicates that his resignation was not the result of any decision about his operational capabilities, but instead was the result of his misconduct.~~

454.    Indeed, in his interview with Lead Counsel, Hamamoto later confirmed that Defendant Burns' resignation occurred at the prompting of the Board, as the Board had collectively determined that Burns' resignation was what was best for Lordstown.  Hamamoto pointed to several factors that the Board considered, including that Burns failed to provide the Board with adequate financial information, the information that was brought to light by the Hindenburg Report and later confirmed by the Special Committee.

**(5)    The SEC and DOJ Investigations Support the Inference of Scienter**

455.    ~~405.~~ While the existence of government investigations is not *alone* sufficient to establish scienter, they do add support to the inference of scienter when combined with the other facts alleged herein.

456.    ~~406.~~ The fact that both the SEC and DOJ ~~are~~were investigating ~~Defendants~~and that the SEC reached settlement over the same conduct alleged in this Complaint supports the inference of scienter.  Prior to the announcement of an SEC investigation, the agency typically engages in fact finding to determine if the matter is sufficiently suspicious to warrant their attention.  That the SEC ~~has been investigating Lordstown for many months~~conducted a years-long investigation, and began such investigation even before the Hindenburg Report was

185

published, provides support for the inference of scienter.  Similarly, the DOJ investigation also supports the inference of scienter.  Defendants have admitted that the investigations relate to the same conduct at issue in this ~~case~~Action.

457.  ~~407.~~ Most importantly, the SEC investigation demonstrates scienter in a far more direct sense as well.  On February 17, 2021, Lordstown received an SEC inquiry that it admits related to the same claims alleged in this action.  Defendants either knew of this inquiry or were reckless in not knowing of the inquiry, as management of a publicly traded company (especially one of this relatively modest size) would be reckless in not knowing of an SEC inquiry into the ~~business'~~business's public disclosures.  Nevertheless, even after receiving this inquiry, Defendant Burns continued to make the same sort of false and misleading statements—including those statements that were found to be misrepresentations by the independent committee's investigation.  That ~~Defendant~~ Burns continued to make these misrepresentations after being put on notice by the SEC as to their possible illegality is nearly incontrovertible evidence of his scienter as to the statements made after February 17, 2021, and his willingness to continue to brazenly misrepresent the business ~~even after receiving an SEC inquiry~~ also strongly supports the inference of ~~Defendants~~ Burns' scienter more generally, including for the period before receipt of the SEC's inquiry.

458.  Ultimately, on March 22, 2024, the SEC filed charges against Defendant Burns for violations of the securities laws.  Specifically, the SEC summarized their complaint as follows:

> According to the SEC's complaint, Burns made misleading statements about Lordstown's business in SEC filings and other public statements, including that Lordstown had an established base of customer demand evidenced by more than 100,000 nonbinding pre-orders from commercial fleet customers.  As the complaint alleges, these statements were misleading because most of the pre-orders were not submitted by commercial fleet customers, but rather by

186

companies that did not operate fleets or intend to buy the truck for their own use, thereby creating an unrealistic and inaccurate depiction of demand for the truck from commercial fleet customers.

459.    Defendant Burns settled the claims against him with the SEC, agreeing to a permanent injunction, agreeing to pay a $175,000 civil penalty, and agreeing to be prohibited from serving as an officer or director of a publicly traded company for a period of two years.

460.    The SEC also filed charges against Lordstown.  In the settlement of that case, the SEC made certain factual findings, including that Lordstown and Defendant Burns made materially false or misleading statements about: (i) Lordstown's pre-orders for the Endurance and that Lordstown's pre-orders were not all from or primarily from a fleet customer; (ii) Lordstown's access to certain critical parts from GM to develop the Endurance; and (iii) Lordstown's ability to deliver the Endurance to the commercial fleet market.  Significantly, Hamamoto confirmed that he had no reason to doubt the SEC's findings, and further confirmed that the SEC's findings were consistent with the Special Committee's findings.  For example, the SEC recounted that the September 21, 2020 proxy statement, stated that it had "received pre-orders primarily from fleet operators to purchase over 38,000 Endurance vehicles."  But the SEC noted that, "according to the Special Committee's analysis, pre-orders from intermediaries or influencers, and not fleets, comprised over 40% of the 38,000 amount."

461.    The SEC also stated that on October 26, 2020—the first day of trading for Lordstown's common stock—Defendant Burns stated in an interview that Lordstown had "pre-sold 40,000 of [the Endurance] to fleet customers already[,]" and that on November 12, 2020, Lordstown filed a Form S-1 stating it currently had "pre-orders primarily from fleet operators to purchase over 44,000 vehicles[.]"  As the SEC noted, "[a]ccording to the Special Committee's analysis, 48% of the 40,000 amount was from intermediaries or influencers."

187

462. Additionally, the SEC referenced a press release issued on November 16, 2020, where Lordstown stated that it had "received approximately 50,000 non-binding production reservations from commercial fleets . . . ."  On that same date, Defendant Burns stated in a capital markets-oriented forum that Lordstown had "50,000 pre-sales already, all from fleets[,]" which he then repeated in an interview by CNBC on November 17, 2020, stating that Lordstown had received "50,000 preorders," sold to "fleets," and described the pre-orders as "very serious orders." Lordstown's Form S-1/A filed on December 1, 2020 similarly stated it had "received pre-orders primarily from fleet operators to purchase approximately 50,000 Endurance vehicles." The SEC acknowledged that, according to the Special Committee's analysis, 50% of the 50,000 amount was from intermediaries or influencers.  The SEC additionally stated that on December 21, 2020, Lordstown posted on social media and filed a Form 8-K stating it had received "80,000 non-binding reservations for the Endurance to date."  As the SEC referenced, the Special Committee's analysis concluded that 67% of the 80,000 amount was from intermediaries or influencers.

463. The SEC further stated that on January 11, 2021, Lordstown stated in a press release that Lordstown "ha[d] received more than 100,000 non-binding production reservations from commercial fleets . . . ."  The press release quoted Defendant Burns as saying, "[r]eceiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history . . . ."  According to the Special Committee's analysis, however, by that time 71% of the 100,000 amount was from intermediaries or influencers.

464. Significantly, in his interview with Lead Counsel, Hamamoto confirmed that he had no reason to doubt the SEC's findings and further confirmed that the SEC's characterization was consistent with the Special Committee's findings.

188

**(6)    Both the Pre-Orders and Lordstown Production Capabilities Were Essential to the Company's Success**

465.    ~~408.~~ As described herein, the Endurance is Lordstown's only product, whereby the vast majority of Lordstown's revenue would be generated from sales of the Endurance once it reaches production.  As a result, and given that Lordstown was a pre-revenue company, its ability to (1) lock in Endurance purchasers (*i.e.*, obtain "serious" real pre-orders) and (2) fulfill the ~~pre-orders~~pre-orders on time (*i.e.*, meet touted production deadlines) was immensely important to the financial success of Lordstown.

466.    ~~409.~~ Because the pre-orders and production capabilities for Endurance were core to the company's success, the materially false statements and omissions detailed herein could not have occurred without the ~~Individual~~ Defendants' knowledge and approval.

467.    ~~410.~~ Defendants frequently touted the importance of Lordstown's pre-orders, with, for example, Defendant Burns stating that the company's entire "first year of production [is] already pre-sold."  Further, Defendants frequently boasted of Lordstown's ability to be first to market and that it would be able to begin production of the Endurance by September 2021.

468.    ~~411.~~ Given the multitude of statements concerning the pre-orders and production capabilities during the Class Period, as well as its importance to the company's financial success, it is unreasonable to think that the ~~Individual~~ Defendants—who were responsible for tracking or reporting Lordstown's revenue—would be unaware of the financial significance and status of the Endurance.

469.    ~~412.~~ The ~~Individual~~ Defendants were highly sophisticated and in positions to know that their statements concerning both the pre-orders and production capabilities were false. For example, Defendant Burns founded both Lordstown and Workhorse, the latter of which he founded in 1998, meaning that he has been significantly involved in the EV and automotive

189

industry for over 20 years. CW-2 adds that ~~Defendant~~ Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia." Defendant Rodriguez was Lordstown's CFO since September 2019 and previously served as the CIO at Workhorse from August 2017 until August 2019. Defendant Flannery was Lordstown's Vice President <u>of</u> Business Development from October 2019 until October 2020, when he was promoted to Senior Vice President of Business Development. ~~Defendant~~ Flannery ran the sales team at Lordstown and thus <u>was</u> intimately involved in the purported pre-orders. Prior to working at Lordstown, ~~Defendant~~ Flannery was an executive at Workhorse. ~~Defendant Hamamoto was the Chairman and Chief Executive Officer of DPHC, and signatory to the proxy statements soliciting investors of DPHC to approve the merger. Defendant Hamamoto was actively involved in the evaluation of hundreds of companies, including Lordstown.~~

<u>470.</u> ~~413.~~ The sophistication of the ~~Individual~~ Defendants strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud.

**(7)** **Defendants' Other Illegality Supports the Inference of Scienter**

<u>471.</u> ~~414.~~ Despite its short operating history, Lordstown has been embroiled in several lawsuits (not including the suits consolidated into this action or the related breach of fiduciary duty litigation), that support the common-sense conclusion that the ~~company's~~<u>Company's</u> management acted without regard for the legality of their conduct. Furthermore, Workhorse (from which <u>Defendant</u> Burns left just before founding Lordstown) has already paid a judgment resulting from a lawsuit related to its commissions owed to a sales employee who procured the very same supposed pre-orders that Lordstown touted to investors. Additionally, the ~~company has~~<u>Company</u> received notices from the NASDAQ threatening delisting due to delinquent filings and has publicly admitted that it had material weaknesses in its internal controls.

190

472.    415.  **First**, in *Karma Automotive LLC v. Lordstown Motors Corp.*, Case No. 8:20-cv-02104 (C.D. Cal. filed Oct. 30, 2020), it iswas alleged that Lordstown engaged in shocking corporate espionage to steal the intellectual property of Karma Automotive LLC ("Karma").  The lawsuit alleges that Lordstown entered into an a Non-Disclosure Agreement ("NDA") to perform diligence on licensing Karma's automobile software system, but violated that agreementNDA by poaching Karma employees who took the technology with them.  The lawsuit attaches an email that Lordstown sent to a poached Karma employee's email address (at Karma), detailing the economic case for misappropriating the technology rather than licensing it; the email then calculated the potential lost revenue to Karma, a factor relevant to Lordstown's potential liability for the scheme.  The suit also shows that Karma employees emailed confidential files to themselves, in violation of company policy, as they were being poached by Lordstown.

473.    416. While theThe *Karma* case is ongoing, thesettled for $40 million *while Lordstown was in bankruptcy*.  The documentary evidence alreadythat had been submitted isin the case was exceptionally compelling.  The evidence strongly suggestssuggested that Lordstown orchestrated a brazen scheme of corporate espionage to steal Karma's intellectual property and talent.  The willingness of Lordstown to commit such a scheme strongly supports the inference that its management acted with disregard for the legality of their conduct, and that they acted with such disregard when making the misrepresentations and omissions at issue in this case.

474.    417.  **Second**, in *DTE Lordstown LLC v. Lordstown Motors Corp.*, Case No. 2020--cv-01245 (Ohio Trumbull Ct. C.P. filed Oct. 30, 2020), the company is beingLordstown was sued for delinquent utility bills.  The suit alleges that Lordstown almost immediately fell behind on making utility payments, negotiated a payment plan, and then promptly failed to make

191

payments under that plan.  ~~Ultimately the suit alleges that Lordstown owes the utility~~The suit resulted in a $2.5 million judgment against Lordstown.  While not all breach of contract claims ~~signify~~signifies foul play, here, it appears Lordstown is simply ~~brazenly~~ refusing to pay what it owes, consistent with Defendants' general dereliction of legal duties.

475. ~~418.~~ **Third**, in *Esfeld v. Workhorse Group Inc.,* Case No. 2:17-cv-01923 (W.D. Wash. filed Dec. 27, 2017), a former sales employee of Workhorse (during Defendant Burns' tenure as CEO of Workhorse), alleges that ~~he~~Mr. Esfeld was not paid ~~for~~ commissions he was due for obtaining "pre-orders" for Workhorse's truck.  ~~These very same supposed pre-orders were then lauded by Lordstown.~~ Workhorse paid a judgment on the case after ~~Plaintiff~~plaintiff filed a motion for summary judgment arguing, "Workhorse willfully failed to pay Mr. Esfeld the commissions it admits it owes."  While the failure to pay commissions could be the result of legitimate dispute, here the stronger conclusion (given the judgment paid and many other corroborating facts) is that Burns simply has little regard for fulfilling legal obligations.

476. ~~419.~~ **Fourth**, on April 27, 2021, industry publication Transport Topics published an article titled, "Unpaid Taxes Another Troubling Sign for Lordstown Motors."  The article explained that Lordstown ~~has~~ failed to pay $570,000 in property taxes due the prior month. Lordstown has purportedly now paid the outstanding tax bill.  While a delinquent tax bill is not necessarily an indicium of misconduct, it takes on relevance in the context of Defendants' pattern of behavior.

477. ~~420.~~ **Fifth**, on June 4, 2021, Lordstown disclosed that it had received a delinquency notice from the NASDAQ for Lordstown's failure to timely file a form 10-Q quarterly report for the First Quarter of 2021.  While this issue was subsequently addressed, it

192

too suggests a striking failure on the part of Defendants to comply with even the most basic legal requirements.

478.    ~~421.~~ **Sixth**, on June 8, 2021, Lordstown disclosed via amendment of its 10-K Annual Report for the fiscal year ended December 31, 2020, that the ~~company~~Company had material weaknesses in its internal controls.  Such weaknesses are a hallmark of fraud and weigh heavily in favor of Defendants' scienter, given the totality of the allegations in this Complaint.

479.    ~~422.~~ **Additionally**, Defendant Burns' ~~previously~~previous company (Workhorse) has now been accused of similar misconduct related to the fabrication of pre-orders.   On September 1, 2021, *The Wall Street Journal* ran an article with the headline: "SEC Is Investigating Electric Delivery-Truck Maker Workhorse."   The similar allegations and SEC investigation into Workhorse indicates that the misconduct at Lordstown represents a course of deceptive conduct by ~~Burns and his associates~~Defendants.

### (8)    Insider Stock Sales Support the Inference of Scienter

480.    ~~423.~~ As part of the Merger, Defendant Burns agreed to a 2-year lockup, meaning that he could not sell his shares immediately after the Merger.  Therefore, the absence of stock sales during the Class Period by Burns is not a relevant consideration when assessing his scienter.  However, Burns began selling shares nearly immediately after his lockup expired in October 2022.  In the unique circumstances of shares that were subject to a lockup during the Class Period, these post-Class Period sales are indicative of scienter, because they highlight that Burns understood that the business had been propped up by his fraud and was destined to fail now that the fraud had unraveled.  Specifically, Burns' sales, which produced proceeds of approximately $60 million during the post-Class Period timeframe when Lordstown stock continued to plunge, ultimately resulting in bankruptcy—were as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 11/12/2021 | 3,204,000 | $5.88 | $18,839,520 |
| 02/28/2022 | 5,285,000 | $2.56 | $13,529,600 |
| 3/02/2022 | 2,500,000 | $2.44 | $6,100,000 |
| 11/08/2022 | 4,205,000 | $1.97 | $8,283,850 |
| 11/09/2022 | 555,000 | $1.70 | $943,500 |
| 11/11/2022 | 2,100,000 | $1.85 | $3,885,000 |
| 11/14/2022 | 650,000 | $1.73 | $1,124,500 |
| 11/15/2022 | 1,169,000 | $1.70 | $1,987,300 |
| 1/06/2023 | 5,000,000 | $0.87 | $4,350,000 |

481.    However, many other key insiders at Lordstown did sell shares, which lends support for the conclusion that the true dire situation was evident to those within the company, which conclusion supports the inference of scienter.

482.    424. On June 21, 2021, *The Wall Street Journal* reported that "five top executives, including the company's president and its Defendant Rodriguez, sold more than $8 million in stock over three days in early February."  The article explained that "One of its executives, Chuan 'John' Vo, who oversees Lordstown Motors' propulsion division, sold almost all of his vested equity—99.3%—on Feb. 2, leaving him with 717 shares and proceeds of more than $2.5 million, the filings show."  Similarly, it reported that "President Rich Schmidt, a former Tesla Inc. manufacturing executive who joined the companyCompany in 2019, sold 39% of his vested equity over two days in February for $4.6 million."  The article also reported that there were insider sales in December as well.

483.    425. Additionally, the article explained that trading was suspicious for a number of reasons: (1) the trades were made shortly before the companyCompany posted negative news about its production, and shortly before the Hindenburg Report was published; (2) "The size of the stakes sold by some executives within months of the company going public are unusual;" (3)

194

the trades did not appear to be made through pre-approved trading plans; and (4) the fact that a number of different executives all sold at around the same time is also "unusual."

### (9)    Additional Allegations as to Insider Trading Claims

484.    The insider trading claims against Defendants Schmidt, Rodriguez, Brown, and Post allege that those individuals sold Lordstown stock between February 2-4, 2021, while in possession of material non-public information ("MNPI").  The MNPI included true, material information concerning Lordstown's pre-orders and the condition of Lordstown's production capabilities and timeline, including the risks posed by Lordstown's issues arising from its reliance on GM for the supply of critical parts.  Defendants understood the public's perception of Lordstown's production capabilities and pre-orders were material to investors given that Defendants routinely touted the pre-orders.  Defendants knew that Lordstown's business depended on beginning production and would face a liquidity and capital crisis if they did not.  Additionally, internal emails discuss how Lordstown "stock will be rewarded" if Lordstown somehow "executed," but that otherwise it was facing "market corrections."

485.    Each of the Defendants were well apprised of the true situation concerning Lordstown's pre-orders at the time of these insider sales.

486.    For example, internal Lordstown communications demonstrate that these individuals understood that the Company did not have anywhere near the amount of claimed "pre-orders" and that these empty, non-binding arrangements were often with non-commercial fleets.

487.    For example, on August 5, 2020, Defendant Post received a detailed spreadsheet breaking down the supposed pre-orders by costumer.  As the true nature of Lordstown's supposed customers were apparent based on their listed name, Post was informed that many of

195

the supposed pre-orders were not from commercial fleets.  On August 14, 2020, Defendants Schmidt and Rodriguez  received an updated version of the spreadsheet.  Defendant Brown received the same from Defendant Schmidt on August 18, 2020.  Defendants Brown, Schmidt, Post, and Rodriguez all sold Lordstown stock during the Class Period while in possession of MNPI regarding the true nature of Lordstown LOIs.

488.    On November 13, 2020, Defendants Schmidt and Post received an email from Jeffrey Kenny, Director of Corporate and Sales Strategy at Lordstown, which admittedthat an "LOI" was merely "an indication of interest, qualification of an opportunity, estimate of demand, . . . and an invitation to sell."

489.    On December 17, 2020, Defendants Schmidt and Rodriguez received an email, titled "LOI/Pre-Order Update," which clearly catalogued all interest in the Endurance as either actual pre-orders with down payments or non-binding LOIs.  This email further demonstrated that almost all the supposed interest in the Endurance were driven by non-binding LOIs. Defendant Schmidt soon after forwarded this email to Defendants Brown and Post.  Defendants Brown, Schmidt, Post, and Rodriguez all sold Lordstown stock during the Class Period while in possession of MNPI regarding the true nature of Lordstown LOIs.

490.    Additionally, internal Lordstown communications demonstrate that these individuals were aware of the delays to the Endurance's production.  Specifically, on July 11, 2020, Defendants Schmidt, Post, and Rodriguez received an email from Defendant Burns, which discussed the findings of the McKinsey Report.  The McKinsey Report warned that there was no reasonable scenario in which Lordstown could begin production by September 2021—**at best**, it would be delayed four months and likely much longer, putting the start of production at April 2022 at the earliest.  In the July 11, 2020 email, Burns admitted that the report "has exposed

196

some weaknesses in our process that Hamamoto and GS are concerned about.  I think we need one guy that is in charge of us making our schedule.  Having engineering under me is causing some integration issues."  In a response sent only to Defendant Burns, Defendant Rodriguez noted that the "8 month delay they predict sounds reasonable."  The "reasonable" delays forecasted by the McKinsey Report were concealed from investors and the public, and Defendants Schmidt, Post, and Rodriguez all sold Lordstown stock during the Class Period while in possession of that MNPI.

### (10)    Additional Allegations of Scienter as to Defendant Flannery

491.    Defendant Flannery is alleged to have made false statements concerning Lordstown's pre-orders in the proxy materials published August 3, 2020, and in a public statement on September 24, 2020.  Internal Lordstown documents reveal that prior to the filing of the proxy materials with the SEC, a presentation detailing Lordstown's pre-orders was reviewed by Defendant Flannery.  In addition to the allegations stated above, Flannery's scienter is alleged on the following grounds.

492.    Defendant Flannery ran the sales team at Lordstown and it would be impossible for him to have not been aware of the true nature of the pre-orders.  To the extent he was not aware, he was deliberately reckless in not having awareness of the true nature of the pre-orders.

493.    Numerous emails clearly demonstrate Defendant Flannery's knowledge or deliberate recklessness as to the true nature of the pre-orders.  For example, on August 1, 2020, he received an email with an excel sheet with the full list of pre-orders, clearly showing parties like Grid X, governmental parties, and non-fleet operating advocacy organizations like "Clean Fuels Ohio" being counted as pre-orders, as well as a breakdown of the very large number of pre-orders that had been obtained by Climb2Glory.  Flannery had received similar lists routinely

197

in the period before that date, including on July 8, 2020.  Prior to August 3, 2020, he was copied on emails directly with the person from Grid X/E Squared that Lordstown was specifically dealing with, in which the supposed Grid X/E Squared representative explained that his company would "help promote your vehicle fleet sales in North America," *i.e.*, that it was not itself a commercial fleet.

### C.     Transaction Causation — Reliance

494.     426. To the extent that reliance or transaction causation is an element of the claims asserted herein, Plaintiffs and the Class are entitled to proceed due to the following doctrines.

495.     427. **First**, as to claims stemming from material misstatements and/or omissions in the Proxyproxy statements, Plaintiffs and the Class establish transaction causation because the solicitation of DPHC shareholder's votes waswere an essential link in completing the Merger transaction.   Under *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), where material misstatements or omissions are made in a proxy statement, and where shareholder votes were needed to complete the transaction at issue in that proxy statement, the solicitation of proxies with a deficient proxy statement itself satisfies the requirement of pleading transaction causation or reliance.

496.     428. **Second**, the Claimsclaims herein involve primarily omissions, insofar as Defendants omitted to disclose (1) the true nature of the pre-orders, (2) the true status of Lordstown's production capabilities, and (3) that their conduct throughout the Class Period was aimed at inflating Lordstown's stock price rather than accurately informing the market about the companyCompany.   Where claims, like these, involve primarily failures to disclose, the

198

requirement of proving reliance is relieved, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

497.  ~~429.~~ **Third**, Defendants corrupted the market for Lordstown Securities through a course of conduct that misled the market as to the value of Lordstown ~~securities~~Securities, to the extent that these Defendants disrupted the integrity of the market for Lordstown ~~securities~~Securities.  Plaintiffs and the Class members are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute ~~Citizens of Utah v. United States~~*, 406 U.S. ~~128,~~at 153 ~~(1972)~~.

498.  ~~430.~~ **Fourth**, Plaintiffs and the Class members are entitled to a presumption of reliance on the material misrepresentations and omissions alleged herein pursuant to the ~~fraud-on-the-market~~fraud-on-the-market theory:

(a)    Throughout the Class Period, LTMs stock (ticker: "RIDE;" and former ticker: "DPHC") met the requirements for listing on, and was traded on the NASDAQ, an informationally efficient market.

(b)    Throughout the Class Period, LTM's stock traded at high volumes.  Prior to the Merger, there were approximately 35 million shares of DPHC Class A common stock outstanding and average weekly trading volume was approximately 20 million.  After the Merger, there were more than 164 million shares of Lordstown common stock outstanding, and the average weekly trading volume was typically over 40 million shares.

(c)    Throughout the Class Period, LTM's stock traded with a narrow bid-ask spread.  Before the Merger, the average bid-ask spread for DPHC's Class A common stock was low, at around 8 cents per share, and after the Merger, the average bid-ask spread for Lordstown's Class A common stock was around 3 cents per share.

(d)      Both before ~~Merger~~ and after the Merger, LTM's stock and Lordstown's common stock reached approximately $1 billion in market capitalization and retained a market capitalization of well above $500 million for much of the Class Period.

(e)      LTM's Stock was registered with the SEC, both before and after the Merger.  Throughout the Class Period, LTM (including when it was named DPHC) filed periodic reports with the SEC.

(f)      DPHC and Lordstown communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(g)      The market reacted promptly to public information disseminated by and about Lordstown and DPHC.

(h)      Lordstown was covered by numerous securities analysts employed by major brokerage firms and during the Class Period at least seventeen analysts provided coverage of Lordstown.  Both DPHC and Lordstown were extensively covered by news media and investor publications throughout the Class Period.

(i)      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Lordstown's stock and DPHC's stock~~;~~. ~~and~~.

(j)      Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased DPHC stock and Lordstown stock

200

between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period.

499. ~~431.~~ As a result of the foregoing, the market for LTM's stock promptly digested current information regarding or relevant to LTM from all publicly available sources and reflected such information in the stock prices.

### D.  Loss Causation

500. ~~432.~~ During the Class Period, as detailed herein, Defendants' false representations and omissions of material facts about Lordstown's business caused the Lordstown Securities to trade at artificially inflated prices and deceived purchasers of the securities.

501. ~~433.~~ As the Defendants' fraud and the previously-concealed, material, adverse information was revealed to the market, the price of Lordstown Securities fell precipitously. Defendants' false and misleading statements concealed material risks from the public, including the truth concerning demand for the Endurance, the true nature of the supposed pre-orders, as well as Lordstown's true production capabilities. Through Defendants' and other public disclosures, the market became aware of these previously undisclosed risks and/or these risks materialized. As a result, the price of Lordstown Securities fell precipitously.

502. ~~434.~~ Lordstown's stock price reached a Class Period high of $31.57 on February 11, 2021, as a result of Defendants' misrepresentations and omissions, as alleged herein. As the truth was partially revealed to the market, Lordstown's stock price fell to a Class Period low of $6.69.

503. ~~435.~~ As the previously-concealed, material, adverse information was revealed to the market and/or the previously undisclosed risks materialized, the price of Lordstown Securities fell precipitously. In particular:

201

(a)        On March 12, 2021, the Hindenburg Report was published, which partially revealed Defendants' fraud concerning the misleading nature of the publicly touted pre-orderspre-orders for the Endurance and the Lordstown's production capabilities.  As a result, the price of Lordstown stock fell 16.54%, when measured close-to-close.  However, the disclosures on March 12, 2021 did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(b)        On March 17, 2021, after the close of trading, Lordstown issued a press release regarding its full year 2020 results and held a conference call, where Defendant Burns stated that Lordstown had received an SEC inquiry and disclosed that the board had formed a special committee to review the matters detailed in the short report.  The next day, before the market opened, Defendant Burns went on CNBC to defend his prior pre-order statements, in an interview that was strongly criticized by commentators, such as Jim Cramer.  As a result, the price of Lordstown stock fell 13.78%, when measured close-to-close.  However, the disclosures on March 17, 2021 and March 18, 2021 did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(c)        On May 24, 2021, after market close, Lordstown released its First Quarter 2021 results, and disclosed that any production occurring in September would be at "limited capacity," slashing prior production guidance by 50%, and revealing that Lordstown would need additional funding to ramp up production.  As a result, the price of Lordstown stock fell 7.45%, when measured close-to-open.  However, the disclosures on May 24, 2021 did not reveal the full

202

extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(d)      On June 8, 2021, Lordstown released an amended 10-K, announcing a "going concern" notice, that may need "significant" capital to ramp up production, that the company had "material weaknesses in internal control over financial reporting," and additional information about the SEC investigation.  As a result, the price of Lordstown stock fell 20.86%, when measured close-to-intraday low.[1320]  However, the disclosures on June 8, 2021 did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(e)      On June 14, 2021, Lordstown released the results of its own internal investigation, whereby admitting that there were "issues regarding the accuracy of certain statements regarding the Company's pre-orders."  The investigation results corroborated many allegations in the Hindenburg Report, including that Lordstown had paid for pre-orders, and that the company had misrepresented that the pre-orders came from fleets when they had not. Concurrently with the release of the internal investigation report, Lordstown announced the "resignation" of CEO/Chairman Burns and CFO Rodriguez.  As a result, the price of Lordstown stock fell 18.84%, when measured close-to-close.  However, the disclosures on June 14, 2021 still did not reveal the full extent of Defendants' fraud, including the risks that Lordstown bore, given the extent of the fabricated pre-orders and insufficient production capabilities.

(f)      On July 2, 2021, *The Wall Street Journal* reported that Lordstown was also under a DOJ investigation related to Defendants' disclosures regarding the pre-orders.  The

---

[1320] On June 9, 2021, Lordstown issued a new statement that it was supposedly actively pursuing additional financing with several parties, and the share price increased on this news.

DOJ investigation was a risk imposed by Lordstown as a result of Defendants' misrepresentations and the revelation of the investigation informed the market of the manifestation of this risk, and further indicated the gravity of the misrepresentations to the market.  As a result, the price of Lordstown stock fell 10.82%, when measured close-to-close.

504.  ~~436.~~ These price declines each removed artificial inflation from the price of Lordstown's common stock, causing real economic loss to investors who had purchased or otherwise acquired Lordstown Securities during the Class Period.

505.  ~~437.~~ The decline in the price of Lordstown's Securities following these revelations and/or materializations of the risk was a direct result of the nature and extent of Defendants' misrepresentations being revealed to investors and the market and/or the previously undisclosed risks having materialized.  The timing and magnitude of the price declines and reactions to the news, individually and collectively, negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or ~~company-specific~~Company-specific facts unrelated to Defendants' misrepresentations and omissions.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misrepresentations and omissions, and course of conduct to artificially inflate and artificially maintain the price of Lordstown's common stock, and the subsequent material decline in the value of Lordstown's common stock when Defendants' prior misrepresentations, misleading half-truths, and other deceitful conduct were revealed.[14]

---

[14] ~~For the avoidance of doubt, it is not alleged that Defendant Hamamoto engaged in fraudulent conduct, but he did make material misrepresentations and omissions.~~

204

506. ~~438.~~ Additionally, investors in Lordstown's Class A common stock, prior to the Merger, were entitled to redeem their securities in the Merger for a price of approximately $10.15 at the time of the Merger.  To the extent that any such investor sold their shares for less than that price, after the stock price declined due to the truth being revealed or partially known to the market, those investors suffered economic injury in being deprived of fulsome information that would have caused a reasonable investor to exercise their redemption rights.

### E.       No Safe Harbor

507. ~~439.~~ The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.  The statements at issue are not protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the ~~following~~ reasons enumerated below.

508. ~~440.~~ **First**, the statements and omissions alleged to be materially false and misleading relate to historical facts or then-existing conditions, and, therefore, are not protected by the safe harbor.  **Second**, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  **Third**, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that were warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  **Fourth**, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false or misleading.

509.    441. Additionally, the PSLRA safe harbor does not apply to any statements made by Defendants Burns or Flannery prior to the close of the Merger, because they were not acting on behalf of the issuer (here DPHC), and the safe harbor only applies to those acting on behalf of the issuer.  15 U.S.C. § 77z–2(a)(2).  The PSLRA safe harbor also does not apply to any statement made in connection with the Merger because (i) connected with the Merger was an offering of securities was connected with the Merger, and (ii) DPHC was a blank check company, and the safe harbor does not apply to any statement made in connection with any securities offering by a blank check company.  15 U.S.C. § 77z–2(b)(1)(B).  The PSLRA safe harbor also does not apply to any statements made in connection with the Merger, because the Merger functionally was an initial public offering of Lordstown, and the safe harbor does not apply to statements made in connection with an initial public offering.  15 U.S.C. § 77z–2(b)(1)(E).

## VI.    CLASS ACTION ALLEGATIONS

510.    442. Plaintiffs brings bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure (specifically, Rule 23(a) and Rule 23(b)(3)) on behalf of themselves and all persons and entities that (a) purchased or otherwise acquired LTM's Class A Common Stock common stock (ticker: "RIDE;" and prior ticker: "DPHC"), LTM's publicly traded warrants (ticker: "RIDEW;" and prior ticker: "DPHCW"), LTM's publicly traded units (ticker: "DPHCU"), or any publicly traded option to purchase or sell LTM's Class A Common Stock common stock, from August 3, 2020 through July 2, 2021, inclusive (the "Class Period") and were damaged by the conduct alleged herein and/or (b) held LTM's Class A Common Stock common stock (ticker: "DPHC") on September 21, 2020 and were damaged by the conduct alleged herein (altogether, the "Class").

511.  443. For the avoidance of doubt, the Class includes persons and entities that purchased or otherwise acquired publicly traded shares, warrants, or units, during the portion of the Class Period when LTM was known as DiamondPeak Holding Corp.  For the further avoidance of doubt, the Class includes persons and entities that acquired LTM's Class A Common Stockcommon stock during the Class Period through the acquisition of the units listed by LTM (while it was known as DiamondPeak), that were comprised of a share of LTM Class A common stock and a portion of a warrant, which units traded under the ticker ": DPHCU"). For the further avoidance of doubt, the Class includes persons and entities that acquired LTM's Class A Common Stockcommon stock during the Class Period through the exercise of warrants (, which traded under the tickers ": DPHCW" and "RIDEW").

512.  444. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of any entity DefendantLTM, DPHC, or Lordstown EV Corporation; (iv) any company, firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) affiliates of any entity Defendant and of LTM, DPHC, or Lordstown EV Corporation, including their employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interestsuccessors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph, in their capacities as such.

513.  445. The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, LTM had at least 164 million Class A common shares outstanding.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

514.   446.  While the exact number of Class members is unknown to ~~Lead Plaintiff~~Plaintiffs at this time and can only be ascertained through appropriate discovery, it is likely that the proposed number of Class ~~numbers~~members in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained either by Lordstown or by other customary means and may be notified of the pendency of this ~~action~~Action by mail, using a form of notice as is customary in securities class actions.

515.   447. Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' wrongful conduct in violation of the Exchange Act, as alleged and complained of herein.

516.   448. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class actions and securities litigation.

517.   449. There is a well-defined community of interest in the questions of law and fact involved in this ~~case~~Action.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)   whether Defendants' statements made to the investing public during the Class Period contained material misrepresentations;

(c)   whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

208

(d)      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)      whether Defendants knew or recklessly disregarded that their statements were materially false and misleading;

(f)      whether Defendants were negligent in issuing materially false and misleading statements or in omitting to disclose information;

(g)      whether Defendants engaged in a fraudulent scheme;

(h)      whether, Defendants' conduct artificially inflated and/or artificially maintained the price of Lordstown and/or DPHC's stockSecurities during the Class Period;

(i)      whether the Individual Defendants were controlling persons of DPHC or Lordstown;

(j)      whether the proxy materials were a substantial link in the completion of the Merger;

(k)      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(l)      whether, and to what extent, the shareholders of Lordstown and DPHC suffered losses and/or experienced injury due to acts and omissions alleged herein.

518.   450. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in maintaining this ~~action~~Action as a class action.

## VII.    COUNTS

**A.    COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against ~~All~~ Defendants ~~Except Defendants Hamamoto, Schmidt, Brown, and Post~~Burns, Flannery, and Schmidt**

519. ~~451.~~ Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

520. ~~452.~~ This Count is asserted pursuant to ~~Section~~ §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC against ~~all~~ Defendants ~~except Defendant Hamamoto, Schmidt, Brown, and Post~~Burns, Flannery, and Schmidt.

521. ~~453.~~ Defendants Burns, Flannery, and Schmidt, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated ~~Section~~ §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC.

522. ~~454.~~ Defendants Burns, Flannery, and Schmidt made false and misleading statements of material facts, omitted to state material facts, which they had an affirmative duty to disclose under the Exchange Act and SEC rules promulgated thereunder, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

523. ~~455.~~ Defendants Burns, Flannery, and Schmidt made ~~their~~ false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and ~~the other~~ members of the Class.

524.   456. Defendants Burns, Flannery, and Schmidt engaged in a fraudulent intent to and did, as alleged herein, fraud to: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and/or artificially maintain the inflated price of Lordstown Securities, including DPHC and Lordstown's Class A common stock; and (iii) cause Plaintiffs and members of the Class to purchase Lordstown Securities, including DPHC and Lordstown's Class A common stock, at artificially inflated prices.

525.   457. Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and having prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

526.   458. In ignorance of the false and misleading nature of Defendants' Burns, Flannery, and Schmidt's statements and omissions, and relying directly or indirectly on those statements or omissions, or upon the integrity of the market price for Lordstown Securities including DPHC and Lordstown's Class A common stock, Plaintiffs and members of the Class purchased Lordstown Securities including DPHC and Lordstown's Class A common stock at artificially inflated prices during the Class Period.  But for Defendants' Burns, Flannery, Rodriguez and Schmidt's fraud, Plaintiffs and members of the Class would not have bought DPHC's Class A common stock and Lordstown's Class A common stock Lordstown Securities at such artificially inflated prices.  By purchasing DPHC's Class A common stock and Lordstown's Class A common stock Lordstown Securities at these artificially inflated prices, Plaintiffs and

211

members of the Class suffered economic losses, which losses were a direct and proximate result of Defendants'Burns, Flannery, Rodriguez, and Schmidt's fraudulent conduct.

527. 459. By virtue of the foregoing, Defendants Burns, Flannery, and Schmidt are liable to Plaintiffs and members of the Class for violations of Section §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**B.** **COUNT II: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants Except Defendants Hamamoto, Schmidt, Brown, and PostBurns, Flannery, Rodriguez,  and Schmidt**

528. 460. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

529. 461. This Count is brought under Section §10(b) of the Exchange Act and the provisions of SEC Rule 10b-5(a) and (c) promulgated thereunder against all Defendants except Defendant Hamamoto, Schmidt, Brown, and PostBurns, Flannery, Rodriguez, and Schmidt. Accordingly, Plaintiffs need not allege in this Count, nor prove in this caseAction, that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

530. 462. During the Class Period, Defendants Burns, Flannery, Rodriguez, and Schmidt carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and artificially maintain the market price of Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock; and (iii) cause Plaintiffs and Class members of the Class to purchase Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock at artificially inflated prices.

531. 463. Defendants' Burns, Flannery, Rodriguez, and Schmidt's manipulative conduct included, but was not limited to, raising money on the false pretense that there was incredible demand for the Endurance truck and, by painting a picture of the demand for that vehicle and scale of pre-orders that was inconsistent with reality;, falsely representing the timeline and financial resources needed to produce the Endurance truck in a way that would turn Lordstown into a cash-flow positive company; and hiding material information from the public, such as the fact that Lordstown had experienced a massive fire when testing one of its prototype trucks.

532. 464. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants Burns, Flannery, Rodriguez, and Schmidt's employed devices, schemes, and artifices to defraud and manipulate, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a manipulation, fraud, and deceit upon Plaintiffs and members of the Class in connection with their purchases of Lordstown Securities including DPHC's Class A common stock and Lordstown's Class A common stock, in violation of Section §10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) promulgated thereunder.

533. 465. Plaintiffs and members of the Class reasonably relied upon the integrity of the market in which Lordstown's stock traded.

534. 466. During the Class Period, Plaintiffs and members of the Class were unaware of Defendants' Burns, Flannery, Rodriguez, and Schmidt's fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs and members of the Class known the true extent of Defendants' Burns, Flannery, Rodriguez, and Schmidt's unlawful scheme and unlawful course of conduct, they would not have purchased Lordstown

Securities ~~including DPHC's Class A common stock and Lordstown's Class A common stock~~ or if they had, would not have done so at the artificially inflated prices paid for such securities.

535. ~~467.~~ As a direct and proximate result of Defendants~~'~~ Burns, Flannery, Rodriguez, and Schmidt's scheme to defraud and such unlawful course of conduct, Plaintiffs and members of the Class suffered damages in connection with their purchases of Lordstown Securities ~~including DPHC's Class A common stock and Lordstown's Class A common stock~~ during the Class Period.

536. ~~468.~~ By reason of the foregoing, Defendants Burns, Flannery, Rodriguez, and Schmidt violated ~~Section~~ §10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) promulgated thereunder~~,~~ and are liable to Plaintiffs and members of the Class for damages suffered in connection with their purchases of DPHC's Class A common stock and Lordstown's Class A common stock during the Class Period.

### C. COUNT III: Violation of Section 14(a) of the Exchange Act Against Defendants ~~LTM, Lordstown EV Corporation,~~ Burns, Flannery, Rodriguez, and ~~Hamamoto~~Schmidt

537. ~~469.~~ Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein, except that Plaintiffs expressly disclaim any allegations of fraud for purposes of these claims~~, including all allegations contained in Section V(B) above~~.

538. ~~470.~~ SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

214

539.    ~~471.~~ Defendants Burns, Flannery, Rodriguez, and Schmidt prepared, reviewed, and/or disseminated the false and misleading ~~Proxy Statements~~proxy statements, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

540.    ~~472.~~ As stated herein, the ~~Proxy Statements~~proxy statements contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, which the ~~Proxy Statements~~proxy statements were essential links in the consummation of the Merger.

~~473. Defendant Hamamoto acted negligently by signing, issuing, and disseminating the proxy materials because they contained the false and misleading statements alleged herein. Moreover, Defendant Hamamoto was the Chairman and Chief Executive Officer of DPHC, and owed investors a fiduciary duty by way of these roles. Defendant Hamamoto acted negligently by unreasonably making the false and misleading statements alleged herein, given that there was not sufficient information capable of confirming the accuracy of these statements; in fact, readily available information that would be apparent from a reasonably diligent investigation into Lordstown demonstrates the inaccuracy of Defendant Hamamoto's statements, including the truth about the purported pre-orders that Lordstown claimed it had for the Endurance and information about Lordstown's production capabilities (or lack thereof).~~

~~474. Defendant LTM acted negligently in issuing and disseminating the proxy materials because they contained the false and misleading statements alleged herein. Defendant LTM acted through Defendant Hamamoto, and therefore is negligent to the same extent as Defendant Hamamoto.~~

215

541. 475. Defendant Burns acted negligently in issuing and disseminating the proxy materials because they contained the false and misleading statements alleged herein. Defendant Burns was intimately familiar with Lordstown's business and directly made misrepresentations in the proxy materials. Burns was directly involved in the proxy solicitation process, including because he was quoted extensively in proxy materials, made public statements soliciting the Merger for which the proxy statement was issued, and was involved in the issuance and preparation of the proxy statements. Emails reviewed by Lead Counsel show that Burns was personally involved in the preparation of the proxy materials, including emails ranging from discussing filing logistics, emails exchanging draft copies of the proxy materials as they were developed, and emails providing updates from legal counsel about correspondence with the SEC about the proxy filings.

476. Defendant Lordstown EV Corporation acted negligently in issuing and disseminating the proxy materials because they contained the false and misleading statements alleged herein, and Defendant Lordstown EV Corporation acted through Defendant Burns, meaning Defendant Lordstown EV Corporation was negligent to the same extent as Defendant Burns.

542. 477. Defendant Flannery acted negligently in making statements contained within the proxy materials, insofar as he "made" and/or had ultimate control over statements by permitting false and misleading statements to appear next to his name and image, and acted negligently in so allowing the proxy statements to be disseminated with such misleading statements to appear next to his name and image. Defendant Flannery directly oversaw Lordstown's sales efforts and was intimately familiar with the true condition of Lordstown's business and sales practices.

216

543. Defendants Rodriguez and Schmidt acted negligently in participating in the preparation or distribution of the proxy materials without correcting the errors therein.

544. 478. The written communications made by the Defendants Burns, Flannery, Schmidt, and Rodriguez described herein as appearing in proxy materials constitute violations of SEC Rule 14a-9 and §14(a) of the Exchange Act because such communications are materially false and/or misleading and were provided in at least a negligent manner.

545. 479. As a direct result of the Defendants' Burns, Flannery, Schmidt, and Rodriguez's negligent preparation, review, and dissemination of the false and/or misleading Proxy Statements proxy statements, Plaintiffs and members of the Class were deprived of their right to be presented with accurate proxy materials while asked to vote on the Merger, were caused to vote in favor of the Merger, were caused to not exercise their redemption rights.

546. 480. As a direct and proximate result of the dissemination of the false and/or misleading Proxy Statements proxy statements that Defendants Burns, Flannery, and Rodriguez used to obtain shareholder approval of and thereby consummate the Merger, Lead Plaintiff Plaintiffs and members of the Class have suffered damages and actual economic losses (*i.e.*, the difference between the inflated price those investors paid when purchasing DPHC stock and the true value of that stock once the inflation is removed).

547. 481. The omissions and false and misleading statements in the Proxy Statements proxy statements are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statements proxy statements and in other information reasonably available to shareholders.

548.   482.  By reason of the misconduct detailed herein, ~~the~~ Defendants Burns, Flannery, Schmidt, and Rodriguez are liable pursuant to §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

**D.   COUNT IV: Violations of ~~§~~Section 20A of the Exchange Act Against Defendants Schmidt, Rodriguez, Brown, and Post**

549.   483. Plaintiff repeats, incorporates, and reallegesPlaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.  ~~As set forth in the paragraphs above, and as further set forth below,~~ Defendants Schmidt, Rodriguez, Brown, and Post each committed underlying violations of ~~Section~~ §10(b) and SEC Rule 10b-5 promulgated thereunder by selling LTM's common stock while in possession of and on the basis of material nonpublic information about ~~the~~ Lordstown and, consequently, are liable to contemporaneous purchasers of that stock under ~~Section~~ §20A of the Exchange Act.  *See* 15 U.S.C § 78t-1(a).

550.   484. ~~Each of~~ Defendants Schmidt, Rodriguez, Brown, and Post possessed material nonpublic information when they sold shares ~~between February 2, 2021 and February 4, 2021~~during the Class Period.  In total, these Defendants collectively sold 249,820 shares of LTM's common stock for proceeds of $6,327,913.00.

551.   485. Defendants Schmidt, Rodriguez, Brown, and Post created, controlled, and/or served in an executive capacity at Lordstown, possessed material nonpublic knowledge about Lordstown's operations that they knew or recklessly disregarded would cause the LTM's share price to fall when publicly disclosed, and cashed out of significant holdings at artificially inflated prices before the material nonpublic information was revealed.  ~~These Defendants~~Schmidt, Rodriguez, Brown, and Post were able to sell their shares at prices of between $24.63 and $27.21 per share, as opposed to the price Lordstown would fall to following the revelation of the true

218

condition of ~~Lordstown~~Lordstown's pre-orders and manufacturing capabilities and materialization of the undisclosed risks.

552.  ~~486.~~ Due to Defendants Schmidt, Rodriguez, Brown, and Post's conduct in selling shares while in possession of material nonpublic information, which is a violation of ~~Section~~ §10(b) and SEC Rule ~~10b5~~10b-5 promulgated thereunder, they are each liable under ~~Section~~ §20A of the Exchange Act to all Class members who purchased Lordstown's common stock at inflated prices contemporaneously with these sales, including Plaintiff FNY Managed Accounts LLC.

### E. COUNT V: Violations of Section 20(a) of the Exchange Act Against ~~the Individual~~ Defendants Burns, Rodriguez, Flannery, Schmidt, Post, and Brown

553.  ~~487.~~ Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

554.  ~~488. The Individual~~ Defendants Burns, Rodriguez, Flannery, Schmidt, Post, and Brown acted as controlling persons of both pre-Merger and post-Merger LTM ~~and DPHC~~ within the meaning of ~~Section~~§ 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements by and about ~~DPHC and~~ LTM, ~~the Individual Defendants~~Burns, Rodriguez, and Flannery had the power to control the actions of ~~those entities and their~~LTM and LTM's employees.

555.  LTM, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated §10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder.

556.  LTM made false and misleading statements of material facts, omitted to state material facts that it had an affirmative duty to disclose under the Exchange Act and SEC Rules

219

promulgated thereunder, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

557. LTM made false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and members of the Class. LTM is imputed with the scienter of its management level employees, including Defendants Burns, Rodriguez, and Flannery.

558. LTM engaged in a fraud to: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and/or artificially maintain the inflated price of Lordstown Securities; and (iii) cause Plaintiffs and members of the Class to purchase Lordstown Securities at artificially inflated prices.

559. LTM is responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and having prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

560. In ignorance of the false and misleading nature of LTM's misstatements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Lordstown Securities, Plaintiffs and members of the Class purchased Lordstown Securities at artificially inflated prices during the Class Period. But for Defendants Burns, Rodriguez, and Flannery's fraud, Plaintiffs and members of the Class would not have bought Lordstown Securities at such artificially inflated prices. By purchasing Lordstown Securities at

these artificially inflated prices, Plaintiffs and members of the Class suffered economic losses, which losses were a direct and proximate result of LTM's fraudulent conduct.

561.   By virtue of the foregoing, LTM violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and is legally liable to Plaintiffs and members of the Class for such violations, but is not liable in fact to pay a judgment to Plaintiffs and members of the Class, because it has settled and been released of any further obligation to pay Plaintiffs and members of the Class for such claims.

562.   489.  As alleged herein, the Individual DefendantsBurns, Rodriguez, Flannery, Schmidt, Post, and Brown managed DPHC and LTM and are responsible for the wrongful conduct alleged herein, including, but not limited to, the dissemination of false and misleading statements and omissions through formal corporate processes (such as SEC filings).  Due to their involvement in this wrongful conduct, the Individual DefendantsBurns, Rodriguez, and Flannery were culpable participants in the wrongdoing and securities violations alleged herein.

563.   490.  By reason of the foregoing, the Individual Defendants Burns, Rodriguez, Flannery, Schmidt, Post, and Brown violated Section§ 20(a) of the Exchange Act and are liable to Plaintiffs and members of the Class for damageslosses suffered in connection with their sale or exchange of Lordstown securitiesSecurities during the Class Period.

## VIII.   PRAYER FOR RELIEF

564.   491.  WHEREFORE, Plaintiffs respectfully pray for judgment against the Defendants as follows:

(a)     Determining that this actionAction is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class

221

representative, and appointing Labaton Keller Sucharow ~~as lead class counsel~~LLP as Lead Class Counsel pursuant to Rule 23(g);

(b)     Determining and declaring that Defendants violated the Exchange Act by reason of the acts, omissions, and~~,~~ status of control alleged herein;

(c)     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, together with interest thereon;

(d)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this ~~action~~Action, including but not limited to attorneys' fees and costs incurred by Lead Plaintiff's consulting and testifying expert witnesses; and

(e)     Granting such other and further relief as the Court deems just and proper.

## IX.     JURY DEMAND

565.    Plaintiffs demand a trial by jury of all issues so triable.

[signatures on following page]

DATED:  ~~September 10, 2021~~December 11, 2024

**LABATON KELLER SUCHAROW LLP**

By: ~~*Carol C. Villegas*~~[to be signed upon filing]

Carol C. Villegas (admitted *pro hac vice*)
Christine M. Fox (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
Jake Bissell-Linsk (admitted *pro hac vice*)
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Email: cvillegas@labaton.com
Email: cfox@labaton.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

*Counsel for Lead Plaintiff*
*George Troicky and Lead*
*Counsel for the Class*

**THE SCHALL LAW FIRM**

Brian Schall (*pro hac vice* forthcoming)
Rina Restaino (*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, CA 60067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
Email: rina@schallfirm.com

*Additional Counsel for Lead*
*Plaintiff George Troicky*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Steve W. Berman (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: reed@hbsslaw.com
Email: ucasg@hbsslaw.com

Reed R. Kathrein (admitted *pro hac vice*)
Lucas Gilmore (admitted *pro hac vice*)
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com

*Counsel for Additional Named Plaintiff*
*Ashith Pabbathi and Additional Counsel for*
*the Class*
~~*Additional Counsel for the Class*~~

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim (admitted *pro hac vice*)
Laurence M. Rosen (admitted *pro hac vice*)
Daniel Tyre-Karp (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, ~~New York~~NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: dtyrekarp@rosenlegal.com

*Counsel for Additional Named Plaintiffs*
*Daniel Tavares and Globestar Systems Inc.*
*and Additional Counsel for the Class*

224

[signatures continued on following page]


**ENTWISTLE & CAPPUCCI LLP**

Andrew J. Entwistle (admitted *Pro Hac Vice*)
Frost Bank Tower
401 Congress Avenue, Suite 1170
Austin, TX 78701
Telephone: (512) 710-5960
Email: aentwistle@entwistle-law.com

-and-

Robert N. Cappucci (admitted *Pro Hac Vice*)
230 Park Avenue, 3rd Floor
New York, ~~New York~~NY 10169
Telephone: (212) 894-7200
Email: rcappucci@entwistle-law.com

*Attorneys for Plaintiff FNY*
*Managed Accounts LLC*
*and Additional Counsel for the Class*

225

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

/s/ Carol C. Villegas
Carol C. Villegas

226