**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE LORDSTOWN MOTORS CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00616 (DAR) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND .................................................................................................... 3

III.    ARGUMENT......................................................................................................... 7

        A.     The SAC Adequately Alleges Misstatements........................................................ 7

              1.     The Misstatements Concerning Pre-Orders ................................................ 7

              2.     The Misstatements Concerning Lordstown's Production Capacity.......... 18

              3.     Defendants' *Janus* Argument Is Misplaced................................................ 22

        B.     The SAC Adequately Pleads Defendants' Scienter.............................................. 23

              1.     Defendants' Access to Information Supports an Inference of Scienter.... 24

              2.     Defendants' Hands-On, Personal Involvement in the Pre-Order Process Supports an Inference of Scienter.............................................................. 29

              3.     The SEC Inquiry Supports an Inference of Scienter................................. 31

              4.     Defendants' Motive Supports an Inference of Scienter........................... 31

              5.     Additional Facts Support an Inference of Scienter................................... 34

        C.     The SAC Adequately Pleads Loss Causation ...................................................... 36

        D.     The SAC Adequately Alleges Reliance ............................................................... 38

        E.     The SAC Adequately Pleads Control Person Claims .......................................... 39

        F.     The SAC Adequately Pleads a Claim Under §14(a)............................................ 39

        G.     The SAC Adequately Pleads Insider Trading Claims.......................................... 39

IV.    CONCLUSION.................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)................................................................................................38

*In re Am. Serv. Grp., Inc.*,
   2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ...............................................................33

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)....................................................................35

*Bond v. Clover Health Invs., Corp.*,
   587 F. Supp. 3d 641 (M.D. Tenn. 2022)............................................................................31

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ..............................................................................38

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010).............................................................................35

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
   29 F.4th 802 (6th Cir. 2022) ..............................................................................................26

*In re Compuware Sec. Litig.*,
   301 F. Supp. 2d 672 (E.D. Mich. 2004).............................................................................22

*In re Comshare, Inc. Sec. Litig.*,
   183 F.3d 542 (6th Cir. 1999) ...............................................................................................7

*Cosby v. KMPG, LLP*,
   2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ..................................................................31

*In re Diebold Sec. Litig.*,
   2008 WL 3927467 (N.D. Ohio Aug. 22, 2008),
   *aff'd,* 590 F.3d 390 (6th Cir. 2009)...................................................................................33

*Dougherty v. Esperion Therapeutics, Inc.*,
   905 F.3d 971 (6th Cir. 2018) ...................................................................................... *passim*

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) .................................................................................. 20, 27-28

*Emps.' Ret. Sys. of City of St. Louis v. Jones*,
2021 WL 1890490 (S.D. Ohio May 11, 2021) ................................................................39

*In re Empyrean Bioscience, Inc. Sec. Litig.*,
255 F. Supp. 2d 751 (N.D. Ohio 2003) .......................................................................38

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004) .......................................................................13

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
964 F. Supp. 2d 875 (N.D. Ohio 2013) .......................................................................34

*Frank v Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ............................................................................31, 35

*In re Gen. Motors Co. Sec. Litig.*,
773 F. Supp. 3d 429 (E.D. Mich. 2025) .................................................................28, 29

*Harris v. AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015) .........................................................................37

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ...................................................................20, 21

*Havenick v. Network Express, Inc.*,
981 F. Supp. 480 (E.D. Mich. 1997) ..........................................................................33

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) .................................................................................39

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ..................................................................20, 29

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) .......................................................................................22, 23

*KBC Asset Mgmt. N.V. v. Eaton Corp.*,
572 F. App'x 356 (6th Cir. 2014) .............................................................................37

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
2021 WL 4397946 (S.D. Ohio Sep. 27, 2021) .................................................................17

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) .......................................................................33

*Lea v. TAL Educ. Grp.*,
837 F. App'x 20 (2d Cir. 2020) ...............................................................................37

iii

*Lim v. Hightower*,
    2024 WL 4349409 (N.D. Ohio Sep. 30, 2024) .................................................................. 30-31

*Lowinger v. Morgan Stanley & Co.*,
    841 F.3d 122 (2d Cir. 2016) .......................................................................................33

*Mediacom Se. LLC v. BellSouth Telecomms., Inc.*,
    672 F.3d 396 (6th Cir. 2012) .....................................................................................13

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .................................................................................37

*Miller v. Champion Enters., Inc.*,
    346 F.3d 660 (6th Cir. 2003) .....................................................................................22

*Mosaic Fin. Ltd. v. Mut. S'holder Servs., LLC*,
    767 F. Supp. 3d 619 (N.D. Ohio. 2025).....................................................................26

*N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Cooperweld, Inc.*,
    929 F. Supp. 2d 740 (M.D. Tenn. 2013)................................................................. 32-33

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
    580 F. Supp. 2d 630 (S.D. Ohio 2008) ......................................................................21

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .....................................................................................37

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
    877 F.3d 687 (6th Cir. 2017) .....................................................................................36

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) .............................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*,
    575 U.S. 175 (2015).............................................................................................17, 21

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).......................................................................................37

*Plagens v. Deckard*,
    2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) .....................................................10, 34

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) .....................................................................................39

*PR Diamonds, Inc. v. Chandler*,
    91 F. App'x 418 (6th Cir. 2004) ...............................................................................32

iv

*Reese v. Malone,*
747 F.3d 557 (9th Cir. 2014) ...............................................................................35

*Ricker v. Zoo Ent., Inc.,*
534 F. App'x 495 (6th Cir. 2013) ........................................................................26

*Rubin v. Schottenstein, Zox & Dunn,*
143 F.3d 263 (6th Cir. 1998) ...............................................................................10

*Salvani v. ADVFN PLC,*
50 F. Supp. 3d 459 (S.D.N.Y. 2014),
*aff'd*, 628 F. App'x 784 (2d Cir. 2015)................................................................38

*SEC v. Brethen,*
1992 WL 420867 (S.D. Ohio Oct. 15, 1992)........................................................40

*SEC v. Hurgin,*
484 F. Supp. 3d 98 (S.D.N.Y. 2020)....................................................................23

*SEC v. Talbot,*
530 F.3d 1085 (9th Cir. 2008) .............................................................................37

*Shupe v. Rocket Cos.,*
660 F. Supp. 3d 647 (E.D. Mich. 2023)...............................................................13

*South Ferry LP #2 v. Killinger,*
687 F. Supp. 2d 1248 (W.D. Wash. 2009).............................................................36

*Stein v. U.S. Express Enters., Inc.,*
2020 WL 3584800 (E.D. Tenn. June 30, 2020)....................................................27

*In re Supreme Indus., Inc. Sec. Litig.,*
2018 WL 2364931 (N.D. Ind. May 23, 2018) ......................................................16

*Tchrs.' Ret. Sys. of La. v. Hunter,*
477 F.3d 162 (4th Cir. 2007) ...............................................................................37

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.,*
83 F.4th 514 (6th Cir. 2023) ..........................................................................27, 30

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
551 U.S. 308 (2007)........................................................................... *passim*

*In re TransDigm Grp., Inc. Sec. Litig.,*
440 F. Supp. 3d 740 (N.D. Ohio 2020).................................................................36

*United States v. Smith,*
155 F.3d 1051 (9th Cir. 1998) .............................................................................40

v

*In re Virtu Fin., Inc. Sec. Litig.*,
 770 F. Supp. 3d 482 (E.D.N.Y. 2025) ................................................................35

*Weiner v. Tivity Health, Inc.*,
 365 F. Supp. 3d 900 (M.D. Tenn. 2019).............................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) .......................................................................27, 34

**Statutes**

15 U.S.C. § 77z–2(a)(2)......................................................................................22

**Other Authorities**

Joanna Lee, *Activist Short Sellers: Market Manipulators or Market Protectors?*,
 REV. BANKING & FIN. L. 274 (Spring 2013)........................................................37

George Troicky ("Lead Plaintiff") and additional named Plaintiffs Daniel Tavares, Globestar Systems Inc., Ashith Pabbathi, and FNY Managed Accounts LLC (together, "Plaintiffs') hereby oppose the motion to dismiss ("MTD," ECF Nos. 86 and 86-1) filed by Defendants Stephen Burns, Julio Rodriguez, Caimin Flannery, Shane Brown, Rich Schmidt, and Darren Post.[1]

## I. INTRODUCTION

This is a classic "fake it 'til you make it" fraud.  Defendants secured hundreds of millions of dollars of investment for their electric truck startup that was out of cash and far from production. In doing so, Defendants repeatedly claimed that Lordstown would generate billions of dollars in revenue beginning in September 2021, when it would start delivery of the tens of thousands of trucks it had "pre-sold" to fleet operators—Lordstown's picky target market.  This was all a lie.

Detailed allegations—sourced from, *e.g.*, internal emails, confidential witnesses ("CW(s)"), and an interview with a former Lordstown Board member—establish that Defendants knew, or were reckless in not knowing, that their statements about pre-orders and Lordstown's production timeline were false and misleading.  Ultimately, investors lost hundreds of millions of dollars as the truth came to light, triggering SEC and DOJ investigations, the termination of Lordstown's CEO and CFO, public recognition by a Special Committee of Lordstown's Board that Defendants made inaccurate statements, and the total collapse of the Company.

Defendants' MTD proceeds by misdirection (*e.g.*, irrelevant diatribes about general electric vehicles demand) and by impermissibly disputing—or just ignoring—the pleadings.  Notably, the MTD barely mentions one of Defendants' most frequent and insidious lies: that Lordstown's so-called pre-orders were "*all*" with "fleet operators."  *See, e.g.*, ¶124.  ***In reality, <u>at best</u> 15% of the claimed pre-orders reflected documented deals with commercial fleet operators***.  ¶206.

---

[1] Emphasis is added, internal quotations and citations are omitted, and terms/conventions are adopted from the Second Amended Complaint (ECF No. 83, the "SAC," cited as "¶__").

Defendants strain to rewrite history by arguing that Burns only claimed that Lordstown had many pre-orders from fleets.  MTD at 19.  This continued subterfuge tells you all you need to know.  The record is clear, in statement after statement, Defendants reaffirmed that the touted pre-order numbers were *only* from commercial fleets.  *E.g.*, ¶¶126, 127, 130, 132, 135, 137, 325, 351, 396.  Consider, as just one example, Burns' statement to *IPO Edge* on November 16, 2020:

> Today we announced a couple big things.  Demand, like you said, 50,000 pre-sales already, **all** from fleets.  That's just the commercial sector.  Does not count military or police departments, municipalities, state vehicles, so really just to have that many commercial vehicles sold already is a big deal.

¶333.  While Burns boasted that it was a "big deal" that the orders were from fleets, at that time, Lordstown had no more than 6,126 legitimate pre-orders with fleets, and no more than 9,507 pre-orders with fleets, even including deals that weren't papered with signed letters of intent.  ¶206.

As another example, consider how Burns claimed to *Yahoo Finance* on February 23, 2021 that "we have pre-sold 100,000 of these **to** various fleets across America."  ¶363.  At that time, Lordstown only had about 13,000 pre-orders from fleets (8,500 with documentation).  ¶206.

That the pre-orders were supposedly coming from fleets was immensely important. Lordstown needed to show investors that its target market would be interested in taking a chance on novel technology and a new company.  ¶¶104-05.  Deals with non-fleets or "intermediaries" would not make this showing.  ¶104.  There is a mountain of difference between saying, "I'd like to buy your house" and saying, "I might like to work as an agent to try to sell your house."

While Defendants' misrepresentations concerning the quantity of pre-orders from fleets were at the heart of this fraud, Defendants spun many additional lies.  For example:

*First*, Defendants touted pre-orders that were entirely fabricated or based on dealings with firms that could not plausibly buy the stated number of trucks, such as a 14,000 truck, $735 million cancelled deal with an individual with no (real or even claimed) affiliation to a fleet operator.

2

*Second*, Defendants repeatedly touted the pre-orders in misleadingly strong terms.  While some SEC filings stated that the "pre-orders" were non-binding, Defendants publicly claimed to have "pre-sold" or "sold" the vehicles already.  ¶¶315, 333, 363, 450, 461, 467.  At best, this misleading language raises questions of fact regarding how investors would construe the language.

*Third*, Defendants claimed Lordstown would start production in September 2021, despite *knowing* that numerous obstacles—*e.g.*, mandatory regulatory steps—made this an impossibility.  In fact, renowned consultants warned Defendants of this reality.  ¶¶55, 227, 282, 370, 452, 490.

Altogether, the allegations of falsity and scienter easily meet the requisite pleading requirements.  Defendants' remaining challenges are entirely meritless, as explained herein.

## II.    BACKGROUND

Shortly after being pushed out as CEO of his prior firm, Workhorse (¶¶69, 81, 85), Defendant Burns hatched the idea to buy a recently closed GM manufacturing plant and formed a company to sell an electric truck: the Endurance.  ¶¶88-93, 95.  The vehicle's defining feature was an unprecedented "hub motor" design, placing motors inside the truck's wheels.  ¶¶93-94.

In June 2019, Burns launched Lordstown but lacked sufficient capital to run the Company.  ¶¶87-93.  For months, Burns unsuccessfully tried to raise funds.  ¶¶100-16.  In doing so, Burns developed a false narrative that Lordstown had a growing number of pre-orders that would quickly convert into billions of dollars of revenue.  ¶¶91-99.  In June 2020, at an event unveiling an early Endurance prototype, Burns boasted to Vice President Mike Pence that Lordstown had "*already pre-sold*" its first year of production.  ¶¶98-99.

By August 2020, Lordstown was essentially out of cash.  ¶107.  Burns made a last-ditch, bet-the-company play to secure financing, soliciting the Merger with DPHC.  ¶100.  DPHC was a SPAC—*i.e.*, a public company with the goal of buying a private firm and taking it public.  ¶83.  The Merger would provide Lordstown with $675 million in desperately needed funding.  ¶100.

3

However, DPHC's shareholders needed to approve the Merger, so Burns renewed his efforts to fraudulently pitch Lordstown.  On August 3, 2020, Defendants filed proxy materials with the SEC that touted the inflated book of pre-orders.  ¶¶101-10, 290-305.  The purported demand from commercial fleets—Lordstown's target market—was critical, as it showed the viability of Lordstown's business in persuading these selective customers.  ¶105.  The proxy also falsely stated that Lordstown was near production ready.  ¶¶372-84.  Burns reiterated these lies while the Merger was pending.  ¶¶111-16.  On October 22, 2020, based on the materially misleading proxy materials, shareholders voted in approval, the Merger closed.  ¶¶114, 118.

Burns successfully defrauded investors into funding his startup.  But, as is standard in SPAC deals, Burns was bound by a "lockup" barring him from selling his shares for a period of time.  ¶480.  Thus, he continued the fraud, hoping it would go undetected until he could either cash out or until Lordstown, despite the fraud, somehow found success—gambling with others' cash.

When virtually ringing the bell at the NASDAQ following the Merger, Burns indicated that Lordstown was "on target" to bring the Endurance to market in ***September 2021***.  ¶119.  For months after, Burns continued to make media appearances touting an ever-growing count of "serious" pre-orders "all" from commercial "fleet operators," as well as Lordstown's ability to begin production in September 2021.  ¶¶327-68, 394-415.  For example, on November 17, 2020, Burns appeared on *CNBC* with Jim Cramer, who asked about how "solid" the 50,000 pre-orders were and if "***[t]hey are <u>committed</u>***?"  ¶339.  Burns responded: "***Right.  Yeah.  All of them***," adding that the "average order size is about 500 trucks" and that they were "***very serious orders***."  *Id*.

On February 17, 2021, Lordstown received an SEC subpoena inquiring about the fraud alleged herein.  ¶¶243-44, 457.  ***Incredibly***, Burns' lies continued—*e.g.*, on February 23, 2021, he claimed in an interview with *Yahoo Finance* that Lordstown had "pre-sold" 100,000 trucks.  ¶363.

4

The truth began to emerge on March 12, 2021, when Hindenburg published a lengthy analysis of the fraud. ¶138. After a thorough investigation, which included interviews with employees and purported customers, the Hindenburg Report concluded that "Burns sought to book orders, regardless of quality, purely as a tool to raise capital and confer legitimacy," and as a result, "Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles." ¶140. The Hindenburg Report further stated:

- Lordstown counted E Squared as making a massive 14,000 truck pre-order worth **$735 million** (more than all of the cash Lordstown raised in the Merger), even though E Squared was a non-incorporated, 1-2 person operation, run out of a one-bedroom apartment, which did not operate a fleet. ¶¶143-45.

- Lordstown counted Momentum Groups for a 900 truck pre-order, even though it is not a fleet operator and merely ran a webpage inviting others to buy the truck. ¶151.

- Lordstown counted Innervations LLC for a 1,000 truck pre-order, a self-described "influencer[]" business operated as a side hustle by two individuals, which did not operate a fleet, or "get involved in the actual ordering," and instead sought to act as a promoter for Lordstown trucks by hosting events. ¶¶147-49.

- Lordstown counted a 500 truck pre-order by Clean Fuels Ohio, even though it was an educational non-profit, not a fleet operator, and was "really clear" with Lordstown about the deal being "promotional." ¶150.

- Lordstown booked pre-orders from the City of Ravenna, which did not place an order or sign a LOI. ¶¶157, 187-89.

Through a review of internal documents, subsequently publicly disclosed information, and interviews, Lead Counsel has confirmed many of the claims in the Hindenburg Report. ¶¶161-209. Internal emails show Lordstown executives, including Burns, viewed obtaining pre-orders as driving positive publicity and investment, rather than as a legitimate indicator of demand. ¶181. Analysis of internal tracking documents shows the scale of the fraud: if one only counted deals that were **potentially** with commercial fleet operators, and **actually had** a supporting agreement, Lordstown inflated its pre-order numbers by between **85% and 92%.** ¶¶206-07.

The Hindenburg Report also explained that Lordstown faced undisclosed production issues and touted an unrealistic production schedule.  ¶¶210-16.  Lead Counsel's investigation, including consultation with an automotive expert, further demonstrated that Defendants' assurances of beginning production by September 2021 were not feasible.  ¶¶217-23.  Indeed, a report from July 2020, conducted by McKinsey—retained by DPHC as part of Merger diligence—projected that, even if Lordstown performed better than "best industry practices," the earliest vehicle production could begin was April 2022.  ¶224.  McKinsey's detailed analysis was shared with Burns.  ¶225.

The market reacted sharply to the Hindenburg Report's revelations, sending Lordstown's stock down 16.54% on March 12, 2021, which news articles attributed to the report.  ¶¶230-32.

The truth continued to gradually emerge, causing further investor loss.  On March 17, 2021, Defendants finally disclosed the SEC investigation and announced the formation of a Special Committee to investigate the issues raised in the Hindenburg Report.  ¶236.  Shockingly, the next day, Burns appeared on *CNBC* and stated: "***We've never said we had orders.***"  ¶237.  Jim Cramer, who conducted the prior interview where Burns claimed Lordstown had "***very serious orders***" was stunned.  Cramer recalled that Burns had "***point blank said the opposite to me***" and concluded, based on Burn's reversal, that "***the prosecution rests***."  ¶¶238-39.  Following Burn's admissions, Lordstown's stock price closed down 13.8% on March 18, 2021.  ¶240.

On May 24, 2021, Lordstown slashed its production guidance by 50% for September 2021, revealing it would not meet the touted production schedule.  ¶¶246-47.  Lordstown's stock price closed down another 7.45% on May 25, 2021.  ¶248.  On June 8, 2021, Lordstown released an amended 10-K, announcing a "going concern" notice that it may need "significant" capital to reach production, and that it had "material weaknesses in internal control over financial reporting."  ¶¶250-52.  Lordstown's stock fell 20.86% from June 8, 2021 through June 9, 2021.  ¶254.

6

On June 14, 2021, Lordstown disclosed that its own internal investigation had found "***issues regarding the accuracy of certain statements regarding the Company's pre-orders.***" ¶¶256-59.  That same day, Lordstown announced the "resignations"—really, terminations—of Burns and its CFO, Defendant Rodriguez.  ¶¶262-63.  The price of Lordstown's stock fell 18.84% on June 14, 2021.  ¶265.  On July 2, 2021, *The Wall Street Journal* reported that Lordstown was under criminal investigation by the DOJ, causing a same-day decline of 10.8%.  ¶¶269-70.

Lordstown filed for bankruptcy in June 2023, ceasing all operations.  ¶56.  While in bankruptcy, it settled the SEC's claims, which were based on findings that the statements about pre-orders and production capabilities were "false and misleading."  ¶¶56-57, 460-63.

## III.    ARGUMENT

On a motion to dismiss, the court takes all factual allegations in the complaint as true and generally reviews the pleadings in the light most favorable to plaintiff.  *See In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 547 (6th Cir. 1999).  This remains true even in PSLRA fraud cases. *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 322 (2007).

### A.    The SAC Adequately Alleges Misstatements

#### 1.    The Misstatements Concerning Pre-Orders

The statements touting the number of pre-orders Lordstown obtained (detailed in SAC Section V(A)(1) (¶¶287-368)) were materially false and misleading because Lordstown did not have pre-orders or pre-orders with commercial fleets in the amounts disclosed by Defendants.

##### a.    Defendants Inflated the Pre-Order Book Through Fake Deals

The statements touting the number of pre-orders were false and misleading because Defendants counted orders that were fake, or from businesses that could not place the touted orders, and thus did not indicate any real demand for Lordstown's truck.  The SAC provides detailed descriptions of many of these bogus deals.  *See* ¶¶183-205.

For example, the 14,000 truck pre-order with E Squared began as a supposed deal with Tim Grosse on behalf of "Grid X."  ¶¶183-86.  Lordstown touted this deal in proxy filings using the logo of a US-based firm "Grid X, Inc."—that had nothing to do with the deal whatsoever.  *Id.* Rather*,* Gross was supposedly working for a tiny UK-based management consulting firm called "Grid X Limited."  *Id.*  However, shortly after the pre-order was inked, Grosse wrote to Lordstown indicating that he *also* wasn't even employed by the UK firm, asking Lordstown to "cancel this LOI."  *Id.*  Despite this, Lordstown shifted the order to Grosse's new firm "E Squared," which also did not operate a fleet or have any even remotely colorable basis to order $735 million of trucks. *Id.*  **The absurdity of this was obvious.**  Indeed, Burns was copied on emails that made clear Grosse had no intent to buy the trucks.  *Id.*  Burns sent emails suggesting that (while Lordstown counted the deal), it should not mention it publicly due to the supposed buyer's [lack of] "financial strength."  *Id.*  Burns even resisted paying commissions on the deal—he knew it was bogus.  *Id.*

As another sizable example, Lordstown booked a $52.5 million 1,000 truck deal with a tiny business called "Innervations."  ¶195.  Burns personally congratulated the salesperson on this pre-order.  *Id.*  Indeed, Defendant Burns and Defendant Flannery were copied on an email stating it was not a "purchase LOI" and another email titled, "the difference between LOI and broker deal," which stated that Innervations would merely be "encouraging their customers to buy."  *Id*.

Similarly, Lordstown booked a 500 truck pre-order worth $26 million from an advocacy group called Sacramento Clean Cities. ¶194.  The organization had merely sent Lordstown a letter stating that it did "not have a vehicle fleet and as such, is not in a position to make a commitment to purchase electric pickup trucks," but that it was "aware of demand" for electric trucks among fleets in California.  *Id.*  Lordstown invented the pre-orders out of thin air based on this letter *expressly* stating the organization would not order trucks.

Indeed, Lordstown habitually made-up deals where none existed.  For example, Lordstown booked the City of Ravenna as pre-ordering 15 trucks, when, in reality, it had merely sent a letter indicating the city already owned 15 trucks and would consider buying the Endurance.  ¶187.  When Lead Counsel spoke with the Mayor of Ravenna, he stated that there was "no way on God's green earth" that an order of 15 new trucks would be within the City of Ravenna's budget.  ¶188.

**Defendants' Responses Are Meritless**.  Defendants raise several arguments in an attempt to justify their decision to tout the bogus pre-orders, but none come close to supporting dismissal.

*First*, Defendants claim these allegations are based on the Hindenburg Report.  MTD at 17.  This is simply false.  While the investigation did ***confirm*** many of the allegations in that report, the SAC's allegations are based on Lead Counsel's independent investigation after reviewing an extensive record of internal emails, documents, CW interviews, an interview with a former Lordstown Board member, and other materials.  It does not merely rely on the Hindenburg Report.

*Second*, Defendants try to downplay their decision to count these non-existent deals as pre-orders.  Defendants note that just because "a company is run out of an apartment or has a short operating history does not mean its pre-order was not genuine."  MTD at 16, 17.  As the accounts above (and additional accounts in the SAC, ¶¶183-205) clearly show, the allegations go far beyond commenting on a short operating history.  The supposed deals at issue were from companies that Defendants *knew* could not possibly place the requested pre-orders and often came from companies that had *not* in any sense whatsoever suggested they were making a pre-order.

*Third*, Defendants argue that demand for a vehicle *like* the Endurance was "significant."  MTD at 16-17.  Even if true, this could not excuse Defendants' decision to overstate the pre-orders.  Moreover, the key question for investors was whether fleets would want to buy a highly novel truck from the upstart Lordstown, not whether there was demand for electric trucks generally.

*Fourth*, Defendants downplay the bogus orders by characterizing the allegations as "piecemeal attacks."  MTD at 16, 17.  This argument is astoundingly weak.  For example, just the E Squared "deal" alone was worth 14,000 trucks, or $735 million.  ¶¶183-86.  That was 36% of the total *claimed* pre-orders at the time the deal was touted in the Merger proxy and remained a whopping 14% of all supposed pre-orders by the time the Company was touting 100,000 pre-orders.  ¶183.  The phony "deal" was worth more than the *entirety* of the proceeds Lordstown raised in the Merger.  ¶¶107, 143.  Even if this were the *only* deceit in the case, it would be material.  *Cf. Plagens v. Deckard*, 2023 WL 2711263, at *23 (N.D. Ohio Mar. 30, 2023) (commenting on 5% "rule of thumb" for materiality, but noting materiality is a fact issue for the jury).

*Fifth*, in another act of misdirection, Defendants argue that Lordstown disclosed that the pre-orders were non-binding (*e.g.*, MTD at 14-16) and claim there were no accounting rules about pre-orders (MTD at 17). The relevance of the pre-orders as indicators of demand does not turn on whether they are binding, and the deceit in non-accounting (non-GAAP) pre-order claims has nothing to do with accounting rules.  Investors would be misled by claims that Lordstown had a certain number of pre-orders when a substantial majority were bogus.  *See generally Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (upon speaking, one "assume[s] a duty to speak fully and truthfully on those subjects").  Investors credited the pre-orders as a significant indication of demand.  *E.g.*, ¶117 (analyst "Buy" rating based on Lordstown's "over 40,000 pre-orders . . . from established fleet customers"); ¶130 (R.F. Lafferty Equity Research explaining pre-orders from "fleets" should provide "steady revenue stream through 2022").[2]

---

[2] *See also* ¶128 (Credit Suisse asking about fleet demand, and Burns touting pre-orders and "pent up demand"); ¶126 (Jim Cramer of *Mad Money* asking if the pre-orders were "solid," and Burns confirming they were from fleets and "very serious orders"); ¶109 (proxy materials claiming the SPAC acquirer had determined that Lordstown had "attracted a clear lane of customers in the commercial fleet segment" as "evidenced by its $1.4 billion in pre-orders to-date").

**b.** **Defendants Falsely Claimed the Pre-Orders Were from Fleets**

Defendants repeatedly claimed that all the pre-orders came from commercial fleet operators. This indicated that the pre-orders were meaningful proof of the strong demand for Lordstown's trucks from its target audience. Selling to fleets was a logical target market, since it would reduce the need to establish a broad charging and service network, but posed challenges because fleets are sophisticated and may be reluctant to rely on a startup with novel technology.

Indeed, Defendants repeatedly stated that all the pre-orders came from commercial fleets. *See, e.g.*, ¶333 (Burns: "50,000 pre-sales already, ***all from fleets***. That's just the commercial sector."); ¶323 (Burns: Lordstown had "pre-sold 40,000 of [the Endurance] to ***fleet customers*** already"); ¶351 (Burns: "Receiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history."); *see also* ¶¶124, 339, 341, 357, 363.

But the truth was that only a small percentage of the pre-orders were from fleets, as detailed in the SAC. This reality became well documented as the fraud gradually unraveled:

***First***, the Hindenburg Report initially revealed that the pre-orders came "from customers that generally do not even have fleets," recounting examples. ¶¶25, 28. As detailed in the SAC, internal documents and other evidence confirmed these allegations. ¶¶29-35.

***Second***, Lead Counsel's analysis of internal Lordstown documents confirmed this widespread issue. *E.g.*, ¶204 (supposed deal for 500 trucks that Burns and Flannery were personally involved in negotiating with Clean Fuels Ohio—a non-profit advocacy organization that did not have trucks, and which Lordstown internally recounted would encourage others to buy the Endurance); ¶197 (supposed deal with a non-profit dedicated to "promoting civic policy"). Internal spreadsheets that were circulated internally to track the supposed pre-orders and internal communications concerning those supposed pre-orders, further confirmed the deceit.

11

The table at ¶30 of the SAC documents highlights the breadth of the issue—showing that when Lordstown was touting 80,000 pre-orders, it only had 9,924 supposed pre-orders with fleets and only 6,541 of those pre-orders with fleets were backed by documentation; and when Lordstown was touting 100,000 pre-orders, it only had 12,934 supposed pre-orders with fleets and only 8,541 of those pre-orders with fleets were backed by documentation.  In fact, ***nine of Lordstown's ten largest pre-orders*** were recorded internally as deals with "intermediaries," and not with "fleets."  ¶208.  The only one that was not recorded as a deal with an intermediary was a $650 million pre-order to Holman Enterprises.  But emails show, and former Board member Hamamoto confirmed, Burns and Flannery knew that the deal called only for Holman to broker sales to third-parties—it too was just a differently recorded intermediary deal.  *See* ¶¶190-91.

***Third***, as part of the SEC's findings of fact supporting its conclusion that Defendants' statements touting Lordstown's pre-orders were false and misleading, the SEC stated that "the pre-orders were ***not all from or primarily*** from fleet customers."  ¶56.

***Fourth***, Lordstown's Special Committee found "40% to 71% of the pre-orders during this period were from intermediaries or influencers who indicated they would encourage, facilitate, or influence the purchase of the Endurance and did not intend to buy it for their own use."  *Id*. (SEC recounting Special Committee's findings).  In an interview with Lead Counsel, Hamamoto (who chaired that Special Committee) confirmed that the SEC's factual findings were consistent with his understanding of the facts.  ¶274.  Hamamoto also recounted his view that pre-orders that did *not* come from fleets—and instead came from influencers or intermediaries—should not have been counted as pre-orders indicative of the demand for Lordstown vehicles.  ¶264.

**Defendants' Responses Are Meritless.**  Defendants again primarily respond with misdirection and obviously untenable arguments.

12

Defendants initially argue that, in certain statements, Burns only stated the pre-orders were "primarily" from fleet customers.  MTD at 14.  This carries no weight as to the many statements directly asserting that the touted pre-orders were **all** from commercial fleets.  However, even if Defendants had merely claimed that the pre-orders were "primarily" from fleets, they still would have been lying.  The vast majority of the touted pre-orders did not come from commercial fleets—*i.e.*, anywhere from 81% and 88% were not from commercial fleets.  ¶206.

Defendants' other argument attempts to downplay the distinction between fleet and non-fleet customers.  To do so, Defendants improperly reach outside the record for the proposition that "[i]n the automotive industry, commercial fleet operators often procure vehicles through fleet management companies."  MTD at 7, 19-20.  This argument fails at every turn.

*First*, it fails because it depends on facts that fall outside the four corners of the pleadings.  Defendants cannot raise an argument at this stage based on extrinsic facts.  *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 399 (6th Cir. 2012).

*Second*, Defendants' argument runs itself off the road.  The assertion that fleets often buy from intermediaries, *necessarily* recognizes a distinction between fleets and intermediaries.

*Third*, even charitably interpreting Defendants argument, it could, at most, be construed as an attempt to dispute the meaning of the term "fleets" to include "intermediaries."  But fact disputes about the meanings of terms cannot be resolved in Defendants' favor on a motion to dismiss.  *See Tellabs,* 551 U.S. at 322 (all facts must be construed in plaintiffs' favor); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) (a "question of fact . . . cannot be decided on Defendants' motion to dismiss"); *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 674 (E.D. Mich. 2023) (rather than "resolve the factual dispute" about the meaning of a term, the court "must assume" plaintiffs' meaning at the motion to dismiss stage).

13

*Fourth*, even if fact disputes about the meaning of terms could be raised at this stage, here Lordstown's own SEC filings defined fleets as "commercial or governmental organizations with three or more trucks." ¶56.  If Defendants had wanted to include intermediaries in this definition, they could have done so, they cannot now retrofit the definition *via* motion to dismiss briefing.

*Fifth*, there is no basis to dispute the meaning of fleets from Defendants' observation that fleets often buy from intermediaries.  If fleets *always* bought through intermediaries, one could imagine a textual construction dispute arising from that observation.  But that is not the case.  Fleets do buy directly—indeed a small number did place pre-orders with Lordstown.  ¶206.

*Sixth*, in context, the misstatements obviously referred to purchases directly with fleets (as opposed to intermediaries).  Defendants routinely represented that it was a "big deal" that it received so many orders from fleets (¶333) and touted the fleet pre-orders as genuine indications of demand.  Analysts accepted this representation.  *See supra* at 10.  If the pre-orders merely reflected intermediaries stating they were interested in brokering sales, that would indicate nothing about the actual demand for the trucks—a broker offering to broker sales is not a "big deal" and says next to nothing about demand for the product.

*Seventh*, Lordstown's own Special Committee rejected Defendants' argument, when called upon to investigate the matter following the Hindenburg Report.  The Special Committee determined that public statements touting the pre-orders were "**inaccurate**," precisely because Lordstown counted pre-orders from intermediaries.  ¶259.

*Eighth*, even if Defendants' definitional argument were credited, it would not cure the fraud.  Many of the pre-orders were not "even" from fleet intermediaries.  For example, a significant magnitude of deals were with **influencers** (*e.g.*, ¶195 (Innervations); ¶197 (Mayors' Association)) or **non-profits** (*e.g.*, ¶194 (Sacramento Clean Cities); ¶204 (Clean Fuels Ohio)).

14

c.        **Defendants Falsely Touted the Pre-Orders as Serious Orders**

In addition to counting bogus orders and orders from non-fleet customers, Defendants also defrauded the investing public by misrepresenting the seriousness of the progress.  This was misleading because it overstated the significance of the pre-orders both as a pipeline of largely secured future revenue and as an indicator of demand.  This deception took several forms.

Sometimes, Defendants just directly referred to these supposed deals as actual sales.  ¶323 (Burns: Lordstown had "*pre-sold* 40,000 of [the Endurance] to fleet customers already"); ¶333 ("50,000 *pre-sales* already, all from fleets. . . . to have that many commercial vehicles *sold* already is a big deal."); ¶363 (Burns: "Our initial foray is into fleets and we have *pre-sold* 100,000 of these to various fleets across America.  So, really a big appetite."); *see also* ¶¶315, 327, 339, 365, 392.

More generally, Defendants spun a false narrative that these deals were "serious" and "sticky."  *See* ¶357 (Burns: "I think these orders are *very, very sticky*. . . fleets generally take their business *very, very seriously*."); ¶339 (Burns: "*So it's very serious orders*."); ¶414 (Defendant Schmidt: "Currently, we have enough orders for production for '21 and '22. . . . Those are *__firm orders__* we have for those two years… they are *__basically binding orders__*.").

Moreover, Defendants reinforced the misconception of concreteness by tying the pre-orders to concrete revenue figures.  *See, e.g.*, ¶102 (Burns: "we have *secured $1.4 billion* in pre-orders"); ¶108 ("*~$1.4bn* of Existing Pre-Orders"); ¶106 (Lordstown has received orders for "*revenue* sufficient to cover 2021 production and into 2022").

Indeed, the "pre-orders" were not sales at all, as they were not binding and did not involve payment, commitment, or indicia of seriousness of any kind.  Defendants argue that it is industry practice to use the term "pre-order" to refer to a non-binding deal and point out that in SEC filings Lordstown stated the pre-orders were non-binding.  These responses fail.

15

*First*, Defendants ignore that their statements often referred to "*sales*" or "*pre-sales*," not just "pre-orders," and so the definition of "pre-order" therefore does not resolve this issue.

*Second*, at best, Defendants suggests a basis for ambiguities about the meaning of the term "pre-orders" that cannot be resolved at this stage.  *See supra* at 13.

*Third*, the notion that Defendants simply conveyed these were non-binding orders is contrary to the facts.  It is far more plausible that the use of stronger language reflected an intent to deceive than a slip of the tongue.[3]  The stronger language was used in so many instances, and with such elaboration, that it obviously carried intentional weight.  Indeed, on November 17, 2020, when Jim Cramer asked Burns about the arrangements, Burns expressly doubled-down, stating:

> When you order, I think our average order size is about 500 trucks at a time.  And as most of them were signed by the CEOs of these large firms, and bringing in 500 electric vehicles into your fleet, it's not trivial.  So you've got to plan all the charging and everything.  So it's *very serious orders*.

¶126.  That this was deceptive was perfectly captured by Jim Cramer's reaction to Burns' March 18, 2021 admission that these were not "orders."  ¶238.  Cramer concluded: "he point blank said the opposite to me."  ¶238-39.  That Cramer felt misled is more than sufficient to establish that reasonable investors were also misled.  *See also* ¶56 (SEC finding that "Burns' statements that the pre-orders were "*very serious orders*" or "*very sticky*" were "misleading").

### d.       Defendants Additional Arguments Are Meritless

Defendants argue certain pre-order statements are inactionable because they were opinions, puffery, or forward-looking statements protected by the PSLRA safe harbor.  These arguments are desperate and frivolous, and each similarly depends entirely on misleading selective quotation.

---

[3] Defendants' citation to *In re Supreme Industries, Inc. Securities Litigation*, where the court gave the defendant a pass on an "off-the-cuff statement . . . in an unscripted portion of an earnings call," is misplaced.  2018 WL 2364931, at *12 (N.D. Ind. May 23, 2018).  The court was talking about scienter, not falsity.  *See id*.  Here, Defendants repeatedly made the same misstatements.

16

***The Statements Were Not Inactionable Opinions***.  Defendants argue ¶351 expressed the opinion "we feel that we are about to revolutionize the pickup truck industry" but omit the key text that Plaintiffs allege is false and misleading (*see* ¶352): Lordstown "[r]eceiv[ed] 100,000 pre-orders from commercial fleets."  MTD at 20-21.  Statements are obviously not made inactionable by proximity to opinion language.  Indeed, even pure opinion statements are actionable if they "conflict with what a reasonable investor would take from the statement."  *Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

***The Statements Were Not Puffery***.  Defendants attempt the same selective quotation chicanery to argue puffery.  For example, Defendants argue ¶359's statement "demand for the Endurance has been overwhelming" was puffery, omitting the key text that Lordstown had "100,000 pre-orders."  MTD at 21.  Defendants' ploy fails because a factual statement is not suddenly "so vague, so lacking in specificity" as to be immaterial to investors by proximity to other, more vague language.  *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *7 (S.D. Ohio Sep. 27, 2021) (describing standard for assessing puffery).

***The Statements Were Not Forward-Looking***.  Defendants repeat this ploy a third time, arguing statements are "forward looking" by selective quotation.  For example, they quote ¶361 as saying "it's gonna take us a couple of years to fulfill that demand," omitting the claim Lordstown had "over a hundred thousand pre-orders[] ***right now***."  MTD at 22.  That claim is a present tense assertion, not dependent on the comment about fulfilling that demand or whether orders are placed in the future.  *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (statement not forward-looking if its "veracity can be determined at the time").[4]

---

[4] Even if deemed "forward looking" these statements were not accompanied by meaningful cautionary language and were known to be misleading when made.  *See* Section III(A)(2).

17

**2.**     **The Misstatements Concerning Lordstown's Production Capacity**

Defendants' statements touting Lordstown's production capabilities and supposed September 2021 start of production and delivery ("SOP") misrepresented the actual condition of Lordstown's development process.  *See, e.g.*, ¶390 (Investors can be "assured of production *by September*."); ¶392 ("*September deliveries start*."); ¶398 ("[T]he Endurance, is coming out *in September*."); ¶410 ("Production starts *in September*."); ¶388 ("We have a *near production-ready plant*.").[5]  Many facts confirm these claims were materially misleading, as detailed below.

The SAC detailed that prior to the Merger, the McKinsey Report warned that there was no reasonable scenario in which Lordstown would reach SOP by September 2021—*at best*, it would be delayed for months.  ¶224.  McKinsey's analysis was shared with Burns, and in an interview with Lead Counsel, Hamamoto recalled a "lot of specific dialogue with [Burns]" about it.  ¶225.

Lead Counsel's automotive industry expert, with 40 years of experience, stated that a vehicle launch takes 32–36 months, and that the steps to release a vehicle need to be performed sequentially, meaning that there was no way Lordstown could produce and deliver its vehicle anywhere close to the September 2021 timeline it was telling investors.  ¶¶217-18.

The Hindenburg Report revealed numerous facts indicating Lordstown was not genuinely on even an optimistic path toward the claimed SOP.  *E.g.*, ¶¶210-16 (detailing major fire in vehicle street test, reliance on tiny manufacturer for critical component, recent drastic design changes, lack of government testing that would take months to begin and complete).

---

[5] Defendants also told investors that no additional funding would be required to get to production. *See, e.g.*, ¶380 (capital provided through Merger "will fully fund Lordstown's current business plan and position the [C]ompany to achieve positive EBITDA"); ¶386 (Merger is "the final chapter where we get the necessary resources to be able to bring" the Endurance to market); ¶388 (Merger provided "more than enough funding" to reach production).  These statements are even more outrageous than those touting the September 2021 start of production because they indicated not only that Lordstown would begin production on schedule, but that Lordstown was so far along that it would not just begin production with then-current funding, it would also reach profitability.

18

The SAC recounted internal emails documenting the impossibility of a September 2021 SOP.  For example, a series of emails from October to December 2020 documented Lordstown's inability to procure critical parts from GM at a pace that would allow Lordstown to meet its production timeline, including emails to Burns himself.  *See, e.g.*, ¶228(i) (December 20, 2020 email from GM employee to Burns: "The main purpose of the email was to signal the constraints that we are facing and allow [Lordstown] time to set up contingency plans.")

CW-3, whose responsibilities included taking minutes for various meetings at Lordstown, described meetings while the Merger was pending where executives said that Lordstown was "running way behind," with software "running severely behind."  ¶¶222-23.  These statements corroborate that the publicly claimed start of production date was not feasible.

Indeed, the SEC found that these production statements were "materially false and misleading at the time they were made because Lordstown could not, and had no plans to, sell and deliver the Endurance to a customer by September 2021."  ¶57.

**Defendants' Responses Are Meritless**.  Against these compelling allegations, Defendants offer the following meritless responses.

*First*, Defendants try to dispute the obvious import of the many mutually corroborating facts that establish the touted start of production date was obviously unattainable.

Defendants attempt to cast doubt on the McKinsey Report, contending that "McKinsey never 'warned that there was no reasonable scenario in which Lordstown could begin production by September 2021."  MTD at 24 (citing ¶45).  But the SAC showed McKinsey's warning that even if Lordstown followed "best industry practices," the first vehicle production would not take place until, at the earliest, June 2022 and described how McKinsey warned that, even with improvements beyond that, April 2022 was the very best Lordstown could do.  ¶224.

19

Defendants try to downplay Lordstown's emails about GM parts by characterizing them as "normal supply chain issues" (MTD at 25), but the issues were far more serious than that. *See* ¶227 (SEC's findings: "By October 2020, Lordstown still had no access to the vast majority of the requested GM parts. A Lordstown officer alerted Burns, 'so far we have GM Tooling authorization letters for just 4 of ~90 parts completed. . . . The Endurance program timing is now in jeopardy for the key parts that need [GM] approval.'").

Defendants' attempt to discredit CW-3's testimony is also unavailing. MTD at 26-27. The SAC details CW-3's job description and explains why he was "in a position to have gained first hand knowledge of the facts attributed to him," *In re Huffy Corp. Securities Litigation*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008), detailing that he was an administrative assistant who took down minutes for various meetings related to production. ¶¶222-23. Numerous facts also corroborate his testimony, which further supports his reliability. *Huffy*, 577 F. Supp. 2d at 993.[6]

Nor is there any merit in Defendants' theory that the Court should discount the opinion of Plaintiffs' automotive expert on the grounds that he claims no personal knowledge about Lordstown. MTD at 24. The expert has abundant knowledge of the process of commercializing and launching vehicles, and so, when Hindenburg revealed information pertinent to where Lordstown stood in the process when it published its report, the feasibility of Lordstown's stated production timeline is squarely within the expert's wheelhouse and entitled to weight as well. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159-60 (N.D. Cal. 2015) (crediting plaintiffs' expert at pleading stage regarding timeline of production and finding falsity).

---

[6] It is also irrelevant that his tenure was short, because he can speak credibly about the statements attributable to him. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 939 (9th Cir. 2023) (CW who quit at start of class period provided "relevant and probative" information). Further, courts permit reliance on hearsay in complaints where it is sufficiently reliable. *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019).

20

**Second,** Defendants claim the statements touting the September 2021 production date were mere opinion statements.  MTD at 23-24.  Many of the statements are not opinions, but ordinary factual assertions.  For instance, Burns flat out asserted that "**September deliveries start**" and that this was "**assured**."  ¶¶390, 392.  Similarly, Defendants stated that Lordstown had sufficient funding to reach production, not as an opinion, but as a plain, present-tense fact.  ¶¶380, 388.

Further, Defendants ignore the multitude of particularized facts demonstrating that these statements do not "fairly align[] with the information in the [statement maker's] possession at the time," making these statements misleading.  *Omnicare*, 575 U.S. at 188-89; *see In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 639 (S.D. Ohio 2008) (opinion statements actionable if "opinion is not factually well-grounded"); *see also Hatamian*, 87 F. Supp. 3d at 1160 ("on target" statements actionable because they "created an impression of a state of affairs that differed in a material way from the one that actually existed").  Here, given the multitude of facts demonstrating that, at the time these statements were made, Defendants had no ability or intention of meeting the September 2021 deadline, the statements were actionably false.[7]

**Third**, Defendants argue these statements were protected by the PSLRA's safe harbor for certain forward-looking statements.  MTD at 22-23.  While some statements concerned the future, they were not "forward looking" because they were false when made—Lordstown was not on track and did not have enough financing to begin production.  *Dougherty*, 905 F.3d at 983 (finding statement not "forward-looking" if its "veracity can be determined at the time [it was] made").

---

[7] In the face of Plaintiffs' voluminous factual allegations corroborating the SEC's findings that "Lordstown could not, and had no plans to, sell and deliver the Endurance to a customer by September 2021" (¶57), Defendants point to a Special Committee report suggesting a different conclusion.  *See* MTD at 26-27.  Defendants are raising a disputed issue to be probed in discovery, as all allegations are to be taken in Plaintiffs' favor at this stage.  *See Tellabs*, 551 U.S. at 322.

Even "forward-looking" statements are actionable if they are not "accompanied by meaningful cautionary language" and there is "actual knowledge of their false or misleading nature."  *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).  The statements at issue were nearly all made without cautionary language.  *E.g.*, ¶¶333, 386, 390, 398, 410.  Further, "cautionary language cannot be meaningful if it is misleading in light of historical fact[s]" because such language is "neither significant nor of useful quality or purpose."  *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019).

Here, the purported cautionary language referenced by Defendants (MTD at 23 n.36) does nothing to "satisfy Defendants' obligation to warn investors of risks."  *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685 (E.D. Mich. 2004); *see, e.g.*, ¶57 (SEC finding: "***These statements were materially false and misleading*** at the time they were made because Lordstown could not, and had no plans to, sell and deliver the Endurance to a customer by September 2021.").  Finally, Defendants knew their statements were misleading.  *See* Section III(B).

Furthermore, the safe harbor does not apply to statements Burns made before the Merger, as he was not yet acting on behalf of an issuer of securities.  ¶509; 15 U.S.C. § 77z–2(a)(2).

### 3.  Defendants' *Janus* Argument Is Misplaced

Defendants argue that three categories of alleged misstatements are not actionable under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 143 (2011).  MTD at 13.

***First***, Plaintiffs acknowledge that statements made by Lordstown directly, such as SEC filings and tweets, were not "made" by any one Defendant.  As Plaintiffs stated in the SAC, these statements are included because they are critical to the question of whether Defendants are liable as control persons of Lordstown.  ¶286 n.17.  For each such statement, it is alleged that Lordstown made a misleading statement, that Lordstown is imputed with the Defendants' scienter, and that the Individual Defendants are liable as control persons of Lordstown under §20(a).  *See* ¶¶553-63.

22

***Second***, statements in DPHC proxy materials by Hamamoto are included in the SAC because they were included in proxy materials and bear on Plaintiffs' §14(a) claims.  As such, *Janus* does not apply, because what is relevant for §14(a) is not who "made" the statement, but whether the defendant participated in the dissemination of misleading proxy materials, as Defendants did here.  ¶¶541-43; *SEC v. Hurgin*, 484 F. Supp. 3d 98, 117 (S.D.N.Y. 2020) (*Janus* does not apply to §14(a) claims).

***Third***, Burns' affirmative act of nodding in agreement with President Trump's statement about the Endurance (¶315) was a statement "made" by Burns because there can be no dispute that he had "ultimate authority" over ***his*** act of reaffirming Trump's statement.  *Janus*, 564 U.S. at 142-43.  Whether investors interpreted Burns' affirmative act of nodding in agreement as the equivalent of a verbal representation is a question of fact that cannot be decided at this stage—but it does not implicate *Janus*: Plaintiffs are not alleging that Trump's statement was misleading; it was Burns' non-verbal nod in agreement that was misleading.

### B.     The SAC Adequately Pleads Defendants' Scienter

To plead PSLRA fraud claims, Plaintiffs must allege a "strong inference" of scienter, but this does not require "smoking-gun" proof.   *See Tellabs*, 551 U.S. at 313-14, 323-24.  Circumstantial evidence is sufficient.  *Id.*  To assess these pleadings, courts (i) "accept all factual allegations in the complaint as true," (ii) "consider the complaint in its entirety," and (iii) determine "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter." *Dougherty*, 905 F.3d at 979-80.  The requisite "strong inference" refers to an inference of intent, knowledge, or recklessness.  *Id.*  It must be "at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314 (ties go to the plaintiff).  The SAC pled many mutually reinforcing facts supporting the inference of scienter.

23

### 1. Defendants' Access to Information Supports an Inference of Scienter

The SAC pleads specific facts, including internal Lordstown documents and emails, statements from CWs, and confirmation from Lordstown Board member Hamamoto, thoroughly establishing that Defendants knew of, or had access to, information showing that their public statements about the pre-orders and production capabilities were false and misleading. *See Dougherty*, 905 F.3d at 979, 981 ("divergence between internal reports and external statements on the same subject," which the court described "as the 'key factor' to a finding of scienter").

***Scienter as to the Pre-Order Statements***.  Internal documents demonstrate Defendants' access to information showing that Lordstown's pre-order numbers were bogus and were not attributable to fleet customers.  Indeed, Burns was personally copied on emails with the list of pre-orders, which demonstrated that he was overstating the true quantity of pre-orders from commercial fleets at any given time.  ¶¶205, 435.  Burns was also copied on, or engaged with, numerous emails about particular supposed pre-orders in which it was made obvious that the party making the supposed pre-order was not a commercial fleet.  ¶¶186, 202, 203, 205, 435.  For example, Burns was directly copied on correspondence about E Squared/Grid X and personally expressed doubts about the legitimacy of that deal—and yet he touted pre-order figures in which E Squared/Grid X accounted for a substantial portion of the pre-orders.  ¶¶186, 435.  It is therefore reasonable to infer that Burns knew that his statements touting the number of pre-orders were materially false and misleading.

In addition to the many emails discussed elsewhere herein, the examples listed below are just a sampling of those detailed in the SAC supporting the inference of Defendants' scienter.

- On May 21, 2020, a Lordstown salesperson sent Burns an email confirming that pre-orders would be used for "driving investment in LMC" (¶181);

24

- On February 17, 2020, Flannery sent Burns an email recounting "plans to engage Intermediaries to accelerate . . . the signing of LOIs" (¶181);

- On September 12, 2020, Burns wrote in an email that "some of the pre-orders are more solid than others" (¶358);

- On September 2, 2020, Burns wrote in an internal email that pre-orders were not a "binding commitment," but stated "we still want preorders" (¶181);

- On February 22, 2021, Burns wrote, in a signed letter to the Ohio Attorney General, "Lordstown has not entered into 'pre-orders' as your letter states. Instead, Lordstown has entered into non-binding letters of intent" (¶181);

- Defendants Burns and Flannery were also copied on an email with the subject "difference between an LOI and a broker deal," in which Lordstown employees discussed how Innervations did not own (or "ground") vehicles, but were "more along the lines of what Clean Fuels Ohio is doing. They're encouraging their customers to buy Endurances for their fleets" (¶195);

- On August 9, 2021, Burns emailed senior Lordstown employees expressing that he was reluctant to publicly mention pre-order entity Grid X by name, because their "website is so lame," and because of concerns about their "financial strength" (¶35); and

- On September 19, 2020, Burns, Rodriguez, Schmidt, and Flannery received a spreadsheet listing pre-orders, including a cover email that expressly broke out "consumer pre-orders" and distinguished between "LOIs and preorders" (¶162).

Defendants' emails further indicate that they were well informed of the details of Lordstown's pre-order deals with the supposed commercial fleets that were—in reality—either bogus or not with fleets. *E.g.*, ¶¶192-93 (Burns and Flannery notified by email of 1,000 truck deal with AutoFlex; Burns informed by email of Autoflex's business—it was not a fleet operator); ¶194 (Flannery informed by email about deal with Sacramento Clean Cities, an advocacy organization that did not operate a fleet); ¶195 (Burns and Flannery informed of deal with Innervations—an influencer that did not operate a fleet—by email, and received emails stating deal was not a "purchase LOI," given Innervations merely hoped to encourage sales for others); ¶203 (Burns

25

informed by email of deal with Momentum Groups, receiving link to its website showing it was not a fleet operator, and receiving later email update distinguishing between intermediaries like Momentum and fleet operators); and ¶¶204-05 (Burns and Flannery directly involved in negotiating deal with Clean Fuels Ohio—a non-profit advocacy organization, not a fleet operator).

Defendant Flannery was particularly well informed, given his role as Senior Vice President of Business Development (¶71), and as the face of Lordstown's sales organization (¶298).  Indeed, he routinely received Excel sheets documenting Lordstown's preorders.  ¶493.  For example, Flannery received an email on August 1, 2020 with an Excel sheet detailing the full list of pre-orders, showing parties like Grid X, governmental parties, and non-fleet operating advocacy organizations like "Clean Fuels Ohio" being counted as pre-orders, as well as a breakdown of the very large number of pre-orders that had been obtained via a highly incentivized commission basis by outside contractor Climb2Glory.  ¶¶174, 493.  Notably, Flannery was Burns' "right hand man," which is yet another basis to infer Burns' knowledge (as Flannery would keep him apprised) and is a further indication of Burns' intense focus on the sales organization.  ¶173.

Such allegations demonstrate, at a minimum, that Defendants were deliberately reckless in claiming those orders were from fleets without inquiring into the issue.  *See Mosaic Fin. Ltd. v. Mut. S'holder Servs., LLC*, 767 F. Supp. 3d 619, 647 (N.D. Ohio. 2025) (finding inference of scienter where plaintiffs "alleged that [individual defendants] had access to records and hard information that raised multiple obvious red flags, if only they had reviewed it"); *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 813-14 (6th Cir. 2022) (affirming inference of recklessness because CEO was "intimately aware" of grave issues at the company and instead of "sharing the full picture with investors, he brushed off concerns and predicted massive profits").

26

Defendants argue that the internal documents do not demonstrate that Defendants knew any particular pre-orders were illegitimate or that the Company could not start production in September 2021. *See* MTD at 32. These arguments fail for the same reasons Defendants' arguments against falsity fail. *See* Section III(A)(1). Defendants' knowledge goes beyond the "general awareness" of purported red flags detailed in *ServiceMaster*, cited by Defendants. *See Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 531 (6th Cir. 2023) ("Nor does the [a]mended [c]omplaint offer anything more than vague assertions that issues relating to the Formosan termite crisis were discussed amongst ServiceMaster executives."). *Ricker v. Zoo Entertainment, Inc.*, 534 F. App'x 495, 498, 500 (6th Cir. 2013) is equally distinguishable, as the plaintiff there argued defendant's knowledge of "alleged revenue-recognition problems 'similar in nature and temporally proximate to the reasons for the restatement'" alone raised a "strong inference" of recklessness. Circumstances like the ones here, where Defendants' knowledge of undisclosed issues "could not plausibly" be doubted, easily satisfy the requisite standards for pleading scienter. *See Stein v. U.S. Express Enters., Inc.*, 2020 WL 3584800, at *38 (E.D. Tenn. June 30, 2020).

CW statements corroborate these facts. CW-2 stated that he "talked with Steve frequently," and that Burns "knew every single order" that was counted as a pre-order, as well as the customers behind them.[8] ¶448. CW-2 further explained that, upon signing up the LOI with Innervations,

---

[8] Defendants note that CW-2 left shortly before the Merger was announced and cite *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) to argue that this invalidates the witness. But *Zucco* rejected the witness because their knowledge was only "second hand," and regardless CW-2's information is especially relevant because (1) the pre-orders from his time at Lordstown were still being counted; (2) it indicates a practice by Burns, which reasonable people would expect continued; and (3) it is corroborated by other allegations of scienter. Moreover, the Ninth Circuit more recently credited allegations of a CW who left at the start of the class period, noting that the CWs "statements about [defendant's] practices in the period immediately preceding the [c]lass [p]eriod—***in particular, his micromanaging and attention to detail—are relevant and***

Lordstown employees had understood Innervations had no operating history, and that Lordstown's spokesperson, Ryan Halley, had indicated that they should not publish a press release counting the Innervations deal as pre-orders because of "how weak [it] was," that a member of the sales team explained to Burns how sketchy the LOI was and strongly advised against promoting Lordstown based on the deal, but that Burns nevertheless chose to count the Innervations deal in the pre-order total. ¶178. Internal Lordstown emails support CW-2's account and show that Burns and Flannery were copied on an email expressly saying that the LOI with Innervations was not a "purchase LOI," *i.e.,* because Innervations was merely hoping to broker eventual sales. ¶195. CW-2's allegations, coupled with the internal documents, demonstrate that Burns obviously understood that pre-orders were not from fleet customers and were not based on legitimate or serious LOIs. *See In re Gen. Motors Co. Sec. Litig.*, 773 F. Supp. 3d 429, 452 (E.D. Mich. 2025).

Likewise, CW-1 explained that the internal sales team at Lordstown and Flannery had access to and could edit a shared Excel file used to keep track of LOIs/pre-orders. ¶¶166-70. Lead Counsel conducted a thorough review of the supposed pre-orders using these Excels, which show the stark disconnect between Defendants' public statements regarding the number of pre-orders and the reality: where pre-orders often reflected no serious intent to purchase the Endurance. ¶¶206-09. CW-1 further stated that Flannery regularly said that he had spoken with Burns and provided him with updates about the pre-orders. ¶169. Internal documents show how both Burns and Flannery were kept up-to-date regarding the status of pre-orders, including situations like those with Innervations and Clean Fuels Ohio, where "they're encouraging their customers to buy Endurances for their fleets" and not committing to purchase themselves. *See, e.g.*, ¶¶195, 204-06.

---

*probative*, showing how [defendant] would have behaved and what he would have known during the immediately following [c]lass [p]eriod." *NVIDIA*, 81 F.4th at 939.

While Defendants attempt to handwave away the CW accounts (MTD at 33-34), they are corroborated by internal documents and support a strong inference of scienter. *See Tellabs*, 551 U.S. at 313-14, 323-24; *Dougherty*, 905 F.3d at 979-80.  Further, the SAC details each CW's job description and details why the CWs were in a position to have personal knowledge of the facts attributed to them, which is what is required. *Huffy*, 577 F. Supp. 2d at 993.

*Scienter as to the Production Schedule Statements*.  The same is true with respect to statements about the production timeline.  Burns received and discussed the McKinsey Report, which estimated an April 2022 or June 2022 start of production date.  ¶452.  During the Class Period, Burns was also well apprised of delays and uncertainties caused by Lordstown's reliance on an underdeveloped parts supply agreement with GM. *Id.*; ¶228.  In sum, these detailed and highly specific allegations raise a strong inference of scienter as to the production schedule statements. *See, e.g.*, *Gen. Motors*, 773 F. Supp. 3d at 452-53 (finding allegations, including that defendant was "deeply involved in and intimately knew" technology at issue and "regularly reviewed and addressed employees' safety concerns," support inference that defendant "at least consciously disregarded" the falsity of the statements).

### 2. Defendants' Hands-On, Personal Involvement in the Pre-Order Process Supports an Inference of Scienter

Defendants' personal involvement in overseeing Lordstown's pre-orders supports an inference that they knew the undisclosed truth despite their public misrepresentations.

As an initial matter, Burns' nearly incessant decision to discuss the pre-orders publicly weighs in favor of a finding that he was heavily involved with the pre-orders, especially given the degree of detail he provided in these statements.  Similarly, the large volume of emails in the SAC in which Burns is personally involved in discussing the pre-orders proves his involvement.

29

Indeed, Hamamoto explained that Defendant Burns "certainly gave the impression that he was very involved" in overseeing the pre-orders and sales force, and "definitely positioned himself as if he were intimately involved in" discussing the issue with Lordstown's sales force.  ¶434. Hamamoto recalled Burns "continually" saying "these were real orders signed by C-suite executives."  *Id*.  Hamamoto also recalled that Lordstown's Board would receive presentations about the pre-orders and believed Burns was the one making those presentations.  *Id*.  Likewise, Hamamoto explained that "production and pre-orders were two things that Steve [Burns] tended to focus on."  *Id*.  When asked how closely Burns tracked the pre-orders and whether he would know about particular deals with non-fleet customers, Hamamoto responded: "I think so.  He was pretty focused on it," and added, Burns "talked pre-orders a lot."  *Id*.  Hamamoto agreed that orders by influencers or intermediaries, rather than commercial fleets, should not have been counted as pre-orders.  *Id*.  Hamamoto's statements are corroborated by CW-2, who explained that Burns "micromanaged every aspect" of Lordstown's business down to the "smallest minutia."  ¶177.

Further, Defendant Flannery ran Lordstown's sales team, and so it is reasonable to infer that he knew about the true nature of the pre-orders.  ¶492.  To the extent Flannery was not aware, he was deliberately reckless in disregarding facts in his possession.

Defendants turn these allegations on their head, arguing that "such personal involvement in essential Company affairs demonstrates responsible stewardship of the Company."  MTD at 41. But Defendants' cited authority differs from what Plaintiffs offer here, mainly the concrete evidence that Defendants were aware of information that contradicted their public statements. Unlike the plaintiffs in *ServiceMaster* and *Hightower*, Plaintiffs' scienter allegations include "specific facts or circumstances suggestive of their knowledge."  *See ServiceMaster*, 83 F.4th 514 at 531; *see also Lim v. Hightower*, 2024 WL 4349409, at *17 (N.D. Ohio Sep. 30, 2024) ("Plaintiffs

30

do not allege facts contradicting the positive aspects of the partnership that support Defendants' generally hopeful public characterizations of the relationship.").

### 3.  The SEC Inquiry Supports an Inference of Scienter

Lordstown received the SEC inquiry on February 17, 2021, and later admitted it related to the same allegations raised by the SAC (¶¶242-44).  Defendants either knew of this inquiry or were reckless in not knowing of the inquiry, as management of a publicly traded company would be reckless in not knowing of an SEC inquiry into the business' public disclosures.

Defendants' responses are only relevant to whether the SEC's decision to investigate weighs in favor of scienter.  MTD at 34-35.  It does, as courts often recognize.  *See Frank v Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) (finding scienter on holistic analysis of allegations that included SEC investigation).  But the point here goes well beyond that fact.  The SEC inquiry is ***smoking gun*** evidence, because the misstatements continued even after that inquiry was received, which shatters any "alternative inference" that Burns simply had not realized his statements may be deceptive.  *See Cosby v. KMPG, LLP,* 2018 WL 3723712, at *5 (E.D. Tenn. Aug. 2, 2018) (notice of SEC inquiry was a "red flag" that supported the finding of scienter); *see also Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 677 (M.D. Tenn. 2022) (finding defendants' awareness of DOJ investigation supported scienter).

### 4.  Defendants' Motive Supports an Inference of Scienter

Though not required to plead scienter (*Dougherty*, 905 F.3d at 982 ("the absence of a motive allegation is not fatal")), the SAC includes detailed allegations demonstrating Defendants' motive to commit fraud.  Indeed, Lordstown was out of cash before the Merger (¶¶427-31), and misrepresentations were used to raise desperately needed capital.  Indeed, Defendants routinely used their book of supposed pre-orders to market the Company to investors, including in media appearances, proxy materials, other SEC filings, press releases, and in various other events.  ¶442.

For example, the pre-orders were prominently featured in the investor deck, filed in the proxy materials as a "Key Investment Highlight," given the supposed "[d]emand proven with pre-orders covering first year production," and with a flashy list of the logos showing "Selected Pre-Order Customers."  *Id*.  The fraud was critical to raising funds, and raising those funds was critical to Defendants keeping their lucrative positions as executives and maintaining the upside offered by the "fake it 'til you make it" fraud.[9]

Defendants err in claiming this motive is less relevant because it is "common to all corporations."  MTD at 31.  But the Sixth Circuit has recognized "the self-interested motivation in the form of saving their salaries or jobs" as a motive that weighs in favor of scienter.  *See Dougherty*, 905 F.3d at 979 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)).  Furthermore, not every corporation is facing insolvency, fewer try to cure that insolvency through a take-public SPAC Merger, and fewer still rely heavily on a false narrative to pitch that Merger.

As Defendants' own authority recognizes, "more particularized sorts of motive allegations," like these, are "more probative of scienter."  *See PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 435 (6th Cir. 2004) (considering scienter allegations relating to defendants' motivation to "forestall [] default of its bank loan agreement and to preserve the [c]ompany's ability to borrow pursuant to its credit facility").  Other courts similarly recognize facts like these as a significant motive.  *See, e.g.*, *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Cooperweld, Inc.*, 929 F. Supp. 2d 740, 786 (M.D. Tenn. 2013) (motive supports scienter where

---

[9] Defendants comment that continued investment into Lordstown's operations proves Defendants believed in the project.  MTD at 31.  This is mere misdirection.  If a contractor falsely claims to have roofing experience, but does not, this is fraudulent regardless of whether their ploy involves taking your money and disappearing or buying shingles and hoping (despite the odds) of doing passable work.  Here too, Defendants' fraud ultimately misrepresented the odds of Lordstown's success, which was fraudulent, even if (despite those odds) his ideal outcome was for it to succeed.

32

corporation and its officers were in "[a] very difficult position" and faced "unusual pressures to perform") (citing *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1029 (N.D. Ohio 2000)); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *57 (M.D. Tenn. Mar. 31, 2009) (scienter supported by motive to maintain appearance as a "financially viable company in which to invest").

In addition, Defendants Schmidt, Rodriguez, Brown, and Post sold large blocks of stock during the Class Period, which supports an inference of scienter. ¶484. These insider sales occurred *after* Lordstown's catastrophic road test in January 2021, and while they knew the true situation concerning Lordstown's pre-orders and production timeline. ¶¶211, 484-90. Scienter is supported by "insider trading at a suspicious time or in an unusual amount." *See Dougherty*, 905 F.3d at 979. The suspicious timing of these sales is distinguishable from Defendants' cited authority, which lack any discussion of insider sales at suspicious times. *See Havenick v. Network Express, Inc.*, 981 F. Supp. 480, 528 (E.D. Mich. 1997) (noting "only allegations suggest[ing] fraudulent intent" were insider sales "when the stock reached an all-time high" and "Underwriter's on-going relationship with [defendant]"); *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *9 (N.D. Ohio Aug. 22, 2008) ("The only thing even arguably 'suspicious' about the sale of this stock, however, is that it was sold during the Class Period."), *aff'd,* 590 F.3d 390 (6th Cir. 2009).

Contrary to Defendants' arguments, the fact that Burns and Flannery did not sell shares during the Class Period "[does] not negate the inference of scienter." *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1255 (N.D. Cal. 2008). Indeed, as the SAC explained, Burns was subject to the lockup that restricted his ability to sell for a period after the Merger, as is standard industry practice in mergers and IPOs. ¶480; *see Lowinger v. Morgan Stanley & Co.*, 841 F.3d 122, 131 (2d Cir. 2016). While Defendants argue that Burns' post-Class Period sales show he had no motive to commit fraud (MTD at 29-30), the sales indicate scienter because they highlight that

33

Burns understood that the business had been propped up by his fraud and was now destined to fail, and Burns needed to cash out.  And cash out he did, to the tune of almost $60 million.  ¶480.

### 5.      Additional Facts Support an Inference of Scienter

*First*, suspicious personnel changes support an inference of scienter.  *See, e.g.*, *Plagens v. Deckard*, 2023 WL 2711263, at *29 (N.D. Ohio Mar. 30, 2023) (finding departure a few weeks after SEC subpoena "weighs slightly in favor of a showing of a strong inference of scienter").  While styled as a resignation, Burns was terminated due to the misconduct alleged herein.  ¶¶262-64.  Indeed, Hamamoto confirmed that Burns' resignation occurred at the prompting of the Board, due to its concern with the information at issue herein.  ¶264.  Defendant Rodriguez also "resigned" at this time.  ¶¶262-64.  As to both of them, the notion that the resignations were innocent—*i.e.*, due to a shift to production as Defendants' claim (MTD at 34)—is belied by the timing, Hamamoto's statements, and the fact that Lordstown did not immediately announce successorship.

Defendants cite *Zucco* to downplay the import of these terminations.  MTD at 34 n.51 (citing 552 F.3d at 1002).  But *Zucco* merely affirmed that resignations must be "accompanied by suspicious circumstances" to support scienter, as they were here.  Defendants also cite *Florida Carpenters Regional Council Pension Plan v. Eaton Corp.*, but it is distinguishable on the same basis.  964 F. Supp. 2d 875, 888-89 (N.D. Ohio 2013).

*Second*, Defendants' outright lies, including Burns claiming "we've never said we had orders" when he previously claimed to have "very serious orders" on *CNBC*, establish a wanton disregard for the truth and indicate that Defendants' true motive was to mislead investors.  ¶¶126, 237, 450.  Indeed, while Lordstown occasionally disclosed that the orders were "non-binding," Burns frequently described them in much stronger terms, indicating his clear desire to exaggerate the veracity of the supposed orders.  ¶450.  Relatedly, Defendants' disregard for lawfulness exhibits a troubling pattern of illegality that weighs in favor of their unlawful activity here.  *Cf.*

34

*Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 710 (E.D. Mich. 2010) ("Allegations that a defendant engaged in 'deliberately illegal behavior' can give rise to a strong inference of scienter."). Indeed, Lordstown has been sued for alleged corporate espionage and unpaid utility bills, announced a material weakness in internal controls, failed to timely pay property taxes, and had been threatened with delisting due to late public filings. ¶¶471-78.

*Third*, the pre-orders and Lordstown's production capabilities were essential to the Company's success, which supports an inference that Defendants had specific knowledge about these issues. *See* ¶¶465-70; *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (stating that "it would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market"). Here, likewise, it "would be absurd" to suggest that Lordstown's executives were unaware of the true nature of the Endurance pre-orders and their production issues, given the singular importance of the Endurance orders to Lordstown. *See Frank*, 646 F.3d at 962 (crediting scienter based on inference that, given defendants' roles and public statements, they likely knew the truth).

*Fourth*, the specificity of Defendants' statements supports an inference that Defendants were receiving information about the matters on which they repeatedly spoke—specifically concerning pre-orders and the production schedule. *See, e.g.*, *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (finding that because defendant addressed particular issue in statement, that it was "unlikely that she was not aware of it"); *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 522, 525 (E.D.N.Y. 2025) (the specificity of defendants' statements "is strong circumstantial evidence that [defendants] were receiving some form of specific information" regarding the issue). Indeed, Defendants made repeated statements touting the precise number of pre-orders they received and represented that these pre-orders were from fleet customers, and so, it is reasonable to infer that

Defendants were receiving specific information about these topics and were at the very least reckless in making these statements without inquiring further. *South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) ("If [defendants] did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all.").

### C. The SAC Adequately Pleads Loss Causation

To establish loss causation at the pleading stage, "a plaintiff need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *See Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Plaintiffs allege the fraud was revealed through a series of partial corrective disclosures that each revealed previously-concealed, material, adverse information, and caused Lordstown's stock to fall—damaging investors. ¶¶500-06.

Defendants assert that the Hindenburg Report was not a corrective disclosure because the public already knew that pre-orders were non-binding and revealed no hidden truth about the production schedule. MTD at 35. The Hindenburg Report—which has been corroborated through investigation of Lead Counsel, Lordstown internal documents, and the Company's admissions (¶¶161-209, 217-29, 256-61)—disclosed *new* facts based on interviews with former Lordstown employees, business partners, and purported customers. Many of those facts have been discussed herein. Any claim by Defendants that the Hindenburg Report "merely used innuendo" based on public information (MTD at 44) is simply contrary to the facts.

Defendants' citation to *In re TransDigm Group, Inc. Securities Litigation*, 440 F. Supp. 3d 740, 771-72 (N.D. Ohio 2020) is misplaced because there the short report was based on "public information," which had been "previously reported" and "discussed extensively." *See* MTD at 35-

36

36.[10]  And unlike the short report in *Harris v. AmTrust Financial Services, Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015) (cited in MTD at 36), the Hindenburg Report "correct[ed]" public knowledge about the pre-orders and production capacity and schedule.[11]

The drastic 16.54% decline in Lordstown's price following the Hindenburg Report (¶¶230-32)—especially when combined with the allegations concerning its substantive content and the fact that it prompted an internal investigation at Lordstown—firmly establish that it provided substantial new information to the market.  *E.g.*, *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (market reaction "supports a finding of materiality"); *SEC v. Talbot*, 530 F.3d 1085, 1095-96 (9th Cir. 2008) (similar).

Defendants further make the threadbare assertion that if the Hindenburg Report is a corrective disclosure, "then the [C]lass [P]eriod would need to end there, given each of the subsequent alleged corrective disclosures did not reveal any new truth hidden by the challenged statements."  *See* MTD at 36.  But each alleged corrective disclosure revealed new information contradicting Defendants' public statements regarding the viability of the demand for the trucks and Lordstown's production capabilities.  *See, e.g.*, ¶503(b) (disclosing receipt of SEC inquiry);

---

[10] The other cases cited by Defendants are similarly inapposite.  MTD at 36 n.52; *see KBC Asset Mgmt. N.V. v. Eaton Corp.*, 572 F. App'x 356 (6th Cir. 2014) (corrective disclosure in form of affidavit reflected information already absorbed by market); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013)("[R]epackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("What appellant has shown is a negative characterization of already-public information."); *Tchrs.' Ret. Sys. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) (alleged corrective disclosure had already been disclosed in public filings).

[11] While Defendants vaguely attack short sellers, the business model of short sellers is not at issue here, as courts routinely accept short reports as corrective disclosures.  *See, e.g.*, *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020).  Moreover, while perhaps controversial, short reports are recognized as playing a role in enhancing market efficiency.  *See* Joanna Lee, *Activist Short Sellers: Market Manipulators or Market Protectors?*, REV. BANKING & FIN. L. 274, 281 (Spring 2013) (short sellers "have uncovered serious fraud perpetuated by the companies, thereby aiding the market to adjust over-inflated share prices").

37

¶503(c) (disclosing any production in September 2021 would occur at "limited capacity"); ¶503(d) (announcing "going concern" notice, the need for "significant" capital to ramp up production, and material weaknesses in internal control over financial reporting); ¶503(e) (admitting to "issues regarding the accuracy of certain statements regarding the Company's pre-orders"); ¶503(f) (reporting Company under a DOJ investigation).

Finally, Defendants incorrectly claim that the May 24, 2021 disclosure is "antithetical to loss causation" because three days after the announcement, the stock price was higher than before the announcement.  *See* MTD at 33.  But "the fact that the price rebounded does not, at the pleading stage, negate the plaintiff's showing of loss causation." *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 760-61 & n.75 (S.D. Ohio 2006) ("[W]here the Plaintiffs allege that the subject of the misrepresentations and omissions caused their losses, they need not specify 'corrective disclosures' causing the decline in stock value.").

### D.      The SAC Adequately Alleges Reliance

Defendants argue that Plaintiffs fail to plead reliance as to the pre-Merger statements. MTD at 36-37.  This is a premature fact-based argument.  *In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 763 (N.D. Ohio 2003) ("plaintiffs need not prove that the market is efficient at the pleading stage" and only need to plead efficiency); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 473 n.9 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 784 (2d Cir. 2015) (market efficiency is a "question of fact . . . not meant to be answered on a motion to dismiss").  Further, Plaintiffs invoke the fraud on the market theory (¶498), as well as the *Affiliated Ute* presumption (¶496), and plead facts sufficient to establish that the market for DPHC stock was efficient.  ¶498.

### E.      The SAC Adequately Pleads Control Person Claims

Having alleged a primary violation under §10(b), the SAC also adequately states claims for control-person liability against the Defendants (¶¶555-60; *Dougherty*, 905 F.3d at 984), who had direct and indirect control over Lordstown.  ¶¶562-63. Indeed, as high-level executives who participated in the dissemination of false and misleading statements, including through formal SEC filings (¶¶69-73, 562), Defendants possessed the "power to direct or cause the direction of management" of Lordstown and culpably participated in Lordstown's wrongdoing.  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 697-98 (6th Cir. 2004).

### F.      The SAC Adequately Pleads a Claim Under §14(a)

All statements identified in the SAC as appearing in proxy material are actionable for the same reasons they are actionable under §10(b) without regard to whether the statements were made with scienter.  *Emps.' Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490 at *12-13 (S.D. Ohio May 11, 2021).  Relatedly, the statement "maker" is not a relevant inquiry for the §14(a) claim; rather, it is whether a defendant participated in the dissemination of misleading proxy materials, as Defendants did here.  *See supra* at 23.

### G.      The SAC Adequately Pleads Insider Trading Claims

Defendants only challenge the insider trading claims by arguing that (1) the information was not material and (2) the information was public.

***First***, Defendants do not remotely approach establishing immateriality *as a matter of law*, *i.e.*, that the information was "so obviously unimportant . . . that reasonable minds could not differ on the question."  *Helwig*, 251 F.3d at 563.  Internal Lordstown communications demonstrate that Defendants were aware of the Endurance's production delays.  *See* ¶485-89; Section III(B)(1).  For example, on July 11, 2020, Defendant Burns emailed Defendants Schmidt, Post, and Rodriguez about the McKinsey Report's findings.  *See* ¶¶224-25, 490.

Defendants Rodriguez, Schmidt, Brown, and Post all received a detailed spreadsheet containing supposed pre-orders by August 18, 2020 and subsequently received an email titled "LOI/Pre-Order Update," which catalogued all Endurance pre-orders with down payments or non-binding LOIs on December 17, 2020—mere *weeks* before they unloaded their stock holdings for collective profits exceeding $6 million. ¶¶134, 487, 489. *See United States v. Smith*, 155 F.3d 1051, 1064-66 (9th Cir. 1998) ("forecasts of future sales and revenue" were MNPI); *SEC v. Brethen*, 1992 WL 420867, at *18 (S.D. Ohio Oct. 15, 1992) (MNPI included "Preliminary Sales" and "Rolling Sales" forecasts). Defendants' argument that they received MNPI "months" before any sales were made fails factually as well. MTD at 40. If anything, Defendants received additional MNPI in August and December 2020 that depicted the present and future condition of Lordstown's business—insights unavailable to any public investor at the time, and certainly applicable to the status of Lordstown's business in early February 2021.

*Second*, Defendants' assertion that all material information was public because Defendants sometimes caveated their statements that the pre-orders were "non-binding" (MTD at 40) is meritless for the reasons discussed in Section III(A)(1).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

**Dated**: August 8, 2025

**LABATON KELLER SUCHAROW LLP**

*/s/ Jake Bissell-Linsk*

Carol C. Villegas (admitted *pro hac vice*)
Christine M. Fox (admitted *pro hac vice*)
Jake Bissell-Linsk (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  cvillegas@labaton.com
        cfox@labaton.com
        jbissell-linsk@labaton.com

*Counsel for Lead Plaintiff George Troicky*
*and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (admitted *pro hac vice*)
Rina Restaino (admitted *pro hac vice*)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
Email: brian@schallfirm.com
        rina@schallfirm.com

*Additional Counsel for Lead Plaintiff*
*George Troicky*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Steve W. Berman (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: steve@hbsslaw.com

Reed R. Kathrein (admitted *pro hac vice*)
Lucas Gilmore (admitted *pro hac vice*)
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: reed@hbsslaw.com
        lucasg@hbsslaw.com

*Counsel for Additional Named Plaintiff Ashith*
*Pabbathi and Additional Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (admitted *pro hac vice*)
Laurence M. Rosen (admitted *pro hac vice*)
Daniel Tyre-Karp (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        dtyrekarp@rosenlegal.com

*Counsel for Additional Named Plaintiffs*
*Daniel Tavares and Globestar Systems Inc. and*
*Additional Counsel for the Class*

[signatures continued on following page]

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (admitted *Pro Hac Vice*)
Frost Bank Tower
401 Congress Avenue, Suite 1170
Austin, TX 78701
Telephone: (512) 710-5960
Email: aentwistle@entwistle-law.com

Robert N. Cappucci (admitted *Pro Hac Vice*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Email: rcappucci@entwistle-law.com

*Attorneys for Plaintiff FNY Managed
Accounts LLC and Additional Counsel for
the Class*

42